J79QwilO

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CRECITA WILLIAMS, as Proposed Administrator
for the Estate of Roberto Grant,
NICOLE MORRISON, as Administrator for
the Estate of Roberto Grant, and
NICOLE MORRISON, as Mother and Legal
Guardian for the Property of AG and SG,
Decedent's Minor Children,
                          Plaintiffs        17 Civ. 6779 (WHP)
           V.                                Oral Argument
UNITED STATES OF AMERICA, FEDERAL
BUREAU OF PRISONS, CORRECTION OFFICER
KERN, EXECUTIVE ASSISTANT LEE
PLOURDE, and JOHN AND JANE DOE(S)
AGENTS, SERVANTS AND EMPLOYEES OF
                          Defendants
------------------------------------x
                                             New York, N.Y.
                                             July 9, 2019
                                             11:00 a.m.
Before:

                HON. WILLIAM H. PAULEY III

                                             District Judge

                        APPEARANCES

LAW OFFICE OF ANDREW C. LAUFER
     Attorney for Plaintiff
ANDREW C. LAUFER

UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
     Attorney for Defendants
JENNIFER C. SIMON
```

1              (In open court; case called)
2              DEPUTY CLERK:  Appearances?
3              MR. LAUFER:  Andrew Laufer, 255 West 36 Street, Suite
4    1104, New York, New York, 10008.  For the plaintiff, your
5    Honor.
6              Good morning.
7              THE COURT:  Good morning.
8              MS. SIMON:  Jennifer Simon from the U.S. Attorney's
9    Office on behalf of the federal defendants.
10             THE COURT:  Good morning, Ms. Simon.
11             This is oral argument on the defendant's motion.  Do
12   you want to be heard?
13             MS. SIMON:  Yes, your Honor.
14             THE COURT:  All right.
15             MS. SIMON:  As your Honor is aware, plaintiff alleges
16   in her amended complaint that Mr. Grant died of blunt force
17   trauma while he was in a multi-inmate cell at MCC.  Recognizing
18   that tragedy of Mr. Grant's death, particularly given his young
19   age and whatever the cause of the death, however, does not
20   alter the fact that the amended complaint contains no factual
21   allegations of any negligence by the defendants that could have
22   caused Mr. Grant's death, nor does the amended complaint
23   identify the violation of any constitutional right by
24   Mr. Plourde or Officer Kearins that would support a *Bivens*
25   claim.

1      If I could, your Honor, I would just like to highlight
2 some of the flaws in the *Bivens* claims in particular to begin
3 with.
4      With respect to Mr. Plourde, it appears in the amended
5 complaint, and to some extent in the opposition, that
6 plaintiffs are attempting to assert a violation of the Eighth
7 Amendment.  Here, however, there is no allegation in the
8 amended complaint or anywhere else that Mr. Plourde was
9 deliberately indifferent to any of Mr. Grant's medical needs.
10 There is no allegation that would support a plausible inference
11 that he intentionally denied or delayed access to medical care
12 to Mr. Grant, which is a fundamental requirement of any Eighth
13 Amendment *Bivens* claim.
14      Similarly, with respect to the allegations of a
15 coverup, even if a coverup implicated some constitutional
16 right -- which none is identified and I can think of none --
17 there is no factual allegation that would support a plausible
18 inference that Mr. Plourde himself was personally involved in
19 such a coverup.  In fact, what the amended complaint simply
20 says is that the morning after Mr. Grant's death, Mr. Plourde
21 advised plaintiff that he died of a drug overdose and that that
22 statement was untrue.  There is no allegation Mr. Plourde
23 himself knew the statement itself to be false or was involved
24 in any conspiracy personally.
25      In her opposition brief, plaintiff adds the theory

that it actually amounted to a deprivation of a property interest.  Again, under *Abbasi*, there's no basis to expand the *Bivens* remedy to this wholly new context as we set forth in our brief.

Even assuming that that constitutional right did suffice for a *Bivens* claim, however, there is no factual allegations of any deprivation of property interest here.  In fact, when looking at *Barrett* in which a plaintiff was deprived of an FTCA claim, and then some 20 years later learned of the conspiracy, learned that she had settled this FTCA claim for a nominal amount compared to what she would have had she known the truth of the death, here plaintiff herself has asserted an FTCA claim and did so since the beginning of this lawsuit.  There is no allegation that any deprivation happened here and in the way that *Barrett* contemplated.

As to Officer Kerns, again, with the Eighth Amendment claim, similarly to Mr. Plourde, there's no allegation that he was deliberately indifferent to his medical needs.  There's no allegation that he intentionally denied or delayed medical care.  And, again, both Officer Kearins and Mr. Plourde are non-medical personnel.  So that is what would need to be alleged to assert an Eighth Amendment violation here.

