UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICOLE MORRISON, as Administrator for the Estate of Roberto Grant, and NICOLE MORRISON, as Mother and Legal Guardian for the Property of AG and SG, Decedent's Minor Children,

                    Plaintiffs,

v.

UNITED STATES OF AMERICA,

                    Defendant.

17 Civ. 6779 (WHP)

## DECLARATION OF JAMES R. GILL

In accordance with the provisions of 28 U.S.C. § 1746, I, James R. Gill, M.D., hereby declare as follows with respect to the above-captioned case:

I am currently the Chief Medical Examiner for the Connecticut Office of the Chief Medical Examiner. I have served in this position since July 2013.

On February 5, 2021, I provided an expert report in this matter based upon my review of, *inter alia*, memoranda of interviews documented in FBI form 302, the autopsy report prepared by Dr. Jennifer Hammers of the New York City Office of the Chief Medical Examiner ("NYC OCME"), and 51 autopsy images and 12 radiographs provided by NYC OCME. A true and correct copy of that report is attached as Exhibit A.

On May 21, 2021, I received a disk with additional autopsy images. The disk contained 344 autopsy images, 2 fingerprint images, 11 radiographs, 10 neuropathology images, 3 visual ID images, 1 evidence image, and 6 check-in and 6 check-out images. I reviewed the images and compared them with the autopsy report. Aside from the 1/8" red

contusion of the right lower lip that is described in the autopsy report but not seen in the autopsy images, there were no inconsistencies between the autopsy report and the autopsy images. Nothing in these additional photographs has caused me to change any of the opinions set forth in my February 5, 2021 report.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Old Saybrook, Connecticut
July 1, 2021

_____
JAMES GILL

# EXHIBIT A

**James Gill, M.D.**
Forensic Pathology Consultation
17 Otter Cove Drive
Old Saybrook, CT 06475

February 5, 2021

Re: Roberto Grant

Dear Attorney Simon and Attorney Issacharoff,
    I have been engaged by counsel on behalf of the United States of America to provide my opinions in connection with the matter of Roberto Grant.  I am a licensed physician and board certified in anatomic and forensic pathology.  I have experience in autopsy pathology and in determining the cause and manner of death.  My opinions below are all given to a reasonable degree of medical certainty.  My compensation is not contingent on my opinions below or on the outcome of this matter.  I have received the following in reference to this matter:

1. New York City Office of Chief Medical Examiner (OCME) autopsy report (M15-003072), neuropathology report, case notes, investigative report, NYPD/OCME Missing Person's Squad report, Death Certificate, and family identification form,
2. OCME Autopsy images (51) and radiographs (12)
3. Autopsy notes
4. Toxicology reports (OCME and NMS)
5. OCME hospital report of death form
6. Medical Records: New York Presbyterian Hospital (5/19/15, MRN: 75678352)
7. Bureau of Prisons Health Services:  medical records (Reg#: 69913-054)
8. FBI 302 Investigative Reports
9. Inmate Incident report (NYM-15-0038)
10. Metropolitan Correctional Center: Staff Memos
11. NYS Dept of Correctional Services: Health Services (NYSID: 08481707N)
12. Plaintiff Disclosure (Dr. Zhongxue Hua)

**Brief synopsis of clinical history:**
    Mr. Roberto Grant was 35-year-old man and inmate at the Metropolitan Correctional Center. He had a past medical history of intermittent chest pain and shortness of breath with exertion (5/18/10) and anemia (HCT 32.2, 3/12/20).  On 11/17/11 he had a normal treadmill stress test.

    On May 18, 2015 at approximately 23:40 hours, inmates on 11-South Tier 12 started yelling to the unit officers that that an inmate "passed out."  Per hospital records, he was with other prisoners and witnessed to be smoking some unknown substance (possibly synthetic marijuana) before his cardiac arrest.  Inmates reported seeing him suddenly become unresponsive.  He was witnessed to be sitting on his bed, then moved his feet to the floor, leaned over, slumped and crumpled forward, and slowly fell to the floor (see FBI 302 interviews of ███████████████████████████).  He was reported as unresponsive, sweating profusely, and "snoring."  When facility staff responded, he was unresponsive ("atraumatic") and in cardiac arrest.  A medical emergency was called and CPR was initiated.  Attempts at defibrillation occurred in the facility prior to EMS arrival.  EMTs found him still in arrest; he

1

was intubated, treated with medications, and shocked a fifth time.  Attempts at resuscitation continued for approximately 35 minutes in the jail and continued at the hospital.  He remained flatline and was pronounced dead at 00:33 on May 19th.  An autopsy and toxicological testing were performed at the New York City OCME.  The death was certified with an "undetermined" cause and manner of death.

