UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X   17 Civ. 6779 (RA)
NICOLE MORRISON, as Administrator for the Estate
Of Roberto Grant, and NICOLE MORRISON, as Mother
and Legal Guardian for the Property of AG and SG,
Decedent's Minor Children,

                                                     Plaintiff(s),

    -against-

UNITED STATES OF AMERICA,
FEDERAL BUREAU OF PRISONS, CORRECTION
OFFICER KERN, EXECUTIVE ASSISTANT LEE PLOURDE,
and JOHN AND JANE DOE(S) AGENTS, SERVANTS AND
EMPLOYEES OF THE DEFENDANTS,

                                                     Defendant(s),
-----------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS UNITED STATES OF AMERICA, AND THE FEDERAL BUREAU OF PRISONS

                                                        LAW OFFICE OF
                                                        ANDREW C. LAUFER, PLLC

                                                        By: Andrew C. Laufer
                                                        Attorney for Plaintiffs
                                                        Office & P.O. Address
                                                        264 West 40th Street, Suite 604
                                                        New York, New York 10018
                                                        (212) 422-1020

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………….ii

INTITIAL STATEMENT………..…………………………………………………...2

FACTUAL BACKGROUND…...……………..…………………………………..….2

STANDARD OF REVIEW………………………………………………………...…8

ARGUMENT……………………………………………………………………….…9

    A.    PLAINTIFF ADEUQUATLY PRESENTS EVIDENCE SUBSTANTIATING NEGLIGENCE AND THE WRONGFUL DEATH OF ROBERTO GRANT AGAINST DEFENDANT UNITED STATES OF AMERICA.

    B.    NEW YORK NEGLIGENCE STANDARD.

    C.    DEFENDANT'S PUTATIVE EXPERT, DR. ROBERT GILL, SHOULD BE PRECLUDED.

CONCLUSION…………………………………………………………………...16

# TABLE OF AUTHORITIES

Pages(s)

Cases

Greco v. Orthopedic & Sports Medicine Clinic, P.C.,
2015 IL. App. (5th) 130370 …………………………………………………..5

Celotex Corp. Catrett,
477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ………….……8

Giano v. Senkowski,
54 F.3d 1050, 1052 (2d Cir.1995) …………………………………………....8

Hemphill v. Schott,
141 F.3d 412, 415 (2d Cir. 1998) …………………………………………….8

McKelvie v. Cooper,
190 F.3d 58 (1999) …………………………………………………….……..8

Sovujl v. United States of America, et al.,
2003 WL 21424835(2003) ……………………………………………………..8

Hercules Inc. v. U.S.,
516 U.S. 417, 422, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996)………………….8

Ben v. United States of America, et al.,
160 F.Supp.3d 460 (2016) …………………………………………………...9

Coulthurst v. United States,
214 F3d 106, 109 (2d Cir.2000) ……………………………………………….9

Triestman v. Federal Bureau of Prisons,
470 F.3d. 471 (2006) …………………………………………………………...9

Enigwe v. Zenk,
No. 03-CV-954, 2007 WL 2713849, at 9* (E.D.N.Y. Sept 14, 2007)……………..9

Hartman v. Holder,
2009 WL 792185 (2009)……………………………………………………………..9

Caraballo v. United States,
830 F.2d 19, 22 (2d Cir. 1987)……………………………………………………10

Rodriguez-Borton v. Pereira-Castillo,
593 F.Supp.2d 399 (2009)…………………………………………………………...10

Sanchez v. State of New York,
99 N.Y.2d 247 (2002)……………………………………………………………..11

Smith v. State of New York,
284 A.D.2d 741, 728 N.Y.S.2d 530 …………………………………………………...11

Stanley v. State of New York,
239 A.D.2d 700, 657 N.Y.S.2d 481……………………………………………………11

Gordon v. City of New York,
70 N.Y.2d 839, 840, 523 N.Y.S.2d 445, 517 N.E.2d 1331………..……………….....12

O'Grady v. City of Fulton,
4 N.Y.2d 717, 171 N.Y.S.2d 108, 148 N.E.2d 317……………………………………12

Hartman v. Holder,
2009 WL 792185 (2009)……………………………………………………………12

IP LLC v. CureMD.com,
48 F.Supp.3d 600 (2014)……………………………………………………………14

Greco v. Orthopedic & Sports Medicine Clinic, P.C.,
2014 IL. App. (5th) 130370…………………………………………………………...15

