# EXHIBIT L

Gravette Consulting LLC

Tim Gravette

126 Playfair Drive

Lafayette, Louisiana 70503

361-742-2500

I, Roy T. (Tim) Gravette have been retained as an expert in the matter of the *Nichole Morrison as Administrator for the Estate of Roberto Grant and as Mother and Legal Guardian for the Property of SG and AG, Decedents Minor Children v United States of America, Federal Bureau of Prisons, Executive Assistant Lee Plourde, Correction Officer Kern and John and Jane Doe(s) Agents and Employees of the Defendants.*  United States District Court Southern District of New York.  Case No: 17 Civ. 6779 (WHP).

## **Background and Qualifications**

I am a twenty-year corrections veteran.  Nine of my twenty years was as Associate Warden with the Federal Bureau of Prisons.

My career assignments included work as a Correctional Officer at the Federal Correctional Institution in Talladega, Alabama from June 1990 until October 1993.  Lieutenant at the Federal Detention Center and the Metropolitan Correctional Center in Miami, Florida and Lieutenant at the Federal Correctional Institution in Estill, South Carolina.  I was a Lieutenant from October 1993 until December 1997.  I was a Captain at the Federal Detention Center in Oakdale, Louisiana and at the Federal Correctional Institution in Edgefield, South Carolina.  My tenure as a Captain was from December 1997 until November of 2001.  My assignments as Associate Warden were from November of 2001 until my retirement in June 2010.  My assignments were at the Federal Correctional Institution Talladega, Alabama, the Federal Correctional Complex in Beaumont, Texas and at the Federal Correctional Institution in Three Rivers, Texas.  During my assignment at the Federal Correctional Complex in Beaumont I was assigned to the medium security facility for two years, as the Associate Warden at the Central Administration Building for a period of five months and to the United States Penitentiary for my final seven months.  When my career began as a Correctional Officer, I was assigned in the inmate housing units, as a compound patrol officer, and to various other duties assigned where I had direct supervision of the inmate population.  As a Lieutenant, I would make rounds throughout the facility as part of my daily duties and interact with the inmate population in their assigned units, work assignments and leisure time activities.  As my career progressed, I was promoted to Captain.  During my time as a Captain I was

responsible for the Correctional Officers daily duties and all other aspects of the safety, security and orderly running of the facility.

As an Associate Warden, I had the responsibility to oversee and direct staff in the performance of their daily duties. I wrote and critiqued local policy and made decisions which affected the safety, security and orderly running of the facility to which I was assigned. The policies were written using the principles of sound and proven correctional management, Federal law and standards provided by the American Correctional Association (ACA). I wrote lesson plans, taught classes and wrote performance appraisals for our staff. I have commanded and been involved in incidents of emergency response for medical emergencies, inmate disturbances, hostage situations, assaults, suicides, homicides and attempted escapes.

A copy of my Curriculum Vitae is attached as exhibit A.

## Basis of Opinions

After a careful evaluation of the facts and circumstances that are known to me as a result of the review of the materials available (which are attached as Exhibit B), and taking into account my experience, training and knowledge of the practices that should be standard in all correctional facilities, I have formed several opinions, to a reasonable degree of certainty that are applicable to the correctional profession and the treatment and care of Roberto Grant on 05/18/2015 at the Metropolitan Correctional Center, Federal Bureau of Prisons, New York, New York..

As to the facts presented of which I am aware, I applied my experience and training and my twenty-year career as a corrections veteran concerning inmate culture, correctional investigative practices, sound correctional management, proper correctional environmental practices, inmate management and prison administration experience in forming my opinions. I understand that additional information may be provided to me in this case which may to some extent add to, change or alter my opinions. I reserve the right to supplement my opinions and or this report based on any said additional facts or materials that may come forward after the scheduled expert disclosure date.

## 05/18/2015 Death Roberto Grant

Roberto Grant FBOP #69913-054 was in the custody of the Federal Bureau of Prisons (FBOP) at the Metropolitan Correctional Center, (MCC) New York on 05/18/2015. Grant was found on his assigned bunk in the 11-South Unit by responding staff who had been told by inmates that Grant had passed out.

