# EXHIBIT M

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------X
   NICOLE MORRISON AS ADMINISTRATOR FOR THE

4  ESTATE OF ROBERTO GRANT AND AS MOTHER AND
   LEGAL GUARDIAN FOR THE PROPERTY OF SG AND

5  AG, DECEDENTS MINOR CHILDREN,

6                           PLAINTIFF,

7

        -against-        Case No.:

8                        17Civ.6779(WHP)

9

   UNITED STATES OF AMERICA, FEDERAL BUREAU OF

10 PRISONS, EXECUTIVE ASSISTANT LEE PLOURDE,
   CORRECTION OFFICER KERNS and JOHN AND JANE

11 DOE(S) AGENTS, SERVANTS AND EMPLOYEES OF
   THE DEFENDANTS,

12

                          DEFENDANTS.

13 -------------------------------------------X

14             DATE: July 28, 2020

15             TIME: 10:17 A.M.

16

17         VIDEOCONFERENCE DEPOSITION of a

18 non-party witness, MICHAEL CRAIG WARD,

19 taken by the Plaintiff, pursuant to a Court

20 Order and to the Federal Rules of Civil

21 Procedure, held at the U.S. Attorney's

22 Office, 86 Chambers Street, 3rd Floor, New

23 York, New York 10007-2632 before MELISSA

24 HARBORD, a Notary Public of the State of

25 New York.

1

2   A P P E A R A N C E S:

3

4   LAW OFFICE OF ANDREW C. LAUFER, PLLC
        Attorneys for the Plaintiff
5       264 West 40th Street, Suite 604
        New York, New York 10018-1512
6       BY: ANDREW C. LAUFER, ESQ.

7

8   UNITED STATES ATTORNEY'S OFFICE
    NEW YORK SOUTHERN DISTRICT
9       Attorneys for the Defendants
        86 Chambers Street, 3rd Floor
10      New York, New York 10007-2632
        BY: LUCAS ISSACHAROFF, ESQ.

11

12

13                  *          *          *

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *     *     *     *

25

Page 4

```
 1                    M.C. WARD
 2  M I C H A E L    C R A I G    W A R D, called
 3  as a witness, having been first duly sworn
 4  by a Notary Public of the State of New
 5  York, was examined and testified as
 6  follows:
 7  EXAMINATION BY
 8  MR. LAUFER:
 9        Q.    Please state your name for the
10  record.
11        A.    Michael Craig Ward.
12        Q.    What is your address?
13        A.    86 Chambers Street, 3rd Floor,
14  New York, New York 10007-2632.
15        Q.    Good morning, Captain Ward.
16        A.    Good morning, sir.
17        Q.    My name is Andrew Laufer.  I'm
18  an attorney.  I represent the Estate of
19  Roberto Grant in a lawsuit against the
20  United States of America.  I'll be asking
21  you some questions regarding that.
22              Please wait for me to ask my
23  question first before you begin your
24  response, as the court reporter can't take
25  us down at the same time.
```

```
                                              Page 5
1                        M.C. WARD
2                  Please know that all your
3     responses to my questions should be in
4     verbal form.  No nodding or shaking of the
5     head, as the court reporter can't take down
6     gestures.
7                  Any time you need clarification
8     of anything I'm asking, you're more than
9     welcome to let me know that and I'll do my
10    best to clarify things for you.
11                 If you want to take a break at
12    any time, you have to let us know.  But not
13    while a question is pending.  You must
14    answer the question first before we take a
15    break.
16                 Do you have any questions
17    before we begin?
18         A.    No, sir.
19         Q.    In preparation for this
20    deposition, did you review any documents?
21         A.    Yes, sir.
22         Q.    Could you tell me what you
23    reviewed?
24         A.    Just one document.  I think it
25    was a 583, which is a report of incident
```

```
                                    Page 6
 1                    M.C. WARD
 2  document.   That's it.
 3        Q.     Form 583?
 4        A.     That's correct, sir.
 5        Q.     Are you currently employed?
 6        A.     Yes, sir.
 7        Q.     What are you employed as right
 8  now?
 9        A.     I'm a security specialist at
10  the Poster House Museum in Downtown
11  Manhattan.
12        Q.     When were you hired to do that?
13        A.     June of 2019.
14        Q.     So I assume you're no longer
15  with the Federal Bureau of Prisons; is that
16  correct?
17        A.     That's correct, sir.
18        Q.     When did you retire from BOP?
19        A.     November 2015, sir.
20        Q.     How long were you with Federal
21  BOP before that?
22        A.     20 years, sir.  And I think a
23  month two.  Take a month or two.
24        Q.     That was your 20-year stint?
25        A.     That's correct, sir.
```

1                    M.C. WARD

2       Q.    And at that juncture you are

3    eligible for retirement benefits?

4       A.    That's correct, sir.

5       Q.    And you retired with whatever

6    benefits you were supposed to retire with?

7       A.    Yes, sir.  That's correct.

8       Q.    Were you asked to retire?

9       A.    Not at all, sir.

10      Q.    Very good.

11            Would it be fair it say that

12   you initially began your employment with

13   BOP back in 1995?

14      A.    It was back in 1994, sir.

15            I was right out of the

16   military.

17      Q.    What branch did you serve in?

18      A.    I was in the Army, sir.

19      Q.    Thank you for your service.

20      A.    Thank you, sir.

21      Q.    Were you honorably discharged?

22      A.    Yes, sir.

23      Q.    Did you have a rank?

24      A.    Yes.  Sergeant, E5.

25      Q.    What year did you graduate high

```
                                          Page 8
 1                    M.C. WARD
 2   school?
 3        A.     1983.
 4        Q.     What year did you go into the
 5   Army?
 6        A.     1982.
 7        Q.     So you started in the military
 8   basically since the time that you graduated
 9   high school until 1994?
10        A.     Yes, sir.  That's correct.
11        Q.     After 1984, you were honorably
12   discharged and you began your work with
13   BOP; is that correct?
14        A.     That's correct, sir.
15        Q.     I know it's a long time.
16               Do you recall when you entered
17   the academy for BOP?
18        A.     I would say November of '94.
19   I'm not really sure.  November, December
20   '94, maybe.  I'm not sure.
21        Q.     That's fine.
22               Did you initially work for BOP,
23   then, after the academy?  Or did you just
24   go into the academy straight off?
25        A.     No.  I worked probably a month
```

```
                          M.C. WARD
 1
 2   or two, and then I went into the academy.
 3         Q.    To make sure that the position
 4   was appropriate for you?
 5         A.    I was doing that in the
 6   military, so.
 7         Q.    Oh.  All right.  That was your
 8   job in the military.
 9               What were you?  An MP?
10         A.    Well, I initially was airborne
11   infantry, and then became military
12   intelligence.  And then my last three years
13   I was corrections NCO at the U.S.
14   Disciplinary Barracks in Leavenworth,
15   Kansas.
16         Q.    Did you successfully complete
17   the academy?
18         A.    Yes, sir.
19         Q.    Do you recall what your first
20   assignment was out of the academy?
21         A.    As far as location or --
22         Q.    Location.
23         A.    Yes.  Otisville, New York.  The
24   Federal Correctional Institution in
25   Otisville, New York.
```

```
 1                    M.C. WARD
 2        Q.    That's a minimum security
 3   federal prison; is that correct?
 4        A.    Otisville at the time was
 5   administrative.  We held all different --
 6        Q.    What was your first title
 7   coming out of the academy?  What were you?
 8        A.    Correction officer, sir.
 9        Q.    Was it probationary correction
10   officer?
11        A.    Yes, sir.
12        Q.    How long were you a
13   probationary correction officer?
14        A.    One year, sir.
15        Q.    Did you successfully complete
16   that stint as a CO, probationary?
17        A.    I was actually the rookie of
18   the year, sir.  Yes.
19        Q.    Congratulations.  That's great.
20              So how long were you at
21   Otisville?
22        A.    From 1994 until 1999, sir.  I'm
23   almost sure.
24        Q.    During that time period, did
25   your duties and responsibilities change in
```

```
 1                    M.C. WARD
 2   any way?
 3        A.    Yes, sir.
 4        Q.    Can you describe for me your
 5   responsibilities as a probationary CO, and
 6   if they changed, and how they changed as
 7   you progressed from 1994 through 1999?
 8        A.    Again, my first year was a
 9   probationary correction officer.  Basic
10   duties were the management of inmate
11   housing units.  You were pretty much all
12   the different posts assignments within a
13   federal prison that first year just to get
14   experience working different assignments.
15   That was my first year.
16              Second year, you get assigned
17   an actual unit to work in.  That's based
18   upon your seniority or just knowledge of
19   different work areas.
20              From there, I just progressed
21   to the point where I was actually temporary
22   promoted as a lieutenant my last year there
23   for six months.  My last six months I was
24   temporary promoted as a lieutenant, which
25   was the position of great responsibility.
```

```
                                    Page 12

 1                    M.C. WARD

 2        Q.     What type of lieutenant were

 3    you?  There are different types, I believe?

 4        A.     Yes.  You have an activities

 5    lieutenant and you have an operations

 6    lieutenant.

 7              The activities lieutenant is

 8    the GS9 lieutenant, which is the lower

 9    echelon position of lieutenants.  You have

10    a GS9 lieutenant and a GS11 lieutenant.

11    The GS9 lieutenant is your activities

12    license.  And the GS11 lieutenant, which

13    will be your operations lieutenant.

14              So I was an activities

15    lieutenant as GS9.  And my duties included

16    making rounds throughout the housing units,

17    paperwork, disciplinary hearings and things

18    like that, as far as dealing with inmates

19    on a daily basis and staff.

20        Q.     During that time period, from

21    1994 through 1999, were you ever part of an

22    investigation involving an inmate death?

23        A.     Not directly, sir.  No.

24    Indirectly, yes.

25        Q.     Briefly describe for me your
```

```
 1                    M.C. WARD
 2   involvement or experience in dealing with
 3   an inmate death during that time period.
 4        A.    We had an inmate who committed
 5   suicide in the housing unit, okay.  And
 6   although it wasn't my unit, we were all
 7   made aware of the situation that took
 8   place.  That's the extent that I was -- I
 9   wasn't in a supervisory position at that
10   time.  I was just an officer when that took
11   place.  So I was very minimal.
12        Q.    Do you know how the inmate went
13   about killing himself?
14        A.    He hung himself in -- I think
15   it was a closet or a shower stall.
16   Something like that.
17        Q.    Did you observe him in any way
18   after he committed suicide?
19        A.    No, sir.
20        Q.    After 1999, what was your next
21   assignment with the BOP?
22        A.    Okay.  I was transferred to the
23   lower security correctional institution in
24   Butner, North Carolina as a full lieutenant
25   as a GS9 lieutenant.  Not a temporary
```

```
 1                     M.C. WARD
 2   promotion, but a full promotion, to GS9
 3   lieutenant at that time.
 4        Q.    How long were you at that
 5   location?
 6        A.    Three years, if I'm not
 7   mistaken, sir.
 8              I made senior lieutenant, which
 9   would have been operational lieutenant
10   during that tenure there, my tenure there.
11        Q.    During your stint at that
12   particular institution, were you involved
13   in any kind of investigation pertaining to
14   an inmate death?
15        A.    No, sir.
16        Q.    After 2002, what was your next
17   assignment?
18        A.    My next assignment was deputy
19   captain at the Metropolitan Detention
20   Center in Brooklyn, New York.
21        Q.    And that was about 2002?
22        A.    I think it was maybe 2003 --
23   2002, 2003 time frame.  I'm not really
24   sure.  It's been some time.
25        Q.    That's fine.
```

```
 1                    M.C. WARD
 2              Could you describe for me your
 3    duties and responsibilities as a deputy
 4    captain?
 5         A.    As deputy captain at MDC
 6    Brooklyn, I supervised 20 lieutenants and
 7    over 400 correction officers were under my
 8    charge.
 9              My job entailed assignments --
10    lieutenants assignments, training,
11    briefings of all sorts.  And just a daily
12    operation -- management and operation of a
13    federal prison.
14         Q.    Okay.
15         A.    And assisting the captain.
16    Excuse me.
17         Q.    Now, how long were you in this
18    position at MDC?
19         A.    Two years, sir.
20         Q.    During this time period, were
21    you involved in any type of investigation
22    involving an inmate death?
23         A.    No, sir.
24         Q.    Now, either as a CO lieutenant,
25    either type of lieutenant or deputy
```

```
 1                    M.C. WARD
 2   captain, did you receive any training
 3   involving investigating a death of an
 4   inmate?
 5        A.    Direct training involving a
 6   death of an inmate, sir, no.  But with our
 7   training, we're taught procedural things to
 8   do in the event of a death of an inmate.
 9   There are certain procedures that have to
10   be followed that you are -- you know,
11   you're trained, you know, to do, to carry
12   out, in the event that an inmate has died,
13   you know, during your time there.  But you
14   mean like a class on what to do?  No.
15        Q.    Well, could you describe for me
16   what kind of training you received?
17        A.    As far as procedurals, depends
18   upon what type of death, you know, took
19   place.  Whether it be, you know, a
20   homicide, suicide, or something like that.
21   You know, we're taught proper forms you
22   have to fill out.  583, which is a report
23   of an incident.  The proper notifications,
24   as far as notifying, you know, the chain of
25   command, in that type of situation.
```

Page 17

```
 1                    M.C. WARD
 2  Medical staff.  You know, medical
 3  notifications that need to be made.  As
 4  well as any type of training, like I said,
 5  in CPR, things like that, depends upon, you
 6  know, when you go on the scene of a
 7  situation, you know, how to react to that.
 8  And then the notifications to the FBI.  You
 9  know, things along that line there.
10      Q.   Up to this point have you ever
11  been involved in any way, directly
12  involved, either as a witness or
13  investigating the death of an inmate?
14      A.   No, sir.
15      Q.   So how long did you stay at MDC
16  as a deputy captain until?
17      A.   I think until 2005, sir.
18      Q.   After 2005, or during 2005,
19  what was your next assignment?
20      A.   The next assignment was captain
21  at the Federal Correctional Institution in
22  Fairton, New Jersey.
23      Q.   Was that in 2005 that you were
24  assigned there?
25      A.   Yes, sir.  I'm almost sure.
```

```
                                           Page 18
 1                    M.C. WARD
 2        Q.    Could you describe for we what
 3   your duties and responsibilities were as a
 4   captain at FCI?
 5        A.    At the FCI, I was a
 6   correctional supervisor, supervising
 7   approximately 12 lieutenants, maybe 200
 8   officers.  And again, my role was the
 9   overall supervisor to the correctional
10   working staff at that facility.
11        Q.    And the warden is the only
12   person that was above you, is that correct,
13   at that juncture?
14        A.    No, sir.
15              You have an associate warden,
16   and then a warden.
17        Q.    I see.  That's right.
18              How long did your stint at FCI
19   last until?
20        A.    Two years, sir.  I think to
21   2007.
22        Q.    During that time period, were
23   you involved either directly or indirectly
24   in any investigation involving the death of
25   an inmate?
```

```
                                        Page 19
 1                   M.C. WARD
 2        A.     Involving the death of an
 3   inmate?  No, sir.  But again, numerous
 4   suicide attempts and things like that, I
 5   was involved in.  But not an inmate death,
 6   sir.
 7        Q.     In 2007, what was your next
 8   assignment?
 9        A.     My next assignment was to the
10   northeast regional office.
11               I was the regional special
12   investigations supervisor.
13        Q.     I'm sorry.  What were you
14   again?  Repeat that one more time.
15        A.     Okay.  I was assigned to the
16   northeast regional office.
17        Q.     Okay.
18        A.     Which is the regional office
19   for 18 federal prisons within the northeast
20   regional.
21               I was the regional special
22   investigations supervisor.  So I oversaw 18
23   special investigative supervisors at 18
24   federal prisons within that region.
25        Q.     And that's in Philadelphia?
```

1                    M.C. WARD

2      A.    That's correct, sir.  That's in

3   Philadelphia.

4      Q.    How long were you in that

5   position for?

6      A.    I think four years, sir.

7      Q.    So approximately 2011?  Would

8   that sound about right?

9      A.    Yes, sir.

10      Q.    During that time period, were

11   you involved in any kind of investigatory

12   capacity of an inmate death in those --

13   it's a lot of prisons, I understand.  But

14   any investigation involving an inmate

15   death?

16      A.    The answer to that question is

17   yes.  But at the regional level, where I

18   would receive --

19      Q.    I'm sorry, captain.  Could you

20   just repeat that again?

21      A.    I was -- my answer was yes.  At

22   the general level I would have received

23   reports from those institutional special

24   investigative supervisors, special

25   investigative agents, in reference to

```
 1              M.C. WARD
 2  inmate deaths at their institutions.  I
 3  would review paperwork.  And if there are
 4  any video footage, I would be privy to that
 5  evidence, and so forth.
 6       Q.    What would you do with this
 7  information that you would get?  Would you
 8  approve it?  Would you send it somewhere
 9  else?  What would you do with it?
10       A.    It would all be a part of the
11  investigative file.  Which if the FBI would
12  be called in to investigate, depends on
13  what type of death occurred.  My job would
14  be, as far as the regional level, reviewing
15  to make sure that, you know, all the I's
16  were dotted and T's were crossed and
17  everything was done procedurally correct in
18  dealing with that -- an inmate death.
19       Q.    So it would be more of an
20  administrative position, in that you were
21  making sure that everyone was doing their
22  job properly?
23       A.    That's correct, sir.
24       Q.    So it wasn't as if you were
25  directly involved in any investigation, per
```

1                    M.C. WARD

2    se?

3         A.    Well, I conduct and -- I would

4    conduct investigations if the wardens at

5    those facilities did not want

6    investigations run in-house.  They would

7    conduct the regional office and I would be

8    dispatched to those facilities to conduct

9    the investigations.  But I did not conduct

10   any investigations on inmate deaths during

11   that period.

12        Q.    What type of investigations did

13   you conduct?

14        A.    Staff misconduct.

15        Q.    Would any of that staff

16   misconduct investigations involve

17   misconduct of an investigation involving an

18   inmate death?

19        A.    No, sir.  Not to the best of my

20   knowledge.

21        Q.    That's fine.

22              So in 2011, what was your next

23   assignment?