THE COURT:  What about the allegations that he harassed Grant?

MS. SIMON:  With respect to those claims, it appears

that plaintiff is attempting to assert some sort of excessive force claim. Not only does the government not concede that that is a *Bivens* claim, particularly after *Abbasi*, there's no allegation that he actually used any force, and the mere threat of force -- even assuming that's true, which defendants do not concede -- doesn't amount to excessive force. And the sort of vagueness of that allegation isn't even connected in any way to Mr. Grant's death. There is no allegation that he was involved in any way in whatever the cause of Mr. Grant's death was. In fact, what the amended complaint alleges is that unidentified assailants beat up Mr. Grant.

With respect to the FTCA claim, certainly the allegations as a whole are enormously conclusory, and there's no factual allegations from which you could draw an inference of negligence on the part of any defendant. On the contrary, they are the sort of what the Supreme Court refers to as unadorned, the-defendant-harmed-me type of allegations that are insufficient to state a claim of negligence.

THE COURT: An individual who is in the custody and care of the Bureau of Prisons was beaten to death in a dormitory. How can you say that there aren't sufficient allegations of negligence? Weren't there cameras in the dormitory?

MS. SIMON: No, your Honor. Our understanding is that because it was where the bunks were, there were no cameras in

1    there.

2              And with respect to your Honor's question about --
3    even assuming plaintiff's allegations about the manner in which
4    Mr. Grant died are true, an allegation of negligence would
5    still require that the government either foresaw this harm and
6    failed to prevent it or did not respond in a --

7              THE COURT:  I read the autopsy report.  He was beaten
8    to death in a dormitory that people are supposed to be
9    supervising.  Right?

10             MS. SIMON:  I think with respect to the supervision
11   claim, however, it is up to the discretion of the prison, and
12   the discretionary function would apply here, to determine the
13   manner in which they're supervised.  And it appears that
14   whatever happened to Mr. Grant, it happened very quickly.
15   Officers responded very quickly.  There's no allegation in the
16   amended complaint that there was a delay in the responsiveness
17   of the correctional officers or in any way that they foresaw
18   that this was about to happen.

19             THE COURT:  How would they be in a position to know?
20   How would the plaintiff be in a position to know?  Because
21   Mr. Grant is deceased and the one prison official who spoke to
22   Mr. Grant's relatives said he died of a drug overdose.

23             MS. SIMON:  So, as your Honor instructed, we've
24   responded at this point to plaintiff's document requests.  We
25   have provided all of the responsive records from BOP that

plaintiff requested in her discovery requests, and those included the medical records of Mr. Grant, notes from the interviews of the inmates who were present, as well as notes from the interviews of the correctional officers who responded when Mr. Grant fell unconscious.  It also included incident reports and so forth.

So, to the extent that plaintiff has a fulsome view of what happened, she is now aware of BOP's conclusions with respect to the investigation.

There isn't an indication either, in our view, in those records or in plaintiff's allegations in the amended complaint, that there was any negligence earth through a delay or through some failure to protect him from a foreseeable harm, any indication of negligence on the part of defendants.

Moreover, to the --

THE COURT:  Couldn't plaintiff's allegations fairly be read to suggest that someone at MCC was negligent in enforcing security policies?

MS. SIMON:  And that itself would be subject to the discretionary function.  So, to the extent that plaintiff's allegations is that somebody was harmed in the care of MCC and that therefore somebody must have done something wrong, or there must be some misconduct, that is not only insufficient to state a claim, but the claim about the oversight and supervision of the prison without some more specificity as to

1    the act or omission alleged is subject to the discretionary
2    function exception.
3             THE COURT:  But that's the enforcement of the
4    policies.  I mean, this is not someone who slipped and fell.
5             MS. SIMON:  As far as the enforcement, there isn't --
6    and now that plaintiff has the discovery, there isn't an
7    allegation anywhere here that there was some specific act or
8    omission that the government or one of its agents could have
9    done differently, and that at the heart of it is what is needed
10   to plead a negligence claim.  There must be a failure of a duty
11   to protect, and the duty here is to protect him from
12   foreseeable harms.  There is no allegation or an indication
13   anywhere here that whatever befell Mr. Grant was foreseeable
14   and that the government either failed to protect or failed to
15   respond quickly once being aware of his condition.
16            As to any argument, for example, that there should
17   have been cameras in the residence, there are reasons, as I
18   understand it, why there might not be cameras on the bunks of
19   the inmates for privacy concerns or whatever it is, but any
20   allegation that the negligence was the failure to install a
21   camera such that every inmate was under observation 24/7 is
22   plainly within the discretionary function exception.  And there
23   is simply no allegation in the amended complaint or elsewhere
24   that identifies any act or omission or any negligence by any of
25   the defendants.