**Brief synopsis of findings at autopsy and photographs:**
      Mr. Grant underwent an autopsy on May 19, 2015.  He was a well-developed 5'10", 204 lb. man.  There was an endotracheal tube and defibrillator pads.
      There were abundant petechiae and subcutaneous periorbital emphysema.  A 1/8" red contusion was described of the right lower lip but is not seen in the autopsy image after the face was cleaned (image 045).  This lip area is where the endotracheal tube was secured (see image 005).  There were no external injuries of the face, neck, trunk, or extremities. Specifically, there were no contusions (bruises), abrasions (scrapes), or lacerations of the skin of the neck, face, hands, arms, legs, or trunk.  Internal exam revealed hemorrhages of the anterior neck muscles/vessels/trachea, and tongue.  The airway mucosal hemorrhage involved the posterior (back) trachea, carina, and right main stem bronchus.  There were scattered subcutaneous hemorrhages of the extremities and head.  There was no bone injury of the head or neck and no intracranial collections of blood. The hyoid bone was not fractured.
      Disease: There was hypertensive and atherosclerotic cardiovascular disease with cardiac hypertrophy (450 gms) and concentric left ventricular hypertrophy (1.8 cm).  There was atherosclerosis (50% stenosis) of the left main coronary artery and arteriolosclerosis of the renal arteries.
      Postmortem toxicology testing did not detect ethanol or drugs of abuse.

**Opinions:**
The following are my opinions:
1. Mr. Grant had hypertensive and atherosclerotic cardiovascular disease with enlargement of the heart, narrowing of a major coronary artery, and kidney involvement. He had a history of exertional chest pain. His diseases are common causes of sudden death. Enlargement of the heart puts a person at risk for a fatal arrythmia.  Coronary artery atherosclerosis also puts a person at risk for a fatal arrythmia.  These two disease processes, in combination, increased the risk of his sudden death.  Although the left main coronary artery has moderate (not marked) atherosclerotic stenosis (narrowing), it is located in a critical artery, the left main (also known as the "widow-maker") because it branches into two major arteries that supply the left ventricle with blood and oxygen.

2. Given the context of the circumstances of his medical event related by witnesses, the attempted resuscitation, and the autopsy findings, his death was not caused by neck compression.  Neck compression first causes unconsciousness and then if maintained, death.  A person whose death is caused by strangulation, does not have an intervening "lucid" interval between compression and death.  Therefore, a person witnessed to be casually chatting while sitting on a bunk bed and then suddenly slump and crumple to the floor, was not strangled to death.
      Instead, this is a classic description of a sudden cardiac arrest.  He also was described as "snoring."  After the heart stops, it is common to have terminal seizure activity and reflexive attempts to continue breathing, so-called "agonal" breathing which are often described as snoring.

2

3. Attempted cardiovascular resuscitation does result in hemorrhage of the airways and surrounding tissues as well as petechiae (small hemorrhages) and subcutaneous emphysema. All of Mr. Grant's neck, airway, and oral cavity findings are explained by resuscitation attempts.[1-3] Mr. Grant underwent a prolonged resuscitation attempt by multiple providers (some inexperienced) which started before arrival of the EMTs. For example, the mucosal hemorrhage involving the right lung bronchus (which is in the chest and cannot be caused by compression of the neck) was caused by a traumatic endotracheal tube insertion.  The lip contusion has not been documented photographically but is a classic injury seen from a malpositioned endotracheal tube.

4. No synthetic cannabinoids were detected in the toxicology testing.  In 2014 there were over 170 different known synthetic cannabinoids. NMS labs tested for 32 of them.  One of the reasons synthetic cannabinoids are popular is that many may not be detected by toxicological testing.  This is one reason there are so many varieties—the manufacturers (and users) are trying to stay ahead of drug testing laboratories.

5. There were minor blunt injuries (hemorrhages under the scalp) of the head but none of them caused or contributed to death.

6. Dr Hua stated that in the absence of "fatal and acute intoxication or fatal natural disease…the cause of death should be listed as inflicted and/or homicidal neck compression."  I agree that no drugs were detected but I disagree that there was an absence of "fatal natural disease." Hypertensive and/or atherosclerotic cardiovascular disease are well-recognized causes of sudden death.

7. Based on the circumstances and autopsy findings, Mr. Grant's heart disease with or without a contribution of an undetected synthetic cannabinoid caused his death.

All of my opinions are based on a reasonable degree of medical certainty.  I reserve the right to revise my opinions based upon the receipt of new and/or additional information.

Sincerely,

James Gill, M.D.

1. Raven, K. P., et al. (1999). "Artifactual injuries of the larynx produced by resuscitative intubation." Am J Forensic Med Pathol 20(1): 31-36.
2. Maxeiner, H. and R. Jekat (2010). "Resuscitation and conjunctival petechial hemorrhages." J Forensic Leg Med 17(2): 87-91.
3. Krischer, J. P., et al. (1987). "Complications of cardiac resuscitation." Chest 92(2): 287-291.

3