**Rules**

Fed.R.Civ.P.56(c) …………………………………………………………….....8

28 U.S.C. §§ 2671 et. seq. …………………………………………………….....8

U.S.C.A. Const.Amend. 14…………………………………………………….10

Fed.Rules Evid.Rule 702, 28 U.S.C.A……………………………………………14

Plaintiffs NICOLE MORRISION, as Administrator for the Estate of Roberto Grant, and as Mother and Legal Guardian for the Property of AG and SG, Decedent's minor children (hereinafter "Plaintiffs") by her attorneys, respectfully submits this memorandum of law in opposition of Defendants' motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56.

## I. INITIAL STATEMENT

Decedent Roberto Grant was formerly incarcerated in the care, custody, and control of the Defendants at the Metropolitan Correction Center in lower Manhattan. On or about May 19, 2015, Mr. Grant was beaten and strangled to death at the facility within Unit 11-South where he was housed while awaiting to be sentenced. Approximately 20 prisoners, including the decedent, resided there at the time. Mr. Grant was 35 years of age. He is survived by two minor daughters he fathered with Ms. Morrison.

## II. FACTUAL BACKGROUND

After being notified of his death, Crecita Williams, Mr. Grant's mother, and Ms. Morrison, went to MCC to identify his body.

Upon arriving at the prison, they were told that Mr. Grant died of a drug overdose and that he wasn't physically harmed. They were told this by Officer Lee Plourde, an employee of the defendants. This was untrue. Three toxicology report findings were "…without significant positivity." (See Exhibit A of Plaintiff's Declaration.)

In other words, no illegal drugs or toxic substances were found in Mr. Grants system. His remains were previously taken by agents, servants, and employees of the City of New York to Bellevue hospital. Ms. Williams and Morrison were able to identity Mr. Grant's remains there.

On January 10, 2017, nearly two years after Mr. Grant's death, the Office of the Chief Medical Examiner of the City of New York finally issued a Report of Autopsy deriving from

an examination of Mr. Grant's remains on May 19, 2015. The report was authored by Dr. Jennifer Hammers.

Specifically, the report stated that Mr. Grant suffered from "Blunt Force Trauma Of (the) Head, Neck, Torso, and Extremities, Petechial Hemorrhages of the Eyes, Periorbital Soft Tissue and Muscle, Oral Mucosa, Posterior Oropharynx, Base of Tongue, Trachea, Esophagus, and Temporalis Muscles. Blotchy Sclera Hemorrhages, Bilateral. Subcutaneous Emphysema, Eye Lids and Periorbital Tissues. Distention of Neck Veins and Temporal Vessels, Marked. Contusion, Right Lower Lip. Excoriations, Oral Mucosa of Lips. Neck Muscle and Soft Tissue Hemorrhages, Multiple, Bilateral, Tracheal Ring Hemorrhage, Large. Peri-Carotid Artery Hemorrhages, Bilateral. Hemorrhage of Tongue, Left (1/2"). Subscapular Hemorrhage (3), Occipital (2" Each). Cerebral Edema, Moderate. Hemorrhage, Left Forearm Muscle (5"), Right Elbow (1/2"), Left Shoulder (4"), And Right Lateral Chest Soft Tissues (1"). Deep Lung Parenchymal Laceration (1"), Left Lower Lobe. In other words, Mr. Grant was murdered via blunt force trauma and strangulation. (See Exhibit A of Plaintiff's Declaration.)

Plaintiff's forensic pathologist and neuropathologist expert, Dr. Zhongxue Hua, after reviewing Dr. Hammers report, autopsy notes, 332 autopsy photographs (See Exhibit P of Plaintiff's Declaration - deposition of Dr. Hua pg. 65-66 correction of number of photographs from 338 to 332 which existed), case information, police report, toxicology and reports concerning the decedent, Roberto Grant came to the following conclusion:

> "Based on my experience both as a practicing forensic pathologist and neuropathologist, within a reasonable degree of medical certainty, it is my considered opinion that Roberto (Grant) suffered recent, multiple, and significant, neck compression in multiple areas of his neck. In the absence of his fatal and acute intoxication or fatal natural disease, Roberto's cause of death should be listed as inflicted and/or homicidal neck compression;" (See Plaintiff's Declaration – Exhibit B).