2

The following is a description of the incident as written in a memorandum provided by Operations Lieutenant Delaney. "On May 18, 2015 at approximately 11:40 pm inmates on 11-South tier 12 started yelling to the unit officers to come to the tier for an inmate passed out. The officers called for a medical emergency/hit Body Alarm and staff responded. Upon arrival of staff inmate Grant, Roberto #69913-054 was found on his bunk bed unresponsive. Staff checked the inmate for a pulse and no pulse was felt. Inmate Grant was moved off the bed and to the floor were staff began CPR. I arrived and cleared the tier of all inmates. I then connected the AED to inmate Grant and no shock was advised. Staff continued CPR and moved the inmate to a stretcher. The AED then analyzed the inmate again and it advised to shock. I then shock inmate Grant as per the AED. Inmate Grant was then removed off the unit to the medical sally port on the second floor with staff continuing CPR the whole time. The AED advised another shock upon arrival to the second-floor sally port. Staff then shocked inmate Grant as per the AED. CPR was then continued the AED then advised a third shock and staff administered that shock as per the AED. Staff then continued CPR until the arrival of EMS/ FDNY who then took over medical care. Inmate was transported/escorted to the local hospital where he was pronounced dead at 0033 by an emergency room doctor. (US_00256)

There were two Correctional Officers (CO) assigned to 11-South at the time of the incident. Officer Michael Kearins and Officer Dionysia Georgopoulos. Georgopoulos stated in her deposition when she and Officer Kearins were conducting the 10:00 pm count all of the inmates in the unit were standing. (41-2) When asked how often correctional officers conduct rounds in the unit Georgopoulos stated: "During the tour, a few times. We will make rounds. We inspect certain tiers. It's more random which tiers we go to. We inspect the bathrooms of each tier. We inspect--basically what we are looking for if there is any contraband inside these tiers and we are just observing and looking. (22-3)

Based on the information provided by Officer Georgopoulos she observed Grant who was alive and standing at his assigned bunk during the 10:00 pm count which is normal procedure and protocol. Based on my experience following the count the officers return to their office area and phone in the count totals to the institution Control Center. During this time, the inmates would have been unsupervised in the unit and on the tier, Grant was assigned to. Inmates are familiar with the routines of the correctional officers and they use these times to do things that can go undetected by the unit officers. Based on my review of the case material this is when K-2 was smoked in the unit and when the rumored horse play took place where Granted was allegedly choked.

3

## Neck Injury

Per the autopsy report (US_0291-0299) Grant had injuries to his body which were listed as blunt force injuries of the head, neck, torso and extremities. (US_0294)  The report was signed by Jennifer L. Hammers, D.O. dated 12/28/2016.  The injury to the neck is consistent with rumors of inmate horseplay which were brought to the attention of investigators by Officer Georgopoulos.  On 0/1/2015 Officer Georgopoulos was interviewed by the FBI about the death of Roberto Grant and the following is part of that interview (US_3472) "GEORGOPOULOS was asked about the identity of an inmate that she had mentioned in a previous interview regarding a rumor involving the death of an inmate identified as ROBERTO GRANT in which the inmate stated that he heard that GRANT died as a result of a chokehold placed on him during "horseplay" while inside the unit.  She responded that she was unable to recall the identity of the inmate but that it was someone on the unit and most likely it was an inmate she identified as (redacted).  The inmate told her that it could have been an accident."  On the last page of the interview it states: (US_3477) "She also recalled that this was the inmate who told her about the rumor that GRANT died as a result of an accident while horsing around on the unit and that someone had choked him from behind."  Georgopoulos also stated in her sworn deposition: Q. What were you—what was your determination once you received the autopsy report?  A. My determination?  Q. Yes, what did you think happened to him?  This is just you saying this not anyone else?  A. I truly felt that he was murdered inside the tier.  Q. Do you feel it was another prisoner that may have done that?  A. It had to have been another one because they were locked down at the time and it was whoever was inside that tier.  They were locked down and I remember for the 10:00 count he was standing up with no issues.  So, I felt like from the moment we locked the grill and we stepped away, whatever happened in my mind happened at that time." (39-8 to 40-3)  Officer Georgopoulos was a first responder in the unit she was in the unit during the time of the incident and she was familiar with the inmates and their actions in 11-South.  Based on my experience I trust what she says to be an accurate description of what she feels happened on the night of 05/18/2015 when Roberto Grant was found unresponsive in his assigned area of the unit.