24        A.    Next assignment, I was captain

25   of MCC New York.

```
 1                    M.C. WARD
 2       Q.    When were you assigned to be
 3  the captain of MCC New York?
 4       A.    I think it was March 2011, sir.
 5       Q.    And you stayed at that position
 6  until you retired in 2015?
 7       A.    That's correct, sir.  Yes, sir.
 8       Q.    Prior to the incident involving
 9  my client, were you involved in any
10  investigations of inmate deaths at MCC?
11       A.    No, sir.
12       Q.    Please describe for me what
13  your duties and responsibilities were as
14  assigned captain at MCC.
15       A.    Again, I was the chief
16  correctional supervisor.  I supervised 12
17  lieutenants, over 250 officers.  My job was
18  the daily operations and activities --
19  overseeing the daily operations and
20  activities and the orderly running of the
21  federal institution in Manhattan.  Oversaw
22  all training, again, in activities and
23  operations, basically.
24       Q.    Did any of your duties and
25  responsibilities involve investigation of
```

```
 1                    M.C. WARD
 2  staff misconduct, to the degree any
 3  existed?
 4       A.    I didn't conduct investigations
 5  of staff misconduct, but I was privy to all
 6  investigations involving staff misconduct.
 7       Q.    Were you privy to
 8  investigations involving staff misconduct
 9  and issues they may have involving
10  prisoners?
11       A.    Yes, sir.
12       Q.    Would any of that include
13  investigations of excessive force used
14  against prisoners by staff?
15       A.    Yes, sir.
16       Q.    Did any of your investigations
17  involve anyone by the name of an officer by
18  the name of Kerns?
19       A.    Officer Kerns?
20       Q.    Yes.
21       A.    No, sir.
22       Q.    Do you know who he is?
23       A.    Yes, sir.
24       Q.    What do you know about him?
25       A.    He was one of my correction
```

```
1                    M.C. WARD
2   officers when I was the captain there, sir.
3        Q.    Anything outstanding that you
4   remember about him?
5        A.    Nothing that was, you know --
6   again, as the captain, you remember the
7   ones that were in trouble more than you
8   remember the ones that did well.
9        Q.    Gotcha.
10            Let's talk about my client,
11   Roberto Grant.
12            Are you familiar with my
13   client?
14       A.    I do remember your client, sir.
15   Yes.
16       Q.    Prior to the incident involving
17   him, do you recall anything else about him?
18       A.    As far as personality-wise,
19   sir?
20       Q.    Yes.  Anything.
21       A.    Yeah.  Well, I remember Grant
22   because he was a very out -- not really
23   outspoken in a negative way, but just, you
24   know, he would -- when I go make rounds in
25   the unit, you know, he'd be the person that
```

```
 1                    M.C. WARD
 2   you could talk to in the unit if there was
 3   issue.  Something like that.  If you needed
 4   to find out information or something, you
 5   know, you could talk to him.  He was, you
 6   know, very approachable.
 7        Q.    Would he tell you about
 8   incidents involving other prisoners that
 9   may have occurred in his unit?
10        A.    Not to me, sir.  I think he
11   would have probably spoken with my special
12   investigative agent or one of the
13   supervisors.
14        Q.    Could you describe for me the
15   unit that Mr. Grant was assigned to at BOP?
16        A.    Oh, boy.
17              I remember it was an open bay
18   unit, okay.  Not -- well, the tiers that
19   they were on were -- there were some open
20   bay tiers inside that unit.  You also had
21   some tiers that had several beds within an
22   area in the unit.
23        Q.    Was that 11 South, do you
24   recall?
25        A.    Yes, sir.  Yes.  11 South.
```

Page 27

1                    M.C. WARD

2        Q.    Can you describe for me the

3   entire housing area of 11 South, what it

4   looks like, and where everything is kind of

5   located?

6        A.    It's been so long.

7        Q.    I hear you.

8        A.    Wow.

9              You walk into the unit, and you

10  had stairs that would go down into the

11  inmate living quarters, as well as stairs

12  that would go up to the other areas that

13  were inmate living quarters, also, as well.

14              It's been a while now.

15              And then you'd walk onto the

16  tiers themselves and we have maybe be bunk

17  beds in the units.  And inside that area,

18  you'd have the bathroom, you'd have the

19  shower area inside the unit -- inside the

20  living quarter area where the inmates were,

21  in those open bay areas.

22              Just to the best of my

23  recollection.  It has been a while.

24        Q.    No.  I hear you.

25              Now, you say tiers.  It's kind

```
                            M.C. WARD
 1
 2   of like there's an open area at the bottom,
 3   and then it kind of goes up with steps?
 4        A.    That's correct.  You'd have to
 5   go the stairs to get to the next level.
 6   Where they would also be other inmate
 7   living quarters.  I think four, if I'm not
 8   mistaken.
 9        Q.    And those living quarters would
10   be gated off from --
11        A.    That's correct, sir.
12        Q.    Within those tiers, was it an
13   open area, were there individual cells,
14   something else?
15        A.    No.  There were -- it's an open
16   area that had bunk beds.
17        Q.    And the showers were actually
18   within each tier?
19        A.    Yeah.  Each area had their own
20   showers, if I'm not mistaken.  No, no.
21   Wait up.  That's where I'm --  the
22   showers -- the showers were -- the
23   bathrooms were in the area where -- wow.
24   Excuse me.  I'm sorry.  Because it has been
25   a while.  I'm just trying to remember.
```

```
 1                    M.C. WARD
 2   Because we had so many different
 3   configurations.
 4        Q.     Take your time.  It's fine.
 5        A.     I think the showers either were
 6   in the area where -- like inmates could
 7   take showers at any time and utilize the
 8   bathroom.  They would have to access to
 9   that, even if we were locked down, I
10   assume.  But I think that the showers, as
11   well as the restroom areas were within
12   those areas -- those gated areas where they
13   spelt.
14        Q.     How many inmates would be in
15   each tier in these gated areas?  Do you
16   know how many would be assigned?
17        A.     I would say -- oh, my goodness.
18   Maybe 20.
19        Q.     Was there a specific time that
20   the inmates would be locked in for the
21   evening?
22        A.     Yes.  After the 9:00 count.
23   9:00 -- we would have the 9:00 count, then
24   we'd open it up.  And I think at 11:00,
25   then that's when we would shut it down at
```

Page 30

M.C. WARD

1
2  11:00, if I'm not mistaken.  It's been -- I
3  kind of put all that on the other side of
4  my brain.  But I think that we would shut
5  it down prior to the shift change.
6        Q.    Was it like lights out at that
7  point?
8        A.    No.  I think -- what happened
9  is the inmate orderlies would come out and
10  clean the units at that point.  And the
11  other inmates would be, you know -- if they
12  had units that had cells, they would be in
13  the cells.  If they didn't have cells, they
14  would just be outside on their bunks in the
15  open bay areas.  But it would be -- yeah,
16  it would be -- again, if you had single
17  cells, you could have your light on.  If
18  you're in the open bay areas, they had, you
19  know, access to the lights themselves.  So
20  they could have them on or off.  But the
21  common area lights would go down and so
22  forth after the cleaning was done -- when
23  the common area was done.
24        Q.    How many inmates in total were
25  in 11 South around, let's say, May of 2015?

```
                                        Page 31
 1                    M.C. WARD
 2         A.    I don't recall, sir.  But if I
 3    had to give a number, I would say, you
 4    know, 90-something inmates, maybe.
 5         Q.    During the evening hours, how
 6    many officers, according to the BOP, would
 7    be in charge of overseeing these inmates?
 8         A.    One, sir.
 9         Q.    Where would this officer's post
10    be?
11         A.    He would have an office.
12         Q.    Where?
13         A.    It would be -- when you walked
14    into the housing unit, it was just an area
15    that -- it was turned into like an
16    officer's station type office, you know,
17    right there in the middle common area.  Not
18    in the middle, but along the wall, as you
19    came into the unit, you could see -- the
20    officer, he could see to the left or to the
21    right.
22         Q.    From this office, would the
23    officer, BOP personnel, have a view of the
24    entire housing unit?
25         A.    Not of the entire housing unit.
```

```
 1                    M.C. WARD
 2  But he could still see movement on the
 3  tiers and things like that.
 4       Q.    So he would be able to look
 5  from that particular post into each housing
 6  unit?
 7       A.    To the tiers.  Yeah, he could
 8  probably see all the tiers.  Not the --
 9  like the downstairs tiers, maybe the
10  upstairs tiers, he could see, depending
11  upon where he was in his office.  I'm just
12  trying to get a better picture of how I
13  recall it looking.  Yeah, I think he could.
14  I think he could actually see at least two
15  tiers in front of him, the one on the left
16  and the one on the right from his officer's
17  station.
18       Q.    Were one of those tiers where
19  my client, Roberto Grant, was housed, do
20  you know?
21       A.    I'm not sure, sir.  I don't
22  recall.
23       Q.    That's fine.
24             Would the officer also patrol
25  during that time?
```

```
 1                    M.C. WARD
 2      A.     Yes, sir.  He's supposed to.
 3      Q.     Were there ever any instances
 4  that you can recall where an officer just
 5  stayed at this post and didn't patrol?
 6      A.     Yes, sir.
 7      Q.     And that was during your stint
 8  at MCC?
 9      A.     Yes, sir.
10      Q.     Do you know who the officer was
11  that was assigned the evening of my
12  client's incident?
13      A.     I don't recall, sir.
14      Q.     If I told you it was Officer
15  Kerns, would that refresh your
16  recollection?
17      A.     Yes, sir.
18      Q.     So could you describe for me
19  how, according to your rules, how Officer
20  Kerns on that evening was supposed to
21  patrol the unit?
22      A.     Again, different officers would
23  do different things.  But as far as
24  policies are concerned, officers were
25  supposed to just make continuous rounds
```

1                    M.C. WARD
2  throughout the housing unit.  And again,
3  they would have certain checks that they
4  would have to do going through the units.
5  Just to ensure, like I said, there were no
6  issues or incidents taking place.
7       Q.    How often would they have to
8  patrol?  It would just be constant?  They
9  would just keep patrolling the entire
10 night?
11      A.    You know what?  It depends on
12 the officer.  But you know, a minimal of
13 every 30 minutes that they're out and
14 about, you know, patrolling the units that
15 they were in.  A minimal of every 30
16 minutes, they should be out and about
17 patrolling.
18      Q.    So there's a period of time
19 when they're not patrolling?
20      A.    Yes.  They would be conducting
21 what are known as shake-downs, where
22 they're searching for contraband throughout
23 the unit, okay.  They're doing security
24 checks, ensuring that, you know, doors are
25 secured, you know, bars are not being

```
 1                   M.C. WARD
 2   tampered with.  Things like that.  You
 3   know, throughout that period of time, those
 4   were some of the things that the officers
 5   would do when they're making their rounds.
 6        Q.    Well, when they're making their
 7   rounds.  But there's also a period of time
 8   when they're not doing rounds, when they
 9   would just be at their posts; is that
10   correct?
11        A.    Correct.  Yes, sir.
12        Q.    And they have to make at least
13   one round every 30 minutes, correct?
14        A.    That's correct, sir.
15        Q.    So when they're not, how long
16   does it take to make a round?
17        A.    It all depends.  In the open
18   bay unit, it would be a little bit longer.
19   Because, again, they should go through
20   those units -- you have so many units in
21   the area -- just to make sure, you know,
22   everyone's okay.  You go down to the next
23   unit -- I mean the next tier, the next
24   tier.  It's a little bit different than
25   when you're in a secure unit, where you
```

```
                                        Page 36
 1                  M.C. WARD
 2   just, you know, make your rounds and put a
 3   flashlight through the door and keep going.
 4        Q.    During this time period of,
 5   let's say, 2015, May, April, June -- we'll
 6   go back to January.  Were there any issues
 7   in this particular housing unit involving
 8   synthetic marijuana, K2?
 9        A.    I don't recall that being
10   specific to that tier.  I know that whole
11   K2 thing, even for me as a captain, was
12   fairly new.  And we were still trying to
13   understand it, you know, what it was.
14   Because I was under the assumption that --
15   well, not just me, but -- you know, we
16   didn't know whether it was drugs or whether
17   it was -- you know, because they were
18   selling it at stores in the city at that
19   time.  So we really didn't know what we had
20   on our hands.
21        Q.    Do you know whether or not any
22   K2 was brought into MCC during that time
23   period?
24        A.    Yes.  There was K2 brought into
25   the institution during that time period.
```

                          M.C. WARD

1

2       Q.     During that time period, would

3   K2 be considered a contraband, something

4   that prisoners shouldn't possess?

5       A.     Yes, sir.  K2 was contraband,

6   yes.

7       Q.     And it was prevalent within the

8   prison at that time?  Would that be fair to

9   say?

10      A.     I wouldn't say prevalent.  But

11  it was there.

12      Q.     Would there be any kind of

13  disputes between prisoners over K2 for any

14  reason that you're aware of during that

15  time period?

16      A.     No.

17      Q.     Do you know if people were

18  dealing K2 during that time period?

19      A.     Yes.

20      Q.     Within the prison?

21      A.     Within the prison, sir, yes.

22  That's correct.

23      Q.     Do you know if my client,

24  Roberto Grant, was involved in any kind of

25  these allegations against him involving

Page 38

```
 1                      M.C. WARD
 2  dealing K2?
 3       A.    I will say this, sir.  That
 4  while I'm not 100 percent sure, I do recall
 5  not just basically K2, but that Grant was
 6  involved in some sort of contraband prior
 7  to that.
 8       Q.    Drugs?  Something else?
 9       A.    I think drugs, sir.
10       Q.    Do you know if he was dealing
11  or there were allegations that he was
12  dealing?
13       A.    I would say allegations of him
14  dealing, sir.
15       Q.    Did you institute or do you
16  know if anyone instituted an investigation
17  regarding that?
18       A.    It would not have been me.  It
19  would have been my special investigative
20  agent or my special investigative
21  supervisor, sir.
22       Q.    Fair enough.
23             During your time period over at
24  MCC, do you know whether or not any inmates
25  got into altercations over, you know,
```

Page 39

                        M.C. WARD

 1
 2   contraband or drugs that may have been
 3   being dealt at MCC?
 4         A.    Yes, sir.  Yes, sir.  There
 5   would be numerous incidents of altercations
 6   based on drugs as the contraband.
 7         Q.    Physical altercations?
 8         A.    Yes, sir.  Physical
 9   confrontations.
10         Q.    Do you know whether in this
11   particular housing area that would apply as
12   well, there would be instances of --
13         A.    I don't know of any specific
14   incident.  But again, you know, we're
15   talking federal prison, open bay unit.
16   Again, yes, I would have assumed during my
17   period of time there that that would have
18   happened.  No doubt.
19         Q.    Are open bay units more prone
20   to having incidents between prisoners, as
21   opposed to ones that just have cells?
22         A.    Yes, sir.
23         Q.    Because there's more
24   interaction between the prisoners; is that
25   correct?

```
 1                    M.C. WARD
 2        A.    Yes, sir.
 3        Q.    Did you feel, during this time
 4   period, that you would need some more
 5   security oversight of COs in these types of
 6   units that had open bays?
 7        A.    No, sir.  I didn't feel that
 8   way.
 9        Q.    You felt that, it was the
10   evening, it was appropriate just to have
11   one CO patrolling the unit that housed over
12   90 inmates?
13        A.    Yes, sir.
14        Q.    Is that a BOP regulation, or is
15   that just what you felt in terms of
16   managing the operations?
17        A.    Well, BOP regulations.  There
18   were certain staffing guidelines that we
19   followed as far as when we staff units.  I
20   don't recall when I first came into the
21   bureau, you would have two officers per
22   unit.  And over the years, that went down
23   because of staffing issues to one officer
24   to a unit.
25        Q.    So there were staffing issues
```

```
 1                    M.C. WARD
 2   that led to the one officer change?
 3          A.    I think at bureau-wide.  Not
 4   just at MCC.  This is something throughout
 5   the entire bureau, when they put together
 6   staffing guidelines.  They said that, you
 7   know, one officer sufficed to run a housing
 8   unit, basically.
 9          Q.    Do you know when this occurred?
10          A.    I don't.
11          Q.    So this new policy was in
12   effect at the time of the incident
13   involving my client; is that correct?
14          A.    Yes, sir.
15          Q.    Do you recall the incident
16   involving my client?
17          A.    I do.
18          Q.    What do you recall?
19          A.    I recall getting the call from
20   my operations lieutenant that there was a
21   situation in the unit involving an inmate,
22   and the inmate had to be evacuated to the
23   hospital.
24          Q.    Do you recall who your
25   operations lieutenant was at that time?
```

Page 42

1                          M.C. WARD

2         A.      I think it was Lieutenant

3    Delaney, Patrick Delaney.

4         Q.      And he just informed you that

5    this was occurring?  Did he need any

6    approvals or anything from you?

7         A.      No.  Negative.  He didn't need

8    any approvals for anything.  There was

9    notifications and I would have to notify

10   the warden, or the associate warden.  Or

11   the duty officer would have made those

12   notifications, as well.  Any time an inmate

13   went out of the institution unauthorized or

14   not scheduled, we would be notified.

15        Q.      Did he inform you of the

16   condition that Grant was in at the time

17   that he had to be evacuated from the unit?

18        A.      Yes.  He said that he was

19   unresponsive.  I think he was unresponsive

20   at the time when I got the call.

21        Q.      Did you receive any other facts

22   involving what had occurred at that time?

23        A.      At that time, no.  Going into

24   the next day, yes.

25        Q.      Were you on duty at the time

Page 43

M.C. WARD

1
2   that you were notified?
3       A.    As a captain, I'm on duty 24
4   hours a day, sir.
5       Q.    But were you actually at the
6   facility at that time?
7       A.    No, sir.  I would have been
8   home.
9       Q.    After you received this
10  notification what, if anything, did you do?
11      A.    I would have notified my
12  supervisor, which would have been the
13  associate warden.  Who would have then
14  notified the warden.
15      Q.    Did you notify the associate
16  warden?
17      A.    I would have.  I mean, that was
18  procedure, so I know I would have notified
19  the associate warden.
20      Q.    After you did that, what, if
21  anything, did you do?
22      A.    I would have just stood by,
23  waited for further updates on the situation
24  with the inmate going out to the hospital,
25  ensuring that we had enough staff, as far

Page 44

```
 1                    M.C. WARD
 2   as security to get the inmate to the
 3   hospital and so forth.  So I would have
 4   just stood by to ensure everything, you
 5   know, went according to the procedures, per
 6   the phone call.
 7        Q.    Do you recall anything specific
 8   that you did?  I understand that's what you
 9   would normally do, but did you --
10        A.    No, I can't recall anything
11   specific I would have done.  I know I would
12   have came to work a little bit earlier than
13   normally that next day, once I got the
14   information that the inmate passed away.
15        Q.    Do you know what the inmate
16   passed away from?
17        A.    At the time, that day, no, sir.
18        Q.    Did you hear any kind of rumors
19   or any kind of thoughts -- before you
20   actually learned what he died from, did you
21   hear anything prior to that, what he may
22   have died from?
23        A.    Yes, sir.
24        Q.    What was that?
25        A.    It was K2.
```

Page 45

1              M.C. WARD

2      Q.    K2 overdose?

3      A.    Yes, sir.

4      Q.    Do you recall who told you

5  that?