1          Also, to sort of emphasize the difference between the
2     allegations in the amended complaint here, as compared to those
3     in *Coulthurst* or *Triestman* even where you have an allegation in
4     *Triestman* there was a failure to inspect gym equipment that led
5     to the harm. In *Coulthurst* there's a failure alleged to
6     provide signaling devices in unlocked cells, things of that
7     nature. There is a specific act or omission alleged from which
8     a plausible inference could be drawn there was sort of a
9     negligent or a lazy guard, to use the language of *Triestman*.
10    Here, there is no alleged act or omission from which that can
11    be inferred.
12         And, relatedly, the FTCA only permits -- as your Honor
13    is aware, only permits claims to proceed to the extent that
14    they are available under New York State law, and New York State
15    law, in particular with respect to the duty of care, emphasizes
16    that it must be a foreseeable harm, and plaintiff herself
17    concedes this in her opposition brief that it must include an
18    act or omission of failure to protect the defendant or
19    Mr. Grant from a foreseeable harm. That is simply not alleged
20    here.
21         And for the same reasons, the negligent hiring and
22    supervision aspect of plaintiff's FTCA is similarly barred by
23    sovereign immunity. In other words, it's plain under New York
24    State law that under such circumstances as these, those claims
25    cannot proceed.

1        If your Honor has no further questions, we will rely
2   on our papers.
3        THE COURT:  Thank you.
4        MS. SIMON:  Thank you.
5        THE COURT:  Counsel.
6        MR. LAUFER:  Yes, your Honor.
7        Your Honor, I really don't know what to say in terms
8   of what type of duty BOP thinks they do owe to prisoners after
9   what I just heard.
10       Their mandate is safekeeping care and subsistence of
11  prisoners under their care.  18 U.S.C. 4042(a).  That would
12  infer, your Honor, oversight, security, things of that nature,
13  to ensure reasonably that prisoners are safe and free from
14  harm.
15       Here, we don't allege necessarily a specific device or
16  policy or procedure in an attempt to second-guess what they
17  should install or what they should place in everyone's dorm.
18  What we do allege is that these guards and people overseeing
19  these areas of dormitories are already equipped with eyes and
20  ears to oversee what goes on with these prisoners in a maximum
21  security prison where some of the most notorious prisoners are
22  held.
23       My client, and we have Crecita Williams here, her son
24  was a healthy 35-year-old man.  As your Honor reviewed in the
25  autopsy report, he was beaten savagely to death.  Even

defendants notes and the limited discovery that we received show that he was choked.  Now, how long does it take to murder a 35-year-old man, a healthy 35-year-old man, a strong 35-year-old man?  How long does that take in the middle of the night in his dormitory?  Not some unsurveilled aspect of prison; in his dormitory, where he lives, where he keeps his personal items, where he converses with other prisoners.  How much force, how much power, how many people does it take to murder someone like that, to choke them to death, to beat them to death?  The amount of trauma that my client's son -- who has two twin daughters that he will, unfortunately, not be able to raise -- how much of trauma does it take to murder him?  How long does it take?  How come no one was there to either hear or see what was going on, when I'm sure he was screaming for his life, when he knew that the odds were stacked against him from his assailants.

       Now, counsel for the defense says that they acted quickly and appropriately.  That was only after they found his deceased form on his bunk the next day, your Honor.  He was there for hours.  Hours.  Before anyone inquired as to his health, safety or welfare.

       I don't get how the United States Government in this case can say with a straight face that they owed no duty to my client.  That is actionable upon its breach.  In the FTCA claim counsel says, yes, it is reasonable -- it was reasonably

foreseeable in a maximum security prison; that there's going to be violence there.  Was this something that happened quickly under *Sanchez v. State*.  That's the standard under New York State law.  They don't need to know the specifics of what may happen that there's a beef between two prisoners or that someone's life is in imminent danger.  It just needs to be reasonably foreseeable.

This type of violence is reasonably foreseeable, your Honor, and it happened over a long course of time.  My client's neck wasn't immediately broken.  He wasn't killed immediately. It wasn't one strike.  There were several strikes, if you review or if you take the time to review or the government takes the time to review the autopsy report.

This clearly falls within *Carlson v. Green*, your Honor, lazy guard.  I think we can all agree at a minimum there needs to be observation on dormitories where prisoners are staying at night in a maximum security prison in this country. There needs to be eyes and ears at some point, whether it's a patrol or constant surveillance even if they don't have cameras.  They need to look.  They need to see.  They need to assist if the need arises, and here it did clearly, and no one came.  No one came to help him.  He was paying his debt to society.  But that debt did not include being murdered.