3

Interestingly, defendants fail to mention that Dr. Hammers of the New York City medical examiner's office listed Blunt Force Trauma of Head, Neck, Torso, and Extremities first in her autopsy report. They also failed to mentioned Dr. Hammers listed "Peri-Carotid Artery Hemorrhages, bilaterally" meaning that Mr. Grant's remains demonstrated he suffered neck compression injuries on both sides of his neck. (See Exhibit A of Plaintiff's Declaration.)

Defendant's putative "expert", forensic pathologist Dr. Robert Gill, laughably referred to the severe injuries suffered by Mr. Grant as "minor blunt force trauma" within his report. (See Exhibit C – Pg. 3 – Point 5 – Dr. Gill's report - of Plaintiff's Declaration). Nowhere within Dr. Hammers autopsy finding does she state the blunt force trauma inflicted upon Mr. Grant was minor. (See Exhibit A of Plaintiff's Declaration). Dr. Gill's crafted reported focuses on hypertension and a narrowing of the left main coronary artery as the basis for the "sudden death" of Mr. Grant. He completely ignores Dr. Hammers report that the narrowing of the artery was slight and not listed within her final diagnosis as contributary to Mr. Grant's death. (See Exhibit A – bottom of page 6 - of Plaintiff's Declaration)

Unlike Dr. Gill, Dr. Hammers did not rely upon the contradictory statements of Mr. Grant's fellow inmates, at the time of his death, in generating her diagnosis. (See Exhibit A of Plaintiff's Declaration.)

Some inmates stated Mr. Grant was lying down on his bunk. Others stated he was sitting on the floor, while others stated he was standing and fell to the floor during the incident. Another inmate stated that Grant was standing and having a conversation with him before fell to the ground. One of the inmates even stated he thought there was a fight involving Grant immediately prior to his death. (See Exhibit D of Plaintiff's Declaration). At least two inmates stated that they heard rumors Mr. Grant's windpipe was crushed. (See Exhibit E of Plaintiff's Declaration).

4

Defendants apparently did not approve of these statements considering they aren't referenced in Dr. Gill's report or defendant's motion. Nor does it further the fantasy that Roberto Grant, a 35-year-old man without serious cardiovascular issues, had a sudden cardiac event resulting in his death.

Dr. Gill has a history of creating medical narratives to suit his client's needs. In Greco v. Orthopedic & Sports Medicine Clinic, P.C., 2015 IL. App. (5th) 130370 a wrongful death matter, the Appellate Court held that Dr. Gill's testimony "…. had great potential to mislead the jury about causation and invited them to speculate about whether decedents death was related to ankle injury. During the trial, Dr. Gill, the defendant's pathology expert, specifically referenced Dover's testimony about her diagnosis of carotid artery disease before highlighting a finding in the decedent's autopsy report. Dr. Gill noted that there was a 50% blockage of one of the major arteries in the decedents heart, and that a 50% blockage was unusual for a 36-year-old woman. Dr. Gill testified that the blockage was a serious health issue and reduced the decedent's life expectancy. Neither Dr. Gill or any other expert testified that this arterial blockage caused or contributed to the decedent's death. ***Dr. Gill's testimony floated about untethered, and invited nothing more than inappropriate speculation about the cause of the decedent's death.***" (See Exhibit F of Plaintiff's Declaration).

The Appellate Court's description of Dr. Gills report and testimony closely mirrors the content found within his current report and deposition testimony. Dr. Gill flip-flops between claiming the injuries suffered by Mr. Grant were a result of CPR, although he states CPR is not his specialty, but also could have been a result of Mr. Grant being choked to death. (See Exhibit G – pg. 14 line 11 through pg. 15 line 5, pg. 22 line 6 through 17, pg. 23 line 17 through pg. 24 line 16, pg. 25 line 15 through line 24, pg. 26 line 8 through line 16 of Plaintiff's Declaration).

5

Neither Dr. Hammers nor plaintiff's expert, Dr. Hua, presented any evidence that Mr. Grant's "slight 50%" narrowing of his left main coronary artery led to his death.