The FBOP does not allow horse play and this type of behavior is prohibited.  Horse play is found in the category of HIGH SEVERITY LEVEL PROHIBITED ACTS.  Code 220 in the Inmate Discipline policy states: "Demonstrating, practicing, or using martial arts, boxing (except for use of a punching bag), wrestling, or other forms of physical encounter, or military exercises or drill (except for drill authorized by staff)."  Based on my experience and training as a Disciplinary Hearing Officer horse play would be included in this prohibited act.  If in fact the inmates were involved in horse play and Grant was a participant, I can say based on my experience with a reasonable degree of certainty the likelihood of him being injured is probable.

4

Dr. Zhongyue Hua wrote in his Expert Report dated 03/11/2020 "Based on my experience both as a practicing forensic pathologist and neuropathologist, within a reasonable degree of certainty, it is my considered opinion that Roberto suffered recent, multiple, and significant neck compression in multiple areas of the neck. In the absence of his fatal and acute intoxication or fatal natural disease, Roberto's cause of death should be listed as inflicted and/or homicidal neck compression."  I don't profess or claim to be a medical expert or a trained medical professional but as a trained investigator in corrections by the FBOP and my past experience the information provided by Officer Georgopoulos, the Medical Examiner's office and Dr. Hua I am of the opinion the probability of inmate horseplay in 11-South which included the choking of Grant possibly played a part in his death.

### Inmate Use of Synthetic Marijuana (K-2)

The use of Synthetic Marijuana (K-2) at the MCC in 2015 was common and an ongoing problem for the MCC staff who had the responsibility for inmate supervision.  America Pina the Special Investigative Technician at the MCC stated "It was basically all over the place." (41-22)  The following is from Operations Lieutenant Patrick DeLaney's deposition: Q. Back in 2005, how often would staff find inmates using or possessing K2?  MR. ISSACHAROFF: 2005? I think you mean 2015.  MR. LAUFER: 2015.  My bad.  A. Okay.2015, it was the height.  2014, 2015 it was blowing up.  So, when the staff was catching the items and there were mass shakedowns done on the institution and it slowed down, you would have one case maybe a week. When it wasn't slowed down and there wasn't mass shakedowns and everything locked down, the institution going through every nook and cranny that came into the institution, you were looking at four or five cases a week, even topping up to about seven, and inmates were showing signs of being under the influence, slur—slurred speech, couldn't stand on their own, would be escorted down to medical and be sent to the local hospital. (47-14 to 48-11)  Officer Georgopoulos stated as she and Officer Kearins were waiting for responding staff to enter 11-South she could see inmates spraying the air and she could smell K-2 in the unit before the reached Grant's bunk where he was found unresponsive. (US_3686)  There are numerous other statements about the use of K-2 at the MCC by both inmates and staff in the discovery material I reviewed including one from inmate Corey Thomas.  Thomas stated Grant had smoked K-2 earlier on the day of his death. (US_3470)

My review of the case material indicates a problem with K-2 consumption and the introduction of the drug into the facility.  As Lieutenant DeLaney stated the MCC had as many as seven inmates a week being intoxicated as a result of using K-2 and some having to be sent to outside medical facilities for treatment.  I am aware of the difficulties staff have with drugs being used in the facility from the problems with the inmates