6      A.    Again, it would have my special

7  investigative supervisor who would have

8  told me that.  But, as you stated earlier,

9  like with rumors, we found out -- I found

10  out the next day that several inmates had

11  also overdosed on K2 in that same -- on

12  that same tier where Inmate Grant was.

13  They actually -- I think there were maybe

14  three or four other inmates.  And the other

15  inmates tried -- took them either in the --

16  you know, the shower or in the toilet area,

17  and were putting water on their faces to

18  revive them.  I remember that specifically,

19  you know, hearing that news.  That there

20  were several of the inmates on the tiers

21  themselves who had also overdosed.  And

22  they were able to bring those inmates back.

23  When it came to Grant, he was unresponsive

24  to the point that that didn't happen.

25      Q.    What did you actually learn the

```
 1                    M.C. WARD
 2   next day, aside from what you just told me,
 3   about the death involving my client?
 4        A.    At that point, the FBI would
 5   have been notified.  I would have
 6   notified -- as the captain, I would have
 7   notified the FBI to come in and -- to do
 8   their part.  Which is to conduct a full
 9   investigation.  The FBI would conduct a
10   full investigation involving an inmate
11   death within federal property.
12        Q.    And the FBI was called in on
13   this particular instance?
14        A.    Yes, sir.
15        Q.    Did you speak to anyone at the
16   FBI regarding this incident?
17        A.    I do recall speaking to our
18   agent, but not -- at that time we didn't
19   have facts about what happened.  So it
20   would have just been basic, you know,
21   talking to the agent about, okay, this is
22   the situation that we have and that's it.
23   They will handle the investigation, not us.
24   We would have turned over everything that
25   we had at the time to the FBI.
```

```
                                        Page 47
 1                  M.C. WARD
 2        Q.    Did your staff investigate at
 3    all and turn over -- do you know what they
 4    turned over to the FBI?
 5        A.    I don't know what they turned
 6    over to the FBI.  No, sir.
 7        Q.    Were you involved in the
 8    investigation at all?
 9        A.    No.  Not at that point.  My
10    SIA, which is special investigation agent,
11    he would have turned over any documents,
12    memorandums, interviews from other inmates
13    on the tier, any type of drug paraphernalia
14    from the unit itself.  He would have
15    gathered all that information and turned
16    that over to our FBI agent.
17        Q.    Do you know if any drug
18    paraphernalia or drugs themselves were
19    seized at that time?
20        A.    I don't recall at this time,
21    sir.
22        Q.    What was the next thing that
23    you were involved in regarding the death of
24    my client?
25        A.    I think at that point, once the
```

```
 1                        M.C. WARD
 2   FBI took it over, the bureau of prisons at
 3   that point in time would have waited for
 4   them to finish conducting their
 5   investigation.  There were things that we
 6   were being told, you know, off the record,
 7   basically.  But other than that, you know,
 8   it wouldn't have been up to us now to
 9   proceed to conduct our investigation.
10        Q.    Were you told anything off the
11   record about it?
12        A.    Yes.
13        Q.    What were you told?
14        A.    That he had a family member, a
15   woman, who had came in to the visit that
16   day and had brought him in some drugs.
17        Q.    K2 or something else?
18        A.    K2.
19        Q.    And at that point you didn't
20   know whether or not it was drugs, it was
21   just something that they sold in stores,
22   and she brought it in?
23        A.    Yes.
24        Q.    But it's still contraband?
25        A.    Exactly.
```

Page 49

M.C. WARD

1

2      Q.    How did they know that she
3  brought something in?
4      A.    I think through the
5  investigation, they would have pulled the
6  cameras.  And through the video footage, I
7  think they would have seen something that
8  would have alerted them that possibly
9  exists that she could have passed something
10  to him.
11      Q.    Are those cameras regularly
12  monitored?
13      A.    Yes, sir.
14      Q.    If something was observed that
15  may have been suspicious, should your staff
16  or whoever was manning the cameras or the
17  security at the time in the area that this
18  supposed handoff occurred, would they have
19  stopped it?
20      A.    During the time that it
21  happened, in real time, yes, they would
22  have stopped it.  If they didn't see it
23  because there were so many other things
24  going on, you know they're still reviewing
25  other things that are happening during the

1                      M.C. WARD

2    visit, they may not have caught it at that

3    time.  But then after this incident, you

4    know, you go back, view the tapes again,

5    now they may have saw something at that

6    point in time that would have alerted them

7    that the family member or the person who

8    came into the facility to visit Inmate

9    Grant would have given him something.

10        Q.    Was this captured on video

11   surveillance?

12        A.    Again, it's been so long.  I

13   was made aware that he had a visit that day

14   and that something was given to him at that

15   visit.  Even to the point where I do recall

16   the FBI agent saying to me that they were

17   going to conduct an investigation on the

18   female who came to visit him that day.  So

19   from that, I felt strong enough that they

20   had evidence or information that something

21   was brought into Grant by someone.

22        Q.    When prisoners have visitors,

23   are they searched prior to going back to

24   their housing area after the visit is

25   concluded?

```
 1                   M.C. WARD
 2       A.    Yes, sir.
 3       Q.    Do you know if Mr. Grant, as a
 4  matter of course, would have been searched
 5  after this visit?
 6       A.    As you said, as a matter of
 7  course, yes, sir, he would have been
 8  searched.
 9       Q.    Do you have any issues with any
10  COs that may have been assigned to the
11  visiting area to search prisoners of being
12  bribed or not properly doing their job in
13  searching prisoners for contraband?
14       A.    At that time I don't recall
15  that, sir.  No.
16       Q.    So there was allegedly a
17  handoff, and after the visit he would have
18  been searched as a matter of course prior
19  to going back to his housing area?
20       A.    Are you asking me, counsel?
21       Q.    Yes.  Is that correct?
22       A.    Yes.  He would have -- again,
23  if he was given something, he would have
24  either swallowed it, you know, done
25  something with it.  He would have been
```

```
 1                    M.C. WARD
 2  strip searched by our staff.  Then he would
 3  have went back to his housing unit at that
 4  time and that's it.  So he would have had
 5  to strip search prior to leaving the
 6  visiting area.
 7        Q.    So it wouldn't just be a
 8  pat-down, it would be an actual strip
 9  search, where you cough?
10        A.    Exactly.
11        Q.    K2, it comes in various forms;
12  is that correct?
13        A.    Again, I was not so familiar
14  with it at that time, you know, because it
15  was still something fairly new, even to the
16  bureau.  But they said that there were --
17  it comes in several different forms.  It
18  could be smoked, there was incense.  There
19  were so many different things.  Marijuana
20  that's laced.
21        Q.    It could be sprayed on paper
22  and they could smell the paper?
23        A.    Yes, sir.
24        Q.    And it could look like
25  marijuana, things like that?
```

Page 53

1                    M.C. WARD

2        A.    Yes, sir.

3        Q.    It could smell, it would have

4   kind of a pretty pungent odor?

5        A.    Yes, it did.  I do recall that.

6        Q.    Do you know whether or not any

7   of your staff were investigated in relation

8   to either the drug smuggling -- alleged

9   smuggling, I should say, of the K2 drug,

10  and/or the death of my client by the FBI?

11       A.    The FBI would have interviewed

12  any staff that were on duty in that unit

13  that day.  As well as the lieutenant.  Or

14  as well as anyone who would have come into

15  contact with Inmate Grant during the visit.

16  You know, they would have spoken to anyone

17  that had any contact with that inmate that

18  day.  Yes, sir.

19       Q.    You weren't interviewed by the

20  FBI, correct?

21       A.    Correct.  I was not.

22       Q.    Do you know if Lieutenant

23  Patrick Delaney was?

24       A.    I didn't see his report, but I

25  would assume that he was.

```
 1                    M.C. WARD
 2        Q.     What about Officer Kerns?
 3        A.     Again, I would assume that he
 4   was.
 5        Q.     Do you know if anyone else
 6   might have been interviewed?
 7        A.     I'm not sure.  Maybe the
 8   officers in the visiting room, sir.  But I
 9   don't want to say what I don't know for
10   sure.
11        Q.     Aside from what you told me, do
12   you recall any other information that
13   you've learned in relation to my client's
14   death?
15        A.     No, sir.
16        Q.     Were you the one that made the
17   referral to the FBI of this?
18        A.     My SIS or my SIA, special
19   investigative agent at that time, I think
20   her name was Mary Wade Jones, she would
21   have been the one to make that.
22        Q.     Do you know whether or not one
23   was actually done in order to get the FBI
24   involved?
25        A.     As far as what would actually
```

1                    M.C. WARD

2    be done?

3         Q.    No.

4              Do you know whether or not it

5    was done to get the FBI involved?

6         A.    Yes.   I spoke with the FBI

7    agent that day.

8         Q.    Do you know the basis for the

9    request of the investigation by the FBI by

10   your staff?

11        A.    It would be a phone call from

12   the special investigative agent at MCC to

13   the FBI agent assigned to our facility,

14   notifying that agent of an inmate death.

15   And then that agent would then come into

16   the institution and begin his

17   investigation.

18        Q.    Do you need a like a referral

19   reason to get the FBI involved, why it's

20   been referred?

21        A.    Yes.

22        Q.    Do you know what the reason was

23   in this particular instance?

24        A.    Because the inmate passed away.

25        Q.    Do you know whether or not it

```
                                        Page 56
 1                    M.C. WARD
 2    was deemed a drug overdose, or a homicide,
 3    or something else?
 4                MR. ISSACHAROFF:  Off the
 5           record.
 6                (Whereupon, an off-the-record
 7           discussion was held.)
 8                MR. LAUFER:  Read back the last
 9           question, please.
10                (Whereupon, the referred-to
11           question was read back by the
12           reporter.)
13        A.    Again, I didn't get the report
14    after the investigation was concluded.  I
15    think initially we felt it was a drug
16    overdose.  But again, not being privy to
17    the coroner's report or anything like that,
18    you know, we went off of a drug overdose.
19    And I think the reason we did that was
20    because, again, there were several other
21    inmates in the unit who also had overdosed,
22    but they were able to revive them.
23        Q.    Do you know if any other
24    inmates passed out or had any issues?
25        A.    They had passed out during that
```

```
 1                    M.C. WARD
 2   evening and other inmates in the unit
 3   stated that they had poured water on their
 4   face to bring them back to, in a sense.  So
 5   that led me, as the captain, to believe
 6   that it was something that they ingested.
 7   You know what I'm saying?  Because it was
 8   not just Inmate Grant, it was several other
 9   inmates in that unit that I can recall who
10   also passed out from something dealing with
11   what Grant had, also.
12        Q.    Did you ever get a chance to
13   review the toxicology for my client?
14        A.    No, sir.
15              MR. LAUFER:  Off the record.
16              (Whereupon, an off-the-record
17         discussion was held.)
18              MR. LAUFER:  I have here US 304
19         and 305.  I guess for this purpose,
20         we'll mark it as Plaintiff's 1 for
21         this deposition you reviewed.
22              (Whereupon, US 304 and 305 were
23         marked as Plaintiff's Exhibit 1 for
24         identification as of this date by the
25         Reporter.)
```

```
 1                    M.C. WARD
 2       Q.    Are you familiar with this
 3  two-page document?
 4       A.    Me, sir?
 5       Q.    Yes.
 6       A.    Yes.
 7       Q.    What do you know this two-page
 8  document to be?
 9       A.    That's just the FBI referral
10  investigating an inmate death.
11       Q.    Was this document created in
12  the ordinary course and scope of FBOP's
13  business investigating my client's death?
14       A.    Yes.
15       Q.    At the top of the document,
16  does it give a referral reason?
17       A.    I'm not looking at the document
18  right now.  Give me a second.
19       Q.    Sure.
20       A.    Yes.  It says homicide.
21       Q.    Do you know when this referral
22  was made?
23       A.    It shows four days after the
24  incident, which would have been the 22nd.
25       Q.    And this was prior to getting
```

Page 59

```
  1                    M.C. WARD
  2   the autopsy report of my client; is that
  3   correct?
  4        A.    I wouldn't know the answer to
  5   that question, sir.  Because I wouldn't
  6   know whether or not the autopsy report came
  7   through or not.
  8        Q.    Do you have any idea why they
  9   referred it as a homicide?
 10        A.    I think initially -- okay.
 11   Again, I don't like to assume under oath.
 12   But because the officer not knowing what
 13   took place going into unit and the inmate
 14   is unresponsive could be for numerous
 15   conditions.  At the time I don't think they
 16   knew what happened.  So with that report,
 17   they would have probably put that down
 18   until they got the autopsy findings back to
 19   show exactly what happened which resulted
 20   in Inmate Grant's death.
 21        Q.    But there were other
 22   classifications they could have put down as
 23   the reason for referral, simply inmate
 24   death; is that correct?
 25        A.    Yes.
```

Page 60

1                          M.C. WARD

2          Q.     Do you have any idea why they

3    put down inmate homicide, aside from what

4    you already told us?

5          A.     No, sir.  I don't know why they

6    put it down as a homicide.

7          Q.     Fair enough.

8                 I think you may have answered

9    this.  I apologize if I'm repeating myself

10   in any way.

11                Prior to the incident involving

12   my client's death, how long were you a

13   captain?

14         A.     I was a captain for total of

15   six years.

16         Q.     And -- go on.

17         A.     As a captain at MCC, as well as

18   a captain at Fairton.  And if you want to

19   include my deputy captain time at Brooklyn,

20   it would be a total of nine years.

21         Q.     Is there anything else that you

22   can tell me that you haven't already told

23   me regarding the incident involving my

24   client and his death?

25         A.     No, sir.

```
                                              Page 61
 1                    M.C. WARD
 2        Q.    What were the rumors again that
 3   you heard as the basis for my client's
 4   death?
 5        A.    The next day, I was told that
 6   there were several inmates in the unit also
 7   who had passed out that evening, where
 8   other inmates in the unit themselves placed
 9   them, I think, in the shower area or in the
10   bathroom area to place some water on them
11   to bring them out of the state that they
12   were in.  They had passed out.  When it
13   came to Mr. Grant, the attempt was made to
14   do the same thing, but he didn't come
15   around.
16        Q.    Do you know if he was actually
17   brought into a shower?
18        A.    That's what I was told.  That
19   he was brought into either a shower or
20   bathroom area, where they would maybe get
21   the water out of the toilet or the shower.
22   I just remember that so much, you know, the
23   inmates saying that there were several of
24   the inmates that they had to drag into the
25   shower area in order to try to revive them.
```

Page 62

```
 1                    M.C. WARD
 2   Because they had -- they must have ingested
 3   the same thing that Mr. Grant had ingested
 4   or something happened to them which may
 5   have happened to him, also.
 6        Q.    In this particular tier where
 7   Mr. Grant was found, how far are the bunks
 8   away from where the showers or bathroom
 9   are, the facility?
10        A.    They're right there.  I'm
11   almost sure -- it's been a while, but I
12   think they're close by where -- you know,
13   ten steps places them in the shower area or
14   the bathroom area, where there's access to
15   water and things like that.
16        Q.    So there were multiple inmates
17   that supposedly OD'd on K2 that night and
18   they were being dragged into this area to
19   be reviewed by other inmates?
20        A.    Yes, sir.
21        Q.    During this time period, the
22   officer on duty had no idea any of this was
23   going on?
24        A.    Again, I don't know that for a
25   fact.  You know what I'm saying?  I mean,
```

```
                                      Page 63
 1                   M.C. WARD
 2   inmates are smoking in tiers, you know.
 3   Inmates will smoke.  It's hard to tell, you
 4   know, if he was someplace, you know, doing
 5   something, making rounds on another tier
 6   when it happened.  It's hard to tell.
 7        Q.    As I think you testified
 8   earlier, K2 has a distinctive smell?
 9        A.    Yes.  That's correct.
10        Q.    So if inmates were engaging in
11   K2 and it produced that kind of smell, what
12   would, if anything, be the responsibility
13   of the officer on the duty to do in dealing
14   with that?
15        A.    Well, again, a lot of times
16   inmates would burn -- they would try to
17   burn like orange peels to disguise
18   different smells like when they would try
19   to go use the restroom in order cover up
20   the different odors, you know.  They would
21   burn orange peels.  And we would always
22   find those things during shake-downs.  You
23   weren't authorized any type of lighters, or
24   matches, or anything like that.  So they
25   made those with batteries and wires in
```

Page 64

1                          M.C. WARD
2      order to create fires.  So again, if he had
3      smelled it -- I mean, it wasn't as if they
4      would smoke right out in the open.  They
5      would go into the stalls, the restroom
6      stalls, and smoke in those areas like that.
7           Q.     Essentially, you're not allowed
8      to burn things, whatever it may be?
9           A.     That's correct, sir.
10          Q.     Or create fires in any way in
11     these areas?
12          A.     That's correct, sir.
13          Q.     Inmates at any time?
14          A.     At any time.
15          Q.     So this was a reoccurring issue
16     prior to my client's death?
17          A.     Yes, sir.
18          Q.     If the officer on duty smelled
19     anything burning, what, if any, procedures
20     would he follow in addressing that?
21          A.     What an officer would have
22     done, he would have walked up into the --
23     on the tier where he smelled the odor, and
24     he would have possibly walked around to see
25     if he could, you know, find the contraband

```
 1                    M.C. WARD
 2   or the person who would have -- you know,
 3   where the odor was coming from in that area
 4   to see if he could find some kind
 5   contraband.  That's what he would have
 6   done, you know, more than likely.
 7        Q.    Would he have called for
 8   backup?
 9        A.    No.  Not for a situation like
10   that, sir.
11        Q.    Would he have to actually enter
12   the tier through the gate, and then we
13   would conduct the investigation in that
14   manner?  Or would he just flash his light
15   inside the gate?
16        A.    Right.  Either/or.  He could
17   go, okay, into the gate, or he could, you
18   know, take his flashlight and look in the
19   area to see if he noticed something that
20   was amiss or -- you know.
21        Q.    Do you recall if you
22   interviewed Officer Kerns at any point
23   involving this particular incident?
24        A.    As a captain, I would not have
25   interviewed him.  No, sir.
```

```
 1                    M.C. WARD
 2        Q.    Do you know who would have?
 3        A.    Yes.  It would have been my
 4   special investigative agent and it would
 5   have been the FBI agent.
 6        Q.    To your knowledge, while these
 7   inmates were being dragged that were passed
 8   out and being brought into the bathroom,
 9   assuming Officer Kerns was assigned to the
10   housing area that night and he looked
11   through the grill, would he have been able
12   to observe this?
13        A.    Depends upon where he was at in
14   the unit, sir.  Because, again, inmates
15   would not have made a lot of commotion in
16   that type of situation to draw attention to
17   themselves until they felt that it was, you
18   know, something that was really dangerous
19   had taken place.  So they would have -- you
20   know, if someone would have smoked or
21   something like that and they would have
22   noticed that the person had a reaction to
23   it and, you know, them just trying to
24   helped, would have dragged that person to
25   the shower, got some water on them, and
```

```
 1                    M.C. WARD
 2   placed them back in their bunk.  Because
 3   that's what I heard the next day had
 4   happened.  Several of the inmates that had
 5   also had a reaction to something that was
 6   ingested in that unit that night, which
 7   resulted in them being placed in the
 8   showers and then reviewed and brought back
 9   to their bunks.
10        Q.    So I guess my question is, if
11   Officer Kerns, or Kerns, if I'm not
12   mispronouncing his name, flashed his light
13   to the tier, to the grill, I'm assuming
14   that's how he would do it, he wouldn't
15   actually enter the area, would he be able
16   to observe prisoners doing this, dragging
17   prisoners --
18        A.    Yes.
19        Q.    He would be able to see it?
20        A.    He would be able to see it.
21   Most certainly.  Yes, sir.
22        Q.    Did you come to learn what
23   caused my client's death at any point?
24        A.    No, sir.  I ended up retiring
25   six months later.  And with MCC, we have so
```

Page 68

1                    M.C. WARD

2    many cases going on, not just inmate death

3    cases, but misconduct cases and, you know,

4    a little bit of everything going.  Once the

5    FBI has the case, we pretty much step back

6    until they conduct their investigation and

7    their findings to report back to the bureau

8    as to exactly what happened.  I think I had

9    retired before that information came out.