I don't see how any of these actions that we've enumerated fail the plausibility standard in *Iqbal* or Rule 8 or

Case 1:17-cv-06779-WHP Document 50 Filed 09/03/19 Page 13 of 16   13
J79QwilO

any of its progeny, *Twombly*.  I think this is a waste of time, this motion.  My client still doesn't know who murdered her son.  That gets me to the so-called investigation that they claim they did, and the coverup, which is very apparent, that somehow my client died of a synthetic marijuana overdose of K-2.

How would Mr. Plourde know this?  Who did he hear it from?  It might be a few questions I'd have to ask him at deposition.  Why were they pushing this theory that he died from some sort of heart attack secondary to drug overdose?  I'll tell you why.  Because this frees them of liability for his life.

Now, I would imagine -- and this argument is just false and ridiculous.  I would imagine that death would be problematic for a body to process any type of illicit substance out of.  It would remain within the system after death.  And a review of the autopsy report shows that no illicit drugs or anything of that nature was found in his system.  I don't know how they can run with this type of defense, Judge.  I don't know how they can't seek to resolve this matter with my clients.  Yet, instead, they litigate this case for years and keep us going through discovery, denying any type of responsibility.

To date my client still does not know who murdered her son, who would have gotten out of jail, who would have been

(212) 805-0300

|   |   |
|---|---|
| 1 | able to help raise his daughters with his ex-wife, who are now |
| 2 | turning seven and will no longer have a parental guidance and |
| 3 | emotional support of their father. |
| 4 | I just don't know what more we would need to say. |
| 5 | THE COURT:  What exactly are the grounds for your |
| 6 | *Bivens* claim? |
| 7 | MR. LAUFER:  Well, with regard to Mr. Plourde, Eighth |
| 8 | Amendment, your Honor, to say it clearly.  There is clear case |
| 9 | law which supports an Eighth Amendment violation for the death |
| 10 | of an inmate in their individual capacity.  That's *Carlson v.* |
| 11 | *Green*. |
| 12 | THE COURT:  Is that deliberate indifference to serious |
| 13 | medical needs?  What's the theory? |
| 14 | MR. LAUFER:  It would be Eighth Amendment -- I mean, |
| 15 | they inflicted the need for -- someone inflicted the need |
| 16 | for -- as a result of their negligence, and maybe they heard |
| 17 | him scream, maybe they heard him yelling for help, and they |
| 18 | just ignored it.  We don't know yet because we haven't deposed |
| 19 | anyone yet. |
| 20 | But what we do know is that we believe Mr. Plourde |
| 21 | furthered a conspiracy by lying to my clients, and Officer |
| 22 | Kearins had serious issues with my client, consistently |
| 23 | accusing him of engaging in use of K-2, the use of illegal |
| 24 | drugs, and that my client, the decedent, Mr. Grant, spoke |
| 25 | specifically to both his mother and his ex-wife that this guard |

1  was threatening him, was threatening his physical safety and
2  potentially his life.
3         Again, this is a motion to dismiss.  We need to meet a
4  plausibility standard, and I think we can further flesh or
5  flush this issue out with depositions of her discovery defense.
6         THE COURT:  Anything further?
7         MR. LAUFER:  No, your Honor.
8         THE COURT:  Ms. Simon, anything further?
9         MS. SIMON:  Briefly, your Honor, a couple of points.
10        Recognizing that at this stage we are obliged to
11 accept the facts as pled in the amended complaint, I do feel
12 compelled to note that defendants in no way concede plaintiff's
13 counsel's representation of the facts, and in fact based on the
14 documents that were provided and established in interviews and
15 the medical records establish a very different timeline than
16 the one plaintiff's counsel outlined here.
17        But, in any event, relying on the allegations in the
18 amended complaint which are at issue in the motion to dismiss,
19 certainly there is no allegation of any of the type of
20 negligence that would suffice to state a claim against the
21 defendants.  And the Court should look to the allegations there
22 and not those augmented either here by plaintiff's counsel or
23 anywhere else.
24        With respect to your Honor's questions on the *Bivens*
25 claims against Mr. Plourde and Officer Kearins, again, any

1   allegation that Mr. Plourde -- I might be misstating how
2   plaintiff's counsel framed this but -- inflicted the need for
3   medical care is not only fully and adequate to state a *Bivens*
4   claim, but is also not in any way alleged in the amended
5   complaint.  And with respect to Officer Kearins, again, the
6   allegation that Officer Kearins had issues with Mr. Grant or
7   accused him of using K-2 or threatening his physical safety,
8   for the reasons we stated previously, are simply insufficient
9   to state a *Bivens* claim.
10          Thank you, your Honor, unless you have further
11  questions
12          THE COURT:  Thank you for your arguments.
13          Decision on the motion is reserved.
14          Have a good afternoon.
15          (Adjourned)