Defendants also "forgot" to include documentary evidence from their investigation of the murder of Roberto Grant. Defendants believed, from the very beginning of the investigation, that Mr. Grant was murdered. Their "Referral of an Inmate Criminal Matter for Investigation" document delivered to the FBI on May 22, 2015, three days after his death, lists the referral reason as "Homicide, Inmate." (See Plaintiff's Declaration - Exhibit H - US__00304-305).

Moreover, a handwritten note created by agent for the defendant stated that Mr. Grant's injuries were "Not CPR Related", "Hyoid Bone Not Broken But Compressed & Bruised", "lots of Hemro. front & Back of Neck", "Petechiae In The Eyes/Neck/Mouth", "Consist. Of Being Choked". (See Plaintiff's Declaration - Exhibit I - US__00237).

Defense witness FBOP Officer Dionysia Georgopoulos, along with Officer Michael Kearins, were on duty and posted to the housing area on the evening the decedent was murdered. They were also the first to respond to the scene.

On June 18, 2015, July 21, 2015, and September 18, 2915, Georgopoulos was interviewed by the FBI who were investigating Mr. Grant's murder. During her multiple interviews, she stated that she was told by one of the inmates in Mr. Grants dorm that he was choked to death by another inmate during a game of horseplay. She further testified that she felt Mr. Grant was murdered. Officer Georgopoulos rendition of the facts is much more credible than the contradictory statements made by inmates from Mr. Grant's housing area to the FBI. (See Exhibit J – Georgopoulos 302 statements – and Exhibit K – Georgopoulos deposition transcript – pg. 38, line 25 through pg. 40 line 3 - of Plaintiff's declaration.).

Further, plaintiff's prison conditions expert, Tim Gravette, a retired FBOP deputy warden with over 20-years-experience, regarding Officer Georgopolous's testimony, opined the following:

> "Based upon my experience, I trust what she says to be an accurate description of what she feels happened on the night of 05/18/2015 when Roberto Grant was found unresponsive in his assigned area of the unit." (See Exhibit L pg. 4 of Plaintiff's declaration.)

At his deposition, Mr. Gravette testified that Mr. Grant's fellow inmates 302 statements "were all over the place." Some said they didn't believe Grant's windpipe was crushed. Another stated Grant was attempting to stand. While others stated Grant was already standing when suddenly he grabbed his chest and fell. Still others stated Mr. Grant was sitting on his bunk, sat up, and then passed out. (See Exhibit O pg. 55 line 11 through pg. 56 line 6.)

Additionally, defense witnesses Captain Michael Craig Ward and Operations Lieutenant Patrick DeLaney, both supervisors of Officers Georgopoulos and Kearins, testified that patrol rounds by their Correctional Officers must be conducted every 30-40 minutes within housing areas. (See Exhibit M – pg. 33 line 18 through pg. 34, line 17 and N – pg. 44, line 22 through pg. 45, line 11 - of Plaintiff's declaration, respectively.)

According to Mr. Gravette, this would require correctional officers to patrol at least 16 times during an 8-hour tour. Officer Georgopoulos testified that she and Officer Kearins only patrolled a few times during their tour at the time Mr. Grant was murdered. (See Exhibit K pg.21, line 24 through pg. 25, line 10.) This demonstrates a clear violation of directives issued by their supervising officers. (See Exhibit M – pg. 33 line 18 through pg. 34, line 17 and N – pg. 44, line 22 through pg. 45, line 11 - of Plaintiff's declaration, respectively.)

Defendants failed to rebut any of the findings Mr. Gravette demonstrated within his report, either during his testimony or through a defense expert which they did not to retain.

7

## III. STANDARD OF REVIEW

### A. FRCP (56) – Motion Summary Judgment

"To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Giano v. Senkowski, 54 F.3d 1050, 1052 (2d Cir.1995). Hemphill v. Schott, 141 F.3d 412, 415 (2d Cir.1998). See also McKelvie v. Cooper 190 F.3d 58 (1999.

### B. Federal Tort Claims Act - FTCA

The FTCA permits a plaintiff to bring an action for damages against the United States and its agents acting in their official capacities. See 28 U.S.C. §§ 2671 et seq. (consenting to tort suits against the United States and its agents). See Sovujl v. United States of America, et al 2003 WL 21524835 (2003).