dealing the drugs to overdoses and abnormal behavior which is a result of drug use.  Lt. DeLaney provided information is his deposition testimony about the use of illegal drugs at the MCC including 11-South which was an open bay dormitory style unit which allowed inmates more freedom and interaction with other inmates 24 hours a day as opposed to a unit where inmates are locked in their assigned cells after lights out at 10:00 pm until 6:00 am. "Q. Did you have any issues with drug transactions occurring within 11 South on or before the incident involving my client?  A. Throughout the whole institution there was issues and not specifically just 11 South.  But there were several times on different occasions throughout the years, whatever, that people responded to 11 South, because it was an over bay area, and most of the inmates were always either smoking or doing some sort of illicit behavior." (31-16 to 32-4)  On the night Grant was found unresponsive there were other inmates in 11-South who had been overcome with the effects of K-2 and he made the following statement in his deposition testimony.  "I found out the next day that several inmates had also overdosed on K2 in that same--on that same tier where Inmate Grant was.  They actually--I think there were maybe three or four other inmates.  And the other inmates tried--took them either in the--you know, the shower or in the toilet area, and were putting water on their faces to revive them.   I remember that specifically, you know, hearing that news.  That there were several of the inmates on the tiers themselves who had also overdosed.  And they were able to bring those inmates back.  When it came to Grant, he was unresponsive to the point that that didn't happen."  Based on my training this also explains the responding stating Grant was wet when they found him.   Both Captain Ward and Lt. DeLaney also stated in their deposition testimony correctional staff were to conduct 30-minute rounds in their assigned area.  "A minimal of every 30 minutes, they should be out and about patrolling. (Ward 34-15)  "So they do rounds every thirty minutes, not to exceed forty." (DeLaney 45-10)  Officer Georgopoulos in her deposition stated the correctional officers conduct safety and security rounds "a few times during the tour" (a shift which is eight hours) based on my experience as a shift supervisor and administrator a few times was not sufficient and this is also corroborated by Captain Ward and Lt. DeLaney.  The proper amount of times security and safety checks should have been conducted would have been 16.  Based on the testimony of Officer Georgopoulos the correctional staff only completed the safety and security checks a few times which based on my experience falls short of the 16 checks as described by her supervisors.  Given the problems in 11-South with drug use and other illicit behavior as described by Lt. DeLaney and Captain Ward. A trained and reasonable correctional officer should have taken additional steps to observe the inmates which would include all required safety and security checks and not a few times in an eight-hour period.  Additionally, Lt. DeLaney knowing what he talked about in his sworn deposition should have ensured the officers assigned to his shift made the required safety and security rounds in a unit known for illicit behavior.  Given the information about the use of K-2 in 11-South on the night of Grant's death I am of the opinion based on my review of the case material K-2 also played a role in his death.

**Present Opinions:**

Based upon my knowledge, education, training and years of experience working as a correctional professional, it is my opinion that the Defendants in this case had a duty to protect Roberto Grant from harm during the time he was incarcerated at the MCC. Grant was found on his assigned bunk unresponsive. He had urinated on himself and his upper torso was wet. Based on my review of the case material there are rumors as to what happened to Roberto Grant and no definitive answers by either the FBOP, the FBI or the Medical Examiner's Office as to the cause of death. The Office of the Chief Medical Examiner issued a final diagnoses which lists the Cause of Death as UNDETERMINED and the Manner of Death UNDETERMINED. The FBI issued a memorandum stating the case of Roberto Grant was closed on 01/15/2020. The writer stated all leads have been exhausted and the USAO declined prosecution.

As a trained and experienced investigator and administrator in the field of corrections I to can only speculate what happened to Grant on 05/18/2015. Based on the rumors and the evidence from the autopsy report it appears he was choked during possible horse play with other inmates. I cannot say with 100% certainty what took place in 11-South on the night of Grant's death but I can say he was entrusted by the Court system to be safely housed at the MCC by the Federal Bureau of Prisons and he died while in their custody. Additionally, the failure of the assigned unit officers Kearins and Georgopoulos to conduct timely and required security checks of 11-South was a violation of the standards and practices at the MCC. Security checks in a correctional facility is an important duty. When an officers presence is known to the inmate population and they are aware the officer is coming into the area at irregular times it interferes with inmate illegal activity and helps to curb that activity creating a more safe and secure environment for both the staff and inmates.

Attachment B of this report identifies the information I reviewed in this case in order to form my opinions in this case. Based on my review of the case material I have been provided as of this date I am of the opinion the investigators in this case failed to solve the case and identify the exact cause of death, the manner in which Grant died and if it was foul play as a result of a chokehold placed on Grant by another inmate during the prohibited act of horse play in a Federal Correctional Institution.

**Dated this 24th day of November 2020**

*R. Tim Pravetto* (signature)

**Compensation**

Research, preparation and report writing:     $250.00 per hour

Deposition and Court Time:     $300.00 per hour

Deposition fee to be paid on the day of the deposition. A $1200.00 payment is required prior to the start of the deposition. In the event the fee for the deposition does not meet or exceed the $1200.00 amount, expert will refund the balance back to the requesting attorney at the conclusion of the deposition. Travel is billed at actual costs with mileage being at the current rate set by the IRS.