10        Q.    Did you ever have a chance to

11   review my client's autopsy report?

12        A.    No, sir.  Not at all.

13        Q.    How about his toxicology

14   report?

15        A.    No, sir.

16        Q.    If I told you that he was

17   tested for synthetic marijuana and it was

18   not found in his system, nor were any other

19   illicit substances found in his system,

20   would that refresh your recollection?

21        A.    No, sir.  Because, to the best

22   of my recollection, was that it had

23   something to do with an illegal substance,

24   which resulted in all of those other

25   inmates passing out, as well.  I mean, we

```
                                    Page 69
 1                  M.C. WARD
 2   had confidential informants in the unit who
 3   stated that it wasn't just Grant who got
 4   affected.  It affected other inmates in the
 5   unit, as well.  Again, at the time we
 6   didn't really know -- we didn't even have
 7   tests for the K2 drug.  We didn't have the
 8   proper testing procedure.  So again, you
 9   know, for us it was a drug overdose.
10        Q.    Did any of your investigators
11   ever find that my client had suffered any
12   kind of blunt force trauma?
13        A.    No, sir.
14        Q.    Did you come to learn from
15   anyone that my client showed signs that he
16   was choked?
17        A.    No, sir.
18        Q.    That he had injured his hyoid
19   bone, or his hyoid bone was injured?
20        A.    No, sir.
21        Q.    Were you ever made aware that
22   my client was actually murdered?
23        A.    Was I made aware that he was
24   murdered?
25        Q.    Yes.
```

Page 70

1                    M.C. WARD

2       A.    No, sir.  Not at all.

3       Q.    Did you ever observe my

4  client's body around the time of the

5  incident, after this incident occurred?

6       A.    No, sir.

7             But what I will say is that

8  there was something in reference to the CPR

9  that was being performed.  Because I think

10  so many staff attempted to perform CPR on

11  him at the time.  And so that kind of, you

12  know, through the months, something came up

13  about the level of CPR was not done

14  properly, which could have exacerbated

15  whatever condition he had, which could have

16  possibly resulted.  But there was never any

17  concrete -- I never got full concrete

18  information that that's what happened.

19       Q.    Do you know if my client's body

20  was ever dropped on the ground while he was

21  being removed from his bunk?

22       A.    I did not get information that

23  Mr. Grant was dropped on the ground.  No.

24       Q.    Or maybe that his head hit the

25  ground while he was being moved?

Page 71

1                    M.C. WARD

2        A.      No, sir.

3        Q.      Were you ever made aware that

4    he had injuries to his throat and neck?

5        A.      I was made aware, as I stated

6    before, about something that -- a rumor

7    again, in reference to the CPR that was

8    performed that may have had something to do

9    with injuries that he had.

10       Q.      You heard rumors that someone

11   didn't properly do CPR, which --

12       A.      No.  Not that they did it

13   improperly.  But that amount of CPR that

14   was done resulted in certain marks that he

15   had on his body.  You know what I'm saying?

16   Like say, for instance, you have five

17   different people giving someone CPR from

18   different levels of pressure from the CPR

19   itself would cause certain things to happen

20   with the body.  I do remember that.

21       Q.      Doing CPR, that wouldn't cause

22   any injuries to the throat or neck, would

23   it?

24       A.      If done improperly.  But I

25   don't know that that happened.  So again, I

```
 1                    M.C. WARD
 2   didn't receive that information, sir.
 3        Q.    When you're doing CPR, you're
 4   doing a number of different things, like
 5   chest compressions; is that correct?
 6        A.    Yes, that's correct, sir.
 7   You're doing head lift, chin -- you know,
 8   head lift, chin up, chin down, and
 9   breathing, and then chest compressions and
10   so forth.
11        Q.    And you're breathing into the
12   mouth and things of that nature?
13        A.    Yes, sir.
14        Q.    So you were not doing anything
15   to the neck or throat, per se?
16        A.    You are tilting the head back.
17        Q.    Right.
18        A.    Lifting the chin.  So your hand
19   is around that area right there.  Not that
20   you're placing anything here, but you are
21   in that vicinity because you have to
22   control the head.  In order to open up the
23   mouth, you're dropping the chin.  So your
24   hand is in that area.
25        Q.    Okay.  Fair enough.
```

```
 1                    M.C. WARD
 2              I think you discussed you had
 3    SIS training, right?
 4        A.    Yes, sir.  I went to SIS
 5    training.
 6        Q.    When was that again that you
 7    went for SIS training?
 8        A.    I'm not really sure, sir.  I
 9    went to the bureau of prisons special
10    investigative supervisor training, yes.  I
11    am a graduate of that course.
12        Q.    Aside from what you've already
13    mentioned, did you have any other role in
14    investigating Grant's death?
15        A.    No, sir.
16        Q.    Aside from my client's death,
17    have you, throughout your entire career,
18    investigated any other prisoner's death?
19        A.    No, sir.
20              I think that was one of the
21    reasons why, for me, I remembered it.
22    Because after 20 years, I said I'm going to
23    walk away without having an inmate die on
24    my watch, and then that happened.  And so
25    for me, that was why I remembered so many
```

Page 74

1                    M.C. WARD
2    small things about it.
3         Q.    I think we discussed it before.
4    I apologize.
5              You discussed how often the
6    unit officer is supposed to observe
7    inmates.  There has to be once every half
8    hour, I think you mentioned?
9         A.    Yeah.  30-minute rounds.
10   30-minute checks.
11        Q.    And that he patrols the area?
12        A.    That's correct, sir.
13        Q.    How would he go about doing
14   anything aside from just patrolling the
15   area?
16        A.    He would conduct searches,
17   contraband searches, which we call
18   shake-downs.  He would do security checks,
19   looking at the -- ensure that bars are not
20   being tampered with, doors are secured.
21   Things of that nature.
22        Q.    I think we discussed earlier
23   that K2 was prevalent within the prison
24   back in 2015?
25        A.    When you say prevalent, I think

Page 75

1                        M.C. WARD
2      I said earlier that I wouldn't use the term
3      prevalent.  Because during that period of
4      time it was still a new form of synthetic
5      marijuana or drug that we really didn't
6      understand fully.
7            Q.     I understand.
8                   But it was around.  It was
9      definitely active?
10           A.     Yes, sir.
11           Q.     Do you think Grant's
12     involvement in possibly distribution of K2
13     was a factor in his death?
14           A.     I feel that way, sir.  Yes,
15     sir.
16           Q.     Why do you feel that way?
17           A.     Because at the time, again,
18     what the other inmates in the unit were
19     saying, that he had given other inmates
20     that drug.  Which resulted in them passing
21     out, as well.  And based on the fact that
22     it was his, that, you know -- you know,
23     it's his supply, so he can use as much as
24     he wants.  Which resulted in him possibly
25     overdosing from it.  Because there were

```
 1                    M.C. WARD
 2   other inmates in that unit that were
 3   affected by what he had given them, or what
 4   they had purchased from him.  I do remember
 5   that, sir.
 6        Q.    You think the other inmates
 7   were upset with Mr. Grant regarding the K2
 8   that was distributed, allegedly, by him?
 9        A.    Not that I -- I never got that,
10   sir.  No.
11        Q.    What is your responsibility as
12   a captain preventing the introduction of K2
13   into the institution?
14        A.    My responsibility is just to
15   ensure, as far as the searches that we
16   conduct of all items coming into a federal
17   prison.  The strip searches that are
18   conducted during inmate visits.
19   Surveillance cameras, ensuring that they're
20   all operational so that we could, you know,
21   monitor these things.  The policies and
22   procedures are posted outside and shared
23   with all the staff on the Title 18, about
24   bringing in any types of drugs or
25   contraband.  And training my staff members,
```

1                    M.C. WARD
2   you know, how to search for contraband, how
3   to look for contraband.  I mean, all those
4   things that come into play.
5          Q.    Was there any camera
6   surveillance in that particular housing
7   area?
8          A.    I'm going -- I think there
9   was -- we would have had surveillance
10  cameras, yes, sir.  I don't know if we had
11  any on the range that he was on.  But I
12  know we had common area cameras that could
13  see into the common area of that unit.  And
14  you could probably catch a view of the
15  tiers.  You necessarily couldn't see the
16  inmates if they had bunks in the corners or
17  things like that.  But you could still see
18  movement and you can still see the action
19  in the common area of that unit.
20         Q.    Do you know if any of the
21  surveillance footage would have captured
22  any of the events that we discussed
23  involving my client's death?
24         A.    Not that I can recall.  I would
25  have reviewed those cameras myself, you

```
                                        Page 78
 1                    M.C. WARD
 2   know.  And based on the fact that it was an
 3   inmate death, I would assume that those
 4   tapes would still be in evidence even till
 5   today.
 6              MR. LAUFER:  I'm going to call
 7          for production of copies of any of
 8          the surveillance.  I know you
 9          produced some.  I don't know if you
10          produced from the actual inside of
11          the housing area.  I'll call for
12          production of that and any kind of
13          surveillance involving the supposed
14          hand to hand transfer of something
15          from Ms. Morrison to Mr. Grant that
16          the captain referred to.
17              MR. ISSACHAROFF:  Okay.
18       Q.    Now, during the evening hours,
19   these cameras are active, right, in the
20   housing unit?
21       A.    They're active 24 hours a day,
22   sir.
23       Q.    Whose duty is it to observe and
24   monitor these cameras?
25       A.    The special investigative
```

```
1                    M.C. WARD
2    technicians can pull those cameras up to
3    observe them.  Our control center has
4    cameras in their area to be able to see
5    what's going on inside that unit.  And I
6    had access to those cameras, also.
7         Q.    I understand accessing the
8    footage afterward.
9               In real time, does anyone
10   observe the surveillance footage?
11        A.    I mean, there's so many cameras
12   in the institution that, you know, you only
13   have one or two people that would actually
14   be in the room that we have the monitors,
15   the video monitors.  You only have one
16   working in that room.  So with so many
17   different things going on at one time, you
18   know, they're not looking at -- you know,
19   it's hard to look at 20-something different
20   cameras of 20 different areas at the same
21   time.  So if they noted something, they
22   would have notified the lieutenant.
23        Q.    Would any of those cameras
24   depict what you described earlier, as
25   inmates bringing other inmates, or
```

```
                                        Page 80
 1                    M.C. WARD
 2   dragging, or carrying, or whatever, other
 3   inmates to the bathroom to try to revive
 4   them?
 5        A.    Those would have to be cameras
 6   within the unit within that range where
 7   those beds are and everything.  Those
 8   cameras would have to be in there.  I think
 9   we had cameras in there.  We had cameras in
10   the common areas.
11             MR. LAUFER:  To the degree that
12        they exist, I would call for any
13        surveillance footage that may exist
14        within the area depicting what
15        occurred.
16        Q.    Are you aware of anyone
17   dropping Mr. Grant as he was being
18   transferred to the gurney in the housing
19   unit?
20        A.    Not that I'm aware of, sir.
21        Q.    So you didn't hear anything at
22   all about Mr. Grant being dropped in any
23   way when he was being transferred to a
24   gurney?
25        A.    Not that I'm aware of.
```

```
                          M.C. WARD
```

1        Q.     Are all FBOP staff trained in

2   emergency response to medical emergencies?

3        A.     Yes, sir.

4        Q.     Tell me about your particular

5   training in that regard.

6        A.     Oh, boy.

7               First from the military, as

8   well as in the bureau, it's just basic CPR

9   that you would perform on someone that's

10  not breathing.  Okay.  The use of the AED

11  in our training.  And then again, you have

12  medical staff on board.  Immediately

13  contacting medical staff to any medical

14  emergency, whatever it may be.  As a first

15  responder getting there, you assess the

16  situation.  If it's something that you're

17  not trained to do, then you wait for

18  medical staff to arrive.

19       Q.     Was it part of your duties as a

20  captain to train staff as responders to

21  emergency situations?

22       A.     Yes.  Every year we have annual

23  training.  And we would go over all type of

24  emergency responses, emergency management.

```
                                          Page 82
 1                    M.C. WARD
 2   Medical staff would give classes, you know,
 3   of different medical emergencies, medical
 4   situations, how to reaction to them and so
 5   forth, in dealing in a correctional
 6   environment.
 7        Q.    Are there any additional inmate
 8   observation practices at MCC that occurred
 9   in 2015 that you haven't already described?
10        A.    No, sir.
11        Q.    Did any of these procedures or
12   practices change in any way after my
13   client's death?
14        A.    I retired right after.  So I
15   wouldn't know, sir.
16        Q.    Within that six-month time
17   period.
18        A.    Okay.  No, sir.
19        Q.    So as part of the unit
20   officer's duties, would they actually enter
21   the tier, you know, through the gate?  Or
22   would they just only flash the light --
23        A.    No.  They could enter the tier
24   through the gate.
25        Q.    Would that be optional for
```

```
                                            Page 83
 1                    M.C. WARD
 2   them?
 3        A.    Yes, sir.
 4        Q.    But as they're patrolling, they
 5   have the ability to do something like that?
 6        A.    Yes, sir.
 7        Q.    The inmates in this particular
 8   housing unit, do they engage in any kind
 9   of, like, horseplay?  Any kind of, you
10   know, choking each other, things like that,
11   you know, to pass out or any of that stuff?
12   Are you aware of anything like that?
13        A.    I mean, inmates are always
14   wrestling and doing, you know, things that
15   we don't necessarily approve of, you know,
16   within the confines of their housing units,
17   you know.  Because those things could turn
18   serious.  But inmates do horseplay, you
19   know, wrestle.  All of those things like
20   that, sir.
21        Q.    And that's something that they
22   shouldn't be doing and you tell them to not
23   do it?
24        A.    Yes, sir.  There's an actual
25   violation for that.
```

1            M.C. WARD
2      Q.    And inmates have gotten injured
3  involving engaging in horseplay, correct?
4      A.    Yes, sir.  That's correct.
5      Q.    What is the sanction for
6  engaging in horseplay?
7      A.    I think it's a low sanction for
8  something like that, you know.  Maybe some
9  extra duty or something.  But it doesn't --
10  that's not a high level disciplinary action
11  for something like that.
12            MR. LAUFER:  Lucas, I'm going
13        to have him review the Form 583.
14            (Whereupon, 583 form was marked
15        as Plaintiff's Exhibit 2 for
16        identification as of this date by the
17        Reporter.)
18      Q.    Are you familiar with the
19  document?
20      A.    Yes, sir.
21      Q.    Was this document created in
22  the ordinary course and scope of your work
23  at the DOP?
24      A.    Yes, sir.
25      Q.    This particular document, I

Page 85

1                      M.C. WARD
2    believe it states 390 and 392.
3              Can you describe for me the
4    contents of the document?
5         A.   Yes, sir.  It's a report of
6    incident.  Section one is the actual
7    general information.  It will talk about
8    the type of incident.  Section two would be
9    the inmates involved.  If they have inmates
10   involved in that incident.  Section three
11   is any other inmates involved.  Any lethal
12   weapon discharge is section four.  Section
13   five if there is a use of force.  And
14   section six is the description of the
15   incident.
16        Q.   What you just described for me,
17   is it consistent with your understanding of
18   what occurred on the evening of my client's
19   death?
20        A.   From the initial incident, yes,
21   sir.  Because that's not the investigative
22   findings of that.  That's just the initial
23   incident.
24        Q.   Are you familiar with the
25   investigative findings?

```
 1                    M.C. WARD
 2       A.    No.  I don't have the 586 or
 3  any of the FBI the reports after the fact,
 4  sir.  No.
 5       Q.    Did you at any time review any
 6  of those documents?
 7       A.    No, sir.
 8       Q.    So you're not aware of what the
 9  initial findings were?
10       A.    No, sir.
11       Q.    Do you know whether or not you
12  or anyone at MCC conducted an after actual
13  review of this incident?
14       A.    Again, after the FBI finding
15  and so forth, that would have been done.  I
16  wasn't privy to that.  I don't recall ever
17  seeing a 586 from that incident, sir.
18            MR. LAUFER:  Lucas, did you
19       ever produce the 586 to me?
20            MR. ISSACHAROFF:  Could you
21       describe what that would look like to
22       me?
23            MR. LAUFER:  It would be like
24       an after accident review, what the
25       findings what the FBI did.
```

```
 1                    M.C. WARD
 2              THE WITNESS:  583, they both
 3         are together.  583, then you have the
 4         586, which is after accident review.
 5              MR. ISSACHAROFF:  Let me take a
 6         look for that.
 7              I will look and see if that's
 8         something we have and I'll see
 9         whether that can be produced.
10      Q.    Are you aware of what a
11   mortality review is?
12      A.    Am I aware of what a mortality
13   review is?
14      Q.    Yes.
15      A.    No, sir.
16              I mean, based on the word, I
17   can -- I have an understanding of what it
18   is.  But no, I wasn't part of that.  No.
19      Q.    Do you know if anyone was
20   charged in relation to my client's death?
21      A.    Not that I recall, sir.  Not
22   that I know of, sir.
23      Q.    Did you have to review any True
24   scope logs for the 24 hours encompassing my
25   client's death?
```

1                        M.C. WARD

2      A.      No, sir.

3              MR. LAUFER:  I think I made

4        this call for production of those

5        logs.  I'm going to remake that

6        demand.  I'll get you some post-EBT

7        demand requests.  I will make them in

8        writing to you.