"With regard to the jurisdictional claim, Plaintiffs are attempting to sue the United States of America, which, of course, enjoys sovereign immunity from being sued, except insofar as it consents to be sued. Moreover, even in situations in which the United States consents to be sued, a court's jurisdiction is limited by the terms of the Government's consent. See, Hercules Inc. v. U.S., 516 U.S. 417, 422, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996) ("The United States, as sovereign, is immune from suit save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (citations and internal

quotation marks omitted). In other words, the United States decides when and how it can be sued." See Ben v. United States of America, et al 160 F.Supp.3d 460 (2016).

The FTCA allows lawsuits including, but not limited to, negligent supervision, security, and wrongful death against the United States of America. See Sovujl, Id. The FTCA applies the negligence standards and laws of the forum state where the acts of negligence occurred. See Sovujl, supra.

## IV. PLAINTIFF PRESENTS EVIDENCE SUFFICIENT TO SURVIVE SUMMARY JUDGMENT UNDER THE FTCA

**A. Plaintiff adequately presents evidence substantiating negligence and the wrongful death of Roberto Grant against defendant United States of America.**

The negligent guard theory has long been held as a vector of liability in FTCA claims against the defendants. Defendants, as here, are subject to liability where "…negligence of the officer on duty (occurs) by failing to patrol or respond diligently…. that the officer on duty when the incident occurred failed to patrol or respond diligently to an emergency situation out of laziness or inattentiveness." See See Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir.2000) (See Triestman v Federal Bureau of Prisons, 470 F.3d 471 (2006).

In Enigwe v. Zenk, No. 03–CV–854, 2007 WL 2713849, at *9 (E.D.N.Y. Sept. 14, 2007) the Court when finding liability upon defendants "(noting that "certain negligent acts, such as those borne out of laziness, hastiness, or inattentiveness, fall so far outside the range of appropriate judgment that they can no longer be viewed as an exercise of discretion"). See Hartman v. Holder, 2009 WL 792185 (2009).

In Caraballo v. United States, 830 F.2d 19, 22 (2d Cir.1987) (discretion over whether and how to implement beach patrol did not shield government from actions challenging negligent execution of patrol).

In Rodriguez-Borton v. Pereira-Castillo 593 F.Supp.2d 399 (2009) the Court held that a "(g)enuine issue of material fact existed as to correctional officer's failure to patrol living area of annex within which pretrial detainee was found hanged while he knew inmates were able to freely move around, precluding summary judgment on relatives' Fourteenth Amendment deliberate indifference claim." U.S.C.A. Const.Amend. 14.

Defense witnesses Captain Michael Craig Ward and Operations Lieutenant Patrick DeLaney, both supervisors of Officers Georgopoulos and Kearins, testified that patrol rounds by their Correctional Officers must be conducted every 30-40 minutes within housing areas. (See Exhibit M – pg. 33 line 18 through pg. 34, line 17 and N – pg. 44, line 22 through pg. 45, line 11 - of Plaintiff's declaration, respectively.)

According to Mr. Gravette, this would require correctional officers to patrol at least 16 times during an 8-hour tour. Officer Georgopoulos testified that she and Officer Kearins only patrolled a few times during their tour at the time Mr. Grant was murdered. (See Exhibit L of Plaintiff's Declaration). (See also Exhibit K pg.21, line 24 through pg. 25, line 10.) This demonstrates a clear violation of directives issued by their supervising officers. (See Exhibit L of Plaintiff's Declaration). (See also Exhibit M – pg. 33 line 18 through pg. 34, line 17 and N – pg. 44, line 22 through pg. 45, line 11 - of Plaintiff's declaration, respectively.).

Mr. Gravette further opines that guidelines, to timely conduct "safety and security checks" by correction officers in accordance with prison and supervisor directives is an important duty. Properly conducting these checks "…interferes with inmate illegal activity and helps to curb that activity creating a more safe and secure environment for both the staff

10

and inmates." (See Exhibit L of Plaintiff's Declaration).

During his deposition, Mr. Gravette testified that there was a "lack of supervision" due to the failure of correction officers, Georgeopoulos and Kearins to properly and timely patrol, as directed by their supervisors, which gave opportunity for Mr. Grant to be strangled to death. (See Exhibit O – pgs. 10-13 - of Plaintiff's Declaration.)