**Prior Cases in Which I Have Testified as an Expert Witness in a Deposition and/or at Trial**

**I have testified as an expert at trial within the proceeding four years in the following cases:**

- *United States v. Christopher Emory Cramer and Ricky Allen Fackrell.* In the United States Federal Court in the Eastern District of Texas Beaumont Division Case No. 1:16-CR-26.
- *Durell Sims v. Julie L. Jones, Secretary of the Florida Department of Corrections.* United States District Court for the Northern District of Florida Tallahassee Division. Case No. 4:16-cv-49-RH-CAS.
- *State of Florida v. Scott Edward Nelson.* Case No. 17-CF-015684-A-OR; Division 17.
- *Peter Bistrian v. Warden Troy Levi, Assistant Warden Blackman, Captain David C. Knox, J. McLaughlin, SIA, et.al. and the United States of America, Defendants.* Civil Action No. 2:08-CV-03010-CMR United States Federal District Court for the Eastern District of Pennsylvania.

**I have testified at deposition within the proceeding four years in the following cases:**

- *The Estate of Gerome Smith and Virginia Smith v Franklin County and Sheriff Stevie Thomas, et al.* The United States District Court for the Middle District of Georgia case no. 3:15-cv-00112-CAR.
- *Gustavo Lizarazo, Plaintiff v. Miami-Dade County; Timothy P. Ryan, in his official capacity as Director of the Miami-Dade Corrections and Rehabilitation Department; Conrad Greaves, Jr., in his individual capacity; Jeffry Montealegre, in his individual capacity; Calvin Howard, in his individual capacity; and Samuel Menard, in his individual capacity.* Case No. 16-20558-CIV-UU United States District Court Southern District of Florida
- *Brian Keith Deramus, deceased, and Kristie Dawn Deramus as Administrator of the Estate of Brian Keith Deramus v. City of Trussville.* Case No. CV-2016-903113 Circuit Court of Jefferson County, Alabama
- *Kent Richard Ellis vs. Corizon, INC., Dr. Young, N.P. Poulson, Ms. Rona Siegert, P.A. Takagi, Warden Yordy, N.P. Gelok and N.P. Shaffer.* Pending in the United States District Court for the District of Idaho. Case No. 1:15-cv-00304
- *Daniel Taylor vs. City of Chicago; Anthony Villardita #20849, Thomas Johnson #20820, Brian Killacky #20748, Terry O'Connor #20831, Rick Abreu #20796, Robert Delaney #20383, Sean Glinski #3122 and Michael Berti # 12881.* United States District Court Northern District of Illinois, Eastern Division. Case No. 1:14-cv-00737

8

- *Regina Shields Individually and as the Personal Representative of the Estate of Samuel Shields v. Prince George's County, Maryland, et. al*. Case No. 8:15-cv-01736-GJH pending in The United States District Court for the District of Maryland Greenbelt Civil Division
- *K. Carol Velasco-Rodas, in her Personal Capacity, and Laura Bluehorse-Swift, as Personal Representative of the Estate of Morgan P. Bluehorse vs. State of Washington, Department of Corrections; et al*.  Superior Court of the State of Washington in and for the County of Spokane.  Case No. 17-2-02543-1
- *Estate of Erick de Anda, by and through successor in interest Enrique de Anda Garcia; Enrique De Anda Garcia , individually vs. Raymond Herr, Taylor Fithian, Kip Hallman, Marianne Rowe, Elizabeth Falcon, Cindy Watson, Yvonne Maxfield, Jodel Jencks, California Forensic Medical Group, INC., Steve Bernal, John Mihu, James Bass, David Cooper, David Ramon, Monterey County, Monterey County Sheriff's Office, Does 1-10*. United States District Court for the Northern District of California Case No. Case No. 5:17-cv-05320-SVK
- *Jonathan Scott v County of Marion, South Carolina, A Political Subdivision of the State of South Carolina, Marion County Detention Center, Marion County Sheriff's Office, Former Sheriff Mark W. Richardson, Frank Anthony Gibbons and Southern Health Partners, INC*.  United States Federal Court District of South Carolina Florence Division.  Civil Action No. 1:18-CV-0047-RMG-SVH.
- *State of Florida v. Scott Edward Nelson*.  Case No. 17-CF-015684-A-OR; Division 17.
- Warren R. Harris v. Muriel E. Bowser, Tanya A. Royster, Mark J. Chastang and Quincy L. Booth.  Case No. 1:18-cv-00768-CKK pending in the United States District Court for the District of Columbia.
- Ameka Riddick, Administrator of the Estate of Pamela Renee Riddick, The Decedent, deceased v. William Watson, Individually and as Sheriff for the City of Portsmouth, et al.  United Sates District Court for the Eastern District of Virginia Norfolk Division.  Case No. 2:19-CV-00363.
- Ruben Castillo, Plaintiff v C.O. Jeremiah Vance, The West Virginia Regional Jail Authority and The West Virginia Division of Corrections.  Pending in The Circuit Court of Kanawha County, West Virginia.  Civil Action No. 16-C-187