9              I'm going to call for

10       production for the 24 hours

11       encompassing my client's death, the

12       True scope of the logs that you guys

13       may have.

14             MR. ISSACHAROFF:  Okay.

15     Q.      Just give me a few minutes.  I

16   think we're almost done, Captain Ward.

17     A.      Okay.

18     Q.      I may have asked this before.

19             Would the unit officer be able

20   to see inmates bringing other inmates into

21   the shower?

22     A.      If he was standing next to the

23   grills, yes.

24     Q.      But not from his post?

25     A.      Again, dependent upon where he

```
 1                    M.C. WARD
 2   is from the officer's station, he could,
 3   you know.  It depends upon where he is in
 4   that officer's station and where the tiers
 5   are.  It's been a while, so I don't
 6   really -- I can't for sure say how it would
 7   look today.
 8        Q.    Do you think the changes BOP
 9   made in relation to how many officer should
10   be assigned to a particular housing unit
11   may have contributed to my client's death
12   in any way?
13        A.    No.
14        Q.    You don't think that if there
15   had been more officers in the unit
16   patrolling the unit, observing the unit,
17   securing the unit, may have in any way
18   prevented my client's death?
19        A.    No, sir.  I don't think so.
20              MR. LUCAS:  I think we've
21         already requested this, Lucas, the
22         586, the after accident review.
23              MR. ISSACHAROFF:  Off the
24         record.
25              (Whereupon, an off-the-record
```

```
                                         Page 90
 1                      M.C. WARD
 2          discussion was held.)
 3               MR. LAUFER:  We had a
 4          conversation off the record.
 5          Q.    Would normally, Captain Ward, a
 6     586 form be completed in order to close an
 7     investigation?
 8          A.    That's correct, sir.  Because
 9     the way that the system works, an
10     investigation -- we were given time limits
11     on certain investigations based on things
12     that would take place at an institution.
13     The 586 -- the 583 is done, which is the
14     report of incident.  And then the 586 will
15     be done, closing that investigative stage
16     file.  Because it would the case number.
17     The same case number on the a 583 would be
18     on that 586.  In order to close that, you
19     would need both.
20          Q.    So normal procedure would
21     require 586 to be completed in order to
22     close a case?
23          A.    Correct.  Because that's the
24     after accident.  That's like everything is
25     all done.  And that's -- 586 would have
```

```
                                     Page 91
 1                    M.C. WARD
 2   came out of that.
 3        Q.    And the 586 wouldn't be
 4   completed if an investigation was still
 5   open?
 6        A.    That's correct, sir.
 7        Q.    Who would complete the 586?
 8        A.    The special investigative
 9   agent, or the special investigative
10   supervisor.
11        Q.    Would they wait for the FBI to
12   finish their investigation before that?
13        A.    They could at times.  You know.
14   They could always wait for the FBI to
15   complete their investigation.  Depends upon
16   the warden.  You know, if the warden wanted
17   that 586 completed, then they would say,
18   "okay.  Based on what we have right here,
19   let's put it through."
20        Q.    We're over five years past the
21   incident.
22        A.    Right.
23        Q.    Would there be any reason to
24   keep a case open that long like this?
25        A.    If there were still questions
```

Page 92

```
 1                    M.C. WARD
 2  on the case.
 3        Q.    Okay.
 4        A.    Probably why we're here right
 5  now.
 6        Q.    Would a civil lawsuit prevent a
 7  586 from being completed?
 8        A.    No.  Not at all.
 9        Q.    What would be the only reason
10  why a 586 might remain open, to your
11  knowledge?
12        A.    If it's still -- they still
13  have not come to the findings -- the exact
14  findings of an inmate's death or a finding
15  of an incident.
16        Q.    Have you ever heard of an
17  incident like this, or any kind of
18  incident, having remained open this long?
19        A.    Yes.
20              MR. LAUFER:  Lucas, to the
21           degree it exists, I don't know who
22           you would need to speak with, but we
23           need to find out whether or not a 586
24           form was done.  I'm not saying that
25           you're sitting on it.  Absolutely
```

```
                                         Page 93
 1                    M.C. WARD
 2      not.
 3              MR. ISSACHAROFF:  I think the
 4      criminal investigation has never been
 5      closed.
 6              MR. LUCAS:  So that's still
 7      ongoing?
 8              MR. ISSACHAROFF:  It is more or
 9      less dormant, but ongoing.
10              MR. LAUFER:  It's dormant but
11      ongoing.  All right.
12      Q.      Would a continuing criminal
13      investigation, Captain Ward, to your
14      knowledge, prevent a 586 from being
15      executed?
16      A.      Yes.
17      Q.      It seems that since the case is
18      dormant, even though it may still be
19      considered open, would that prevent a 586
20      from being done?
21      A.      It would.  Because with the
22      586, you have all the facts that are needed
23      to close that case docket out.  Again, this
24      is in a computer system within the bureau,
25      in the True system.  And that would show it
```

```
 1                    M.C. WARD
 2    as still being open, pending investigation.
 3              MR. LAUFER:  Lucas, we got to
 4         get to the bottom of this.  I mean if
 5         this thing is still open, preventing
 6         the 586 from being issued or what, I
 7         mean, there are still suspects out
 8         there, even though the leads have
 9         grown cold, my clients have a right
10         to know what's going on here.  And
11         I'm also going to need this for
12         discovery for the case.  So I don't
13         know what you need to do, but we kind
14         of need to kind of get to the bottom
15         of what the United States Attorney's
16         is doing, or what the criminal
17         division is doing, with anything in
18         regard to this.
19              MR. ISSACHAROFF:  I mean, I
20         think we're going to have to
21         potentially talk to the court about
22         this.  Because, you know, my view is
23         that there's a civil case and there's
24         whatever is happening with the
25         criminal investigation.  I certainly
```

Page 95

```
 1                    M.C. WARD
 2        don't have any ability to tell them
 3        "you need to close your investigation
 4        and issue your findings."
 5             MR. LAUFER:  I hear you.  But
 6        regardless, you know, I think my
 7        client's next of kin has a right to
 8        know what occurred here.
 9             So if I could just ask you to
10        do another search for a 586 or just
11        get to the bottom of why one hasn't
12        been issued.  It's probably because
13        of what Captain Ward may have
14        mentioned.
15             Also, I could imagine what your
16        objection would be to something like
17        that, if there's an active criminal
18        investigation.  But it doesn't seem
19        like it's an active criminal
20        investigation anymore.  Not
21        necessarily something that's being
22        pursued zealously.  I guess we may
23        have to engage in some motion
24        practice in regard to that.
25             I think at this juncture I'm
```

Page 96

```
1                    M.C. WARD
2       done with Captain Ward's deposition.
3       I think we have another one scheduled
4       for Thursday.  I need you to get me
5       the ID for Lieutenant Delaney, or DHO
6       Delaney.  A copy of his DOP ID.  And
7       I'll get you some post EBT demands.
8           MR. ISSACHAROFF:  Did I not
9       send that over to you during the last
10      deposition?  Because that was the one
11      we took a few weeks ago.
12          MR. LAUFER:  Right.  And he
13      wasn't able to have a video.  So if
14      you could just shoot that over.
15          Okay, Captain Ward.  I
16      appreciate your time here and thank
17      you.  This is very important to my
18      client and I appreciate your
19      cooperation with this.  Stay safe and
20      good luck with everything.
21          (Whereupon, at 12:15 P.M., the
22      Examination of this witness was
23      concluded.)
24
25          °         °         °         °
```

Page 97

1                      M.C. WARD

2              D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                   _____
15                      MICHAEL CRAIG WARD

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____
22      NOTARY PUBLIC

23

24

25

Page 98

1                         M.C. WARD

2    E X H I B I T S

3    PLAINTIFF(s)' EXHIBITS:

4    EXHIBIT    EXHIBIT                        PAGE

5    Exh 1      304 and 305                    57

6    Exh 2      583                            84

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 99

1                      M.C. WARD

2                   I N D E X

3    EXAMINATION BY                        PAGE

4    MR. LAUFER                            4

5

6      INFORMATION AND/OR DOCUMENTS REQUESTED

7    INFORMATION AND/OR DOCUMENTS          PAGE

8    Production of the surveillance from

9    the actual inside of the housing

10   area and any kind of surveillance

11   involving the supposed hand to hand

12   transfer of something from

13   Ms. Morrison to Mr. Grant          78

14   Any surveillance footage that may

15   exist within the area depicting

16   what occurred                      80

17   Production of the True scope of

18   the logs for the 24 hours

19   encompassing Mr. Grant's death     88

20   Find out whether or not a 586

21   form was done                      92

22

23

24

25

Page 100

1                          M.C. WARD

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK          )

                               :  SS.:

5    COUNTY OF SUFFOLK          )

6

7         I, MELISSA HARBORD, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 10th day of August 2020.

21

22

23

                    MELISSA HARBORD

24

25

Page 101

1                          **ERRATA SHEET**
                    **VERITEXT/NEW YORK REPORTING, LLC**
2

     CASE NAME: Nicole Morrison  v. United States Of America Et Al
3    DATE OF DEPOSITION: 7/28/2020
     WITNESSES' NAME: Michael Craig Ward
4
5     PAGE   LINE (S)        CHANGE                REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                  _____
                                    Michael Craig Ward
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS ____ DAY OF _____, 20__.
23
24
      _____            _____
25    (NOTARY PUBLIC)                 MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   3:17 |

| 1 |
| --- |
| **1**   3:17 57:20,23 98:5 |
| **100**   38:4 |
| **10007-2632**   1:23 2:10 4:14 |
| **10018-1512**   2:5 |
| **10:17**   1:15 |
| **10th**   100:20 |
| **11**   26:23,25 27:3 30:25 |
| **11:00**   29:24 30:2 |
| **12**   18:7 23:16 |
| **12:15**   96:21 |
| **17civ.6779**   1:8 |
| **18**   19:19,22,23 76:23 |
| **1982**   8:6 |
| **1983**   8:3 |
| **1984**   8:11 |
| **1994**   7:14 8:9 10:22 11:7 12:21 |
| **1995**   7:13 |
| **1999**   10:22 11:7 12:21 13:20 |

| 2 |
| --- |
| **2**   84:15 98:6 |
| **20**   6:22,24 15:6 29:18 73:22 79:19 79:20 97:19 101:22 |
| **200**   18:7 |
| **2002**   14:16,21,23 |
| **2003**   14:22,23 |
| **2005**   17:17,18,18 17:23 |
| **2007**   18:21 19:7 |

**2011**   20:7 22:22 23:4
**2015**   6:19 23:6 30:25 36:5 74:24 82:9
**2019**   6:13
**2020**   1:14 100:20
**22nd**   58:24
**24**   43:3 78:21 87:24 88:10 99:18
**24692**   100:23
**250**   23:17
**264**   2:5
**28**   1:14

| 3 |
| --- |
| **30**   3:16 34:13,15 35:13 74:9,10 |
| **304**   57:18,22 98:5 |
| **305**   57:19,22 98:5 |
| **390**   85:2 |
| **392**   85:2 |
| **3rd**   1:22 2:9 4:13 |

| 4 |
| --- |
| **4**   99:4 |
| **400**   15:7 |
| **40th**   2:5 |

| 5 |
| --- |
| **57**   98:5 |
| **583**   5:25 6:3 16:22 84:13,14 87:2,3 90:13,17 98:6 |
| **586**   86:2,17,19 87:4 89:22 90:6 90:13,14,18,21,25 91:3,7,17 92:7,10 92:23 93:14,19,22 94:6 95:10 99:20 |

| 6 |
| --- |
| **604**   2:5 |

| 7 |
| --- |
| **7/28/2020**   101:3 |
| **78**   99:13 |

| 8 |
| --- |
| **80**   99:16 |
| **84**   98:6 |
| **86**   1:22 2:9 4:13 |
| **88**   99:19 |

| 9 |
| --- |
| **90**   31:4 40:12 |
| **92**   99:21 |
| **94**   8:18,20 |
| **9:00**   29:22,23,23 |

| a |
| --- |
| **a.m.**   1:15 |
| **ability**   83:5 95:2 |
| **able**   32:4 45:22 56:22 66:11 67:15 67:19,20 79:4 88:19 96:13 |
| **absolutely**   92:25 |
| **academy**   8:17,23 8:24 9:2,17,20 10:7 |
| **access**   29:8 30:19 62:14 79:6 |
| **accessing**   79:7 |
| **accident**   86:24 87:4 89:22 90:24 |
| **action**   77:18 84:10 100:16 |
| **active**   75:9 78:19 78:21 95:17,19 |
| **activities**   12:4,7,11 12:14 23:18,20,22 |
| **actual**   11:17 52:8 78:10 83:24 85:6 |

86:12 99:9
**additional**   82:7
**address**   4:12
**addressing**   64:20
**administer**   3:11
**administrative**   10:5 21:20
**administrator**   1:3
**aed**   81:11
**afterward**   79:8
**ag**   1:5
**agent**   26:12 38:20 46:18,21 47:10,16 50:16 54:19 55:7 55:12,13,14,15 66:4,5 91:9
**agents**   1:11 20:25
**ago**   96:11
**agreed**   3:5,20
**airborne**   9:10
**al**   101:2
**alerted**   49:8 50:6
**allegations**   37:25 38:11,13
**alleged**   53:8
**allegedly**   51:16 76:8
**allowed**   64:7
**altercations**   38:25 39:5,7
**america**   1:9 4:20 101:2
**amiss**   65:20
**amount**   71:13
**andrew**   2:4,6 4:17
**annual**   81:23
**answer**   5:14 20:16 20:21 59:4
**answered**   60:8
**anymore**   95:20

apologize  60:9
74:4
apply  39:11
appreciate  96:16
96:18
approachable
26:6
appropriate  9:4
40:10
approvals  42:6,8
approve  21:8
83:15
approximately
18:7 20:7
april  36:5
area  26:22 27:3,17
27:19,20 28:2,13
28:16,19,23 29:6
30:21,23 31:14,17
35:21 39:11 45:16
49:17 50:24 51:11
51:19 52:6 61:9
61:10,20,25 62:13
62:14,18 65:3,19
66:10 67:15 72:19
72:24 74:11,15
77:7,12,13,19
78:11 79:4 80:14
99:10,15
areas  11:19 27:12
27:21 29:11,12,12
29:15 30:15,18
64:6,11 79:20
80:10
army  7:18 8:5
arrive  81:19
aside  46:2 54:11
60:3 73:12,16
74:14
asked  7:8 88:18

asking  4:20 5:8
51:20
assess  81:16
assigned  11:16
17:24 19:15 23:2
23:14 26:15 29:16
33:11 51:10 55:13
66:9 89:10
assignment  9:20
13:21 14:17,18
17:19,20 19:8,9
22:23,24
assignments  11:12
11:14 15:9,10
assistant  1:10
assisting  15:15
associate  18:15
42:10 43:13,15,19
assume  6:14 29:10
53:25 54:3 59:11
78:3
assumed  39:16
assuming  66:9
67:13
assumption  36:14
attempt  61:13
attempted  70:10
attempts  19:4
attention  66:16
attorney  4:18
attorney's  1:21
2:8 94:15
attorneys  2:4,9
august  100:20
authorized  3:11
63:23
autopsy  59:2,6,18
68:11
aware  13:7 37:14
50:13 69:21,23
71:3,5 80:16,20,25

83:12 86:8 87:10
87:12

**b**

b  98:2
back  7:13,14 36:6
45:22 50:4,23
51:19 52:3 56:8
56:11 57:4 59:18
67:2,8 68:5,7
72:16 74:24
backup  65:8
barracks  9:14
bars  34:25 74:19
based  11:17 39:6
75:21 78:2 87:16
90:11 91:18
basic  11:9 46:20
81:9
basically  8:8 23:23
38:5 41:8 48:7
basis  12:19 55:8
61:3
bathroom  27:18
29:8 61:10,20
62:8,14 66:8 80:3
bathrooms  28:23
batteries  63:25
bay  26:17,20
27:21 30:15,18
35:18 39:15,19
bays  40:6
beds  26:21 27:17
28:16 80:7
began  7:12 8:12
believe  12:3 57:5
85:2
benefits  7:3,6
best  5:10 22:19
27:22 68:21
better  32:12

bit  35:18,24 44:12
68:4
blood  100:16
blunt  69:12
board  81:13
body  70:4,19
71:15,20
bone  69:19,19
bop  6:18,21 7:13
8:13,17,22 13:21
26:15 31:6,23
40:14,17 89:8
bottom  28:2 94:4
94:14 95:11
boy  26:16 81:7
brain  30:4
branch  7:17
break  5:11,15
breathing  72:9,11
81:11
bribed  51:12
briefings  15:11
briefly  12:25
bring  45:22 57:4
61:11
bringing  76:24
79:25 88:20
brooklyn  14:20
15:6 60:19
brought  36:22,24
48:16,22 49:3
50:21 61:17,19
66:8 67:8
bunk  27:16 28:16
67:2 70:21
bunks  30:14 62:7
67:9 77:16
bureau  1:9 6:15
40:21 41:3,5 48:2
52:16 68:7 73:9
81:9 93:24