Mr. Gravette went on to state with "high probability" that Roberto Grant was choked to death by another inmate. He further opined that the defendants are responsible for his death since they failed to do their required rounds with the frequency ordered by their superiors. (See Exhibit O – page 36 line 12 through pg. 40 line 12, pg. 41 line 6 through 10, pg. 47 line 3 through pg. 48 line 17, pg 49 line 21 through pg. 51 line 24, pg. 53 line 16, pg. 57 line 15 through pg. 59 line 17 and pg. 61 line 20 through pg. 65 line 11.)

### B. New York State Negligence Standard

Under New York State law, negligence is defined as follows:

> "Negligence is the absence of care according to the circumstances. Negligence law allows a person to recover for an injury that was proximately caused by another's violation of a duty of reasonable care…In sum, negligence requires a duty of care owed to a plaintiff, and the breach of the duty of care owed by a reasonably prudent person which causes the plaintiff's legally cognizable injury and/or damages." See 79 N.Y. Jur. 2d Negligence § 1 (2019).

The seminal case within New York state courts regarding a prisons duty to protect inmates and breach thereof is Sanchez v. State of New York 99 N.Y.2d 247 (2002).

Sanchez, Id. and its progeny reflect that the "…State could be held liable if attack was *reasonably foreseeable*, based on its knowledge derived from operation of a maximum security prison;" abrogating Smith v. State of New York, 284 A.D.2d 741, 728 N.Y.S.2d 530, Stanley v. State of New York, 239 A.D.2d 700, 657 N.Y.S.2d 481. The defendants "are not required to have actually knowledge that prisoner's life is imminently in danger."

11

In Iannelli v. County of Nassau, 156 A.D.3d 767 (2017) the Appellate Division, Second Department, in upholding the lower Courts denial of defendant's motion for summary judgment, held that even in instances where a prisoner commits suicide, the municipality "...**99 owes a duty of care to protect its prisoners, even from self-inflicted harm (see Gordon v. City of New York, 70 N.Y.2d 839, 840, 523 N.Y.S.2d 445, 517 N.E.2d 1331; see generally O'Grady v. City of Fulton, 4 N.Y.2d 717, 171 N.Y.S.2d 108, 148 N.E.2d 317).

In Hartman v. Holder, 2009 WL 792185 (2009) the Court stated that "....on a section of a BOP training manual entitled "Staff Survival Skills", because the presence of "correctional worker[s] deters ... assaults, suicide attempts, and other incidents that can be dangerous to [COs] as well as the inmates. Since inmates will violate regulations when and where they feel the risk of detection is lowest, [the presence of corrections officers] will deter this behavior."

The Court further stated that "(i) n a similar vein, plaintiff notes that COs are required by a BOP "program statement"—a set of rules and guidelines that provide standards of conduct for all BOP employees—to be "fully alert and attentive during duty hours." (Pl.'s Ex. N at 9.) This is because, according to the program statement, "[i]nattention to duty in a correctional environment can result in escapes, assaults, and other incidents." See Hartman, id

"Hartman also relies on a post order that governs the 4:00 p.m. to 12:00 a.m. shift worked by Officer Sanders on the night of the assault. This order instructs that after "lights out" at 11:00 p.m., when the unit is "locked down and secured,"

"[i]t is very important for you to conduct rounds of the unit when the lights are out. The inmates depend on you to protect them and enforce the rules ans [sic] regulations of the institution. Use your flashlight to illuminate your path and make frequent rounds of the unit, especially in the

12

last two (2), three (3) rows. Ensure inmates are not being assaulted or fighting once the lights are out." Hartman, id.

"According to Martinez, after "lights out," a corrections officer "makes sure all the inmates are in their beds" and "does continuous rounds to make sure the inmates aren't getting up and wandering about." Hartman, supra

"Moreover, when conducting rounds, COs must vary their actions to avoid establishing a predictable "profile". Hartman asserts, again pointing to a BOP training manual and testimony from BOP personnel, that COs are required to "[a]void establishing daily patterns that are visible to the inmates" (Pl.'s Ex. M at 8), because if inmates are "up to something, or they want to do something, the first thing they're going to want to know is where's that officer. So if the officer keeps them off times ... it kind of deters what they're going to do." (Martinez Dep. Tr. at 72:9–16.)". Hartman, supra.