**Exhibit A**

# ROY T. GRAVETTE (TIM)

126 Playfair Drive, Lafayette, Louisiana 70503 | 361-742-2500 | tim@gravetteconsulting.com

## EDUCATION

Federal Law Enforcement Training Center
Glynco, Georgia

- Introduction to Correctional Techniques (112 hours) — 1990
- Firearms/Self Defense (32 hours) — 1990
- Spanish Immersion for Law Enforcement Officers (141 hours) — 1992
- Training for Trainers for Side Handle Baton Instructors (26 hours) — 1994

Federal Law Enforcement Training Center
Artesia, New Mexico
Prisoner Transportation and Bus Transportation Training (80 hours) — 1993

Federal Bureau of Prisons Management Training Center
Aurora, Colorado

- New Lieutenant Training (76 hours) — 1995
- Advanced Lieutenant Training (72 hours) — 1995
- Special Investigative Supervisor Training (64 hours) — 1997
- New Captain Training (40 hours) — 1998
- CORE Skills Training (40 hours) — 1998
- Discipline Hearing Officer Training (52 hours) — 1998
- New Associate Warden Training (36 hours) — 2001
- Public Speaking and Media Relations (36 hours) — 2002
- National Incident Management Training (36 hours) — 2007

Miami-Dade Community College
Miami, Florida
Arson and Crime Scene Photography/Documenting Domestic Violence — 1995

National Crisis Prevention Institute
Milwaukee, Wisconsin
Instructor Certification — 1996

Federal Bureau of Prisons Employee Development Center
Washington, D.C.
Leadership Forum (40 hours) — 1997

National Institute of Corrections
Longmont, Colorado
Correctional Leadership Development — 2003

Management Development Center
Denver, Colorado
Strategic Leadership: Leading Culture Change and Building Performance Based Organizations
    2005


Offices of the United States Attorneys
The National Advocacy Center
Columbia, South Carolina
Prison Rape Elimination Act Certification Training     2013


De-Escalation – What Does This Mean?
Use of Force Policy Development and Training Standards
Webinar Daigle Law Group Eric P. Daigle     2018

OTHER TRAINING

- Safety Cross Development Course     1991
- Annual Correctional Refresher Training     1991-2010
- Correctional Services Cross Development Course     1992
- Computer Security     1992
- Hostage Survival Skills     1993
- Stun Munitions     1993
- Case Management     1998
- Financial Management     1999
- Religious Services Cross Development     2000
- Suicide Assessment and Management     2001
- Employee Services Cross Development Course     2002
- Psychology Services Cross Development Course     2002
- Human Resource Cross Development Course     2002
- Labor Management     2002
- FEMA Emergency Management Training     2007
- Prison Rape Elimination Act Auditor Training     2014

AWARDS
Norman A. Carlson Award     2000
Supervisor of the Year     2000
Excellence in Operational and Program Review     2000

Specialized Experience

Disturbance Control Squad Member
Disturbance Control Squad Leader
Special Operations Response Team Member
Special Operations Response Team Leader
Special Operations Response Team Commander

## TEACHING EXPERIENCE
Federal Bureau of Prisons

| | |
|---|---|
| Instructor General Classes | 1993-2009 |

Instructor for the following classes during annual training sessions: terrorism both domestic and foreign, first responder, key control, security procedures and report writing.

| | |
|---|---|
| Instructor PR-24 Side Handle Baton | 1994-1995 |

Conducted training classes and certified correctional staff in the proper use of a side handle baton and use of force techniques.

| | |
|---|---|
| Instructor Nonviolent Crisis Intervention | 1995-1996 |

Conducted training for staff in the standards for crisis prevention and intervention training. This training provided staff with the skills to safely and effectively respond to anxious, hostile, or violent behavior while balancing the responsibilities of care.

| | |
|---|---|
| Instructor Use of Deadly Force | 1998-2001 |

Conducted training for all institution staff in the use of deadly force.

| | |
|---|---|
| Instructor Ethics | 2002-2009 |

Conducted training for all staff during annual training sessions in policies related to ethical behavior both in the workplace and outside activities.