**burn** 63:16,17,21 64:8
**burning** 64:19
**business** 58:13
**butner** 13:24

**c**

**c** 2:2,4,6 4:2,2 97:2 100:2,2
**call** 41:19 42:20 44:6 55:11 74:17 78:6,11 80:12 88:4,9
**called** 4:2 21:12 46:12 65:7
**camera** 77:5
**cameras** 49:6,11 49:16 76:19 77:10 77:12,25 78:19,24 79:2,4,6,11,20,23 80:5,8,9,9
**capacity** 20:12
**captain** 4:15 14:19 15:4,5,15 16:2 17:16,20 18:4 20:19 22:24 23:3 23:14 25:2,6 36:11 43:3 46:6 57:5 60:13,14,17 60:18,19 65:24 76:12 78:16 81:21 88:16 90:5 93:13 95:13 96:2,15
**captured** 50:10 77:21
**career** 73:17
**carolina** 13:24
**carry** 16:11
**carrying** 80:2
**case** 1:7 68:5 90:16,17,22 91:24 92:2 93:17,23

**cases** 68:2,3,3
**catch** 77:14
**caught** 50:2
**cause** 71:19,21
**caused** 67:23
**cells** 28:13 30:12 30:13,13,17 39:21
**center** 14:20 79:3
**certain** 16:9 34:3 40:18 71:14,19 90:11
**certainly** 67:21 94:25
**certification** 3:8
**certify** 97:4,8 100:9,14
**chain** 16:24
**chambers** 1:22 2:9 4:13
**chance** 57:12 68:10
**change** 10:25 30:5 41:2 82:12 101:5
**changed** 11:6,6
**changes** 89:8
**charge** 15:8 31:7
**charged** 87:20
**checks** 34:3,24 74:10,18
**chest** 72:5,9
**chief** 23:15
**children** 1:5
**chin** 72:7,8,8,18 72:23
**choked** 69:16
**choking** 83:10
**city** 36:18
**civil** 1:20 92:6 94:23

94:12,23 101:2

**clarification** 5:7
**clarify** 5:10
**class** 16:14
**classes** 82:2
**classifications** 59:22
**clean** 30:10
**cleaning** 30:22
**client** 23:9 25:10 25:13,14 32:19 37:23 41:13,16 46:3 47:24 53:10 57:13 59:2 60:24 69:11,15,22 96:18
**client's** 33:12 54:13 58:13 60:12 61:3 64:16 67:23 68:11 70:4,19 73:16 77:23 82:13 85:18 87:20,25 88:11 89:11,18 95:7
**clients** 94:9
**close** 62:12 90:6 90:18,22 93:23 95:3
**closed** 93:5
**closet** 13:15
**closing** 90:15
**cold** 94:9
**come** 30:9 46:7 53:14 55:15 61:14 67:22 69:14 77:4 92:13
**comes** 52:11,17
**coming** 10:7 65:3 76:16
**command** 16:25
**commission** 101:25

**clarification** 5:7

**clarify** 5:10

**committed** 13:4 13:18
**common** 30:21,23 31:17 77:12,13,19 80:10
**commotion** 66:15
**complete** 9:16 10:15 91:7,15
**completed** 90:6,21 91:4,17 92:7
**compressions** 72:5 72:9
**computer** 93:24
**concerned** 33:24
**concluded** 50:25 56:14 96:23
**concrete** 70:17,17
**condition** 42:16 70:15
**conditions** 59:15
**conduct** 22:3,4,7,8 22:9,13 24:4 46:8 46:9 48:9 50:17 65:13 68:6 74:16 76:16
**conducted** 76:18 86:12
**conducting** 34:20 48:4
**confidential** 69:2
**configurations** 29:3
**confines** 83:16
**confrontations** 39:9
**congratulations** 10:19
**considered** 37:3 93:19
**consistent** 85:17

**constant** 34:8
**contact** 53:15,17
**contacting** 81:14
**contents** 85:4
**continuing** 93:12
**continuous** 33:25
**contraband** 34:22
37:3,5 38:6 39:2,6
48:24 51:13 64:25
65:5 74:17 76:25
77:2,3
**contributed** 89:11
**control** 72:22 79:3
**conversation** 90:4
**cooperation** 96:19
**copies** 78:7
**copy** 3:14,17 96:6
**corners** 77:16
**coroner's** 56:17
**correct** 6:4,16,17
6:25 7:4,7 8:10,13
8:14 10:3 18:12
20:2 21:17,23
23:7 28:4,11
35:10,11,13,14
37:22 39:25 41:13
51:21 52:12 53:20
53:21 59:3,24
63:9 64:9,12 72:5
72:6 74:12 84:3,4
90:8,23 91:6 97:9
**correction** 1:10
10:8,9,13 11:9
15:7 24:25
**correctional** 9:24
13:23 17:21 18:6
18:9 23:16 82:5
**corrections** 9:13
**cos** 40:5 51:10
**cough** 52:9

**counsel** 3:6,17
51:20
**count** 29:22,23
**county** 100:5
**course** 51:4,7,18
58:12 73:11 84:22
**court** 1:2,19 3:13
4:24 5:5 94:21
**cover** 63:19
**cpr** 17:5 70:8,10
70:13 71:7,11,13
71:17,18,21 72:3
81:9
**craig** 1:18 4:11
97:15 101:3,21
**create** 64:2,10
**created** 58:11
84:21
**criminal** 93:4,12
94:16,25 95:17,19
**crossed** 21:16
**currently** 6:5

**d**

**d** 3:2 4:2 97:2 99:2
**daily** 12:19 15:1
23:18,19
**dangerous** 66:18
**date** 1:14 57:24
84:16 101:3
**day** 42:24 43:4
44:13,17 45:10
46:2 48:16 50:13
50:18 53:13,18
55:7 61:5 67:3
78:21 97:19
100:20 101:22
**days** 3:16 58:23
**dealing** 12:18 13:2
21:18 37:18 38:2
38:10,12,14 57:10
63:13 82:5

**dealt** 39:3
**death** 12:22 13:3
14:14 15:22 16:3
16:6,8,18 17:13
18:24 19:2,5
20:12,15 21:13,18
22:18 46:3,11
47:23 53:10 54:14
55:14 58:10,13
59:20,24 60:12,24
61:4 64:16 67:23
68:2 73:14,16,18
75:13 77:23 78:3
82:13 85:19 87:20
87:25 88:11 89:1
89:18 92:14 99:19
**deaths** 21:2 22:10
23:10
**decedents** 1:5
**december** 8:19
**deemed** 56:2
**defendants** 1:11
1:12 2:9
**definitely** 75:9
**degree** 24:2 80:11
92:21
**delaney** 42:3,3
53:23 96:5,6
**demand** 88:6,7
**demands** 96:7
**dependent** 88:25
**depending** 32:10
**depends** 16:17
17:5 21:12 34:11
35:17 66:13 89:3
91:15
**depict** 79:24
**depicting** 80:14
99:15
**deposition** 1:17
3:8,9,14 5:20

57:21 96:2,10
101:3
**deputy** 14:18 15:3
15:5,25 17:16
60:19
**describe** 11:4
12:25 15:2 16:15
18:2 23:12 26:14
27:2 33:18 85:3
86:21
**described** 79:24
82:9 85:16
**description** 85:14
**detention** 14:19
**dho** 96:5
**die** 73:23
**died** 16:12 44:20
44:22
**different** 10:5
11:12,14,19 12:3
29:2 33:22,23
35:24 52:17,19
63:18,20 71:17,18
72:4 79:17,19,20
82:3
**direct** 16:5
**directly** 12:23
17:11 18:23 21:25
**discharge** 85:12
**discharged** 7:21
8:12
**disciplinary** 9:14
12:17 84:10
**discovery** 94:12
**discussed** 73:2
74:3,5,22 77:22
**discussion** 56:7
57:17 90:2
**disguise** 63:17
**dispatched** 22:8

disputes 37:13
distinctive 63:8
distributed 76:8
distribution 75:12
district 1:2,2 2:8
division 94:17
docket 93:23
document 5:24 6:2
58:3,8,11,15,17
84:19,21,25 85:4
documents 5:20
47:11 86:6 99:6,7
doe 1:11
doing 9:5 21:21
34:23 35:8 51:12
63:4 67:16 71:21
72:3,4,7,14 74:13
83:14,22 94:16,17
door 36:3
doors 34:24 74:20
dop 84:23 96:6
dormant 93:9,10
93:18
dotted 21:16
doubt 39:18
downs 34:21 63:22
74:18
downstairs 32:9
downtown 6:10
drag 61:24
dragged 62:18
66:7,24
dragging 67:16
80:2
draw 66:16
dropped 70:20,23
80:22
dropping 72:23
80:17
drug 47:13,17
53:8,9 56:2,15,18

69:7,9 75:5,20
drugs 36:16 38:8,9
39:2,6 47:18
48:16,20 76:24
duly 4:3 97:5
100:11
duties 10:25 11:10
12:15 15:3 18:3
23:13,24 81:20
82:20
duty 42:11,25 43:3
53:12 62:22 63:13
64:18 78:23 84:9

**e**

e 2:2,2 3:2,2 4:2
97:2 98:2 99:2
100:2,2
e5 7:24
earlier 44:12 45:8
63:8 74:22 75:2
79:24
ebt 88:6 96:7
echelon 12:9
effect 3:12,15
41:12
either 15:24,25
17:12 18:23 29:5
45:15 51:24 53:8
61:19 65:16
eligible 7:3
emergencies 81:3
82:3
emergency 81:3
81:15,22,25,25
employed 6:5,7
employees 1:11
employment 7:12
encompassing
87:24 88:11 99:19
ended 67:24

engage 83:8 95:23
engaging 63:10
84:3,6
ensure 34:5 44:4
74:19 76:15
ensuring 34:24
43:25 76:19
entailed 15:9
enter 65:11 67:15
82:20,23
entered 8:16
entire 27:3 31:24
31:25 34:9 41:5
73:17
environment 82:6
errata 101:1
esq 2:6,10
essentially 64:7
estate 1:4 4:18
et 101:2
evacuated 41:22
42:17
evening 29:21
31:5 33:11,20
40:10 57:2 61:7
78:18 85:18
event 16:8,12
events 77:22
everyone's 35:22
evidence 21:5
50:20 78:4
exacerbated 70:14
exact 92:13
exactly 48:25
52:10 59:19 68:8
examination 4:7
96:22 99:3 100:10
100:12
examined 4:5
excessive 24:13

excuse 15:16
28:24
executed 93:15
executive 1:10
exh 98:5,6
exhibit 57:23
84:15 98:4,4
exhibits 98:3
exist 80:12,13
99:15
existed 24:3
exists 49:9 92:21
experience 11:14
13:2
expires 101:25
extent 13:8
extra 84:9

**f**

f 3:2 100:2
face 57:4
faces 45:17
facilities 22:5,8
facility 18:10 43:6
50:8 55:13 62:9
fact 62:25 75:21
78:2 86:3
factor 75:13
facts 42:21 46:19
93:22
fair 7:11 37:8
38:22 60:7 72:25
fairly 36:12 52:15
fairton 17:22
60:18
familiar 25:12
52:13 58:2 84:18
85:24
family 48:14 50:7
far 9:21 12:18
16:17,24 21:14
25:18 33:23 40:19

43:25 54:25 62:7
76:15
**fbi** 17:8 21:11 46:4
46:7,9,12,16,25
47:4,6,16 48:2
50:16 53:10,11,20
54:17,23 55:5,6,9
55:13,19 58:9
66:5 68:5 86:3,14
86:25 91:11,14
**fbop** 81:2
**fbop's** 58:12
**fci** 18:4,5,18
**federal** 1:9,20 6:15
6:20 9:24 10:3
11:13 15:13 17:21
19:19,24 23:21
39:15 46:11 76:16
**feel** 40:3,7 75:14
75:16
**felt** 40:9,15 50:19
56:15 66:17
**female** 50:18
**file** 21:11 90:16
**filing** 3:7
**fill** 16:22
**find** 26:4 63:22
64:25 65:4 69:11
92:23 99:20
**finding** 86:14
92:14
**findings** 59:18
68:7 85:22,25
86:9,25 92:13,14
95:4
**fine** 8:21 14:25
22:21 29:4 32:23
**finish** 48:4 91:12
**fires** 64:2,10
**first** 4:3,23 5:14
9:19 10:6 11:8,13

11:15 40:20 81:8
81:15 97:5
**five** 71:16 85:13
91:20
**flash** 65:14 82:22
**flashed** 67:12
**flashlight** 36:3
65:18
**floor** 1:22 2:9 4:13
**follow** 64:20
**followed** 16:10
40:19
**follows** 4:6
**footage** 21:4 49:6
77:21 79:8,10
80:13 99:14
**force** 3:15 24:13
69:12 85:13
**foregoing** 97:8
**form** 3:21 5:4 6:3
75:4 84:13,14
90:6 92:24 99:21
**forms** 16:21 52:11
52:17
**forth** 21:5 30:22
44:3 72:10 82:5
86:15 100:11
**found** 45:9,9 62:7
68:18,19
**four** 20:6 28:7
45:14 58:23 85:12
**frame** 14:23
**front** 32:15
**full** 13:24 14:2
46:8,10 70:17
**fully** 75:6
**further** 3:20 43:23
97:8 100:14

g

**g** 4:2
**gate** 65:12,15,17
82:21,24
**gated** 28:10 29:12
29:15
**gathered** 47:15
**general** 20:22 85:7
**gestures** 5:6
**getting** 41:19
58:25 81:16
**give** 31:3 58:16,18
82:2 88:15
**given** 50:9,14
51:23 75:19 76:3
90:10 97:10
100:13
**giving** 71:17
**go** 8:4,24 17:6
25:24 27:10,12
28:5 30:21 35:19
35:22 36:6 50:4
60:16 63:19 64:5
65:17 74:13 81:24
**goes** 28:3
**going** 34:4 36:3
42:23 43:24 49:24
50:17,23 51:19
59:13 62:23 68:2
68:4 73:22 77:8
78:6 79:5,17
84:12 88:5,9
94:10,11,20
**good** 4:15,16 7:10
96:20
**goodness** 29:17
**gotcha** 25:9
**gotten** 84:2
**graduate** 7:25
73:11

**graduated** 8:8
**grant** 1:4 4:19
25:11,21 26:15
32:19 37:24 38:5
42:16 45:12,23
50:9,21 51:3
53:15 57:8,11
61:13 62:3,7 69:3
70:23 76:7 78:15
80:17,22 99:13
**grant's** 59:20
73:14 75:11 99:19
**great** 10:19 11:25
**grill** 66:11 67:13
**grills** 88:23
**ground** 70:20,23
70:25
**grown** 94:9
**gs11** 12:10,12
**gs9** 12:8,10,11,15
13:25 14:2
**guardian** 1:4
**guess** 57:19 67:10
95:22
**guidelines** 40:18
41:6
**gurney** 80:18,24
**guys** 88:12

h

**h** 4:2 98:2
**half** 74:7
**hand** 72:18,24
78:14,14 99:11,11
100:20
**handle** 46:23
**handoff** 49:18
51:17
**hands** 36:20
**happen** 45:24
71:19

**happened** 30:8
39:18 46:19 49:21
59:16,19 62:4,5
63:6 67:4 68:8
70:18 71:25 73:24
**happening** 49:25
94:24
**harbord** 1:24
100:7,23
**hard** 63:3,6 79:19
**head** 5:5 70:24
72:7,8,16,22
**hear** 27:7,24 44:18
44:21 80:21 95:5
**heard** 61:3 67:3
71:10 92:16
**hearing** 45:19
**hearings** 12:17
**held** 1:21 10:5
56:7 57:17 90:2
**helped** 66:24
**hereinbefore**
97:11 100:11
**hereunto** 100:19
**high** 7:25 8:9
84:10
**hired** 6:12
**hit** 70:24
**home** 43:8
**homicide** 16:20
56:2 58:20 59:9
60:3,6
**honorably** 7:21
8:11
**horseplay** 83:9,18
84:3,6
**hospital** 41:23
43:24 44:3
**hour** 74:8
**hours** 31:5 43:4
78:18,21 87:24

**house** 6:10 22:6
**housed** 32:19
40:11
**housing** 11:11
12:16 13:5 27:3
31:14,24,25 32:5
34:2 36:7 39:11
41:7 50:24 51:19
52:3 66:10 77:6
78:11,20 80:18
83:8,16 89:10
99:9
**hung** 13:14
**hyoid** 69:18,19

**i**

**idea** 59:8 60:2
62:22
**identification**
57:24 84:16
**illegal** 68:23
**illicit** 68:19
**imagine** 95:15
**immediately** 81:13
**important** 96:17
**improperly** 71:13
71:24
**incense** 52:18
**incident** 5:25
16:23 23:8 25:16
33:12 39:14 41:12
41:15 46:16 50:3
58:24 60:11,23
65:23 70:5,5 85:6
85:8,10,15,20,23
86:13,17 90:14
91:21 92:15,17,18
**incidents** 26:8
34:6 39:5,20
**include** 24:12
60:19

**included** 12:15
**indirectly** 12:24
18:23
**individual** 28:13
**infantry** 9:11
**inform** 42:15
**informants** 69:2
**information** 21:7
26:4 44:14 47:15
50:20 54:12 68:9
70:18,22 72:2
85:7 99:6,7
**informed** 42:4
**ingested** 57:6 62:2
62:3 67:6
**initial** 85:20,22
86:9
**initially** 7:12 8:22
9:10 56:15 59:10
**injured** 69:18,19
84:2
**injuries** 71:4,9,22
**inmate** 11:10
12:22 13:3,4,12
14:14 15:22 16:4
16:6,8,12 17:13
18:25 19:3,5
20:12,14 21:2,18
22:10,18 23:10
27:11,13 28:6
30:9 41:21,22
42:12 43:24 44:2
44:14,15 45:12
46:10 50:8 53:15
53:17 55:14,24
57:8 58:10 59:13
59:20,23 60:3
68:2 73:23 76:18
78:3 82:7
**inmate's** 92:14

**inmates** 12:18
27:20 29:6,14,20
30:11,24 31:4,7
38:24 40:12 45:10
45:14,15,20,22
47:12 56:21,24
57:2,9 61:6,8,23
61:24 62:16,19
63:2,3,10,16 64:13
66:7,14 67:4
68:25 69:4 74:7
75:18,19 76:2,6
77:16 79:25,25
80:3 83:7,13,18
84:2 85:9,9,11
88:20,20
**inside** 26:20 27:17
27:19,19 65:15
78:10 79:5 99:9
**instance** 46:13
55:23 71:16
**instances** 33:3
39:12
**institute** 38:15
**instituted** 38:16
**institution** 9:24
13:23 14:12 17:21
23:21 36:25 42:13
55:16 76:13 79:12
90:12
**institutional** 20:23
**institutions** 21:2
**intelligence** 9:12
**interaction** 39:24
**interested** 100:17
**interviewed** 53:11
53:19 54:6 65:22
65:25
**interviews** 47:12
**introduction**
76:12