The aforementioned findings of fact in Hartman closely mirror the events in the present instance that Georgopoulos and Kearins failed to patrol the housing area where Roberto Grant was murdered in accordance with BOP policy and the orders of their superiors.

Plaintiff's prison condition expert explicitly states with "high probability" that Roberto Grant was choked to death by another inmate and that the defendants are responsible for his death since they failed to do their required rounds with the frequency ordered by their superiors. (See Exhibit O – page 36 line 12 through pg. 40 line 12, pg. 41 line 6 through 10, pg. 47 line 3 through pg. 48 line 17, pg 49 line 21 through pg. 51 line 24, pg. 53 line 16, pg. 57 line 15 through pg. 59 line 17 and pg. 61 line 20 through pg. 65 line 11.)

13

There is significant credible evidence that Mr. Grant was murdered. The medical examiner's findings, coupled with Dr. Hua's report, clearly reflects he suffered significant blunt force trauma and other injuries which suggest a brutal assault and death by strangulation.

Defendant's own investigation revealed that Mr. Grant demonstrated injuries which were "consistent with being choked" and referred the matter to the FBI for a homicide investigation. (See Exhibits H and I attached to Plaintiff's Declaration.)

More than enough evidence has been brought to light precluding summary judgment in favor of defendants.

### C. Defendant's Putative Expert, Dr. Robert Gill, Should Be Precluded

"A court's inquiry into whether to admit expert testimony focuses on three issues: (i) whether the witness is qualified to be an expert, (ii) whether the opinion is based upon reliable data and methodology, and (iii) whether the expert's testimony on a particular issue will assist the trier of fact." Fed.Rules Evid.Rule 702, 28 U.S.C.A. See 523 IP LLC v. CureMD.com 48 F.Supp.3d 600 (2014).

Dr. Gills report and testimony contain a barrage of made-up standards and feigned facts manufactured to suit his clients need in order to demonstrate Mr. Grant died of natural causes. He opines that all medical records must be reviewed which, until the making of this motion, he failed to do. He further opines that all witness statements must be included in any analysis of the plaintiff's cause of death which both Dr. Hua, and Dr. Hammers, the actual individual who conducted the autopsy, found to be irrelevant. Yet, according to his own testimony, he only review "some" of those witness statements. The "some" being the statements which further defendant's baseless allegations that Mr. Grant died of natural causes.

As to defendants feigned medical condition of lucidity between bouts of unconsciousness, there is absolutely no evidence presented which substantiates this imaginative "finding" by Dr. Gill.

Defendants claim that review of all witness statements were a necessity to determine cause of death, yet their pathologist only reviewed "some." (See Exhibit G pg. 28 line 12 through pg. 29 line 11.)

Defendants attempt to obfuscate this fact by mischaracterizing Dr. Hua's testimony. He never testified that witness statements were necessary to determine cause of death. Furthermore, Dr. Hammers never indicated she reviewed any witness statements in coming to her diagnosis within her report.

Further, prior to the making of this motion, Dr. Gill failed to review all of the autopsy photographs. There were over 332 autopsy photographs reviewed by Dr. Hua. (See Exhibit B attached to Plaintiff's Declaration.)

In compiling his report, Dr. Gill cherry-picked 51 to suit defendant's narrative. (See pg 1 point 2 of Exhibit C to Plaintiff's Declaration.). Upon the making of this motion, he suddenly found an additional 281 photographs which he hastily opined, conveniently, didn't significantly change his original diagnosis.

Given Dr. Gill's history of creating medical narratives to suit his client's needs, there every reason to preclude him from this case. See Greco v. Orthopedic & Sports Medicine Clinic, P.C., 2015 IL. App. (5th) 130370 - "...***Dr. Gill's testimony floated about untethered, and invited nothing more than inappropriate speculation about the cause of the decedent's death.***" (See Exhibit F of Plaintiff's Declaration).

15

## VI.     CONCLUSION

For the reasons stated herein, Plaintiffs respectfully requests the Court deny defendants motion for summary judgment and for other such relief as the Court deems just and proper.

Dated: New York, New York
       July 29, 2021

Respectfully submitted,

**LAW OFFICE OF
ANDREW C. LAUFER, PLLC**

By: Andrew C. Laufer
Attorney for Plaintiffs
Office & P.O. Address
264 West 40th Street, Suite 604
New York, New York 10018
(212) 422-1020