## RELATED EXPERIENCE

Litigation Consultant

| | |
|---|---|
| Gravette Consulting LLC | 2010 - Present |

As a Litigation Consultant, I provide litigation support and expert witness testimony. I have the responsibility to review and analyze case materials to include written reports, video footage and if available recorded phone conversations. I assist the attorney client with deposition and trial preparation focusing on discovery and evidence. A written report is prepared with opinions I have formulated from research and materials provided for each case. Inmate standards of care and conditions of confinement are a central focus point of my work and preparation.

I have been involved in cases on the Federal, State, Parish and County levels. My years of experience as a correctional professional has led to cases ranging from homicides, suicides, assault and death in custody. I have prepared Federal Rule 26 reports and provided deposition testimony. I have provided expert testimony in Federal Court and have been qualified in the following areas: prison culture, Bureau of Prisons policy, prison homicide and investigations, prison staffing and policy, inmate behavior and comparative disciplinary records. Attention to the details of each case and interpretation of policy is utilized as the basis for my opinions.

Subject Matter Expert

Creative Corrections                                                                  June 2012 - September 2014

I was employed as a Subject Matter Expert in the field of corrections for Creative Corrections in Beaumont, Texas.  I worked for them conducting Office of Detention and Oversight (ODO) audits for the United States Immigration and Customs Enforcement Office of Professional Responsibility.  I was involved in four to five audits per year during my tenure with Creative Corrections.  I would go with a team of other subject matter experts and review the facilities overall operation and physical plant layout.  The audits were completed utilizing Performance Based National Detention Standards.  Of the areas I have been assigned during the audits I have reviewed and documented the facilities compliance in Use of Force and Restraints, Special Management Units, Food Service Operations, Classification System, Staff-Detainee Communication and Sexual Abuse and Assault Prevention and Intervention.

Contract Special Investigator

KeyPoint Government Solutions                                                          2011 – 2014

As a contract special investigator, I conducted background investigations in support of national security, focusing on casework for the Office of Personnel Management (OPM).  My primary duties included conducting background investigations for determining employment suitability of persons who require access to sensitive or classified U.S. Government information.  I conducted fact-to-face interviews with the subjects and his/her neighbors, employers, friends, and family.  I also performed record searches at law enforcement agencies, courthouses, educational institutions, financial institutions, and medical/mental health facilities.  Following the interviews and record searches I provided written reports to the Office of Personnel Management which was used for official purposes.

Prison Rape Elimination Act Auditor                                                     2015-2018

I am a certified Prison Rape Elimination Act (PREA) Auditor for Adult Facilities by the United States Department of Justice.   I completed a one-week intensive certification class at the National Advocacy Center in Columbia, South Carolina.  I am available to assist with the certification process and complete the required audit process for Adult Facilities as directed by the PREA Resource Center utilizing the standards and guidelines required to meet the standards and laws of the Department of Justice.

Motion Picture Industry Consultant                                                      2015

I was involved in the production of the motion picture Trumbo, which was filmed in New Orleans, Louisiana.  The film was directed by Jay Roach and some of the actors included Brian Cranston, John Goodman, Helen Mirren and Diane Lane.  The film was nominated for an Oscar and other prestigious awards.  I assisted the production personnel prior to my involvement in the filming with costumes and prison dialog.  I also wrote one of the scenes for the movie which was used during the searching of Trumbo when he was processed into the prison.  I was on location during the filming to assist with prison related scenes and helping with the actions of the extras involved in the prison scenes.

Federal Bureau of Prisons

1990 – 2010

During my career with the Federal Bureau of Prisons, my assignments have been as a correctional officer, GS-9 lieutenant, GS-11 lieutenant, GS-12 captain, GS-13 captain and associate warden. My assignments have been at eight different locations and one location twice. The assignments were at varying security levels which included administrative facilities, four medium security facilities, federal detention centers, and two high security facilities in locations across the southern United States. My primary duties dealt with the safety, security and orderly running of the institutions which included the oversight of internal audits and preparation for program review visits, American Correctional Association visits and institution character profile visits. My association with the American Correctional Association has been on six different occasions. I have participated in program review visits as an auditor and accompanied my regional director on two occasions on institution character profile visits. I have been involved in numerous incidents of inmate violent behavior and emergency situations over the span of my career. I have been the on-scene commander for inmate disturbances and riots, responded to medical emergencies and acts of violence ranging from assaults to homicides. I have been a member of after-action review teams and participated in mortality reviews.