**investigate**  21:12
47:2
**investigated**  53:7
73:18
**investigating**  16:3
17:13 58:10,13
73:14
**investigation**
12:22 14:13 15:21
18:24 20:14 21:25
22:17 23:25 38:16
46:9,10,23 47:8,10
48:5,9 49:5 50:17
55:9,17 56:14
65:13 68:6 90:7
90:10 91:4,12,15
93:4,13 94:2,25
95:3,18,20
**investigations**
19:12,22 22:4,6,9
22:10,12,16 23:10
24:4,6,8,13,16
90:11
**investigative**
19:23 20:24,25
21:11 26:12 38:19
38:20 45:7 54:19
55:12 66:4 73:10
78:25 85:21,25
90:15 91:8,9
**investigators**
69:10
**investigatory**
20:11
**involve**  22:16
23:25 24:17
**involved**  14:12
15:21 17:11,12
18:23 19:5 20:11
21:25 23:9 37:24
38:6 47:7,23

54:24 55:5,19
85:9,10,11
**involvement**  13:2
75:12
**involving**  12:22
15:22 16:3,5
18:24 19:2 20:14
22:17 23:8 24:6,8
24:9 25:16 26:8
36:7 37:25 41:13
41:16,21 42:22
46:3,10 60:11,23
65:23 77:23 78:13
84:3 99:11
**issacharoff**  2:10
56:4 78:17 86:20
87:5 88:14 89:23
93:3,8 94:19 96:8
**issue**  26:3 64:15
95:4
**issued**  94:6 95:12
**issues**  24:9 34:6
36:6 40:23,25
51:9 56:24
**items**  76:16

## j

**jane**  1:10
**january**  36:6
**jersey**  17:22
**job**  9:8 15:9 21:13
21:22 23:17 51:12
**john**  1:10
**jones**  54:20
**judge**  3:13
**july**  1:14
**juncture**  7:2 18:13
95:25
**june**  6:13 36:5

## k

**k2**  36:8,11,22,24
37:3,5,13,18 38:2
38:5 44:25 45:2
45:11 48:17,18
52:11 53:9 62:17
63:8,11 69:7
74:23 75:12 76:7
76:12
**kansas**  9:15
**keep**  34:9 36:3
91:24
**kerns**  1:10 24:18
24:19 33:15,20
54:2 65:22 66:9
67:11,11
**killing**  13:13
**kin**  95:7
**kind**  14:13 16:16
20:11 27:4,25
28:3 30:3 37:12
37:24 44:18,19
53:4 63:11 65:4
69:12 70:11 78:12
83:8,9 92:17
94:13,14 99:10
**knew**  59:16
**know**  5:2,9,12
8:15 13:12 16:10
16:11,13,18,19,21
16:24 17:2,6,7,9
21:15 24:22,24
25:5,24,25 26:5,6
29:16 30:11,19
31:4,16 32:20
33:10 34:11,12,14
34:24,25 35:3,21
36:2,10,13,15,16
36:17,19,21 37:17
37:23 38:10,16,24
38:25 39:10,13,14

41:7,9 43:18 44:5
44:11,15 45:16,19
46:20 47:3,5,17
48:6,7,20 49:2,24
50:4 51:3,24
52:14 53:6,16,22
54:5,9,22 55:4,8
55:22,25 56:18,23
57:7 58:7,21 59:4
59:6 60:5 61:16
61:22 62:12,24,25
63:2,4,4,20 64:25
65:2,6,18,20 66:2
66:18,20,23 68:3
69:6,9 70:12,19
71:15,25 72:7
75:22,22 76:20
77:2,10,12,20 78:2
78:8,9 79:12,18,18
82:2,15,21 83:10
83:11,14,15,17,19
84:8 86:11 87:19
87:22 89:3 91:13
91:16 92:21 94:10
94:13,22 95:6,8
**knowing**  59:12
**knowledge**  11:18
22:20 66:6 92:11
93:14
**known**  34:21

## l

**l**  3:2,2 4:2 97:2
**laced**  52:20
**laufer**  2:4,6 4:8,17
56:8 57:15,18
78:6 80:11 84:12
86:18,23 88:3
90:3 92:20 93:10
94:3 95:5 96:12
99:4

| | | | |
|---|---|---|---|
| **law** 2:4 | **living** 27:11,13,20 | 29:1 30:1 31:1 | **marks** 71:14 |
| **lawsuit** 4:19 92:6 | 28:7,9 | 32:1 33:1 34:1 | **marriage** 100:16 |
| **leads** 94:8 | **llc** 101:1 | 35:1 36:1 37:1 | **mary** 54:20 |
| **learn** 45:25 67:22 | **located** 27:5 | 38:1 39:1 40:1 | **matches** 63:24 |
| 69:14 | **location** 9:21,22 | 41:1 42:1 43:1 | **matter** 51:4,6,18 |
| **learned** 44:20 | 14:5 | 44:1 45:1 46:1 | 100:18 |
| 54:13 | **locked** 29:9,20 | 47:1 48:1 49:1 | **mcc** 22:25 23:3,10 |
| **leavenworth** 9:14 | **logs** 87:24 88:5,12 | 50:1 51:1 52:1 | 23:14 33:8 36:22 |
| **leaving** 52:5 | 99:18 | 53:1 54:1 55:1 | 38:24 39:3 41:4 |
| **led** 41:2 57:5 | **long** 6:20 8:15 | 56:1 57:1 58:1 | 55:12 60:17 67:25 |
| **lee** 1:10 | 10:12,20 14:4 | 59:1 60:1 61:1 | 82:8 86:12 |
| **left** 31:20 32:15 | 15:17 17:15 18:18 | 62:1 63:1 64:1 | **mdc** 15:5,18 17:15 |
| **legal** 1:4 | 20:4 27:6 35:15 | 65:1 66:1 67:1 | **mean** 16:14 35:23 |
| **lethal** 85:11 | 50:12 60:12 91:24 | 68:1 69:1 70:1 | 43:17 62:25 64:3 |
| **level** 20:17,22 | 92:18 | 71:1 72:1 73:1 | 68:25 77:3 79:11 |
| 21:14 28:5 70:13 | **longer** 6:14 35:18 | 74:1 75:1 76:1 | 83:13 87:16 94:4 |
| 84:10 | **look** 32:4 52:24 | 77:1 78:1 79:1 | 94:7,19 |
| **levels** 71:18 | 65:18 77:3 79:19 | 80:1 81:1 82:1 | **medical** 17:2,2 |
| **license** 12:12 | 86:21 87:6,7 89:7 | 83:1 84:1 85:1 | 81:3,13,14,14,19 |
| **lieutenant** 11:22 | **looked** 66:10 | 86:1 87:1 88:1 | 82:2,3,3 |
| 11:24 12:2,5,6,7,8 | **looking** 32:13 | 89:1 90:1 91:1 | **melissa** 1:23 100:7 |
| 12:10,10,11,12,13 | 58:17 74:19 79:18 | 92:1 93:1 94:1 | 100:23 |
| 12:15 13:24,25 | **looks** 27:4 | 95:1 96:1 97:1 | **member** 48:14 |
| 14:3,8,9 15:24,25 | **lot** 20:13 63:15 | 98:1 99:1 100:1 | 50:7 |
| 41:20,25 42:2 | 66:15 | **making** 12:16 | **members** 76:25 |
| 53:13,22 79:22 | **low** 84:7 | 21:21 35:5,6 63:5 | **memorandums** |
| 96:5 | **lower** 12:8 13:23 | **management** | 47:12 |
| **lieutenants** 12:9 | **lucas** 2:10 84:12 | 11:10 15:12 81:25 | **mentioned** 73:13 |
| 15:6,10 18:7 | 86:18 89:20,21 | **managing** 40:16 | 74:8 95:14 |
| 23:17 | 92:20 93:6 94:3 | **manhattan** 6:11 | **metropolitan** |
| **lift** 72:7,8 | **luck** 96:20 | 23:21 | 14:19 |
| **lifting** 72:18 | **m** | **manner** 65:14 | **michael** 1:18 4:11 |
| **light** 30:17 65:14 | | **manning** 49:16 | 97:15 101:3,21 |
| 67:12 82:22 | **m** 4:2 | **march** 23:4 | **middle** 31:17,18 |
| **lighters** 63:23 | **m.c.** 4:1 5:1 6:1 | **marijuana** 36:8 | **military** 7:16 8:7 |
| **lights** 30:6,19,21 | 7:1 8:1 9:1 10:1 | 52:19,25 68:17 | 9:6,8,11 81:8 |
| **limits** 90:10 | 11:1 12:1 13:1 | 75:5 | **minimal** 13:11 |
| **line** 17:9 101:5 | 14:1 15:1 16:1 | **mark** 57:20 | 34:12,15 |
| **little** 35:18,24 | 17:1 18:1 19:1 | **marked** 57:23 | **minimum** 10:2 |
| 44:12 68:4 | 20:1 21:1 22:1 | 84:14 | **minor** 1:5 |
| | 23:1 24:1 25:1 | | |
| | 26:1 27:1 28:1 | | |

**minute** 74:9,10
**minutes** 34:13,16
35:13 88:15
**misconduct** 22:14
22:16,17 24:2,5,6
24:8 68:3
**mispronouncing**
67:12
**mistaken** 14:7
28:8,20 30:2
**monitor** 76:21
78:24
**monitored** 49:12
**monitors** 79:14,15
**month** 6:23,23
8:25 82:16
**months** 11:23,23
67:25 70:12
**morning** 4:15,16
**morrison** 1:3
78:15 99:13 101:2
**mortality** 87:11,12
**mother** 1:4
**motion** 95:23
**mouth** 72:12,23
**moved** 70:25
**movement** 32:2
77:18
**mp** 9:9
**multiple** 62:16
**murdered** 69:22
69:24
**museum** 6:10

**n**

**n** 2:2 3:2 97:2 99:2
**name** 4:9,17 24:17
24:18 54:20 67:12
101:2,3
**nature** 72:12
74:21

**nco** 9:13
**necessarily** 77:15
83:15 95:21
**neck** 71:4,22 72:15
**need** 5:7 17:3 40:4
42:5,7 55:18
90:19 92:22,23
94:11,13,14 95:3
96:4
**needed** 26:3 93:22
**negative** 25:23
42:7
**never** 70:16,17
76:9 93:4
**new** 1:2,22,23,25
2:5,5,8,10,10 4:4
4:14,14 9:23,25
14:20 17:22 22:25
23:3 36:12 41:11
52:15 75:4 100:4
100:8 101:1
**news** 45:19
**nicole** 1:3 101:2
**night** 34:10 62:17
66:10 67:6
**nine** 60:20
**nodding** 5:4
**non** 1:18
**normal** 90:20
**normally** 44:9,13
90:5
**north** 13:24
**northeast** 19:10
19:16,19
**notary** 1:24 4:4
97:22 100:7
101:25
**noted** 79:21
**noticed** 65:19
66:22

**notification** 43:10
**notifications** 16:23
17:3,8 42:9,12
**notified** 42:14
43:2,11,14,18 46:5
46:6,7 79:22
**notify** 42:9 43:15
**notifying** 16:24
55:14
**november** 6:19
8:18,19
**number** 31:3 72:4
90:16,17
**numerous** 19:3
39:5 59:14

**o**

**o** 3:2 97:2
**oath** 3:12 59:11
**objection** 95:16
**objections** 3:21
**observation** 82:8
**observe** 13:17
66:12 67:16 70:3
74:6 78:23 79:3
79:10
**observed** 49:14
**observing** 89:16
**occurred** 21:13
26:9 41:9 42:22
49:18 70:5 80:15
82:8 85:18 95:8
99:16
**occurring** 42:5
**od'd** 62:17
**odor** 53:4 64:23
65:3
**odors** 63:20
**office** 1:22 2:4,8
19:10,16,18 22:7
31:11,16,22 32:11

**officer** 1:10 10:8
10:10,13 11:9
13:10 24:17,19
31:20,23 32:24
33:4,10,14,19
34:12 40:23 41:2
41:7 42:11 54:2
59:12 62:22 63:13
64:18,21 65:22
66:9 67:11 74:6
88:19 89:9
**officer's** 31:9,16
32:16 82:20 89:2
89:4
**officers** 15:7 18:8
23:17 25:2 31:6
33:22,24 35:4
40:21 54:8 89:15
**oh** 9:7 26:16 29:17
81:7
**okay** 13:5,22
15:14 19:15,17
26:18 34:23 35:22
46:21 59:10 65:17
72:25 78:17 81:11
82:18 88:14,17
91:18 92:3 96:15
**once** 44:13 47:25
68:4 74:7
**ones** 25:7,8 39:21
**ongoing** 93:7,9,11
**open** 26:17,19
27:21 28:2,13,15
29:24 30:15,18
35:17 39:15,19
40:6 64:4 72:22
91:5,24 92:10,18
93:19 94:2,5
**operation** 15:12
15:12

**operational** 14:9
76:20
**operations** 12:5,13
23:18,19,23 40:16
41:20,25
**opposed** 39:21
**optional** 82:25
**orange** 63:17,21
**order** 1:20 54:23
61:25 63:19 64:2
72:22 90:6,18,21
**orderlies** 30:9
**orderly** 23:20
**ordinary** 58:12
84:22
**original** 3:9,17
**otisville** 9:23,25
10:4,21
**outcome** 100:17
**outside** 30:14
76:22
**outspoken** 25:23
**outstanding** 25:3
**overall** 18:9
**overdose** 45:2
56:2,16,18 69:9
**overdosed** 45:11
45:21 56:21
**overdosing** 75:25
**oversaw** 19:22
23:21
**overseeing** 23:19
31:7
**oversight** 40:5

**p**

**p** 2:2,2 3:2
**p.m.** 96:21
**page** 58:3,7 98:4
99:3,7 101:5
**paper** 52:21,22

**paperwork** 12:17
21:3
**paraphernalia**
47:13,18
**part** 12:21 21:10
46:8 81:20 82:19
87:18
**particular** 14:12
32:5 36:7 39:11
46:13 55:23 62:6
65:23 77:6 81:5
83:7 84:25 89:10
**parties** 3:7 100:15
**party** 1:18
**pass** 83:11
**passed** 44:14,16
49:9 55:24 56:24
56:25 57:10 61:7
61:12 66:7
**passing** 68:25
75:20
**pat** 52:8
**patrick** 42:3 53:23
**patrol** 32:24 33:5
33:21 34:8
**patrolling** 34:9,14
34:17,19 40:11
74:14 83:4 89:16
**patrols** 74:11
**peels** 63:17,21
**pending** 5:13 94:2
**people** 37:17
71:17 79:13
**percent** 38:4
**perform** 70:10
81:10
**performed** 70:9
71:8
**period** 10:24
12:20 13:3 15:20
18:22 20:10 22:11

34:18 35:3,7 36:4
36:23,25 37:2,15
37:18 38:23 39:17
40:4 62:21 75:3
82:17
**person** 18:12
25:25 50:7 65:2
66:22,24
**personality** 25:18
**personnel** 31:23
**pertaining** 14:13
**philadelphia**
19:25 20:3
**phone** 44:6 55:11
**physical** 39:7,8
**picture** 32:12
**place** 13:8,11
16:19 34:6 59:13
61:10 66:19 90:12
97:11
**placed** 61:8 67:2,7
**places** 62:13
**placing** 72:20
**plaintiff** 1:6,19 2:4
98:3
**plaintiff's** 57:20
57:23 84:15
**play** 77:4
**please** 4:9,22 5:2
23:12 56:9
**pllc** 2:4
**plourde** 1:10
**point** 11:21 17:10
30:7,10 45:24
46:4 47:9,25 48:3
48:19 50:6,15
65:22 67:23
**policies** 33:24
76:21
**policy** 41:11

**position** 9:3 11:25
12:9 13:9 15:18
20:5 21:20 23:5
**possess** 37:4
**possibly** 49:8
64:24 70:16 75:12
75:24
**post** 31:9 32:5
33:5 88:6,24 96:7
**posted** 76:22
**poster** 6:10
**posts** 11:12 35:9
**potentially** 94:21
**poured** 57:3
**practice** 95:24
**practices** 82:8,12
**preparation** 5:19
**pressure** 71:18
**pretty** 11:11 53:4
68:5
**prevalent** 37:7,10
74:23,25 75:3
**prevent** 92:6
93:14,19
**prevented** 89:18
**preventing** 76:12
94:5
**prior** 23:8 25:16
30:5 38:6 44:21
50:23 51:18 52:5
58:25 60:11 64:16
**prison** 10:3 11:13
15:13 37:8,20,21
39:15 74:23 76:17
**prisoner's** 73:18
**prisoners** 24:10,14
26:8 37:4,13
39:20,24 50:22
51:11,13 67:16,17
**prisons** 1:10 6:15
19:19,24 20:13

48:2 73:9
**privy** 21:4 24:5,7
  56:16 86:16
**probably** 8:25
  26:11 32:8 59:17
  77:14 92:4 95:12
**probationary** 10:9
  10:13,16 11:5,9
**procedural** 16:7
**procedurally**
  21:17
**procedurals** 16:17
**procedure** 1:21
  43:18 69:8 90:20
**procedures** 16:9
  44:5 64:19 76:22
  82:11
**proceed** 48:9
**produce** 86:19
**produced** 63:11
  78:9,10 87:9
**production** 78:7
  78:12 88:4,10
  99:8,17
**progressed** 11:7
  11:20
**promoted** 11:22
  11:24
**promotion** 14:2,2
**prone** 39:19
**proper** 16:21,23
  69:8
**properly** 21:22
  51:12 70:14 71:11
**property** 1:4
  46:11
**public** 1:24 4:4
  97:22 100:7
  101:25
**pull** 79:2

**pulled** 49:5
**pungent** 53:4
**purchased** 76:4
**purpose** 57:19
**pursuant** 1:19
**pursued** 95:22
**put** 30:3 36:2 41:5
  59:17,22 60:3,6
  91:19
**putting** 45:17

### q

**quarter** 27:20
**quarters** 27:11,13
  28:7,9
**question** 4:23 5:13
  5:14 20:16 56:9
  56:11 59:5 67:10
**questions** 4:21 5:3
  5:16 91:25