Correctional officer at a medium security institution from 1990-1993.

GS-9 and GS-11 lieutenant at two administrative facilities from 1993-1995.

GS-11 lieutenant at a medium security facility from 1995-1997.

GS-12 captain at an administrative facility from 1997-1999.

GS-13 captain at a high security institution from 1999-2001.

I was assigned as an associate warden at three facilities from 2001-2010. During these assignments, I was responsible for several areas of the institutions and the program and operational reviews for those departments. I completed the yearly reviews of our local policy and continued to monitor changes in national policy as it affected the changes we needed to make to our local policy. I was tasked with being the re-accreditation manager for our American Correctional Association visits at two of the assignments. I utilized my experience and knowledge of national and local policy as well as the mandatory standards for correctional institutions as set forth by the American Correctional Association to prepare our facilities for the visits. Along with a team of staff I made numerous inspections and walk thru visits of all the areas of the institution. I noted areas of concern and made on the spot corrections. I was selected to participate in an institution character profile review at another institution by my regional director. This process is similar to a program review, which involves touring the entire facility and noting issues which are to be included in the final report. I have also been utilized as an investigator over the course of my career. I have been involved in investigations of various types which include staff investigations of misconduct and criminal investigations ranging from assault to homicides. I have attended training in Denver, Colorado for investigation and crime scene management. I have worked with other agencies to include the Federal Bureau of Investigations, the United States Marshals Service and the Office of Inspector General in criminal investigations of both staff and inmates. I also conducted investigations for the Federal Bureau of Prisons working closely with the Office of Internal Affairs.

SPEAKING ENGAGEMENTS

      I have made public speaking appearances which included the 16th annual Criminal Justice Act Panel Training and Seminar hosted by the Federal Public Defenders Office in Lafayette, Louisiana and the Lafayette Bar Association CLE program.  My topic was The Prison Investigative Process and Your Client.  The presentation included an insight into prison culture and inmate behavior, the investigative process in a correctional setting, how it is conducted, documented, and reviewed as well as inmate classification issues which include protective custody, high profile inmates and the influence of prison gangs on the day-to-day operation of a prison.

MEMBERSHIPS
    American Correctional Association
    Louisiana Sheriffs' Honorary Membership Program
    Louisiana Correctional Association

**Exhibit B**
**Materials Reviewed**

1. Records FBOP 2015-7997 123 pages
2. Records FBOP (US_0001-0305)
3. Daily Staff Roster (US_0306-0311)
4. DOJ CD MCC New York Investigative File (US_0312-0425)
5. Telephone Logs (US_0426)
6. Sentry Print-out and Phone Records (US_0427-0430)
7. Email Copies (US_0451-03464)
8. Video Footage (US_00446-00447-00448-00449-00450)
9. FBI 302's (US_03470_03490)
10. Deposition Patrick Delaney dated 07/07/2020
11. Criminal Referral (US_0304-0305)
12. FBOP Form 583 (US_0390-0392)
13. TRUINTEL Log Entries (US_03419-03434)
14. Inmate Investigative Report (US_03435-03437)
15. Medical Assessments (US_03491-03513)
16. MCC Incident Summaries (US_03514-03518)
17. TRUINTEL Urinalysis Details (US_03538-03580)
18. Deposition Anthony Pedone dated 07/30/2020
19. Deposition Crecita Williams dated 02/25/2020
20. Deposition Nicole Morrison dated 02/28/2020
21. Deposition America Pina dated 09/03/2020
22. FBI 302's (US_03684-03688, 03690, 036892-99)
23. Deposition Dionysia Georgopoulos dated 10/28/2020
24. Expert Report Zhongyue Hua, MD-PhD dated 03/11/2020
25. FBI Case Closure Memorandum US_03581
26. Medical Examiner Final Diagnoses
27. Deposition Michael Ward dated 07/28/2020