### r

**r** 2:2 3:2 4:2,2 97:2
  100:2
**range** 77:11 80:6
**rank** 7:23
**react** 17:7
**reaction** 66:22
  67:5 82:4
**read** 56:8,11
**real** 49:21 79:9
**really** 8:19 14:23
  25:22 36:19 66:18
  69:6 73:8 75:5
  89:6
**reason** 37:14
  55:19,22 56:19
  58:16 59:23 91:23
  92:9 101:5
**reasons** 73:21
**recall** 8:16 9:19
  25:17 26:24 31:2

32:13,22 33:4,13
  36:9 38:4 40:20
  41:15,18,19,24
  44:7,10 45:4
  46:17 47:20 50:15
  51:14 53:5 54:12
  57:9 65:21 77:24
  86:16 87:21
**receive** 16:2 20:18
  42:21 72:2
**received** 16:16
  20:22 43:9
**recollection** 27:23
  33:16 68:20,22
**record** 4:10 48:6
  48:11 56:5,6
  57:15,16 89:24,25
  90:4 100:12
**reference** 20:25
  70:8 71:7
**referral** 54:17
  55:18 58:9,16,21
  59:23
**referred** 55:20
  56:10 59:9 78:16
**refresh** 33:15
  68:20
**regard** 81:6 94:18
  95:24
**regarding** 4:21
  38:17 46:16 47:23
  60:23 76:7
**regardless** 95:6
**region** 19:24
**regional** 19:10,11
  19:16,18,20,21
  20:17 21:14 22:7
**regularly** 49:11
**regulation** 40:14
**regulations** 40:17

**related** 100:15
**relation** 53:7
  54:13 87:20 89:9
**remain** 92:10
**remained** 92:18
**remake** 88:5
**remember** 25:4,6
  25:8,14,21 26:17
  28:25 45:18 61:22
  71:20 76:4
**remembered**
  73:21,25
**removed** 70:21
**reoccurring** 64:15
**repeat** 19:14 20:20
**repeating** 60:9
**report** 5:25 16:22
  53:24 56:13,17
  59:2,6,16 68:7,11
  68:14 85:5 90:14
**reporter** 4:24 5:5
  56:12 57:25 84:17
**reporting** 101:1
**reports** 20:23 86:3
**represent** 4:18
**request** 55:9
**requested** 89:21
  99:6
**requests** 88:7
**require** 90:21
**reserved** 3:22
**respective** 3:6
**responder** 81:16
**responders** 81:21
**response** 4:24 81:3
**responses** 5:3
  81:25
**responsibilities**
  10:25 11:5 15:3
  18:3 23:13,25

**responsibility**
11:25 63:12 76:11
76:14
**restroom** 29:11
63:19 64:5
**resulted** 59:19
67:7 68:24 70:16
71:14 75:20,24
**retire** 6:18 7:6,8
**retired** 7:5 23:6
68:9 82:14
**retirement** 7:3
**retiring** 67:24
**review** 5:20 21:3
57:13 68:11 84:13
86:5,13,24 87:4,11
87:13,23 89:22
**reviewed** 5:23
57:21 62:19 67:8
77:25
**reviewing** 21:14
49:24
**revive** 45:18 56:22
61:25 80:3
**right** 6:7 7:15 9:7
18:17 20:8 31:17
31:21 32:16 58:18
62:10 64:4 65:16
72:17,19 73:3
78:19 82:14 91:18
91:22 92:4 93:11
94:9 95:7 96:12
**roberto** 1:4 4:19
25:11 32:19 37:24
**role** 18:8 73:13
**rookie** 10:17
**room** 54:8 79:14
79:16
**round** 35:13,16
**rounds** 12:16
25:24 33:25 35:5

35:7,8 36:2 63:5
74:9
**rules** 1:20 33:19
**rumor** 71:6
**rumors** 44:18 45:9
61:2 71:10
**run** 22:6 41:7
**running** 23:20

**s**

**s** 1:11 2:2 3:2,2
98:2,3 101:5
**safe** 96:19
**sanction** 84:5,7
**saw** 50:5
**saying** 50:16 57:7
61:23 62:25 71:15
75:19 92:24
**says** 58:20
**scene** 17:6
**scheduled** 42:14
96:3
**school** 8:2,9
**scope** 58:12 84:22
87:24 88:12 99:17
**se** 22:2 72:15
**sealing** 3:7
**search** 51:11 52:5
52:9 77:2 95:10
**searched** 50:23
51:4,8,18 52:2
**searches** 74:16,17
76:15,17
**searching** 34:22
51:13
**second** 11:16
58:18
**section** 85:6,8,10
85:12,12,14
**secure** 35:25
**secured** 34:25
74:20

**securing** 89:17
**security** 6:9 10:2
13:23 34:23 40:5
44:2 49:17 74:18
**see** 18:17 31:19,20
32:2,8,10,14 49:22
53:24 64:24 65:4
65:19 67:19,20
77:13,15,17,18
79:4 87:7,8 88:20
**seeing** 86:17
**seen** 49:7
**seized** 47:19
**selling** 36:18
**send** 21:8 96:9
**senior** 14:8
**seniority** 11:18
**sense** 57:4
**sergeant** 7:24
**serious** 83:18
**servants** 1:11
**serve** 7:17
**service** 3:16 7:19
**set** 100:11,20
**sg** 1:4
**shake** 34:21 63:22
74:18
**shaking** 5:4
**shared** 76:22
**sheet** 101:1
**shift** 30:5
**shoot** 96:14
**show** 59:19 93:25
**showed** 69:15
**shower** 13:15
27:19 45:16 61:9
61:17,19,21,25
62:13 66:25 88:21
**showers** 28:17,20
28:22,22 29:5,7,10
62:8 67:8

**shows** 58:23
**shut** 29:25 30:4
**sia** 47:10 54:18
**side** 30:3
**signature** 100:23
**signed** 3:10,12,15
**signs** 69:15
**simply** 59:23
**single** 30:16
**sir** 4:16 5:18,21
6:4,6,17,19,22,25
7:4,7,9,14,18,20
7:22 8:10,14 9:18
10:8,11,14,18,22
11:3 12:23 13:19
14:7,15 15:19,23
16:6 17:14,17,25
18:14,20 19:3,6
20:2,6,9 21:23
22:19 23:4,7,7,11
24:11,15,21,23
25:2,14,19 26:10
26:25 28:11 31:2
31:8 32:21 33:2,6
33:9,13,17 35:11
35:14 37:5,21
38:3,9,14,21 39:4
39:4,8,22 40:2,7
40:13 41:14 43:4
43:7 44:17,23
45:3 46:14 47:6
47:21 49:13 51:2
51:7,15 52:23
53:2,18 54:8,15
57:14 58:4 59:5
60:5,25 62:20
64:9,12,17 65:10
65:25 66:14 67:21
67:24 68:12,15,21
69:13,17,20 70:2,6
71:2 72:2,6,13

73:4,8,15,19 74:12
75:10,14,15 76:5
76:10 77:10 78:22
80:20 81:4 82:10
82:15,18 83:3,6,20
83:24 84:4,20,24
85:5,21 86:4,7,10
86:17 87:15,21,22
88:2 89:19 90:8
91:6
**sis** 54:18 73:3,4,7
**sitting** 92:25
**situation** 13:7
16:25 17:7 41:21
43:23 46:22 65:9
66:16 81:17
**situations** 81:22
82:4
**six** 11:23,23 60:15
67:25 82:16 85:14
**small** 74:2
**smell** 52:22 53:3
63:8,11
**smelled** 64:3,18,23
**smells** 63:18
**smoke** 63:3 64:4,6
**smoked** 52:18
66:20
**smoking** 63:2
**smuggling** 53:8,9
**sold** 48:21
**someplace** 63:4
**sorry** 19:13 20:19
28:24
**sort** 38:6
**sorts** 15:11
**sound** 20:8
**south** 26:23,25
27:3 30:25
**southern** 1:2 2:8

**speak** 46:15 92:22
**speaking** 46:17
**special** 19:11,21
19:23 20:23,24
26:11 38:19,20
45:6 47:10 54:18
55:12 66:4 73:9
78:25 91:8,9
**specialist** 6:9
**specific** 29:19
36:10 39:13 44:7
44:11
**specifically** 45:18
**specified** 97:11
**spelt** 29:13
**spoke** 55:6
**spoken** 26:11
53:16
**sprayed** 52:21
**ss** 100:4
**staff** 12:19 17:2
18:10 22:14,15
24:2,5,6,8,14
40:19 43:25 47:2
49:15 52:2 53:7
53:12 55:10 70:10
76:23,25 81:2,13
81:14,19,21 82:2
**staffing** 40:18,23
40:25 41:6
**stage** 90:15
**stairs** 27:10,11
28:5
**stall** 13:15
**stalls** 64:5,6
**standing** 88:22
**started** 8:7
**state** 1:24 4:4,9
61:11 100:4,8
**stated** 45:8 57:3
69:3 71:5

**states** 1:2,9 2:8
4:20 85:2 94:15
101:2
**station** 31:16
32:17 89:2,4
**stay** 17:15 96:19
**stayed** 23:5 33:5
**step** 68:5
**steps** 28:3 62:13
**stint** 6:24 10:16
14:11 18:18 33:7
**stipulated** 3:5,20
**stood** 43:22 44:4
**stopped** 49:19,22
**stores** 36:18 48:21
**straight** 8:24
**street** 1:22 2:5,9
4:13
**strip** 52:2,5,8
76:17
**strong** 50:19
**stuff** 83:11
**subscribed** 97:18
101:22
**substance** 68:23
**substances** 68:19
**successfully** 9:16
10:15
**suffered** 69:11
**sufficed** 41:7
**suffolk** 100:5
**suicide** 13:5,18
16:20 19:4
**suite** 2:5
**supervised** 15:6
23:16
**supervising** 18:6
**supervisor** 18:6,9
19:12,22 23:16
38:21 43:12 45:7
73:10 91:10

**supervisors** 19:23
20:24 26:13
**supervisory** 13:9
**supply** 75:23
**supposed** 7:6 33:2
33:20,25 49:18
74:6 78:13 99:11
**supposedly** 62:17
**sure** 8:19,20 9:3
10:23 14:24 17:25
21:15,21 32:21
35:21 38:4 54:7
54:10 58:19 62:11
73:8 89:6
**surveillance** 50:11
76:19 77:6,9,21
78:8,13 79:10
80:13 99:8,10,14
**suspects** 94:7
**suspicious** 49:15
**swallowed** 51:24
**sworn** 3:10 4:3
97:5,18 100:11
101:22
**synthetic** 36:8
68:17 75:4
**system** 68:18,19
90:9 93:24,25

**t**

**t** 3:2,2 97:2 98:2
100:2,2
**t's** 21:16
**take** 4:24 5:5,11
5:14 6:23 29:4,7
35:16 65:18 87:5
90:12
**taken** 1:19 66:19
**talk** 25:10 26:2,5
85:7 94:21
**talking** 39:15
46:21

**tampered** 35:2 74:20

**tapes** 50:4 78:4

**taught** 16:7,21

**technicians** 79:2

**tell** 5:22 26:7 60:22 63:3,6 81:5 83:22 95:2

**temporary** 11:21 11:24 13:25

**ten** 62:13

**tenure** 14:10,10

**term** 75:2

**terms** 40:15

**tested** 68:17

**testified** 4:5 63:7

**testify** 97:5

**testimony** 97:6,10 100:13

**testing** 69:8

**tests** 69:7

**thank** 7:19,20 96:16

**thing** 36:11 47:22 61:14 62:3 94:5

**things** 5:10 12:17 16:7 17:5,9 19:4 32:3 33:23 35:2,4 48:5 49:23,25 52:19,25 62:15 63:22 64:8 71:19 72:4,12 74:2,21 76:21 77:4,17 79:17 83:10,14,17 83:19 90:11

**think** 5:24 6:22 13:14 14:22 17:17 18:20 20:6 23:4 26:10 28:7 29:5 29:10,24 30:4,8 32:13,14 38:9

41:3 42:2,19 45:13 47:25 49:4 49:7 54:19 56:15 56:19 59:10,15 60:8 61:9 62:12 63:7 68:8 70:9 73:2,20 74:3,8,22 74:25 75:11 76:6 77:8 80:8 84:7 88:3,16 89:8,14,19 89:20 93:3 94:20 95:6,25 96:3

**thoughts** 44:19

**three** 9:12 14:6 45:14 85:10

**throat** 71:4,22 72:15

**thursday** 96:4

**tier** 28:18 29:15 35:23,24 36:10 45:12 47:13 62:6 63:5 64:23 65:12 67:13 82:21,23

**tiers** 26:18,20,21 27:16,25 28:12 32:3,7,8,9,10,15 32:18 45:20 63:2 77:15 89:4

**till** 78:4

**tilting** 72:16

**time** 1:15 3:22 4:25 5:7,12 8:8,15 10:4,24 12:20 13:3,10 14:3,23,24 15:20 16:13 18:22 19:14 20:10 29:4 29:7,19 32:25 34:18 35:3,7 36:4 36:19,22,25 37:2,8 37:15,18 38:23 39:17 40:3 41:12

41:25 42:12,16,20 42:22,23,25 43:6 44:17 46:18,25 47:19,20 48:3 49:17,20,21 50:3,6 51:14 52:4,14 54:19 59:15 60:19 62:21 64:13,14 69:5 70:4,11 75:4 75:17 79:9,17,21 82:16 86:5 90:10 96:16 97:10

**times** 63:15 91:13

**title** 10:6 76:23

**today** 78:5 89:7

**toilet** 45:16 61:21

**told** 33:14 45:4,8 46:2 48:6,10,13 54:11 60:4,22 61:5,18 68:16

**top** 58:15

**total** 30:24 60:14 60:20

**toxicology** 57:13 68:13

**train** 81:21

**trained** 16:11 81:2 81:18

**training** 15:10 16:2,5,7,16 17:4 23:22 73:3,5,7,10 76:25 81:6,12,24

**transcript** 97:9,9

**transfer** 78:14 99:12

**transferred** 13:22 80:18,23

**trauma** 69:12

**trial** 3:22

**tried** 45:15

**trouble** 25:7

**true** 87:23 88:12 93:25 97:9 99:17 100:12

**truth** 97:5

**try** 61:25 63:16,18 80:3

**trying** 28:25 32:12 36:12 66:23

**turn** 47:3 83:17

**turned** 31:15 46:24 47:4,5,11,15

**two** 6:23,23 9:2 15:19 18:20 32:14 40:21 58:3,7 79:13 85:8

**type** 12:2 15:21,25 16:18,25 17:4 21:13 22:12 31:16 47:13 63:23 66:16 81:24 85:8

**types** 12:3 40:5 76:24

| u |
|---|

**u** 3:2

**u.s.** 1:21 9:13

**unauthorized** 42:13

**understand** 20:13 36:13 44:8 75:6,7 79:7

**understanding** 85:17 87:17

**unit** 11:17 13:5,6 25:25 26:2,9,15,18 26:20,22 27:9,19 31:14,19,24,25 32:6 33:21 34:2 34:23 35:18,23,25 36:7 39:15 40:11 40:22,24 41:8,21

42:17 47:14 52:3
53:12 56:21 57:2
57:9 59:13 61:6,8
66:14 67:6 69:2,5
74:6 75:18 76:2
77:13,19 78:20
79:5 80:6,19
82:19 83:8 88:19
89:10,15,16,16,17
**united** 1:2,9 2:8
4:20 94:15 101:2
**units** 11:11 12:16
27:17 30:10,12
34:4,14 35:20,20
39:19 40:6,19
83:16
**unresponsive**
42:19,19 45:23
59:14
**unsigned** 3:14
**updates** 43:23
**upset** 76:7
**upstairs** 32:10
**use** 63:19 75:2,23
81:11 85:13
**utilize** 29:7

**v**

**v** 101:2
**various** 52:11
**verbal** 5:4
**veritext** 101:1
**vicinity** 72:21
**video** 21:4 49:6
50:10 79:15 96:13
**videoconference**
1:17
**view** 31:23 50:4
77:14 94:22
**violation** 83:25
**visit** 48:15 50:2,8
50:13,15,18,24

51:5,17 53:15
**visiting** 51:11 52:6
54:8
**visitors** 50:22
**visits** 76:18

**w**

**w** 4:2
**wade** 54:20
**wait** 4:22 28:21
81:18 91:11,14
**waited** 43:23 48:3
**waived** 3:9
**walk** 27:9,15
73:23
**walked** 31:13
64:22,24
**wall** 31:18
**want** 5:11 22:5
54:9 60:18
**wanted** 91:16
**wants** 75:24
**ward** 1:18 4:1,11
4:15 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1

63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1,16 89:1
90:1,5 91:1 92:1
93:1,13 94:1 95:1
95:13 96:1,15
97:1,15 98:1 99:1
100:1 101:3,21
**ward's** 96:2
**warden** 18:11,15
18:16 42:10,10
43:13,14,16,19
91:16,16
**wardens** 22:4
**watch** 73:24
**water** 45:17 57:3
61:10,21 62:15
66:25
**way** 11:2 13:17
17:11 25:23 40:8
60:10 64:10 75:14
75:16 80:23 82:12
89:12,17 90:9
100:17
**we've** 89:20
**weapon** 85:12
**weeks** 96:11
**welcome** 5:9
**went** 9:2 13:12
40:22 42:13 44:5
52:3 56:18 73:4,7
73:9
**west** 2:5
**whereof** 100:19

**whp** 1:8
**wide** 41:3
**wires** 63:25
**wise** 25:18
**witness** 1:18 3:10
3:16,18 4:3 17:12
87:2 96:22 100:10
100:13,19
**witnesses'** 101:3
**woman** 48:15
**word** 87:16
**work** 8:12,22
11:17,19 44:12
84:22
**worked** 8:25
**working** 11:14
18:10 79:16
**works** 90:9
**wow** 27:8 28:23
**wrestle** 83:19
**wrestling** 83:14
**writing** 88:8

**x**

**x** 1:3,13 98:2 99:2

**y**

**yeah** 25:21 28:19
30:15 32:7,13
74:9
**year** 6:24 7:25 8:4
10:14,18 11:8,13
11:15,16,22 81:23
**years** 6:22 9:12
14:6 15:19 18:20
20:6 40:22 60:15
60:20 73:22 91:20
**york** 1:2,23,23,25
2:5,5,8,10,10 4:5
4:14,14 9:23,25
14:20 22:25 23:3
100:4,8 101:1

| z |
| --- |
| **zealously**   95:22 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.