# EXHIBIT N

Page 1

```
1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------------------X
    WILLIAMS,
4
                                PLAINTIFF,
5
6         -against-          Case No.:
                             17CV06779
7
8   UNITED STATES OF AMERICA ET AL,
9                               DEFENDANTS.
    ------------------------------------------X
10
11               DATE:  July 7, 2020
12               TIME:  10:00 A.M.
13
14
15         TELEPHONIC DEPOSITION of the
16  Defendant, UNITED STATES OF AMERICA BY THE
17  WITNESS PATRICK DELANEY, taken by the
18  Plaintiff, pursuant to a Notice and to the
19  Federal Rules of Civil Procedure, held at
20  525 Hicksville Road, Far Rockaway, New York
21  11691, before Ephraim Jacobson, a Notary
22  Public of the State of New York.
23
24
25
```

```
 1
 2   A P P E A R A N C E S:
 3
 4   THE LAW OFFICE OF ANDREW LAUFER, PLLC
        Attorneys for the Plaintiff
 5      264 West 40th Street #604
        New York, New York 10018
 6      BY:  ANDREW LAUFER, ESQ.
 7
 8
     UNITED STATES ATTORNEY FOR THE
 9   SOUTHERN DISTRICT OF NEW YORK
        Attorneys for the Defendants
10      UNITED STATES OF AMERICA ET AL
        86 Chambers Street, 3rd Floor
11      New York, New York 10007
        BY:  LUCAS ISSACHAROFF, ESQ.
12
13
                  *        *        *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, thirty days after service

17    of the original & 1 copy of same upon

18    counsel for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *     *     *     *

25

```
 1                    P. DELANEY
 2  P A T R I C K    D E L A N E Y, called as a
 3  witness, having been first duly sworn by a
 4  Notary Public of the State of New York, was
 5  examined and testified as follows:
 6  EXAMINATION BY
 7  MR. LAUFER:
 8       Q.    Please state your name for the
 9  record.
10       A.    Patrick Delaney.
11       Q.    What is your address?
12       A.    80 29th Street, Brooklyn, New
13  York 11232.
14            MR. LAUFER:  Between counsel,
15        we just had a conversation that
16        Lt. Delaney's video feed is not
17        working.  Counsel for defendant
18        United States has represented to me,
19        and I feel his representations are
20        satisfactory, that this is in fact
21        the witness that we were seeking to
22        depose.
23            He also stated that we will
24        be -- they will be providing a copy
25        of his BOP identification, and I'm
```

```
 1                    P. DELANEY
 2         willing on this one occasion to
 3         proceed with the deposition.  In the
 4         future I would prefer a live video
 5         feed, but for this particular one I
 6         find it satisfactory century.
 7              Lucas, I don't know if you want
 8         to add anything to that?
 9              MR. ISSACHAROFF:  I agree with
10         that and I so stipulate that the
11         witness is in fact Patrick Delaney.
12     Q.    Good morning, Lt. Delaney.
13     A.    Yes.
14     Q.    Are you still Lieutenant?
15     A.    No.
16     Q.    What rank are you?
17     A.    Currently right now I'm called
18  disciplinary hearing officer.
19     Q.    Is that a DHO?
20     A.    It's a promotion.  It would be
21  a rank of almost a captain.
22     Q.    When did you obtain that rank?
23     A.    Well, I became a captain in
24  2016, March of 2016, and then in July of
25  2019 I was promoted to the rank of a
```

```
                                             Page 6
 1                   P. DELANEY
 2    disciplinary hearing officer or what they
 3    would consider administrative judge.
 4        Q.    Well, congratulations on that.
 5    How should I address you?  DHO Delaney; is
 6    that okay?
 7        A.    That's fine.
 8        Q.    Good morning, DHO Delaney.  My
 9    name is Andrew Laufer.  I'm an attorney.  I
10    represent the plaintiff in a lawsuit which
11    we believe you are -- you may have some
12    pertinent information as a witness
13    regarding.
14              Please wait for me to ask my
15    question first before you begin your
16    response, as the court reporter can't take
17    any -- may have a problem taking us down at
18    the same time.  Obviously, we don't have
19    any video feed, so I'm not really worried
20    about gestures.
21              Please make sure that you
22    respond to all my questions in verbal form,
23    no "uh-huh" or anything like that.  It's
24    got to be yes, no or if you need to expand
25    on an answer, that's fine.  If at any time
```

```
1                    P. DELANEY
2   you're confused or you need clarification
3   of any of the questions I'm asking, please
4   let me know that.
5              Do you have any questions
6   before we begin?
7        A.    No, I don't.
8        Q.    Have you ever been deposed
9   before, like what we're --
10       A.    No.
11       Q.    Have you?
12       A.    No, I have not.
13       Q.    Did you review any
14  documentation in preparation for this
15  deposition today?
16       A.    Yes.
17       Q.    What documentation did you
18  review?
19       A.    Only my memorandum that I
20  submitted.
21       Q.    Was that the 583?
22       A.    No, it was the memorandum I
23  submitted to the captain on the incident of
24  that day.
25       Q.    Was that Capt. Word?
```

```
                                                    Page 8
 1                    P. DELANEY
 2        A.     Correct, sir.
 3               MR. ISSACHAROFF:  This is -- I
 4         will represent that this is the
 5         document -- the page Bates stamped
 6         US_00394.
 7        Q.     That's within the exhibits that
 8    I'm going ask you about today.  Let's start
 9    with preliminary question, DHO Delaney.
10    When were you first hired by BOP?
11        A.     I was hired July of 2001.
12        Q.     You've been working for BOP for
13    approximately nineteen years?
14        A.     Yes, sir.
15        Q.     Did you enter the academy back
16    at that time, July in2001?
17        A.     No, I entered the academy --
18    9/11 happened, and I went to the academy
19    after 9/11.  So when I entered the academy
20    it was October of 2001.
21        Q.     Where did you attend the
22    academy?
23        A.     At Glynco in Georgia.
24        Q.     Could you give me a description
25    briefly of what you learned in the academy?
```

1                    P. DELANEY

2        A.    It was basic correctional

3   techniques.

4        Q.    Did that include giving first

5   aid to prisoners?

6        A.    Yes.

7        Q.    Can you describe for me the

8   training you received with regard to that?

9        A.    Basic first aid and CPR and

10  then continuation of CPR every two years at

11  the institution.

12       Q.    Recertification, right?

13       A.    Recertification; yes, sir.

14       Q.    Did that include dealing with

15  prisoners that have possibly gone into

16  cardiac arrest?

17       A.    Yes.

18       Q.    How about drug overdoses?

19       A.    Just basic first aid prior to,

20  because I want to say that we didn't get

21  into drug overdoses and administering

22  Narcan and all that stuff until 2017, 2018.

23       Q.    How about dealing with

24  overdoses of K2?

25       A.    Basic information, basic first

```
 1                    P. DELANEY
 2   aid.  Just to keep the airway open, monitor
 3   the patient until EMS arrived or medical
 4   arrived.
 5        Q.    What's your highest level of
 6   education?
 7        A.    High school.
 8        Q.    When did you obtain the high
 9   school diploma?
10        A.    1990.
11        Q.    Prior to being hired by BOP,
12   did you have any experience in law
13   enforcement?
14        A.    Prior to the BOP, no.
15        Q.    I'm not going to get so
16   specific about your employment history.
17   But prior to being hired by BOP, in general
18   from the time you graduated high school
19   until when you were hired back in July of
20   2001 by BOP, what was your employment
21   history like?
22        A.    Various security jobs.  I
23   worked for multiple security companies and
24   also worked for Columbia Presbyterian
25   Hospital in New York City, where I was I
```

```
 1                    P. DELANEY
 2   security prevention officer and loss
 3   prevention officer from 1990 to 2000 -- no,
 4   1996 to 2000.  I'm sorry.
 5        Q.    I'm sorry.  Which hospital was
 6   that again?
 7        A.    Columbia Presbyterian, which is
 8   now New York Presbyterian Hospital.
 9        Q.    What type of security jobs did
10   you have from 1990 to 1996 in general?  Was
11   it loss prevention?  Store-type security?
12   Anything more specific than that?
13        A.    Loss prevention and also
14   security at Newark Airport.
15        Q.    That was New Jersey?
16        A.    New Jersey, yes.
17        Q.    Did you receive any kind of
18   first aid training in that fashion while
19   you were doing that?
20        A.    Basic first aid.  Same thing
21   with the hospital.
22        Q.    Did your employer give you this
23   type of training?
24        A.    Yes.
25        Q.    Did you ever have to -- from
```

1                   P. DELANEY

2     1990 to 1996, did you ever have to utilize

3     any of your first aid training in the

4     course and scope of your work?

5          A.     Basic first aid maybe for cuts

6     and bruises.  That's about it.

7          Q.     Nothing like if someone went

8     into cardiac arrest or you found someone

9     nonresponsive?

10         A.     No.

11         Q.     From 1996 to 2000, that's when

12    you were working for Columbia Pres?

13         A.     Yes.

14         Q.     Describe for me just basically

15    your duties and responsibilities there?

16         A.     First couple years, basic

17    security, doing rounds, checking passes of

18    people entering the property and leaving

19    the property; and then toward the end of my

20    career with them I was a loss prevention

21    officer where I secured patients' valuables

22    in the hospital safe.

23         Q.     During that time period, did

24    you ever have the need to deploy any of

25    your first aid skills helping anyone?

```
                                            Page 13
 1                    P. DELANEY
 2         A.     No, luckily, because we were in
 3    a hospital.  So there were always medical
 4    personnel there.  So if there was an
 5    emergency they responded first.
 6         Q.     Thankfully that was the case.
 7         A.     Yes.
 8         Q.     You said you stopped working
 9    for Columbia Pres in 2000, yet you were
10    just hired by BOP in July 2001.  What did
11    you do between 2000, whenever you ceased
12    working for Columbia Pres, and started --
13    you were first hired by BOP?
14         A.     I worked for Northeast Fire,
15    and that was a fire and safety company, and
16    we did fire extinguishers and systems and
17    also fire suppressant systems and sprinkler
18    systems.
19         Q.     That was just basically a
20    selling and installation company for these
21    types of systems?
22         A.     Correct.  I was doing
23    installation for fire alarms and fire
24    suppressant systems.
25         Q.     Let's talk about your
```

```
 1                    P. DELANEY
 2    employment with BOP.  From the time that
 3    you left the academy, what was your first
 4    assignment?
 5         A.    I worked for MDC Brooklyn.  I
 6    was an officer.
 7         Q.    While you were at MDC Brooklyn,
 8    did you receive any additional training in
 9    first aid, things of that nature?
10         A.    Basic first aid and CPR every
11    other year for refresher training.
12         Q.    How long were you at MDC for?
13         A.    I was at MDC until two --
14    November of 2007, when I was promoted to
15    lieutenant at MDC.
16         Q.    From the time that you -- what
17    was the time period that you left the
18    academy and that you first started work at
19    MDC?  When was that?
20         A.    Immediately.
21         Q.    How long was your training at
22    the academy?
23         A.    At the academy was three weeks.
24         Q.    As soon as you were done with
25    your training at the academy they assigned
```

Page 15

1                    P. DELANEY
2    to MDC?
3         A.    Correct.  But I was assigned to
4    MDC prior to that.  So you do on-the-job
5    training and you're physically working side
6    by side with other officers prior to going
7    to the academy.
8         Q.    You were working with officers
9    initially back when you were first hired,
10   then you went to Glynco in Georgia?
11        A.    Correct.
12        Q.    Then you were at Glynco for
13   about three weeks, you said?
14        A.    Yes.
15        Q.    From July 2001 through October
16   or so, you were working at MDC?
17        A.    Correct.  They do basic
18   correctional techniques basically just like
19   the academy, hands on at the institution
20   for two weeks prior to starting work.  So
21   they do a mini-academy at the jail and you
22   start working side by side with officers.
23   Then you go to the academy.  It's basically
24   a -- it's basically to weed out people that
25   can't handle corrections.

```
 1                    P. DELANEY
 2        Q.     The academy is or just --
 3        A.     Basically, the timeframe
 4   between the basic, when you first start and
 5   the time you go to the academy, because
 6   when you had to go to the academy first and
 7   then go start work or whatever, people
 8   flunked out of the academy or didn't want
 9   to return back to work, because they
10   doesn't know what it was like.
11        Q.     I see what you're saying.  They
12   want to give you a taste first.  I
13   understand.
14               Let's go forward to November of
15   2007, when you were promoted to LT.
16        A.     Okay.
17        Q.     When did you transfer from MDC
18   to MCC in Manhattan?
19        A.     November.  I reported the day
20   after Veteran's Day in November 2007.
21        Q.     That was when you were
22   promoted?
23        A.     Correct.
24        Q.     Is that the next rank after CO?
25        A.     So you start off as correction
```

```
 1                    P. DELANEY
 2   officer, and then you go from correctional
 3   officer to senior officer, then senior
 4   offer to senior officer specialist.  Senior
 5   officer specialist, next rank is a
 6   Lieutenant CS-9 junior lieutenant.
 7        Q.    That's what you were in 2007?
 8        A.    Yes.
 9        Q.    You proceeded normally through
10   all the ranks until you became an LT?
11        A.    Yes.
12        Q.    You didn't have any issues with
13   regard to being promoted?
14        A.    No.
15        Q.    No disciplinary issues?
16        A.    No.
17        Q.    Let's talk about your duties
18   and responsibility as a lieutenant junior
19   grade in 2007.  Can you describe them for
20   me?
21        A.    2007?
22        Q.    Yes, as an LT.
23        A.    In 2007, you were working with
24   a senior lieutenant, and you work six to
25   two or two to ten.  You don't work a shift
```

```
                                      Page 18
 1                      P. DELANEY
 2   by yourself, and you -- you're basically in
 3   charge of doing the rounds of the
 4   institution, checking on all the officers,
 5   overseeing all the movement of the inmate
 6   population and going over all the security.
 7              Basically, the -- I would say
 8   like the security enhancements of the
 9   institution.  So you make sure that the
10   roof checks are done and the security
11   checks are done, and the infrared scanners
12   are done.  You check the metal detectors.
13              You're basically in charge of
14   doing all the checks in the institution,
15   and then you're overseen by the operations
16   lieutenant who runs the institution.
17        Q.    How long were you a lieutenant
18   junior grade?
19        A.    I was a lieutenant junior grade
20   from 2000 -- November 2007 to March 2009.
21        Q.    What occurred at that time?
22        A.    I was promoted to a GS-11
23   lieutenant.
24        Q.    That's a senior lieutenant?
25        A.    Yes.
```

```
                                      Page 19
 1                    P. DELANEY
 2        Q.     Could you tell me what your
 3   duties and responsibilities were as a
 4   senior lieutenant?
 5        A.     So, senior lieutenant,
 6   basically when the warden and executive
 7   staff is not in the institution, they are
 8   the warden.  They are in charge of the
 9   whole institution.  They can make all the
10   decisions by themselves.  They don't have
11   to pick up the phone and call anybody.
12   They notify after the fact.
13              So as the operations lieutenant
14   you're running the whole institution.  Of
15   course when the warden is there and the
16   captain is there, everybody's there,
17   they're running the institution and they
18   give the guidance down to the operations
19   lieutenant who does all the security
20   aspects and the correctional aspects of the
21   institution.
22              So they're basically overseeing
23   the junior lieutenant, all the officers,
24   the security officers.  The officers are
25   doing all the screening of the institution.
```

```
 1                    P. DELANEY
 2   They're overseeing all the security
 3   operations, all the movement.  They're
 4   signing and verifying inmates that they're
 5   the correct inmates that are leaving if
 6   they're being released.  They're the one
 7   who sign off on all the releases, too.
 8        Q.    Essentially, you're the third
 9   man in the prison at that rank when, you
10   know, the captain and warden aren't there?
11        A.    When the warden and them aren't
12   there, whenever you're in charge, and when
13   they are there, you got the warden, the AW,
14   the captain and then yourself.  So you're
15   fourth in rank.  I would be assistant
16   warden.
17        Q.    From the time that you first
18   became a senior lieutenant through April of
19   2015, was there ever a time that you needed
20   to deploy your skills in first aid?
21        A.    Yes.
22        Q.    Can you describe for me the
23   times that you recall needing to do that?
24        A.    I mean, most of the time I was
25   there during the day, working day hours.
```

```
 1                    P. DELANEY
 2  So all I had to do was deploy my first aid
 3  skills, or even if it was CPR, doing CPR
 4  until medical staff or other staff arrived.
 5       Q.   How many times did you have to
 6  do that?
 7       A.   Off the top -- I couldn't give
 8  you a number off the top of my head.  But
 9  it was a couple of times at least prior to
10  the incident occurring on May 19.
11       Q.   Prior to the incident involving
12  my client Roberto -- my client, the
13  decedent, Roberto Grant?
14       A.   Yes.
15       Q.   Let's talk about that a little
16  bit.  How long had you been in the position
17  of lieutenant when the incident occurred
18  regarding my client, I believe it was May
19  of 2015?
20       A.   So I was -- the title since
21  2007, and the senior lieutenant since 2009.
22       Q.   You were senior lieutenant in
23  2009?
24       A.   March of 2009.
25       Q.   Approximately six years or so?
```

```
                                          Page 22
 1                    P. DELANEY
 2        A.    Yes.
 3        Q.    Do you remember the events
 4   involving my client, Roberto Grant?
 5        A.    Vaguely.  I --
 6        Q.    Go on.
 7        A.    After reading my memo and
 8   looking at it, it started to come back to
 9   me and I remembered.
10        Q.    Prior to the event involving my
11   client Roberto Grant, had you ever had any
12   interactions with him before?
13        A.    No, not off the top of my head.
14        Q.    What do you recall about what
15   occurred with Roberto Grant on that night?
16        A.    The officer called for
17   assistance over the radio, and then the
18   body alarm going off, which is an alarm
19   that's attached to our radios that
20   identifies that radio that there's a
21   problem.  So then the control center made
22   an announcement that all staff -- staff
23   needs assistance, and announces what the
24   incident is.
25              So particularly on that day a
```

```
 1                    P. DELANEY
 2   call for medical emergency up on 11 South.
 3   I remember responding to that incident.
 4        Q.    Which officer sounded the
 5   alarm?
 6        A.    I think off the top of my
 7   head -- I mean, I don't have it in my memo.
 8   I want to say that the officer that was
 9   working that day was Officer Kearns.
10        Q.    Any other officers that you
11   recall working that day, 11 South?
12        A.    That's the other -- I draw a
13   blank when it comes to the other people
14   that responded.  I know that that was -- it
15   was almost time for change of shifts,
16   because the shift for the officers change
17   at midnight.  So we had officers that were
18   leaving and officers that were coming on
19   that all responded to that incident.  So
20   there were several officers.
21        Q.    This incident occurred, you
22   believe, during a shift change?
23        A.    Prior to a shift change.  It
24   was about 11:40, according to my memo.
25        Q.    Are officers -- are prisoners
```

```
 1                    P. DELANEY
 2   aware of when the shift changes occur?
 3        A.    They -- under observations,
 4   yes, because they see when the officers are
 5   changing.
 6        Q.    Do you find in your experience
 7   up to that point that prisoners may act up
 8   or engage in fighting or horseplay or
 9   anything like that during times like that?
10        A.    Yes, and that's why they
11   usually -- at that particular time.  I
12   don't know it's like that anymore.  But
13   they -- the lieutenants changed at 11:00 at
14   night, so they didn't change at the same
15   time as the officers, and there were other
16   shifts that changed over at different
17   times.
18              So there was always an overlap,
19   because inmates will do that, and
20   especially at flat jails and stuff like
21   that where they're -- they have -- they can
22   see more.  Like this institution being a
23   high-rise or whatever, they can see less.
24   They only see what's on their unit.
25        Q.    Could you describe for me the
```

Page 25

1                        P. DELANEY

2       11 South unit the way it was back in May of

3       2015?

4            A.    It was an interesting unit.  So

5       that was one of the only units in the

6       institution that was dormitory style.  So

7       basically it was just like all the rest of

8       the housing units.  But there were no cells

9       on the tiers.

10                    So they never filled the walls

11      up or anything.  It was just one big giant

12      room with a bathroom and showers -- you

13      know, bathroom and shower facilities in the

14      corner of every tier.

15           Q.    How many tiers are in 11 South?

16           A.    Off the top of my head there's

17      six.

18           Q.    When you say "tiers," they go

19      up vertically, right?  You have Tier 1,

20      Tier 2 and so on?

21           A.    It's very interesting, the

22      design of MCC.  So where I am now in

23      Brooklyn there's two tiers.  There's a

24      lower level with like eighty inmates and

25      there's an upper level with eighty inmates,

Page 26

1                    P. DELANEY
2    whereas at MCC, that particular unit they
3    had the tiers.  So you had three stairways,
4    and you went down like five steps to go to
5    one tier or you went up five steps to go to
6    another tier.  They were on top of each
7    other.
8        Q.    Right.  Stacked?
9        A.    Stacked.  So there were three
10   separate areas and then three separate
11   areas below them with stairs, but they
12   weren't connected.
13       Q.    Were they facing each other,
14   opposite sides?
15       A.    Opposite sides.  So there was
16   one in the center of the unit.  So if you
17   walked in the unit, the main door to the
18   tier in the center of the unit, there's a
19   tier to the right and a tier to the left
20   and they're stacked.
21       Q.    On each tier how many prisoners
22   are bunked?
23       A.    Off the top of my head, there
24   was about twenty on each tier.
25       Q.    In total you had about one

```
                                        Page 27
 1                    P. DELANEY
 2   hundred --
 3         A.    One hundred and twenty.
 4         Q.    One hundred and twenty
 5   prisoners in this particular housing area?
 6         A.    Yes, on bunk beds.
 7         Q.    I'm sorry?
 8         A.    On bunk beds.
 9         Q.    How far apart were the bunk
10   beds from each other?
11         A.    Probably six feet apart.
12         Q.    There are two prisoners on each
13   set of bunk beds?
14         A.    Yes.
15         Q.    What level of security do these
16   prisoners represent to prison?  Are they
17   high-level security prisoners or are they
18   low-level?  Mid level?  Something else?
19         A.    They're mixed.  They're mixed,
20   because it's a pre-trial facility.  So most
21   of the inmates are pre-sentence and not
22   sentenced yet.  So they don't have a
23   security level assigned to them.
24         Q.    You can have murderers in there
25   with drug dealers or low-level offenders --
```

```
 1                   P. DELANEY
 2        A.    Yes, or white collar.  Yes,
 3   they can be mixed.
 4        Q.    White-collar --
 5        A.    Because they're not sentenced.
 6        Q.    They're pretrial detainees?
 7        A.    Pretrial detainees, yes, sir.
 8        Q.    They're basically -- their
 9   appearance are over in the federal
10   courthouse at 500 Pearl or 40 Centre or
11   whatever it -- whatever courthouse they
12   belong to?
13        A.    Yes.
14        Q.    Is there any kind of
15   methodology that you would follow back in
16   May 2015 of which prisoner would share
17   which bunk with which other prisoner?
18        A.    No, because when it came to the
19   assignment of their locations and
20   everything, that was all done by unit team.
21        Q.    Theoretically you can have a
22   murderer or someone accused of murder with
23   someone that may have committed bank fraud
24   sharing the same bunk?
25        A.    Correct.  Yes, sir.
```

Page 29

1                    P. DELANEY

2       Q.      Prior to May of 2015, were

3   there any instances of where prisoners lost

4   their lives in that housing unit?

5       A.      Prior to --

6       Q.      The incident involving my

7   client.

8       A.      Yes.  No, not to my knowledge.

9       Q.      Not that you recall or no,

10   there weren't any?

11       A.      Not that I recall.

12       Q.      Do you remember was there any

13   kind of drug overdose that occurred in that

14   area?

15       A.      Multiple housing units had

16   possible drug overdose where inmates were

17   taken out to the local hospital.

18       Q.      Do you know how these prisoners

19   get drugs in the prison?

20       A.      Multiple ways.  Some of the

21   stuff that's happening now and it happened

22   back then, was stuff was actually being

23   mailed in and sprayed onto paper and stuff.

24   The synthetic stuff and some of the drugs

25   would be sprayed on the paper and would

```
 1                    P. DELANEY
 2   come in legal mail or a picture that was
 3   drawn by a child with crayons that were
 4   made with synthetic drugs or any kind of
 5   drug, and then they would smoke it when
 6   they arrived.
 7         Q.    Would you test for these types
 8   of drugs?  I'm assuming you would check the
 9   mail, you have security provisions that you
10   would follow with regard to vetting the
11   mail before it was disbursed to prisoners?
12         A.    Yes, it would be hand-checked
13   by staff.
14         Q.    Would they do any kind of
15   rudimentary drug testing, anything like
16   that?
17         A.    If something looked out of --
18   didn't -- looked out of synch or whatever,
19   yes, and then there were certain things
20   that ended up through the years from two
21   thousand -- 2014, 2015 started being the
22   big giant boom for synthetics.  There's a
23   big difference between procedures back then
24   and procedures now.
25         Q.    Drug testing for things that
```

Page 31

1              P. DELANEY
2     were smuggled in, you know, synthetic
3     marijuana, wouldn't always occur on every
4     piece of mail that was mailed in to
5     prisoners?
6          A.    Correct.  It would -- they
7     would pass a basic scanning test, a
8     physical test when they looked at it.  If
9     it smelled or it looked wet or if it looked
10    out of suspicious, whatever, then it was
11    tested.  But if there was no suspicion or
12    anything, it went on just like any other
13    mail, and legal mail couldn't be touched
14    until it was opened up in front of the
15    inmate anyway, by law.
16         Q.    Did you have any issues with
17    drug transactions occurring within 11 South
18    on or before the incident involving my
19    client?
20         A.    Throughout the whole
21    institution there was issues and not
22    specifically just 11 South.  But there were
23    several times on different occasions
24    throughout the years, whatever, that people
25    responded to 11 South, because it was an

1                    P. DELANEY

2    over bay area, and most of the inmates were

3    always either smoking or doing some sort of

4    illicit behavior.

5          Q.      Obviously, any kind of smoking

6    or illicit behavior is concerned unlawful

7    in the premises; is that correct?

8          A.      Correct.

9          Q.      Considered contraband, I

10   assume?

11         A.      Yes.

12         Q.      Was there any type of video

13   surveillance operating in the area of 11

14   South on or before the incident involving

15   my client?

16         A.      I know that that particular

17   unit matched all the rest of the units with

18   the surveillance, and I want to say that

19   there was only one camera above the

20   officers station that basically looked at

21   the main -- what we call the common area,

22   the main area in front of all the cells --

23   in front of all the tiers, let me rephrase

24   that.  There was no camera or video

25   surveillance on the tiers themselves.

                                                      Page 33

1                      P. DELANEY

2        Q.    Just in the main area where

3    everyone congregates?

4        A.    Correct.

5        Q.    Can you describe that area for

6    me where everyone congregates?

7        A.    The main area in all the

8    housing units is where all the telephones

9    are located, the officers station.  The

10   computers for the inmates have access to

11   e-mails and law library, and they would

12   have a couple four-person tables that were

13   in the center area for the inmates to be

14   able to sit and watch TV.

15       Q.    So now describe for me in

16   conjunction to the area you just talked

17   about where is the officers station

18   located?

19       A.    Dead center of the housing

20   unit.  It's dead center up against the wall

21   where the kitchen is.  So when you walk

22   into that unit, the kitchen is immediately

23   to your left or the right, depending if

24   you're going on the north side or the south

25   side.

```
 1                    P. DELANEY
 2              On the south side it would be
 3    on your left, and then you would pass mock
 4    closets and washing machine stations and
 5    then you enter the main area, and the
 6    housing unit is on your left-hand side on
 7    that particular unit, in the middle of the
 8    unit.
 9         Q.    Is it an enclosed area?
10         A.    It's like a half -- it's like a
11    dome, and it has a door that enters on the
12    left-hand side.
13         Q.    From that position, does
14    whoever's manning that station have a
15    complete 360 view of the entire tier, or
16    all the tiers?
17         A.    You can look into it.  But they
18    can see the entrances to the tiers, because
19    there were grills, there were bars on --
20    bar doors on the tiers.  So you could sit
21    in the officers station and look into each
22    tier from your vantage point, sitting
23    there.  But you wouldn't be able to look
24    very far into it because all the bunks and
25    the way that they're positioned.
```

```
                                        Page 35
 1                    P. DELANEY
 2        Q.    So all the tiers have grills or
 3   bars in front of them individually?
 4        A.    Correct.
 5        Q.    In order to enter a particular
 6   tier, you would need a key or an access
 7   card or something?
 8        A.    You needed a key.
 9        Q.    Since there are six tiers,
10   would you need the same key or six
11   different keys for each tier?
12        A.    Same key for each tier.
13        Q.    How many officers are capable
14   of manning that post at any given time?
15        A.    So it was two officers on
16   evening watch, and at 10:00 that officer
17   leaves, the second officer leaving the one
18   officer -- so basically once the
19   institutional count was done and completed
20   and inmates were counted and accounted for,
21   then that inmate, the staff member would
22   leave.  Then it would go down to one
23   officer.  So on that time on that
24   particular day, there was only one officer.
25        Q.    There was one officer that's
```

```
 1                    P. DELANEY
 2   actually inside the tier within the
 3   security -- within the post there?
 4        A.     Inside the housing unit.
 5        Q.     But each tier is separated by
 6   its own grill of bars; is that correct?
 7        A.     Correct.
 8        Q.     What time is lights out for the
 9   prisoners?
10        A.     On that particular unit and all
11   the units in MCC, there really wasn't a
12   lights out.  It was just basically they got
13   counted at the 9:30 count, and once the
14   count cleared, which is usually 10:00,
15   that's when the officers left or whatever,
16   and that was the assumed lights out after
17   10:00.  But they physically never shut the
18   lights off.
19        Q.     Are prisoners allowed to get
20   out of their bunks and still mill around
21   their tiers after this time?
22        A.     Yes.  They weren't confined to
23   their beds or anything.
24        Q.     There's no specific time that
25   they had to be in bed or, you know --
```

```
 1                    P. DELANEY
 2        A.    In the open -- in that
 3   particular open dorm they just needed to
 4   report back to their beds during count time
 5   when the officer would announce it.
 6        Q.    After that, they could stay up
 7   all night if they wanted to?
 8        A.    Yes.
 9        Q.    There's always someone --
10   there's always BOP personnel, at least one
11   person in that housing unit
12   twenty-four/seven; is that correct?
13        A.    Correct.
14        Q.    What was the first
15   indication -- I want to draw your attention
16   to the incident involving my client.  What
17   was the first indication that something was
18   wrong in this particular housing unit?
19        A.    The inmates started yelling at
20   the unit officer to come to the tier, that
21   there was a sick inmate.
22        Q.    Do you know which tier that
23   was?
24        A.    I have on my memo -- because I
25   wouldn't remember if you even told me.  The
```

1                    P. DELANEY

2   memo I have is Tier 12.  It says Tier 12.

3   It says "11 South Tier 12 inmate started

4   yelling for the unit officer."

5        Q.    Do any of -- you said there was

6   one camera surveillance that was aimed at,

7   I guess, the middle of the tier where the

8   officers post is.  Does it capture any

9   images from that particular area?

10       A.    It would capture the images of

11  the staff going up to the tier or walking

12  in that general direction.

13       Q.    But nothing from the actual

14  tier itself?

15       A.    No, nothing from the actual

16  tier.

17       Q.    Do you know what time this

18  occurred, approximately when this officer

19  was being notified?

20       A.    I mean I have in my memo

21  approximately 11:40 p.m.

22       Q.    P.M. or a.m.?

23       A.    P.M.

24       Q.    Do you know what officer was

25  posted at that time?

```
 1                    P. DELANEY

 2        A.     Officer Kearns.

 3        Q.     Anyone else?

 4        A.     Not off the top of my head.  I

 5   don't remember any of the other staff.

 6        Q.     Did Officer -- do you know

 7   whether or not Officer Kearns responded to

 8   it?

 9        A.     Yes, he responded, and that

10   when he called for a medical emergency and

11   hit his body alarm.

12        Q.     Do you know who respond to that

13   emergency?

14        A.     I would not know, unless I

15   looked at other paperwork that showed and

16   looked at their memorandums, which would be

17   in the 583.

18        Q.     Prior to discovering the

19   condition of my client, do you know if

20   there were any issues having my client that

21   evening, any kind of fights or any kind of

22   horseplay or anything on the like involving

23   him?

24        A.     Not to my knowledge.

25        Q.     Did you yourself report to the
```

Page 40

```
 1                    P. DELANEY
 2  scene that evening?
 3      A.    Yes.  I was the only lieutenant
 4  in the building that night.
 5      Q.    Really quick, did you ever
 6  attend SIS training?
 7      A.    Yes.
 8      Q.    Can you describe for me that
 9  type of training that you had?
10      A.    It's investigating --
11  investigatory training.  Basically looking
12  at -- I mean all aspects, whatever,
13  everything from how to test for drugs to
14  how the inmates do the introduction of
15  drugs to investigations for fights, how to
16  detain information from when you question
17  inmates, information from closed circuit
18  TVs, how long they last for, how long they
19  have -- what do you call it, the DVRs, last
20  for, all the computer systems and the
21  monitoring systems that BOP has in place
22  for phone monitoring and inmate monitoring
23  of their correspondence, monitoring of
24  their mail, monitoring of recorded phone
25  conversations, how to lock the phone
```

```
 1                    P. DELANEY
 2   conversations, how to do one degree of
 3   separation on an inmate.
 4             So basically investigative
 5   skills and tailored to the systems that the
 6   bureau has.  It was one week of training
 7   separate from the lieutenant training that
 8   I received.
 9        Q.    Do you know what happened to
10   Roberto Grant that evening?
11        A.    Just what I heard, which would
12   be just hearsay.  I don't personally, no.
13        Q.    Did you have a role in
14   investigating to Mr. Grant's death?
15        A.    I did not, because I was
16   involved as a witness.  So usually if
17   you're involved in responding to any
18   incidents in the institution, you can't be
19   involved in the investigation of it.
20        Q.    What were you -- did you have
21   any observation of what occurred involving
22   Mr. Grant that evening?
23        A.    I remember -- so the body alarm
24   went off.  I responded with other staff
25   from other locations of the institution.
```

1                    P. DELANEY
2    But staff -- one or two staff members
3    arrived prior to me arriving to the unit.
4    So I was coming from the third floor.  They
5    may have came over from one of the closer
6    floors.  So the officer was able to gain
7    access to the tier.
8              So after the count and inmate
9    are counted at night, the officer can't
10   enter the tier by himself for safety
11   reasons for the inmates and also for the
12   officer.
13             So the staff member -- once the
14   first staff member arrived, they entered
15   and found the inmate, which was described
16   he was wet, and when I saw him he was
17   soaking wet and he had already been removed
18   from his bunk and they were doing CPR on
19   him when I arrived.
20        Q.   Do you know what caused him to
21   be soaking wet?
22        A.   Again, hearsay and stuff that
23   came on in the investigation afterwards
24   when they were interviewing inmates and
25   stuff that I heard that inmates were trying

```
 1                    P. DELANEY
 2  to revive him in the shower.  Again, I'm
 3  not witness to it.  It was only hearsay.
 4       Q.    Do you have any -- based upon
 5  hearsay not, but based upon your
 6  observations, do you have any idea of
 7  what -- and based upon your experience, do
 8  you have any idea of what wad the cause of
 9  Mr. Grant's death?
10       A.    Some kind of medical issue.  I
11  mean, upon my arrival, with my experience
12  and when I arrived, the -- I went and
13  checked -- the officer had checked and I
14  had checked to see if the inmate had a
15  pulse.  We could not feel a pulse.  So I
16  called for what they call an AED, right, an
17  automatic defibrillator unit, which are
18  located in the sally ports in the elevators
19  right outside the unit doors.
20             So another staff member
21  retrieved that and I placed an AED on the
22  inmate at the time.  So the inmate possibly
23  still has a faint enough pulse, because the
24  AED didn't tell us shock.  So if you have
25  no pulse, the AED is going to tell to you
```

```
 1                    P. DELANEY
 2   shock.  So it did not -- the first time we
 3   put it on and it analyzed, it didn't
 4   request us to shock him.
 5        Q.    Did you notice any trauma on
 6   Mr. Grant's body?
 7        A.    No.
 8        Q.    Did you notice if he was
 9   bleeding anywhere?
10        A.    No, not to my knowledge.
11        Q.    During your career, how many
12   inmate death investigations have you been
13   involved in?
14        A.    I've responded to -- off the
15   top of my head, I want to say I've
16   responded to three attempts, meaning that
17   they attempted to take their own lives, and
18   the inmates didn't succeed or whatever and
19   they made a full recovery, and I've respond
20   to one other inmate that I had to do CPR on
21   after -- I want to say it was after 2015.
22        Q.    How often -- let's talk a
23   little about the about the unit officers in
24   the housing unit.  How often are the unit
25   officers required to observe the inmates?
```

Page 45

1                    P. DELANEY
2        A.    They're supposed to do what
3    they would describe -- you don't want to do
4    rounds at the same time every single time,
5    because then the inmates will figure out
6    your routine.  So they have to do sporadic
7    rounds.  So if they're doing rounds, they
8    do 1, 3 and 5 tiers, and the following time
9    they're going to do, you know, Tier 6, 4
10   and 8.  So they rotate.  So they do rounds
11   every thirty minutes, not to exceed forty.
12       Q.    Do they have to wait thirty
13   minutes before they do a round or is
14   that --
15       A.    It's basically like if you took
16   a clock and made it into pie and divided it
17   in half, you have to do a round in one
18   section of that.  So if your last round was
19   at 12:15, your next round should be prior
20   to 12:50.
21       Q.    How do they go about doing
22   these rounds, like how do they go about
23   observing the inmates?
24       A.    Basically walking from tier to
25   tier.  On this particular unit, it would be

```
                                            Page 46
 1                  P. DELANEY
 2   walking from tier to tier.
 3        Q.    That would be in front of the
 4   grill?
 5        A.    Correct.
 6        Q.    Would they flash a light within
 7   the grill --
 8        A.    Yes.
 9        Q.    -- into the unit?
10        A.    Yes.
11        Q.    Would they try to observe each
12   inmate within that area?
13        A.    Only required to observe each
14   inmate during the count time.
15        Q.    Did the --
16        A.    The count time on a particular
17   day would be, if you did the beginning of
18   the day would be 12 midnight, 3:00 in the
19   morning, 5:00 in the morning, 4:00 in the
20   afternoon, and at that time at MCC I think
21   it was either 9 or 9:30 count at night.
22        Q.    Do they enter their
23   observations in a logbook or an electronic
24   log?
25        A.    Yes.  2015, I think they had
```

```
 1                    P. DELANEY
 2   just started the electronic log, which is
 3   Tru Scope, it's called.
 4        Q.    Tru Scope?
 5        A.    Yes, Tru Scope.  T-R-U scope.
 6              MR. LAUFER:  Counsel, I don't
 7         know if you've produced the
 8         electronic log for the housing area
 9         on that evening.  But to the degree
10         you haven't, I'm calling for
11         production of that.
12              MR. ISSACHAROFF:  Okay.  I'll
13         look into that.
14        Q.    Back in 2005, how often would
15   staff find inmates using or possessing K2?
16              MR. ISSACHAROFF:  2005?  I
17         think you mean 2015.
18              MR. LAUFER:  2015.  My bad.
19        A.    Okay.  2015, it was the height.
20   2014, 2015 it was blowing up.  So when the
21   staff was catching the items and there were
22   mass shakedowns done on the institution and
23   it slowed down, you would have one case
24   maybe a week.
25              When it wasn't slowed down and
```

1           P. DELANEY

2    there wasn't mass shakedowns and everything

3    locked down, the institution going through

4    every nook and cranny that came into the

5    institution, you were looking at four or

6    five cases a week, even topping up to about

7    seven, and inmates were showing signs of

8    being under the influence, slur -- slurred

9    speech, couldn't stand on their own, would

10   be escorted down to medical and be sent to

11   the local hospital.

12        Q.    Do you think Grant's

13   involvement potentially distributing K2 was

14   a factor in his death?

15        A.    That's new to me, because I

16   didn't know that.

17        Q.    Did you observe anyone drop

18   Mr. Grant as he was being transferred to

19   the gurney in the housing unit?

20        A.    No.

21        Q.    Did you ever hear that he was

22   dropped?

23        A.    Just inmates stating while they

24   were doing the investigation or afterwards

25   when they were questioning, they said that

```
1                    P. DELANEY
2    they heard a thump when the staff pulled
3    him off the bed.
4         Q.    Do you know which staff pulled
5    him off the bed?
6         A.    All I know is Officer Kearns
7    was there.  That's the only person I know
8    off the top of my head, without looking at
9    any other documentation that I filled out.
10        Q.    Do you believe that if this
11   dropping occurred, do you think that it
12   contributed to his death?
13        A.    Not to my knowledge.  I mean,
14   I -- I know that there was a lot questions
15   around that.  But there was him being wet,
16   found or whatever, inmates hearsay that
17   they were saying that they were trying to
18   revive him.  I don't know what they were
19   doing to him prior to that, doing
20   life-saving measures on him, and then also
21   EMS intubating him right in front of staff,
22   but prior to loading him into the
23   ambulance.  So I don't know which
24   contributed to his death.
25        Q.    Are all FOB staff trained in
```

```
                                        Page 50
 1                  P. DELANEY
 2   emergency response to medical emergency?
 3       A.    Basic -- yes, basic first aid
 4   and CPR.  Basic life measures until a
 5   higher authority arrives.
 6       Q.    During this time period in
 7   2015, were you the emergency preparedness
 8   officer in MCC?
 9       A.    Off the top of my head, yes, I
10   probably was.  I hold a lot -- I did wear a
11   lot of hats at MCC the last couple years I
12   was there prior to getting promoted.
13       Q.    Was part of your duties as EPO
14   to train staff to respond to emergency
15   situation?
16       A.    As the EPO, you hold the drills
17   to see if the staff received the proper
18   training.  I physically didn't do the
19   training.  As the emergency preparedness, I
20   would do the testing and everything.  I
21   would test the alarm systems.  I would test
22   the fire systems.  I would test the
23   cameras.  I would test the locking
24   mechanisms, the responsive staff, making
25   sure that they had the right keys on then
```

1              P. DELANEY

2  at the right time.  If they needed exits,

3  if they knew where the AED was located,

4  where the fire extinguisher was located.  I

5  was basically in charge of all the

6  emergency responses for the institution.

7       Q.    During the evening hours when

8  you only had one officer at the observation

9  post in this particular housing unit, that

10  one officer would never enter a tier at

11  any -- for any reason whatsoever; is that

12  correct?

13       A.    At that particular time, no,

14  they would not.

15       Q.    They would just flash their

16  lights through the grill?

17       A.    They would check the inmates

18  through the grill, correct, and then once

19  it was count time, you have -- you have to

20  observe living, breathing flesh when you do

21  the count.

22            So an officer would stand in

23  the center of the unit or at the grill,

24  open the grill, let one officer in.  That

25  officer would do the count, physically

1                    P. DELANEY

2    count everybody.  Then they would switch an

3    the other officer would go in and count.

4    That was on a midnight shift.  It was done

5    three times during the midnight shift to

6    make sure the inmates were alive.

7         Q.    In this particular housing

8    unit, do inmates often engage in fights or

9    kind of, you know, arguments, things of

10   that nature, during this time period?

11        A.    Well, during that time period

12   and during like 2015, like towards my time,

13   ending my time there at MCC, they started

14   to -- the inmates that were never getting

15   into trouble and weren't physical were the

16   ones that they tried to house on that

17   particular unit.  It wasn't like an honor

18   dorm, but the inmates that didn't get in

19   trouble and didn't have any problems were

20   the ones that usually were on that dorm.

21             If you were an inmate that got

22   into a fight on that dorm, you never got to

23   go back.  The reason that the inmates liked

24   that dorm was because they had TVs on those

25   tiers.  So you could sit up and watch TV,

```
 1                    P. DELANEY
 2   and there was a table on that tier, and
 3   play cards twenty-four hours a day.  So --
 4   but the regular housing units, you were
 5   locked in your cell from 9:00 at night
 6   until 6:00 in the morning.  So
 7   trouble-wise, there was usually very little
 8   trouble on 11 South dormitory.
 9        Q.    So if anyone is engaging in any
10   of that type of activity, they would get in
11   trouble?
12        A.    They would get in trouble and
13   they would get moved.  They would -- the
14   unit team and see me in my capacity now as
15   a DHO, and then they would go and the unit
16   team would go and move them to another
17   unit, because that particular unit, they
18   would try to keep as quiet as possible
19   because it was a dormitory and it almost
20   like an honor dorm kind of situation.
21             MR. LAUFER:  At this time, I'd
22        like to mark for identification
23        purposes the first exhibit I'm going
24        to use, which is your Form 583 report
25        of incident.  I believe that's United
```

```
                                        Page 54
 1                    P. DELANEY
 2         States_390 through 392.
 3               (Whereupon, the Form 83 was
 4         marked as Plaintiff's Exhibit 1 for
 5         identification as of this date by the
 6         Reporter.)
 7         Q.    Do you have that in front of
 8   you?
 9         A.    I have 390 -- I have three
10   items.
11         Q.    Right.  390 through 392; is
12   that correct?
13         A.    Yes.
14         Q.    Are you familiar with this
15   document?
16         A.    583, yes.
17         Q.    What do you know this document
18   to be?
19         A.    It's the report of incidents.
20   So all incidents that occur in the
21   institution, everything from an assault,
22   assaulting inmate, assaulting staff,
23   attempted assault, an escape, a fight, a
24   fire, self-mutilation, a suicide attempt, a
25   work strike, inmate being under the
```

```
 1                    P. DELANEY
 2   influence of something or any kind of issue
 3   that happens at the institution, the
 4   lieutenant on shift needs to fill out this
 5   report.
 6        Q.   Do you fill -- have you filled
 7   reports out like this before?
 8        A.   Yes.
 9        Q.   Was this report filled out
10   involving my client Roberto Grant?
11        A.   Yes.
12        Q.   Was this report created in the
13   ordinary course and scope of your work at
14   MCC at the time?
15        A.   Yes.
16        Q.   Can you describe the context --
17   contents within this report?  We'll start
18   with page 1, this particular report.
19        A.   Okay.
20        Q.   Take your time to review it.
21        A.   Okay.
22        Q.   Are you done?
23        A.   Yes.
24        Q.   Describe for me the contents of
25   this report.
```

```
 1                    P. DELANEY
 2         A.    Contents of the report is
 3   basically the observations of staff and the
 4   observations that I had, because I was the
 5   one who generated the initial report, make
 6   notification of the incident that occurred
 7   that day.  So you actually see that the
 8   description of the incident, which is
 9   Section 6 of the 583, is almost an exact
10   duplicate of my actual memo.
11         Q.    You were the individual that
12   actually deployed the AED on Mr. Grant; is
13   that correct?
14         A.    Yes.
15         Q.    Did you -- you're telling me
16   you didn't observe him move from the bunk
17   to the actual gurney?
18         A.    From the bunk to the gurney,
19   no, because he was placed on the floor.
20         Q.    Did you observe him being moved
21   from the bunk to the floor?
22         A.    Bunk to the floor, off the top
23   of my head I don't remember seeing that.  I
24   remember moving him from the -- the staff
25   moving him from the floor to the gurney,
```

1                    P. DELANEY

2    because you can't get the gurney up the

3    stairs.

4         Q.    Okay.  To the tier.

5         A.    Or did they get it up the

6    stairs.  I'm trying to think of what they

7    did, because they also had -- I want to say

8    off the top of my head they brought the

9    portable stretcher.  So there's portable

10   stretchers hanging in the hallway of the

11   institution right outside the unit doors

12   right next to the AEDs in what they call

13   the elevator sally port, and they brought

14   the portable stretcher in, and other staff

15   responded ask got the actual gurney or

16   stretcher.  The used like an ambulance

17   stretcher from medical and brought that up.

18             We used the portable, which we

19   laid on the floor next to the inmate, and

20   moved him to the portable stretcher and

21   then moved the portable stretcher to the

22   top of the actual ambulance stretcher that

23   was in the main common area.

24             That's usual procedure, because

25   of the stairs, because you're dealing --

Page 58

1                          P. DELANEY
2     hospital -- ambulance stretchers by
3     themselves or whatever almost weigh five
4     hundred pounds.  So to lift that plus an
5     inmate up the stairs would be a little
6     tasking for a handful of officers.
7         Q.     Did you ever conduct a
8     mortality review regarding the death of my
9     client, Roberto Grant?
10        A.     No.
11        Q.     You didn't conduct a mortality
12    review?  Why not?
13        A.     What's a mortality review?
14        Q.     Isn't that a standard procedure
15    that you would follow in regard to a death
16    of an inmate?
17        A.     That's not what it's named at
18    the Bureau, off the top of my head.
19        Q.     What -- something, you know,
20    that you would, I guess, engage in, some
21    sort of process that you would engage in to
22    determine what caused the death of --
23        A.     To find out the cause?
24        Q.     Yes.
25        A.     I wouldn't be involved in it,

Page 59

1                    P. DELANEY
2   because I was a part of it.
3        Q.    But you were also part of
4   leadership at that time of the prison, were
5   you not?
6        A.    Correct.  Correct, but I was
7   the actual shift lieutenant on.  So if I
8   was the shift lieutenant on, I was involved
9   in the incident.  The internal working of
10  the institution.  So if there's a death of
11  an inmate, it would be done by SIS and it
12  would also be done by the FBI for checks
13  and balances.
14       Q.    Do you know if the FBI was
15  involved in the investigation of my
16  client's death?
17       A.    Yes.
18       Q.    Do you know if either the SIS
19  or FBI came to any kind of conclusion of
20  whether or not my client was murdered?
21       A.    FBI called me in and took
22  statements from me because I was responding
23  staff and took statements from all the
24  responding staff and all the staff that
25  were involved from the time the inmate

Page 60

```
 1                  P. DELANEY
 2   there, the inmate was transferred to EMS to
 3   the time he was pronounced dead at the
 4   hospital, and I was never notified of
 5   anything after that.
 6        Q.    Do you know who referred this
 7   matter to the FBI?
 8        A.    Not off the top of my head, no.
 9        Q.    Is it --
10        A.    I have no knowledge.  I just
11   know that I was called by the FBI and the
12   AUSA to give a statement.
13        Q.    Did they have you sign what's
14   referred to as a 302?
15        A.    I don't know.  Off the top of
16   my head I don't recall.
17        Q.    That's fine.
18              Do you recall signing any
19   paperwork with either the AUSA or the FBI?
20        A.    No, I don't recall signing
21   anything.  I recall giving them all my
22   documentation and giving them a verbal --
23   like we're talking right now.
24        Q.    Do you know if it's standard
25   operating procedure to report all deaths at
```

```
                                        Page 61
 1                    P. DELANEY
 2   that occur at the facility to the FBI?
 3        A.    Yes.
 4        Q.    It's up to the FBI whether they
 5   investigate further?
 6        A.    Yes, because they are the main
 7   investigators.
 8        Q.    Sometimes they investigate and
 9   sometimes they don't?
10        A.    Yes.  It's up to them and the
11   AUSA.
12        Q.    But in this case they did
13   investigate?
14        A.    Yes.  They called me several
15   months or years later.
16        Q.    Did you ever testify before a
17   grand jury in relation to this --
18              MR. ISSACHAROFF:  I'm going
19         to -- I'm sorry.  I going to object
20         and instruct the witness not to
21         answer.  Grand jury testimony is
22         obviously to secret the extent any
23         exists.
24              MR. LAUFER:  I'm going to mark
25         that for a ruling.  I think the
```

Page 62

```
 1                    P. DELANEY
 2        minutes of the grand jury in this
 3        particular instance are discoverable.
 4        Q.    Were you ever served with a
 5   grand jury subpoena involving this
 6   incident?
 7                MR. ISSACHAROFF:  Again, I'm
 8        going to instruct the witness not to
 9        answer.
10        Q.    Do you know if anyone was
11   accused of murdering Mr. Grant?
12        A.    Not to my knowledge.
13        Q.    Do you know if anyone was
14   arrested in relation to the murder of my
15   client, Roberto Grant?
16        A.    Not to my knowledge.
17        Q.    I referred to a procedure
18   called a mortality review to get to the
19   bottom of why someone may have died at a
20   prison facility such as MCC.  Do you have
21   another name for that?
22        A.    I mean, even with that stuff,
23   when it came to any kind of review like
24   that, it was we would be, I would say
25   almost like handcuffed by the FBI or OIG or
```

1                    P. DELANEY

2    OIA to come in, another investigative arm

3    to come in and do an investigation.  We

4    don't do an investigation on ourself.  So

5    we didn't have any kind of mortality review

6    or any kind of procedures in place for

7    that.

8          Q.    Do you know whether or not the

9    FBI, to your knowledge, deemed what

10   occurred to my client as a homicide?

11         A.    Not to my knowledge.  The only

12   thing that I know is they -- the agent who

13   was assigned to the institution came over

14   and interviewed myself and several staff

15   that responded that day, and then again I

16   was called over to the AUSA to give a

17   statement and that was it.

18         Q.    As part of your medical

19   training while working for BOP, does it

20   involve identifying trauma that may have

21   been suffered by a prisoner?

22         A.    With the training is basically

23   basic first aid, airway, breathing and

24   circulation to check and see if the person

25   has a pulse, if they're breathing and if

```
 1                    P. DELANEY
 2   they have circulation.  That's for CPR, and
 3   basic first aid, so the only areas that we
 4   had viewed on the patient at the time was
 5   his neck area, checking his carotid pulse
 6   and his pulse on his wrist, or radial
 7   pulse, and checking or a pulse on his -- by
 8   his ankle, which we didn't get a pulse on
 9   either three, and then removing as much
10   clothing from the upper torso, so you can
11   landmark and do CPR on an inmate or a
12   person.
13        Q.    Did a -- obviously, if you see
14   a prisoner bleeding, that's a form of
15   trauma, you would agree with that, right?
16        A.    Right.  But to my knowledge in
17   that particular incident I don't remember
18   any blood.
19        Q.    How about bruising, if you see
20   bruising you obviously know that that's a
21   form of trauma as well correct?
22             MR. ISSACHAROFF:  Objection to
23        form.
24        A.    I didn't -- off the top of my
25   head I don't remember seeing any blood or
```

```
                                        Page 65
 1                   P. DELANEY
 2   any bruising or anything glue know.
 3         Q.    But you know -- obviously, you
 4   know what those things are?
 5         A.    Correct.  Blood underneath your
 6   skin is bruising --
 7         Q.    Correct.
 8         A.    -- from an injury.
 9         Q.    So you didn't see any kind of
10   bruise or any kind bleeding under the skin
11   around Mr. Grant's neck when you were
12   searching for a pulse?
13         A.    No.
14         Q.    You know what the hyoid bone
15   is?
16         A.    Other than seeing -- hearing
17   about it on the news and other incidents
18   and stuff like that, I don't specifically
19   know where it is or what it is.
20         Q.    Do you know if it's in the
21   neck?
22         A.    It's in the neck, yes.  That's
23   only because of the news reporting about
24   another incident that happened about
25   another death and a hyoid bone being broken
```

```
                                          Page 66
 1                    P. DELANEY
 2    during a hanging.
 3         Q.    Do you know a Lt. Gene Joseph?
 4    Do you know that person?
 5         A.    Gene Joseph?
 6         Q.    They might be NYPD?
 7         A.    Yes.  No.  Not to my knowledge,
 8    I don't know that name.
 9         Q.    Do you know if the NYPD was
10    involved in this investigation at all?
11         A.    Not to my knowledge.
12         Q.    It was all FBI?
13         A.    Yes.
14         Q.    Have you ever observed an
15    inmate after -- withdraw that question.
16              Have you ever observed an
17    inmate who may have suffered an injury from
18    being choked prior to this incident?
19         A.    Prior to this incident, no.
20         Q.    You never had any kind of
21    instance where, you know --
22         A.    An attempted suicide, yes.
23         Q.    They may have tried to hang
24    themselves or whatever?
25         A.    Yes.  When I was an officer and
```

```
                                   Page 67
 1                  P. DELANEY
 2   a couple of times a lieutenant?
 3        Q.    Part of your first aid
 4   training, did it consist of identifying
 5   signs of someone being choked or having
 6   some sort of bruising or injury to the
 7   neck?
 8        A.    Well, in the instances prior to
 9   this incident of other inmates or people
10   that I've seen with injuries to the neck
11   from choking injury of a noose, the staff
12   is trained to hold the person up to make
13   them -- the noose limp, so you can cut the
14   noose away from the person's neck or
15   whatever and so you can restore the airway
16   and breathing.
17             But other than like being -- or
18   treating a person, all those other
19   instances either happened during the day or
20   when medical staff was available and they
21   were the ones that did the medical -- the
22   life-saving measures with the staff that
23   responded.
24        Q.    Right.  But I mean you would
25   be -- you're considered a first responder,
```

```
 1                    P. DELANEY
 2   are you not, in situations like that?
 3        A.     Yes.
 4        Q.     Obviously, as a first responder
 5   you still have to have the ability to
 6   identify what's wrong with someone that may
 7   have a medical emergency?
 8        A.     Correct.  Airway, breathing,
 9   circulation.  ABC.
10        Q.     You want to be able to tell
11   medical personnel that are responding after
12   you what your observations were; would that
13   be fair to say?
14        A.     Yes.  But the observation that
15   day was he didn't have a pulse and he
16   didn't have any trauma, to my knowledge.
17   But when we did our first assessment,
18   checking for the carotid pulse.  He didn't
19   have a pulse.  We started CPR and we were
20   doing the AED.  You stop CPR so the AED can
21   electronically see if you have a rhythm or
22   not.
23        Q.     Did you ever come do learn that
24   my client suffered injuries that were
25   consistent with being choked?
```

```
                                        Page 69
 1                    P. DELANEY
 2         A.     Hearsay, and other people
 3   talking afterwards while the investigation
 4   was going on.  I wasn't privy to any of
 5   that information because I wasn't involved
 6   in the investigation.
 7         Q.     Fair enough.  I understand
 8   that.
 9                What did you hear in regard to
10   my client and him being choked to death?  I
11   know it's hearsay, potentially.
12         A.     Right.  I only heard bits and
13   pieces that other inmates had said that
14   they were toking -- like an inmate, they
15   were toking and smoking.  They were doing
16   something, and he basically passed out and
17   -- or went limp and they were holding him
18   up and trying to revive him and slapping
19   him and threw him in the shower to get --
20   to revive him.
21                That's why I put two and two
22   together, because he was wet when we were
23   trying to resuscitate him, and he wasn't
24   wet from sweating, he was wet from head to
25   toe.
```

Page 70

1                      P. DELANEY

2         Q.    Did you ever review any

3    toxicology reports involving my client

4    postmortem?

5         A.    No, because I wasn't in the

6    investigation.

7         Q.    Did you ever come to learn the

8    results of any toxicology reports?

9         A.    No.

10        Q.    If I fold you they came back

11   next for any kind of illicit substance

12   including K2, would that refresh your

13   recollection?

14        A.    Well, again, if it came back, I

15   don't know, because I wasn't involved in

16   the investigation.

17        Q.    Did it occur to you that as a

18   first responder that the inmates who were

19   telling you that they tried to revive him

20   in the shower may have been lying?

21             MR. ISSACHAROFF:  Objection to

22        form.  I'm not -- well --

23        Q.    You can answer the question.

24   He's just objecting to the way I structured

25   it.

```
                                          Page 71
 1                    P. DELANEY

 2        A.     The inmates lie?  Yes, inmates

 3    do lie.

 4        Q.     Did you did in any way doubt

 5    the veracity of their statements initially

 6    when you appeared at the scene?

 7        A.     There was not very much talking

 8    when we appeared at the scene.  So we

 9    responded.  The only conversation that the

10    inmates basically had with the responding

11    staff was the initial officer telling him

12    to come help the person that was passed

13    out, and then we initiated life-saving

14    measures for them.

15              I actually secured all the

16    inmates, because the inmates were

17    surrounding staff when I arrived, you know

18    just like onlookers, like they do if it was

19    on the street and a staff member or a

20    person collapses, a regular Joe citizen

21    collapses, people, you know, tend to crowd

22    and goggle, you know, like see what's going

23    on, onlookers.

24              So all the inmates did that.

25    They surrounded the staff, which is a
```

```
 1                    P. DELANEY
 2   security concerned.  So when I arrived I
 3   kicked all the inmates off the tier, gave
 4   them, all the inmates instructions to go
 5   with the responding staff that responded
 6   and we secured them in what would be like
 7   the indoor gymnasium that they have on the
 8   unit.  So there wasn't very much talking
 9   between staff and inmates.
10        Q.    Who is Maureen Baird?
11        A.    She was the warden at the time
12   at the institution.
13        Q.    I'm looking back at the 583.
14   This is your report; is that correct?
15        A.    Yes.  It's initiated by the
16   lieutenant on shift.
17        Q.    Do you know who collected --
18   you said that you were a witness; is that
19   correct?
20        A.    Yes, a witness/first responder.
21        Q.    Do you know who -- but you
22   created this report, is that correct, and
23   the information contained in it?
24        A.    So that's the initial
25   information that's collected.  So that's --
```

```
 1                    P. DELANEY
 2    when you do a 583, the operation lieutenant
 3    does a memo of the incident, also puts his
 4    memo in -- he matches the memo that he
 5    gives of the incident to the captain and
 6    the warden, the same memo that they put
 7    into as the operations lieutenant memo in
 8    the 583.
 9              You collect the medical.  If
10    there's medical there, you collect the
11    medical assessments.  You collect the
12    photos.  You collect everything, the chain
13    of custody, and everything gets collected
14    by the lieutenant on the 583.
15              If SIS is available, they
16    collect everything with the chain of
17    custody so there's less people involved
18    with touching any evidence, if there's any
19    evidence involved, and the 583 basically is
20    just a collection of the information at the
21    time of the incident.  Everything from --
22    I'm looking at my memo now -- from when he
23    was pronounced dead from 12:33 by the
24    emergency room doctor, everything after his
25    death or whatever is all done by SIS and
```

                           P. DELANEY

1       FBI.

3           Q.    You collected all the

4       information that's contained in here, is

5       that correct, the attachments?

6           A.    Yes.  I'm the one who scans it

7       and uploads into that particular computer

8       system that keeps tabs of all those 583s.

9           Q.    Did you take the photos of my

10      client at the time?

11          A.    I'd have to look at -- no.  I'm

12      looking right now.

13          Q.    Page 3.

14          A.    So that was not entered by me.

15      That memorandums were entered by 18813.  So

16      that's the actual person who entered

17      information.  So like my number is 18876.

18      So it could have been my activities

19      lieutenant who came in it at -- let me see.

20      They were done on the next day.

21               So I want to say that the

22      photos of Grant were probably -- because we

23      were doing life-saving measures on him or

24      whatever.  So we're not first thing to

25      think about is to grab a camera.  So we

```
 1                    P. DELANEY
 2   probably went off of his inmate photo
 3   that's kept in the system for verification
 4   of him leaving and his name and number, and
 5   then photos were probably uploaded taken at
 6   the hospital after his demise.
 7             MR. LAUFER:  Counsel, to the
 8        degree that you haven't produced
 9        photos involving my client -- I know
10        you produced some -- I'm going to
11        call for production of those photos
12        in color form.
13             MR. ISSACHAROFF:  I'm sorry.
14        Are you saying we haven't produced
15        those all in color form?
16             MR. LAUFER:  I don't think you
17        produced all of them in color form.
18        I know you definitely produced
19        photos.  I don't know if you produced
20        all the photos in your possession.
21        But the ones that you haven't
22        produced, I would just request that
23        you produce them in color form.
24             MR. ISSACHAROFF:  Okay.  I'll
25        look into that.
```

```
 1                    P. DELANEY
 2         Q.    Did you -- when you make a
 3    referral to the FBI -- prior to the
 4    incident involving my client, have you ever
 5    made a referral to the FBI regarding a
 6    prisoner at any of the institutions that
 7    you worked at?
 8         A.    Yes.
 9         Q.    You have to -- are you familiar
10    with the form that's filled out when you do
11    that?
12         A.    Yes.
13         Q.    Do you know whether or not --
14         A.    You fill them out on behalf of
15    SIA or the special investigative agent for
16    the institution or the SIS lieutenant,
17    fills out the form on behalf of the warden,
18    and then sends it to the warden and the
19    warden reviews it, make the changes that he
20    or she wants on it and then they're the
21    ones who do the referral.  The referral
22    always comes from the warden.
23         Q.    There has to be a reason that
24    you put down on the form, is that correct,
25    that you were referred to -- when you
```

```
 1                    P. DELANEY
 2   referred to -- to the FBI?
 3        A.    Yes.   There is a section almost
 4   like a 583 where you have check-off areas
 5   of the investigation, why it's being
 6   referred and what code of conduct is being
 7   violated.
 8        Q.    Did you ever observe the form
 9   that was used for the referral in this
10   particular matter?
11        A.    No, I have not.
12              MR. LAUFER:   I may need you to
13         pull another doc, Lucas.
14              MR. ISSACHAROFF:   Just going
15         back, I'm going to refer you to
16         US_284 to 286, which I believe are
17         the color photos that were referred
18         to.
19              MR. LAUFER:   Thank you.
20        Q.    I'm going to refer to US_304
21   and 305.   I want to just question you
22   regarding this.
23              MR. ISSACHAROFF:   I just sent
24         those over.   It's a very large file,
25         so let me know when it comes through,
```

```
 1                    P. DELANEY
 2         and if it doesn't I'll just pull off
 3         those last two pages and send them to
 4         you.
 5              MR. LAUFER:  Okay.  I just want
 6         to ask him about 304 and 305 really
 7         quick.
 8      Q.    Let me know when you're ready
 9   to go, DHO Delaney.
10              MR. ISSACHAROFF:  Before we
11         proceed, let me just note that this
12         is the same document that I had that
13         is indicated on a privileged a log
14         for a subsequent production.  So I
15         guess we'll withdraw the claim of
16         privilege with respect to that
17         document.  It's still obviously
18         subject to the protective order, but
19         we will no longer assert the
20         privilege.
21              MR. LAUFER:  Sure.  No problem.
22      Q.    Just let me know when you're
23   done reviewing the two-page document, DHO
24   Delaney.
25      A.    Okay.  I reviewed it.
```

1                      P. DELANEY
2      Q.    Are you familiar -- I know you
3  may have not filled out this document, but
4  are you familiar with the form that this
5  document takes?
6      A.    Yes.
7      Q.    Have you fill out documents
8  like this before the incident involving my
9  client?
10      A.    Yes.
11      Q.    Did you fill out this
12  particular document?
13      A.    Not to my knowledge.  But it is
14  my memo that they attached to it.
15      Q.    They put your memo in this
16  document?
17      A.    Right.
18      Q.    Do you believe this document to
19  be created in the ordinary course and scope
20  of the functioning or the work at MCC
21  prison?
22      A.    Yes.
23      Q.    I'm just going to draw your
24  attention to a small area at the top
25  right-hand corner, beneath the initial

```
 1                    P. DELANEY
 2  original enter date, and it says this a
 3  referral; is that correct?
 4       A.    Correct.
 5       Q.    This is a referral of a
 6  criminal matter for investigation?
 7       A.    For homicide inmate.
 8       Q.    So this is -- the basis for the
 9  referral was a homicide regarding the
10  inmate; is that correct?
11       A.    On this particular referral,
12  yes, so that the warden and SIA at the time
13  referred him.
14       Q.    What inmate homicide, what
15  inmate did this involve?
16       A.    That is Roberto Grant.
17       Q.    That is the Roberto Grant that
18  weave been talking about during this
19  deposition; is that correct?
20       A.    Correct.
21       Q.    That's it for that document.
22  DHO Delaney, I'm going to draw your
23  attention -- this is an earlier document
24  that was e-mailed to you by your attorney.
25  It's US_372 through 389.  I believe it's
```

```
 1                    P. DELANEY
 2   one document, maybe forty-four pages or so.
 3   Maybe a little bit less.  I'm sorry.  Maybe
 4   more like seventeen pages.  My apologies.
 5        A.    373?
 6             MR. ISSACHAROFF:  Yes.  The
 7          file is incorrectly named US_373.
 8          But it's -- the first page, you'll
 9          see, is Bates stamped US_372.
10             MR. LAUFER:  Section 1.
11        Q.    What I'd like to you do, DHO
12   Delaney, is just review this document in
13   its entirety.  You don't have to read --
14   you know, as much as you'd like.  When
15   you're done reviewing it, just please let
16   me know.
17        A.    Okay.
18             MR. ISSACHAROFF:  Do you want
19          to that take a break at any point?
20             MR. LAUFER:  If you'd like to,
21          that's fine.  We can take a
22          five-minute break.  That's cool.
23             MR. ISSACHAROFF:  Yes, that
24          sounds great.  I'm come back on at
25          11:41.
```

```
                                    Page 82
 1                 P. DELANEY
 2           MR. LAUFER:  That sounds good.
 3       It is now 11:38.
 4               (Whereupon, a short recess was
 5       taken.)
 6               MR. LAUFER:  Back on the
 7       record.
 8       Q.    Let's talk a little bit about
 9  document US_372 through 389.  Did you have
10  an opportunity to review this, DHO Delaney?
11       A.    Yes.
12       Q.    What do you know this document
13  to be?
14       A.    It's basically all the Sentry
15  transaction and Sentry paperwork on your
16  client that I produced and printed
17  between after he departed to before all the
18  rest of the paperwork was completed.  It's
19  basically what they call a go pack or
20  whatever.  It's basically if an inmate goes
21  to the hospital or leaves our custody or
22  leaves that you have to print -- the
23  information you have to print and show
24  copies that you actually keyed the person
25  out.
```

```
                                    Page 83
 1                P. DELANEY
 2           So you see on page 2 of the
 3   document it actually shows that he was
 4   keyed out at 12:28, out of the institution.
 5       Q.    Specifically let's go to 373.
 6   What information is contained on this
 7   particular page?
 8       A.    Which page?
 9       Q.    373.
10       A.    Which page of 373?
11       Q.    No, it's US_373.  I guess
12   that's --
13       A.    373.  I see it.  Okay.  So that
14   would be page 2 and that was the
15   transaction of your client being keyed out
16   to the local hospital.
17       Q.    That's the officer that
18   actually keyed him out?
19       A.    No, it's probably -- I want to
20   say that I did.  So after hours there's no
21   receiving and discharge, which is R&D, that
22   does all the movement from the institution.
23   So after the hours the lieutenant has to
24   key.  So after EMS got there, EMS left.  I
25   made all the notifications to the captain
```

```
                                        Page 84
 1                   P. DELANEY
 2   and the warden and everybody, and I
 3   actually got back to my desk.  That's when
 4   he was keyed out of the institution at
 5   12:28 or 0028.
 6        Q.   Did you create the entries that
 7   are in this document?
 8        A.   I printed the entries.  So it
 9   basically shows -- yes, I printed and
10   scanned and made the -- that's why it has
11   me as the reporting lieutenant on Section 1
12   or 372.
13        Q.   Right.
14        A.   Those are -- the Sentry
15   transactions are basically the computer
16   program that's used to track everything on
17   the inmate.  It tracks the inmates's
18   movement, the cell he was assigned, the bed
19   he's assigned, the locker he's assigned.
20   If he went to court, came back from court,
21   whose custody he belongs to, U.S.
22   Marshal's, Homeland Security, and basically
23   those are the Sentry transactions.
24             Those are the codes on page
25   372, on PP 44, PP 41, PD15.  That's -- PD
```

1                    P. DELANEY

2    15 is the disciplinary history on the

3    inmate.  PP10 is his separation if he

4    separated from another inmate.  Those are

5    the different transactions.  Basically,

6    it's a packet that's printed any time an

7    inmate will leave the facility.

8         Q.    Do you know if my particular

9    client was in any kind of protective

10   custody, Mr. Grant?

11        A.    Not to my knowledge, and

12   there's no information here.

13        Q.    Do you know whether or not he's

14   working with the United States Attorney's

15   Office for any reason?

16        A.    Not to my knowledge, and there

17   is no information on this paperwork that's

18   here.

19        Q.    Would you be made aware if you

20   had, let's say, a CW, cooperating witness,

21   or a confidential informant, someone that's

22   working with the United States government

23   in a criminal matter?

24        A.    There is -- yes, the inmate

25   would be highlighted in Sentry and there

```
                                         Page 86
 1                    P. DELANEY
 2    would be information here.  It would be on
 3    his 44, and there's no information on his
 4    44 here.
 5         Q.    Do you know whether or not my
 6    client -- I say my client.  The decedent
 7    Roberto Grant, do you know whether or not
 8    he had any issues, like any kind of
 9    arguments or beefs with any of the other
10    prisoners?
11         A.    Not to my knowledge.
12         Q.    Do you know whether or not he
13    had to be segregated from anyone or any of
14    the other prisoners for any reason?
15         A.    It notes on his 44, which is
16    386 or whatever that he had, is a person
17    who enters if they have separation issue,
18    and that was entered on 5/6/2014.
19         Q.    What does the entry state?
20         A.    So Tyrone D. Hoyett was the
21    person he was separated from.  But he was
22    removed 5/6.
23         Q.    2014, a year earlier?
24         A.    Yes.
25         Q.    Do you know why he had to be
```

```
 1                    P. DELANEY
 2   separated from that particular inmate?
 3        A.    No.
 4        Q.    Do you know whether or not it
 5   was gang related?
 6        A.    No, there's no information on
 7   it.  Basically at MCC, off the top of my
 8   head, back then they probably had about --
 9   they had a lot of inmates back in 2015.  So
10   say they had eight hundred inmates.  Out of
11   eight hundred inmates, five hundred of them
12   had separation.
13        Q.    So this is pretty common?
14        A.    Yes, and basic separations
15   usually would be somebody they testified
16   against or somebody that they're
17   cooperating against or any kind of other
18   information, and then that would be listed
19   as a separation.  To go into depth, that's
20   what unit team would know all the
21   information.
22             Any other things that would be
23   what they call a highlighted inmate, which
24   he is not, and that's another story that
25   I'm very familiar with.
```

Page 88

1                        P. DELANEY
2          Q.    Do you know why -- is there any
3    information within this packet that
4    determines why he needed to be separated?
5          A.    It just says that he has a
6    separation and that was current the day he
7    was there.  But it doesn't specifically
8    say.  It's not noted.  There's no
9    information.  The only information on the
10   notes that you see on 386, the notes say
11   that he pled guilty, that he interfered
12   with commerce.  But there is no -- usually
13   they would have information there where the
14   remarks are.
15         Q.    What about 387, the next page,
16   does that clarify anything or no?
17         A.    Just that he was separated from
18   the noise.  But it doesn't give the
19   information why.  Gang-wise, he doesn't
20   have there's no SPG assigned.  That's the
21   assignment they give to a gang member.
22         Q.    Let's go to the next packet of
23   documents, 393 through 418.  I believe your
24   attorney e-mailed this to you already.
25   It's entitled Section 3.

```
 1                    P. DELANEY
 2       A.    This is a file that is -- I'm
 3  sorry.  This is in the same document?
 4       Q.    No, this is US_393 through 418.
 5       A.    Okay.  That's the last one that
 6  was sent to me?
 7            MR. ISSACHAROFF:  Yes, that's
 8        the third one.  It's -- the file name
 9        is US_00393 redacted.
10       A.    Yes.  These were the memos.
11       Q.    I'd like you to review this set
12  of documents, and when you're done
13  reviewing them, please just let me know.
14       A.    Okay.
15       Q.    Are you familiar with this set
16  of documents?
17       A.    Yes.  They were all the
18  documents -- most of the documents that
19  were scanned for the 583.
20       Q.    Were these documents created in
21  the normal ordinary course and scope of the
22  operations at MCC?
23       A.    The memorandums or normal
24  course of operation, see attached to the
25  583 and then the stuff with -- prior to
```

1                    P. DELANEY

2    with the investigation, it looks like

3    Officer Kearns sending information to

4    myself, Gonzales and Jeff Sewell, who was

5    the SIS lieutenant at the time, about

6    ongoing problems on his unit.

7         Q.    What type of ongoing problems

8    with there?

9         A.    He's talking about the way that

10   they're bringing it in.

11        Q.    Do you know if officer Kearns

12   had a specific issue with my client with

13   Mr. Grant?

14        A.    Not to my knowledge, no.

15        Q.    Did he ever report that he had

16   a specific issue with Mr. Grant?

17        A.    Not to my knowledge.

18        Q.    Do you know whether or not he

19   was ever accused of being involved in some

20   way with Mr. Grant's death?

21        A.    No, not to my knowledge.

22        Q.    You note on US_396 -- just go

23   to that page.  I think it's the fourth page

24   in the packet.

25        A.    Okay.

```
                                              Page 91
 1                    P. DELANEY
 2        Q.     This is --
 3        A.     From Trejava.
 4        Q.     He mentions that it smelled os
 5   smoking material.  Do you know anything
 6   about that?
 7        A.     That was his observation at the
 8   time.
 9        Q.     Did you smell any smoke when
10   you were there?
11        A.     Not -- the bad thing about me,
12   whatever, is A, I was smoker back then.  I
13   don't smoke anymore, and a lot of times
14   when I was working -- inmates smoke.  They
15   smoke tobacco.  They smoke everything else,
16   and you couldn't tell the different between
17   what they were smoking and not smoking.
18        Q.     That was a good thing that you
19   quit.  Congratulations.
20        A.     Thank you.
21        Q.     You're welcome.
22        A.     You know, what I'm basically
23   saying is as a smoker or whatever back
24   then, stuff like that, I wouldn't pick up
25   on some of the smells that officers that
```

```
 1                    P. DELANEY
 2   didn't smoke would immediately smell.  Like
 3   you lose that taste and you lose that smell
 4   of smoke or whatever when you're a smoker.
 5        Q.    I see.  Do you believe that --
 6   have you ever smelled K2?  Do you know what
 7   it smells like?
 8        A.    Yes.  It's very hard to
 9   describe, because there's so many different
10   variations of it.  A lot of times it just
11   smells like burnt paper, a harsh smell of
12   burning paper, and that's because a lot of
13   times it's K2 liquid that's sprayed on
14   paper and they just smoke it.
15             When it's the leafy kind of K2
16   and they're smoking it, it smells a little
17   like marijuana but more like a burnt paper
18   or smoking a cigarette.  But again, I was a
19   smoker back then, so I had trouble
20   deciphering between if they were smoking a
21   cigarette or smoking K2.
22        Q.    Do you believe that, I guess
23   the either use or distribution of K2 in
24   that particular housing area had anything
25   to do with the death of my client?
```

```
 1                      P. DELANEY
 2         A.    No.  It's hard to -- hard to
 3    say I mean, other than everything like
 4    hearsay in the investigation and looking at
 5    these memos now and stuff like that because
 6    of all the stuff that was going on in the
 7    institution as a whole or was it just that
 8    unit.
 9         Q.    Did you find that overall --
10         A.    It was rampant.
11         Q.    I'm sorry.  Finish what you
12    were going to say.
13         A.    K2 was rampant through the
14    whole institution.
15         Q.    Did you find that during this
16    time period there was an uptick in violent
17    episodes or confrontations between
18    prisoners at the institution because of K2?
19         A.    Most of the confrontations due
20    to K2 was because of the person being high
21    on K2.  It wasn't usually between the
22    inmates.  It was inmates were getting
23    locked down and they felt that the -- you
24    know, you have model inmates that just want
25    to do their time or whatever and not be in
```

1                    P. DELANEY

2    -- what do you call it, hindered by all the

3    drug use and the inmates going off.  So

4    when you had an inmate that was under the

5    influence, his cell mate or other inmates

6    other tried to hide them or keep them under

7    control and hide them fast, because they

8    knew that if we found them it would be

9    investigated and the unit would be locked

10   down for several days while we came to the

11   bottom of it.

12        Q.    Do you know whether or not my

13   client got in trouble for either possession

14   or dealing K2 to other prisoners in the

15   past?

16        A.    Not to my knowledge.  I mean,

17   his Sentry work says that he had been in

18   possession of other items and stuff like

19   that, but it's not specific, and he had

20   some minor run-ins with staff or whatever.

21   But his disciplinary history was pretty

22   clean for an inmate, to look at the

23   disciplinary paperwork.  That's on the

24   previous document we were looking at.

25        Q.    Let's talk about your

Page 95

1                      P. DELANEY

2    statements to the FBI.  Aside from the FBI,

3    did you give statements about -- and prison

4    officials, did you give statements to any

5    other law enforcement entity?

6         A.    No, it was just the FBI and the

7    AUSA.

8         Q.    Can you tell me what you stated

9    to the FBI?

10        A.    Basically exactly how I

11   responded to -- they only wanted to know

12   the response on how I responded to the

13   incident.  Like I was the witness of that

14   particular -- they talked to everybody --

15   so Kearns was the initial, because he was

16   the first person on scene with -- mentioned

17   in one of the memos, who is the second

18   officer that started to do compressions.

19        Q.    Do you know if Officer

20   Kearns -- go on?

21        A.    It was Officer Kearns -- I

22   forget -- George Stopolopoulos.

23        Q.    Do you know if Officer Kearns

24   was ever accused of assaulting an inmate or

25   using any kind of physical force or

```
                                            Page 96
 1                    P. DELANEY
 2   restraints against an inmate prior to the
 3   incident with my client?
 4        A.     I don't recall.  He was a quiet
 5   officer and a senior officer.  He had been
 6   an officer for a while.  But I don't recall
 7   any -- other than he was, as you see him
 8   from those e-mails that he sent to us, once
 9   that incident happened or prior to that
10   incident, because again, K2 was rampant in
11   the institution, that any time he got
12   information from other inmate he posted it
13   to the lieutenant so we can pass on to SIS
14   to look into, investigate.
15        Q.     Do you recall anything else
16   that you may have said to the FBI on your
17   302 regarding this incident?
18        A.     On the 302?
19             MR. ISSACHAROFF:  Objection to
20        form.  I don't think he ever said
21         that there was a 302 necessarily.
22        A.     No.
23        Q.     That's fine.  Fair enough.
24             Do you recall any other things
25   that you may have said to the FBI regarding
```

Page 97

                    P. DELANEY
1
2    this incident?
3          A.     Other than my response and
4    again, like I've talked -- told you in
5    reference to the -- what the hearsay was,
6    because I wasn't involved.  They asked the
7    exact same thing was the inmate wet, was
8    the inmate -- did you see any marks on him
9    or stuff, and basically same questioning as
10   you're doing.  But I, again, don't remember
11   or recall and that was sooner after the
12   incident, several months after the
13   incident.
14         Q.     You gave them basically the
15   same response as you've given me today --
16   given us today; is that correct?
17         A.     Correct, or again stated that
18   it was hearsay or what heard after the
19   fact, I wasn't privy to.
20         Q.     Was the United States attorney
21   present at the time that he gave these
22   statements?
23         A.     Yes, because they were -- I
24   don't know, off the top of my head, I don't
25   remember the capacity were they basically

Page 98

1                      P. DELANEY

2      in a fact-finding mission or whatever it

3      was.

4          Q.     How many agents were there at

5      the time of the hearing statement?

6          A.     Just the one agent who's

7      assigned to the institution.

8          Q.     The same agent, have you had

9      prior dealings with?

10         A.     Yes.

11         Q.     Prior to the incident, did you

12     ever meet this AUSA before?

13         A.     No, that was my first time

14     meeting that AUSA.

15         Q.     Was it a male or female?

16         A.     There were two AUSAs there.

17         Q.     Were they both male?  Both

18     female?  One of each?  Do you recall?

19         A.     Male and female.

20         Q.     If I told you the name Jason

21     Randanzo, was that the FBI agent that was

22     in charge?

23         A.     Yes, that's the agent that was

24     assigned to the institution at the time.  I

25     knew him as just Jason.

```
 1                    P. DELANEY
 2      Q.    Did you guy socialize outside
 3  of work?
 4      A.    No, I only -- that was actually
 5  maybe the second time I had met him.  Other
 6  times was all through phone and faxes and
 7  e-mails.
 8      Q.    Where did you do this
 9  interview?
10      A.    At the AUSA's office right next
11  door to MCC.
12      Q.    Were you represented by counsel
13  at that time?
14      A.    No.
15      Q.    You just went in there by
16  yourself?
17      A.    Yes.
18      Q.    Were you ever advised to have
19  counsel present?
20      A.    No.
21            MR. LAUFER:  I don't think I
22        have anything further, Lucas, for DHO
23        Delaney.  I think I'm to going to
24        probably make a motion to unseal the
25        grand jury minutes involving my
```

```
 1              P. DELANEY
 2       client's death here.  But other than
 3       that, I think we're done for today
 4       for the time being, unless something
 5       new comes up and I need to recall
 6       this witness.
 7            MR. ISSACHAROFF:  Okay.  I just
 8       want to check in my notes.  I think
 9       we have -- I gave you the Bates
10       numbers for what I believe the color
11       photos that we discussed are, at 284
12       to 286.  Then you want me to look
13       into whether we've produced the Tru
14       Scope log for that evening.
15            MR. LAUFER:  Right.
16            MR. ISSACHAROFF:  Was there
17       anything else?
18            MR. LAUFER:  No, other than the
19       grand jury minutes.  You want to just
20       consent with me now to unseal those?
21            MR. ISSACHAROFF:  Look,
22       honestly, there's so little there
23       that I will discuss it internally.
24       But we will have to follow up on
25       that.
```

Page 101

1                      P. DELANEY

2              MR. LAUFER:  That's fine.  I

3         just want to know where the FBI was

4         going with this, you know, in terms

5         us -- the attorney's office was going

6         with this -- you know, where the

7         United States Attorney's Office was

8         going with this in terms of potential

9         criminal prosecution.  I just want

10        know what their theories were and who

11        they may have suspected may have been

12        involved in my client's murder.

13             MR. ISSACHAROFF:  Yes.  That's

14        obviously a pretty core criminal

15        investigation.  But we'll talk about

16        that.  We can touch base on that.

17             MR. LAUFER:  All right.  DHO

18        Delaney, thank you very much for your

19        attendance here today.  I will get --

20        even though I am not required to, I

21        will do a courtesy and get a copy of

22        the transcript over to your attorney

23        and you can review it with him.

24        Q.    Do you have any questions

25   before we end?

Page 102

1                    P. DELANEY

2      A.     No.  No questions.

3             MR. LAUFER:  Thank you.

4             (Whereupon, at 12:30 P.M., the

5      Examination of this witness was

6      concluded.)

7

8                 °           °           °           °

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

1                        P. DELANEY

2                   D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                 _____

15                      PATRICK DELANEY

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____

22     NOTARY PUBLIC

23

24

25

Page 104

1              P. DELANEY

2            E X H I B I T S

3

4   PLAINTIFF EXHIBITS

5

6   EXHIBIT    EXHIBIT                  PAGE

7   NUMBER     DESCRIPTION

8   Exh 1      Form 583                 4

9

10        (Exhibits retained by Counsel.)

11

12               I N D E X

13

14   EXAMINATION BY                     PAGE

15   MR. LAUFER                         4

16

17    INFORMATION AND/OR DOCUMENTS REQUESTED

18   INFORMATION AND/OR DOCUMENTS       PAGE

19   Electronic log                     47

20   Photos in color form               75

21

22       QUESTIONS MARKED FOR RULINGS

23   PAGE LINE QUESTION

24   61    16  Did you ever testify before a

25   grand jury in relation to this?

Page 105

1                      P. DELANEY

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                             :  SS.:

5    COUNTY OF QUEENS         )

6

7         I, EPHRAIM JACOBSON, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 22nd day of July 2020.

21

22

23

                 EPHRAIM JACOBSON

24

25

Page 106

1                           ERRATA SHEET
                   VERITEXT/NEW YORK REPORTING, LLC
2
    CASE NAME: Williams v. United States Of America Et Al
3   DATE OF DEPOSITION: 7/7/2020
    WITNESSES' NAME: Officer Patrick Delaney
4
5       PAGE   LINE (S)        CHANGE              REASON
    ____|_____|_____|_____
6
    ____|_____|_____|_____
7
    ____|_____|_____|_____
8
    ____|_____|_____|_____
9
    ____|_____|_____|_____
10
    ____|_____|_____|_____
11
    ____|_____|_____|_____
12
    ____|_____|_____|_____
13
    ____|_____|_____|_____
14
    ____|_____|_____|_____
15
    ____|_____|_____|_____
16
    ____|_____|_____|_____
17
    ____|_____|_____|_____
18
    ____|_____|_____|_____
19
    ____|_____|_____|_____
20
                              _____
21
                              Officer Patrick Delaney
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
    _____        _____
25  (NOTARY PUBLIC)                 MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   3:17 |

| 0 |
| --- |
| **0028**   84:5 |
| **00393**   89:9 |
| **00394**   8:6 |

| 1 |
| --- |
| **1**   3:17 25:19 45:8 54:4 55:18 81:10 84:11 104:8 |
| **10007**   2:11 |
| **10018**   2:5 |
| **10:00**   1:12 35:16 36:14,17 |
| **11**   18:22 23:2,11 25:2,15 31:17,22 31:25 32:13 38:3 53:8 |
| **11232**   4:13 |
| **11691**   1:21 |
| **11:00**   24:13 |
| **11:38**   82:3 |
| **11:40**   23:24 38:21 |
| **11:41**   81:25 |
| **12**   38:2,2,3 46:18 |
| **12:15**   45:19 |
| **12:28**   83:4 84:5 |
| **12:30**   102:4 |
| **12:33**   73:23 |
| **12:50**   45:20 |
| **15**   85:2 |
| **16**   104:24 |
| **17cv06779**   1:6 |
| **18813**   74:15 |
| **18876**   74:17 |
| **19**   21:10 |
| **1990**   10:10 11:3,10 12:2 |
| **1996**   11:4,10 12:2 12:11 |

| 2 |
| --- |
| **2**   25:20 83:2,14 |
| **20**   103:19 106:22 |
| **2000**   11:3,4 12:11 13:9,11 18:20 |
| **2001**   8:11,20 10:20 13:10 15:15 |
| **2005**   47:14,16 |
| **2007**   14:14 16:15 16:20 17:7,19,21 17:23 18:20 21:21 |
| **2009**   18:20 21:21 21:23,24 |
| **2014**   30:21 47:20 86:23 |
| **2015**   20:19 21:19 25:3 28:16 29:2 30:21 44:21 46:25 47:17,18,19,20 50:7 52:12 87:9 |
| **2016**   5:24,24 |
| **2017**   9:22 |
| **2018**   9:22 |
| **2019**   5:25 |
| **2020**   1:11 105:20 |
| **22nd**   105:20 |
| **264**   2:5 |
| **284**   77:16 100:11 |
| **286**   77:16 100:12 |
| **29th**   4:12 |

| 3 |
| --- |
| **3**   45:8 74:13 88:25 |
| **302**   60:14 96:17,18 96:21 |
| **304**   77:20 78:6 |
| **305**   77:21 78:6 |
| **360**   34:15 |
| **372**   80:25 81:9 82:9 84:12,25 |

| 373   81:5,7 83:5,9 |
| --- |
| **373**   81:5,7 83:5,9 83:10,11,13 |
| **386**   86:16 88:10 |
| **387**   88:15 |
| **389**   80:25 82:9 |
| **390**   54:2,9,11 |
| **392**   54:2,11 |
| **393**   88:23 89:4 |
| **396**   90:22 |
| **3:00**   46:18 |
| **3rd**   2:10 |

| 4 |
| --- |
| **4**   45:9 104:8,15 |
| **40**   28:10 |
| **40th**   2:5 |
| **41**   84:25 |
| **418**   88:23 89:4 |
| **44**   84:25 86:3,4,15 |
| **47**   104:19 |
| **4:00**   46:19 |

| 5 |
| --- |
| **5**   45:8 |
| **5/6**   86:22 |
| **5/6/2014**   86:18 |
| **500**   28:10 |
| **525**   1:20 |
| **583**   7:21 39:17 53:24 54:16 56:9 72:13 73:2,8,14,19 77:4 89:19,25 104:8 |
| **583s**   74:8 |
| **5872**   105:23 |
| **5:00**   46:19 |

| 6 |
| --- |
| **6**   45:9 56:9 |
| **604**   2:5 |
| **61**   104:24 |
| **6:00**   53:6 |

| 7 |
| --- |
| **7**   1:11 |
| **7/7/2020**   106:3 |
| **75**   104:20 |

| 8 |
| --- |
| **8**   45:10 |
| **80**   4:12 |
| **83**   54:3 |
| **86**   2:10 |

| 9 |
| --- |
| **9**   17:6 46:21 |
| **9/11**   8:18,19 |
| **9:00**   53:5 |
| **9:30**   36:13 46:21 |

| a |
| --- |
| **a.m.**   1:12 38:22 |
| **abc**   68:9 |
| **ability**   68:5 |
| **able**   33:14 34:23 42:6 68:10 |
| **academy**   8:15,17 8:18,19,22,25 14:3 14:18,22,23,25 15:7,19,21,23 16:2 16:5,6,8 |
| **access**   33:10 35:6 42:7 |
| **accounted**   35:20 |
| **accused**   28:22 62:11 90:19 95:24 |
| **act**   24:7 |
| **action**   105:16 |
| **activities**   74:18 |
| **activity**   53:10 |
| **actual**   38:13,15 56:10,17 57:15,22 59:7 74:16 |
| **add**   5:8 |
| **additional**   14:8 |

**address** 4:11 6:5
**administer** 3:11
**administering** 9:21
**administrative** 6:3
**advised** 99:18
**aed** 43:16,21,24,25 51:3 56:12 68:20 68:20
**aeds** 57:12
**afternoon** 46:20
**agent** 63:12 76:15 98:6,8,21,23
**agents** 98:4
**agree** 5:9 64:15
**agreed** 3:5,20
**aid** 9:5,9,19 10:2 11:18,20 12:3,5,25 14:9,10 20:20 21:2 50:3 63:23 64:3 67:3
**aimed** 38:6
**airport** 11:14
**airway** 10:2 63:23 67:15 68:8
**al** 1:8 2:10 106:2
**alarm** 22:18,18 23:5 39:11 41:23 50:21
**alarms** 13:23
**alive** 52:6
**allowed** 36:19
**ambulance** 49:23 57:16,22 58:2
**america** 1:8,16 2:10 106:2
**analyzed** 44:3
**andrew** 2:4,6 6:9
**ankle** 64:8
**announce** 37:5

**announcement** 22:22
**announces** 22:23
**answer** 6:25 61:21 62:9 70:23
**anybody** 19:11
**anymore** 24:12 91:13
**anyway** 31:15
**apart** 27:9,11
**apologies** 81:4
**appearance** 28:9
**appeared** 71:6,8
**approximately** 8:13 21:25 38:18 38:21
**april** 20:18
**area** 27:5 29:14 32:2,13,21,22 33:2 33:5,7,13,16 34:5 34:9 38:9 46:12 47:8 57:23 64:5 79:24 92:24
**areas** 26:10,11 64:3 77:4
**arguments** 52:9 86:9
**arm** 63:2
**arrest** 9:16 12:8
**arrested** 62:14
**arrival** 43:11
**arrived** 10:3,4 21:4 30:6 42:3,14 42:19 43:12 71:17 72:2
**arrives** 50:5
**arriving** 42:3
**aside** 95:2
**asked** 97:6
**asking** 7:3

**aspects** 19:20,20 40:12
**assault** 54:21,23
**assaulting** 54:22 54:22 95:24
**assert** 78:19
**assessment** 68:17
**assessments** 73:11
**assigned** 14:25 15:3 27:23 63:13 84:18,19,19 88:20 98:7,24
**assignment** 14:4 28:19 88:21
**assistance** 22:17 22:23
**assistant** 20:15
**assume** 32:10
**assumed** 36:16
**assuming** 30:8
**attached** 22:19 79:14 89:24
**attachments** 74:5
**attempt** 54:24
**attempted** 44:17 54:23 66:22
**attempts** 44:16
**attend** 8:21 40:6
**attendance** 101:19
**attention** 37:15 79:24 80:23
**attorney** 2:8 6:9 80:24 88:24 97:20 101:22
**attorney's** 85:14 101:5,7
**attorneys** 2:4,9
**ausa** 60:12,19 61:11 63:16 95:7 98:12,14

**ausa's** 99:10
**ausas** 98:16
**authority** 50:5
**authorized** 3:11
**automatic** 43:17
**available** 67:20 73:15
**aw** 20:13
**aware** 24:2 85:19

**b**

**b** 104:2
**back** 8:15 10:19 15:9 16:9 22:8 25:2 28:15 29:22 30:23 37:4 47:14 52:23 70:10,14 72:13 77:15 81:24 82:6 84:3,20 87:8 87:9 91:12,23 92:19
**bad** 47:18 91:11
**baird** 72:10
**balances** 59:13
**bank** 28:23
**bar** 34:20
**bars** 34:19 35:3 36:6
**base** 101:16
**based** 43:4,5,7
**basic** 9:2,9,19,25 9:25 11:20 12:5 12:16 14:10 15:17 16:4 31:7 50:3,3,4 63:23 64:3 87:14
**basically** 12:14 13:19 15:18,23,24 16:3 18:2,7,13 19:6,22 25:7 28:8 32:20 35:18 36:12 40:11 41:4 45:15 45:24 51:5 56:3

63:22 69:16 71:10
73:19 82:14,19,20
84:9,15,22 85:5
87:7 91:22 95:10
97:9,14,25
**basis** 80:8
**bates** 8:5 81:9
100:9
**bathroom** 25:12
25:13
**bay** 32:2
**bed** 36:25 49:3,5
84:18
**beds** 27:6,8,10,13
36:23 37:4
**beefs** 86:9
**beginning** 46:17
**behalf** 76:14,17
**behavior** 32:4,6
**believe** 6:11 21:18
23:22 49:10 53:25
77:16 79:18 80:25
88:23 92:5,22
100:10
**belong** 28:12
**belongs** 84:21
**beneath** 79:25
**big** 25:11 30:22,23
**bit** 21:16 81:3 82:8
**bits** 69:12
**blank** 23:13
**bleeding** 44:9
64:14 65:10
**blood** 64:18,25
65:5 105:16
**blowing** 47:20
**body** 22:18 39:11
41:23 44:6
**bone** 65:14,25
**boom** 30:22

**bop** 4:25 8:10,12
10:11,14,17,20
13:10,13 14:2
37:10 40:21 63:19
**bottom** 62:19
94:11
**break** 81:19,22
**breathing** 51:20
63:23,25 67:16
68:8
**briefly** 8:25
**bringing** 90:10
**broken** 65:25
**brooklyn** 4:12
14:5,7 25:23
**brought** 57:8,13
57:17
**bruise** 65:10
**bruises** 12:6
**bruising** 64:19,20
65:2,6 67:6
**building** 40:4
**bunk** 27:6,8,9,13
28:17,24 42:18
56:16,18,21,22
**bunked** 26:22
**bunks** 34:24 36:20
**bureau** 41:6 58:18
**burning** 92:12
**burnt** 92:11,17

**c**

**c** 2:2 4:2 103:2
105:2,2
**call** 19:11 23:2
32:21 40:19 43:16
57:12 75:11 82:19
87:23 94:2
**called** 4:2 5:17
22:16 39:10 43:16
47:3 59:21 60:11
61:14 62:18 63:16

**calling** 47:10
**camera** 32:19,24
38:6 74:25
**cameras** 50:23
**capable** 35:13
**capacity** 53:14
97:25
**capt** 7:25
**captain** 5:21,23
7:23 19:16 20:10
20:14 73:5 83:25
**capture** 38:8,10
**card** 35:7
**cardiac** 9:16 12:8
**cards** 53:3
**career** 12:20 44:11
**carotid** 64:5 68:18
**case** 1:6 13:6
47:23 61:12 106:2
**cases** 48:6
**catching** 47:21
**cause** 43:8 58:23
**caused** 42:20
58:22
**ceased** 13:11
**cell** 53:5 84:18
94:5
**cells** 25:8 32:22
**center** 22:21 26:16
26:18 33:13,19,20
51:23
**centre** 28:10
**century** 5:6
**certain** 30:19
**certification** 3:8
**certify** 103:4,8
105:9,14
**chain** 73:12,16
**chambers** 2:10
**change** 23:15,16
23:22,23 24:14

106:5
**changed** 24:13,16
**changes** 24:2
76:19
**changing** 24:5
**charge** 18:3,13
19:8 20:12 51:5
98:22
**check** 18:12 30:8
51:17 63:24 77:4
100:8
**checked** 30:12
43:13,13,14
**checking** 12:17
18:4 64:5,7 68:18
**checks** 18:10,11
18:14 59:12
**child** 30:3
**choked** 66:18 67:5
68:25 69:10
**choking** 67:11
**cigarette** 92:18,21
**circuit** 40:17
**circulation** 63:24
64:2 68:9
**citizen** 71:20
**city** 10:25
**civil** 1:19
**claim** 78:15
**clarification** 7:2
**clarify** 88:16
**clean** 94:22
**cleared** 36:14
**client** 21:12,12,18
22:4,11 29:7
31:19 32:15 37:16
39:19,20 55:10
58:9 59:20 62:15
63:10 68:24 69:10
70:3 74:10 75:9
76:4 79:9 82:16

83:15 85:9 86:6,6 90:12 92:25 94:13 96:3

**client's** 59:16 100:2 101:12

**clock** 45:16

**closed** 40:17

**closer** 42:5

**closets** 34:4

**clothing** 64:10

**code** 77:6

**codes** 84:24

**collapses** 71:20,21

**collar** 28:2,4

**collect** 73:9,10,11 73:12,16

**collected** 72:17,25 73:13 74:3

**collection** 73:20

**color** 75:12,15,17 75:23 77:17 100:10 104:20

**columbia** 10:24 11:7 12:12 13:9 13:12

**come** 22:8 30:2 37:20 63:2,3 68:23 70:7 71:12 81:24

**comes** 23:13 76:22 77:25 100:5

**coming** 23:18 42:4

**commerce** 88:12

**commission** 106:25

**committed** 28:23

**common** 32:21 57:23 87:13

**companies** 10:23

**company** 13:15,20

**complete** 34:15

**completed** 35:19 82:18

**compressions** 95:18

**computer** 40:20 74:7 84:15

**computers** 33:10

**concerned** 32:6 72:2

**concluded** 102:6

**conclusion** 59:19

**condition** 39:19

**conduct** 58:7,11 77:6

**confidential** 85:21

**confined** 36:22

**confrontations** 93:17,19

**confused** 7:2

**congratulations** 6:4 91:19

**congregates** 33:3 33:6

**conjunction** 33:16

**connected** 26:12

**consent** 100:20

**consider** 6:3

**considered** 32:9 67:25

**consist** 67:4

**consistent** 68:25

**contained** 72:23 74:4 83:6

**contents** 55:17,24 56:2

**context** 55:16

**continuation** 9:10

**contraband** 32:9

**contributed** 49:12 49:24

**control** 22:21 94:7

**conversation** 4:15 71:9

**conversations** 40:25 41:2

**cool** 81:22

**cooperating** 85:20 87:17

**copies** 82:24

**copy** 3:14,17 4:24 101:21

**core** 101:14

**corner** 25:14 79:25

**correct** 8:2 13:22 15:3,11,17 16:23 20:5 28:25 31:6 32:7,8 33:4 35:4 36:6,7 37:12,13 46:5 51:12,18 54:12 56:13 59:6 59:6 64:21 65:5,7 68:8 72:14,19,22 74:5 76:24 80:3,4 80:10,19,20 97:16 97:17 103:9

**correction** 16:25

**correctional** 9:2 15:18 17:2 19:20

**corrections** 15:25

**correspondence** 40:23

**counsel** 3:6,18 4:14,17 47:6 75:7 99:12,19 104:10

**count** 35:19 36:13 36:14 37:4 42:8 46:14,16,21 51:19 51:21,25 52:2,3

**counted** 35:20 36:13 42:9

**county** 105:5

**couple** 12:16 21:9 33:12 50:11 67:2

**course** 12:4 19:15 55:13 79:19 89:21 89:24

**court** 1:2 3:13 6:16 84:20,20

**courtesy** 101:21

**courthouse** 28:10 28:11

**cpr** 9:9,10 14:10 21:3,3 42:18 44:20 50:4 64:2 64:11 68:19,20

**cranny** 48:4

**crayons** 30:3

**create** 84:6

**created** 55:12 72:22 79:19 89:20

**criminal** 80:6 85:23 101:9,14

**crowd** 71:21

**cs** 17:6

**current** 88:6

**currently** 5:17

**custody** 73:13,17 82:21 84:21 85:10

**cut** 67:13

**cuts** 12:5

**cw** 85:20

**d**

**d** 3:2 4:2 86:20 103:2 104:12

**date** 1:11 54:5 80:2 106:3

**day** 7:24 16:19,20 20:25,25 22:25 23:9,11 35:24 46:17,18 53:3 56:7 63:15 67:19

68:15 74:20 88:6
103:19 105:20
106:22
**days** 3:16 94:10
**dead** 33:19,20
60:3 73:23
**dealers** 27:25
**dealing** 9:14,23
57:25 94:14
**dealings** 98:9
**death** 41:14 43:9
44:12 48:14 49:12
49:24 58:8,15,22
59:10,16 65:25
69:10 73:25 90:20
92:25 100:2
**deaths** 60:25
**decedent** 21:13
86:6
**deciphering** 92:20
**decisions** 19:10
**deemed** 63:9
**defendant** 1:16
4:17
**defendants** 1:9 2:9
**defibrillator** 43:17
**definitely** 75:18
**degree** 41:2 47:9
75:8
**delaney** 1:17 4:1
4:10 5:1,11,12 6:1
6:5,8 7:1 8:1,9 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1

37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1,9
78:24 79:1 80:1
80:22 81:1,12
82:1,10 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1,23
100:1 101:1,18
102:1 103:1,15
104:1 105:1 106:3
106:21
**delaney's** 4:16
**demise** 75:6
**departed** 82:17
**depending** 33:23
**deploy** 12:24
20:20 21:2
**deployed** 56:12
**depose** 4:22
**deposed** 7:8
**deposition** 1:15
3:8,9,14 5:3 7:15
80:19 106:3
**depth** 87:19
**describe** 9:7 12:14
17:19 20:22 24:25

33:5,15 40:8 45:3
55:16,24 92:9
**described** 42:15
**description** 8:24
56:8 104:7
**design** 25:22
**desk** 84:3
**detain** 40:16
**detainees** 28:6,7
**detectors** 18:12
**determine** 58:22
**determines** 88:4
**dho** 5:19 6:5,8 8:9
53:15 78:9,23
80:22 81:11 82:10
99:22 101:17
**died** 62:19
**difference** 30:23
**different** 24:16
31:23 35:11 85:5
91:16 92:9
**diploma** 10:9
**direction** 38:12
**disbursed** 30:11
**discharge** 83:21
**disciplinary** 5:18
6:2 17:15 85:2
94:21,23
**discoverable** 62:3
**discovering** 39:18
**discuss** 100:23
**discussed** 100:11
**distributing** 48:13
**distribution** 92:23
**district** 1:2,2 2:9
**divided** 45:16
**doc** 77:13
**doctor** 73:24
**document** 8:5
54:15,17 78:12,17
78:23 79:3,5,12,16

79:18 80:21,23
81:2,12 82:9,12
83:3 84:7 89:3
94:24
**documentation**
7:14,17 49:9
60:22
**documents** 79:7
88:23 89:12,16,18
89:18,20 104:17
104:18
**doing** 11:19 12:17
13:22 18:3,14
19:25 21:3 32:3
42:18 45:7,21
48:24 49:19,19
68:20 69:15 74:23
97:10
**dome** 34:11
**door** 26:17 34:11
99:11
**doors** 34:20 43:19
57:11
**dorm** 37:3 52:18
52:20,22,24 53:20
**dormitory** 25:6
53:8,19
**doubt** 71:4
**draw** 23:12 37:15
79:23 80:22
**drawn** 30:3
**drills** 50:16
**drop** 48:17
**dropped** 48:22
**dropping** 49:11
**drug** 9:18,21
27:25 29:13,16
30:5,15,25 31:17
94:3
**drugs** 29:19,24
30:4,8 40:13,15

due  93:19
duly  4:3 103:5
  105:11
duplicate  56:10
duties  12:15 17:17
  19:3 50:13
dvrs  40:19

**e**

e  2:2,2 3:2,2 4:2,2
  33:11 80:24 88:24
  96:8 99:7 103:2
  104:2,12 105:2,2
earlier  80:23
  86:23
education  10:6
effect  3:12,15
eight  87:10,11
eighty  25:24,25
either  32:3 46:21
  59:18 60:19 64:9
  67:19 92:23 94:13
electronic  46:23
  47:2,8 104:19
electronically
  68:21
elevator  57:13
elevators  43:18
emergency  13:5
  23:2 39:10,13
  50:2,2,7,14,19
  51:6 68:7 73:24
employer  11:22
employment  10:16
  10:20 14:2
ems  10:3 49:21
  60:2 83:24,24
enclosed  34:9
ended  30:20
enforcement
  10:13 95:5

engage  24:8 52:8
  58:20,21
engaging  53:9
enhancements
  18:8
enter  8:15 34:5
  35:5 42:10 46:22
  51:10 80:2
entered  8:17,19
  42:14 74:14,15,16
  86:18
entering  12:18
enters  34:11 86:17
entire  34:15
entirety  81:13
entitled  88:25
entity  95:5
entrances  34:18
entries  84:6,8
entry  86:19
ephraim  1:21
  105:7,23
episodes  93:17
epo  50:13,16
errata  106:1
escape  54:23
escorted  48:10
especially  24:20
esq  2:6,11
essentially  20:8
et  1:8 2:10 106:2
evening  35:16
  39:21 40:2 41:10
  41:22 47:9 51:7
  100:14
event  22:10
events  22:3
everybody  52:2
  84:2 95:14
everybody's  19:16

evidence  73:18,19
exact  56:9 97:7
exactly  95:10
examination  4:6
  102:5 104:14
  105:10,12
examined  4:5
exceed  45:11
executive  19:6
exh  104:8
exhibit  53:23 54:4
  104:6,6
exhibits  8:7 104:4
  104:10
exists  61:23
exits  51:2
expand  6:24
experience  10:12
  24:6 43:7,11
expires  106:25
extent  61:22
extinguisher  51:4
extinguishers
  13:16

**f**

f  3:2 105:2
facilities  25:13
facility  27:20 61:2
  62:20 85:7
facing  26:13
fact  4:20 5:11
  19:12 97:19 98:2
factor  48:14
faint  43:23
fair  68:13 69:7
  96:23
familiar  54:14
  76:9 79:2,4 87:25
  89:15
far  1:20 27:9
  34:24

fashion  11:18
fast  94:7
faxes  99:6
fbi  59:12,14,19,21
  60:7,11,19 61:2,4
  62:25 63:9 66:12
  74:2 76:3,5 77:2
  95:2,2,6,9 96:16
  96:25 98:21 101:3
federal  1:19 28:9
feed  4:16 5:5 6:19
feel  4:19 43:15
feet  27:11
felt  93:23
female  98:15,18
  98:19
fight  52:22 54:23
fighting  24:8
fights  39:21 40:15
  52:8
figure  45:5
file  77:24 81:7
  89:2,8
filing  3:7
fill  55:4,6 76:14
  79:7,11
filled  25:10 49:9
  55:6,9 76:10 79:3
fills  76:17
find  5:6 24:6 47:15
  58:23 93:9,15
finding  98:2
fine  6:7,25 60:17
  81:21 96:23 101:2
finish  93:11
fire  13:14,15,16,17
  13:23,23 50:22
  51:4 54:24
first  4:3 6:15 8:10
  9:4,9,19,25 11:18
  11:20 12:3,5,16,25

13:5,13 14:3,9,10
14:18 15:9 16:4,6
16:12 20:17,20
21:2 37:14,17
42:14 44:2 50:3
53:23 63:23 64:3
67:3,25 68:4,17
70:18 72:20 74:24
81:8 95:16 98:13
103:5
**five** 26:4,5 48:6
58:3 81:22 87:11
**flash** 46:6 51:15
**flat** 24:20
**flesh** 51:20
**floor** 2:10 42:4
56:19,21,22,25
57:19
**floors** 42:6
**flunked** 16:8
**fob** 49:25
**fold** 70:10
**follow** 28:15 30:10
58:15 100:24
**following** 45:8
**follows** 4:5
**force** 3:15 95:25
**foregoing** 103:8
**forget** 95:22
**form** 3:21 6:22
53:24 54:3 64:14
64:21,23 70:22
75:12,15,17,23
76:10,17,24 77:8
79:4 96:20 104:8
104:20
**forth** 105:11
**forty** 45:11 81:2
**forward** 16:14
**found** 12:8 42:15
49:16 94:8

**four** 33:12 37:12
48:5 53:3 81:2
**fourth** 20:15 90:23
**fraud** 28:23
**front** 31:14 32:22
32:23 35:3 46:3
49:21 54:7
**full** 44:19
**functioning** 79:20
**further** 3:20 61:5
99:22 103:8
105:14
**future** 5:4

**g**

**gain** 42:6
**gang** 87:5 88:19
88:21
**gene** 66:3,5
**general** 10:17
11:10 38:12
**generated** 56:5
**george** 95:22
**georgia** 8:23 15:10
**gestures** 6:20
**getting** 50:12
52:14 93:22
**giant** 25:11 30:22
**give** 8:24 11:22
16:12 19:18 21:7
60:12 63:16 88:18
88:21 95:3,4
**given** 35:14 97:15
97:16 103:10
105:13
**gives** 73:5
**giving** 9:4 60:21
60:22
**glue** 65:2
**glynco** 8:23 15:10
15:12

**go** 15:23 16:5,6,7
16:14 17:2 22:6
25:18 26:4,5
35:22 45:21,22
52:3,23 53:15,16
72:4 78:9 82:19
83:5 87:19 88:22
90:22 95:20
**goes** 82:20
**goggle** 71:22
**going** 8:8 10:15
15:6 18:6 22:18
33:24 38:11 43:25
45:9 48:3 53:23
61:18,19,24 62:8
69:4 71:22 75:10
77:14,15,20 79:23
80:22 93:6,12
94:3 99:23 101:4
101:5,8
**gonzales** 90:4
**good** 5:12 6:8 82:2
91:18
**government** 85:22
**grab** 74:25
**grade** 17:19 18:18
18:19
**graduated** 10:18
**grand** 61:17,21
62:2,5 99:25
100:19 104:25
**grant** 21:13 22:4
22:11,15 41:10,22
48:18 55:10 56:12
58:9 62:11,15
74:22 80:16,17
85:10 86:7 90:13
90:16
**grant's** 41:14 43:9
44:6 48:12 65:11
90:20

**great** 81:24
**grill** 36:6 46:4,7
51:16,18,23,24
**grills** 34:19 35:2
**gs** 18:22
**guess** 38:7 58:20
78:15 83:11 92:22
**guidance** 19:18
**guilty** 88:11
**gurney** 48:19
56:17,18,25 57:2
57:15
**guy** 99:2
**gymnasium** 72:7

**h**

**h** 104:2
**half** 34:10 45:17
**hallway** 57:10
**hand** 30:12 34:6
34:12 79:25
105:20
**handcuffed** 62:25
**handful** 58:6
**handle** 15:25
**hands** 15:19
**hang** 66:23
**hanging** 57:10
66:2
**happened** 8:18
29:21 41:9 65:24
67:19 96:9
**happening** 29:21
**happens** 55:3
**hard** 92:8 93:2,2
**harsh** 92:11
**hats** 50:11
**head** 21:8 22:13
23:7 25:16 26:23
39:4 44:15 49:8
50:9 56:23 57:8
58:18 60:8,16

64:25 69:24 87:8 97:24

**hear** 48:21 69:9

**heard** 41:11 42:25 49:2 69:12 97:18

**hearing** 5:18 6:2 65:16 98:5

**hearsay** 41:12 42:22 43:3,5 49:16 69:2,11 93:4 97:5,18

**height** 47:19

**held** 1:19

**help** 71:12

**helping** 12:25

**hereinbefore** 103:11 105:11

**hereunto** 105:19

**hicksville** 1:20

**hide** 94:6,7

**high** 10:7,8,18 24:23 27:17 93:20

**higher** 50:5

**highest** 10:5

**highlighted** 85:25 87:23

**hindered** 94:2

**hired** 8:10,11 10:11,17,19 13:10 13:13 15:9

**history** 10:16,21 85:2 94:21

**hit** 39:11

**hold** 50:10,16 67:12

**holding** 69:17

**homeland** 84:22

**homicide** 63:10 80:7,9,14

**honestly** 100:22

**honor** 52:17 53:20

**horseplay** 24:8 39:22

**hospital** 10:25 11:5,8,21 12:22 13:3 29:17 48:11 58:2 60:4 75:6 82:21 83:16

**hours** 20:25 51:7 53:3 83:20,23

**house** 52:16

**housing** 25:8 27:5 29:4,15 33:8,19 34:6 36:4 37:11 37:18 44:24 47:8 48:19 51:9 52:7 53:4 92:24

**hoyett** 86:20

**huh** 6:23

**hundred** 27:2,3,4 58:4 87:10,11,11

**hyoid** 65:14,25

**i**

**idea** 43:6,8

**identification** 4:25 53:22 54:5

**identifies** 22:20

**identify** 68:6

**identifying** 63:20 67:4

**illicit** 32:4,6 70:11

**images** 38:9,10

**immediately** 14:20 33:22 92:2

**in2001** 8:16

**incident** 7:23 21:10,11,17 22:24 23:3,19,21 29:6 31:18 32:14 37:16 53:25 56:6,8 59:9 62:6 64:17 65:24

66:18,19 67:9 73:3,5,21 76:4 79:8 95:13 96:3,9 96:10,17 97:2,12 97:13 98:11

**incidents** 41:18 54:19,20 65:17

**include** 9:4,14

**including** 70:12

**incorrectly** 81:7

**indicated** 78:13

**indication** 37:15 37:17

**individual** 56:11

**individually** 35:3

**indoor** 72:7

**influence** 48:8 55:2 94:5

**informant** 85:21

**information** 6:12 9:25 40:16,17 69:5 72:23,25 73:20 74:4,17 82:23 83:6 85:12 85:17 86:2,3 87:6 87:18,21 88:3,9,9 88:13,19 90:3 96:12 104:17,18

**infrared** 18:11

**initial** 56:5 71:11 72:24 79:25 95:15

**initially** 15:9 71:5

**initiated** 71:13 72:15

**injuries** 67:10 68:24

**injury** 65:8 66:17 67:6,11

**inmate** 18:5 31:15 35:21 37:21 38:3 40:22 41:3 42:8

42:15 43:14,22,22 44:12,20 46:12,14 52:21 54:22,25 57:19 58:5,16 59:11,25 60:2 64:11 66:15,17 69:14 75:2 80:7 80:10,14,15 82:20 84:17 85:3,4,7,24 87:2,23 94:4,22 95:24 96:2,12 97:7,8

**inmates** 20:4,5 24:19 25:24,25 27:21 29:16 32:2 33:10,13 35:20 37:19 40:14,17 42:11,24,25 44:18 44:25 45:5,23 47:15 48:7,23 49:16 51:17 52:6 52:8,14,18,23 67:9 69:13 70:18 71:2 71:2,10,16,16,24 72:3,4,9 87:9,10 87:11 91:14 93:22 93:22,24 94:3,5

**inmates's** 84:17

**ins** 94:20

**inside** 36:2,4

**installation** 13:20 13:23

**instance** 62:3 66:21

**instances** 29:3 67:8,19

**institution** 9:11 15:19 18:4,9,14,16 19:7,9,14,17,21,25 24:22 25:6 31:21 41:18,25 47:22

48:3,5 51:6 54:21
55:3 57:11 59:10
63:13 72:12 76:16
83:4,22 84:4 93:7
93:14,18 96:11
98:7,24
**institutional**  35:19
**institutions**  76:6
**instruct**  61:20
62:8
**instructions**  72:4
**interactions**  22:12
**interested**  105:17
**interesting**  25:4
25:21
**interfered**  88:11
**internal**  59:9
**internally**  100:23
**interview**  99:9
**interviewed**  63:14
**interviewing**
42:24
**introduction**
40:14
**intubating**  49:21
**investigate**  61:5,8
61:13 96:14
**investigated**  94:9
**investigating**
40:10 41:14
**investigation**
41:19 42:23 48:24
59:15 63:3,4
66:10 69:3,6 70:6
70:16 77:5 80:6
90:2 93:4 101:15
**investigations**
40:15 44:12
**investigative**  41:4
63:2 76:15

**investigators**  61:7
**investigatory**
40:11
**involve**  63:20
80:15
**involved**  41:16,17
41:19 44:13 58:25
59:8,15,25 66:10
69:5 70:15 73:17
73:19 90:19 97:6
101:12
**involvement**  48:13
**involving**  21:11
22:4,10 29:6
31:18 32:14 37:16
39:22 41:21 55:10
62:5 70:3 75:9
76:4 79:8 99:25
**issacharoff**  2:11
5:9 8:3 47:12,16
61:18 62:7 64:22
70:21 75:13,24
77:14,23 78:10
81:6,18,23 89:7
96:19 100:7,16,21
101:13
**issue**  43:10 55:2
86:17 90:12,16
**issues**  17:12,15
31:16,21 39:20
86:8
**items**  47:21 54:10
94:18

**j**

**jacobson**  1:21
105:7,23
**jail**  15:21
**jails**  24:20
**jason**  98:20,25
**jeff**  90:4

**jersey**  11:15,16
**job**  15:4
**jobs**  10:22 11:9
**joe**  71:20
**joseph**  66:3,5
**judge**  3:13 6:3
**july**  1:11 5:24 8:11
8:16 10:19 13:10
15:15 105:20
**junior**  17:6,18
18:18,19 19:23
**jury**  61:17,21 62:2
62:5 99:25 100:19
104:25

**k**

**k**  4:2
**k2**  9:24 47:15
48:13 70:12 92:6
92:13,15,21,23
93:13,18,20,21
94:14 96:10
**kearns**  23:9 39:2,7
49:6 90:3,11
95:15,20,21,23
**keep**  10:2 53:18
94:6
**keeps**  74:8
**kept**  75:3
**key**  35:6,8,10,12
83:24
**keyed**  82:24 83:4
83:15,18 84:4
**keys**  35:11 50:25
**kicked**  72:3
**kind**  11:17 28:14
29:13 30:4,14
32:5 39:21,21
43:10 52:9 53:20
55:2 59:19 62:23
63:5,6 65:9,10
66:20 70:11 85:9

86:8 87:17 92:15
95:25
**kitchen**  33:21,22
**knew**  51:3 94:8
98:25
**know**  5:7 7:4
16:10 20:10 23:14
24:12 25:13 29:18
31:2 32:16 36:25
37:22 38:17,24
39:6,12,14,19 41:9
42:20 45:9 47:7
48:16 49:4,6,7,14
49:18,23 52:9
54:17 58:19 59:14
59:18 60:6,11,15
60:24 62:10,13
63:8,12 64:20
65:2,3,4,14,19,20
66:3,4,8,9,21
69:11 70:15 71:17
71:21,22 72:17,21
75:9,18,19 76:13
77:25 78:8,22
79:2 81:14,16
82:12 85:8,13
86:5,7,12,25 87:4
87:20 88:2 89:13
90:11,18 91:5,22
92:6 93:24 94:12
95:11,19,23 97:24
101:3,4,6,10
**knowledge**  29:8
39:24 44:10 49:13
60:10 62:12,16
63:9,11 64:16
66:7,11 68:16
79:13 85:11,16
86:11 90:14,17,21
94:16

**l**

**l**  3:2,2 4:2 103:2
**laid**  57:19
**landmark**  64:11
**large**  77:24
**laufer**  2:4,6 4:7,14
  6:9 47:6,18 53:21
  61:24 75:7,16
  77:12,19 78:5,21
  81:10,20 82:2,6
  99:21 100:15,18
  101:2,17 102:3
  104:15
**law**  2:4 10:12
  31:15 33:11 95:5
**lawsuit**  6:10
**leadership**  59:4
**leafy**  92:15
**learn**  68:23 70:7
**learned**  8:25
**leave**  35:22 85:7
**leaves**  35:17 82:21
  82:22
**leaving**  12:18 20:5
  23:18 35:17 75:4
**left**  14:3,17 26:19
  33:23 34:3,6,12
  36:15 83:24
**legal**  30:2 31:13
**level**  10:5 25:24,25
  27:15,17,18,18,23
  27:25
**library**  33:11
**lie**  71:2,3
**lieutenant**  5:14
  14:15 17:6,6,18,24
  18:16,17,19,23,24
  19:4,5,13,19,23
  20:18 21:17,21,22
  40:3 41:7 55:4
  59:7,8 67:2 72:16

73:2,7,14 74:19
  76:16 83:23 84:11
  90:5 96:13
**lieutenants**  24:13
**life**  49:20 50:4
  67:22 71:13 74:23
**lift**  58:4
**light**  46:6
**lights**  36:8,12,16
  36:18 51:16
**liked**  52:23
**limp**  67:13 69:17
**line**  104:23 106:5
**liquid**  92:13
**listed**  87:18
**little**  21:15 44:23
  53:7 58:5 81:3
  82:8 92:16 100:22
**live**  5:4
**lives**  29:4 44:17
**living**  51:20
**llc**  106:1
**loading**  49:22
**local**  29:17 48:11
  83:16
**located**  33:9,18
  43:18 51:3,4
**locations**  28:19
  41:25
**lock**  40:25
**locked**  48:3 53:5
  93:23 94:9
**locker**  84:19
**locking**  50:23
**log**  46:24 47:2,8
  78:13 100:14
  104:19
**logbook**  46:23
**long**  14:12,21
  18:17 21:16 40:18
  40:18

**longer**  78:19
**look**  34:17,21,23
  47:13 74:11 75:25
  94:22 96:14
  100:12,21
**looked**  30:17,18
  31:8,9,9 32:20
  39:15,16
**looking**  22:8 40:11
  48:5 49:8 72:13
  73:22 74:12 93:4
  94:24
**looks**  90:2
**lose**  92:3,3
**loss**  11:2,11,13
  12:20
**lost**  29:3
**lot**  49:14 50:10,11
  87:9 91:13 92:10
  92:12
**low**  27:18,25
**lower**  25:24
**lt**  4:16 5:12 16:15
  17:10,22 66:3
**lucas**  2:11 5:7
  77:13 99:22
**luckily**  13:2
**lying**  70:20

**m**

**machine**  34:4
**mail**  30:2,9,11
  31:4,13,13 40:24
**mailed**  29:23 31:4
  80:24 88:24
**mails**  33:11 96:8
  99:7
**main**  26:17 32:21
  32:22 33:2,7 34:5
  57:23 61:6
**making**  50:24

**male**  98:15,17,19
**man**  20:9
**manhattan**  16:18
**manning**  34:14
  35:14
**march**  5:24 18:20
  21:24
**marijuana**  31:3
  92:17
**mark**  53:22 61:24
**marked**  54:4
  104:22
**marks**  97:8
**marriage**  105:16
**marshal's**  84:22
**mass**  47:22 48:2
**matched**  32:17
**matches**  73:4
**mate**  94:5
**material**  91:5
**matter**  60:7 77:10
  80:6 85:23 105:18
**maureen**  72:10
**mcc**  16:18 25:22
  26:2 36:11 46:20
  50:8,11 52:13
  55:14 62:20 79:20
  87:7 89:22 99:11
**mdc**  14:5,7,12,13
  14:15,19 15:2,4,16
  16:17
**mean**  20:24 23:7
  38:20 40:12 43:11
  47:17 49:13 62:22
  67:24 93:3 94:16
**meaning**  44:16
**measures**  49:20
  50:4 67:22 71:14
  74:23
**mechanisms**  50:24

**medical** 10:3 13:3
21:4 23:2 39:10
43:10 48:10 50:2
57:17 63:18 67:20
67:21 68:7,11
73:9,10,11
**meet** 98:12
**meeting** 98:14
**member** 35:21
42:13,14 43:20
71:19 88:21
**members** 42:2
**memo** 22:7 23:7
23:24 37:24 38:2
38:20 56:10 73:3
73:4,6,7,22
79:14,15
**memorandum**
7:19,22
**memorandums**
39:16 74:15 89:23
**memos** 89:10 93:5
95:17
**mentioned** 95:16
**mentions** 91:4
**met** 99:5
**metal** 18:12
**methodology**
28:15
**mid** 27:18
**middle** 34:7 38:7
**midnight** 23:17
46:18 52:4,5
**mill** 36:20
**mini** 15:21
**minor** 94:20
**minute** 81:22
**minutes** 45:11,13
62:2 99:25 100:19
**mission** 98:2

**mixed** 27:19,19
28:3
**mock** 34:3
**model** 93:24
**monitor** 10:2
**monitoring** 40:21
40:22,22,23,24
**months** 61:15
97:12
**morning** 5:12 6:8
46:19,19 53:6
**mortality** 58:8,11
58:13 62:18 63:5
**motion** 29:11,24
**move** 53:16 56:16
**moved** 53:13
56:20 57:20,21
**movement** 18:5
20:3 83:22 84:18
**moving** 56:24,25
**multiple** 10:23
29:15,20
**murder** 28:22
62:14 101:12
**murdered** 59:20
**murderer** 28:22
**murderers** 27:24
**murdering** 62:11
**mutilation** 54:24

**n**

**n** 2:2 3:2 4:2 103:2
104:12
**name** 4:8 6:9
62:21 66:8 75:4
89:8 98:20 106:2
106:3
**named** 58:17 81:7
**narcan** 9:22
**nature** 14:9 52:10
**necessarily** 96:21

**neck** 64:5 65:11,21
65:22 67:7,10,14
**need** 6:24 7:2
12:24 35:6,10
77:12 100:5
**needed** 20:19 35:8
37:3 51:2 88:4
**needing** 20:23
**needs** 22:23 55:4
**never** 25:10 36:17
51:10 52:14,22
60:4 66:20
**new** 1:2,20,22 2:5
2:5,9,11,11 4:4,12
10:25 11:8,15,16
48:15 100:5 105:4
105:8 106:1
**newark** 11:14
**news** 65:17,23
**night** 22:15 24:14
37:7 40:4 42:9
46:21 53:5
**nineteen** 8:13
**noise** 88:18
**nonresponsive**
12:9
**nook** 48:4
**noose** 67:11,13,14
**normal** 89:21,23
**normally** 17:9
**north** 33:24
**northeast** 13:14
**notary** 1:21 4:4
103:22 105:7
106:25
**note** 78:11 90:22
**noted** 88:8
**notes** 86:15 88:10
88:10 100:8
**notice** 1:18 44:5,8

**notification** 56:6
**notifications** 83:25
**notified** 38:19
60:4
**notify** 19:12
**november** 14:14
16:14,19,20 18:20
**number** 21:8
74:17 75:4 104:7
**numbers** 100:10
**nypd** 66:6,9

**o**

**o** 3:2 103:2
**oath** 3:12
**object** 61:19
**objecting** 70:24
**objection** 64:22
70:21 96:19
**objections** 3:21
**observation** 41:21
51:8 68:14 91:7
**observations** 24:3
43:6 46:23 56:3,4
68:12
**observe** 44:25
46:11,13 48:17
51:20 56:16,20
77:8
**observed** 66:14,16
**observing** 45:23
**obtain** 5:22 10:8
**obviously** 6:18
32:5 61:22 64:13
64:20 65:3 68:4
78:17 101:14
**occasion** 5:2
**occasions** 31:23
**occur** 24:2 31:3
54:20 61:2 70:17
**occurred** 18:21
21:17 22:15 23:21

29:13 38:18 41:21
49:11 56:6 63:10
**occurring**   21:10
31:17
**october**   8:20 15:15
**offenders**   27:25
**offer**   17:4
**office**   2:4 85:15
99:10 101:5,7
**officer**   5:18 6:2
11:2,3 12:21 14:6
17:2,3,3,4,5 22:16
23:4,8,9 35:16,17
35:18,23,24,25
37:5,20 38:4,18,24
39:2,6,7 42:6,9,12
43:13 49:6 50:8
51:8,10,22,24,25
52:3 66:25 71:11
83:17 90:3,11
95:18,19,21,23
96:5,5,6 106:3,21
**officers**   15:6,8,22
18:4 19:23,24,24
23:10,16,17,18,20
23:25 24:4,15
32:20 33:9,17
34:21 35:13,15
36:15 38:8 44:23
44:25 58:6 91:25
**officials**   95:4
**oia**   63:2
**oig**   62:25
**okay**   6:6 16:16
47:12,19 55:19,21
57:4 75:24 78:5
78:25 81:17 83:13
89:5,14 90:25
100:7
**once**   35:18 36:13
42:13 51:18 96:8

**ones**   52:16,20
67:21 75:21 76:21
**ongoing**   90:6,7
**onlookers**   71:18
71:23
**open**   10:2 37:2,3
51:24
**opened**   31:14
**operating**   32:13
60:25
**operation**   73:2
89:24
**operations**   18:15
19:13,18 20:3
73:7 89:22
**opportunity**   82:10
**opposite**   26:14,15
**order**   35:5 78:18
**ordinary**   55:13
79:19 89:21
**original**   3:9,17
80:2
**os**   91:4
**ourself**   63:4
**outcome**   105:17
**outside**   43:19
57:11 99:2
**overall**   93:9
**overdose**   29:13,16
**overdoses**   9:18,21
9:24
**overlap**   24:18
**overseeing**   18:5
19:22 20:2
**overseen**   18:15

**p**

**p**   2:2,2 3:2 4:1,2
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1

19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
**p.m.**   38:21,22,23
102:4
**pack**   82:19
**packet**   85:6 88:3
88:22 90:24
**page**   8:5 55:18
74:13 78:23 81:8
83:2,7,8,10,14
84:24 88:15 90:23
90:23 104:6,14,18
104:23 106:5

**pages**   78:3 81:2,4
**paper**   29:23,25
92:11,12,14,17
**paperwork**   39:15
60:19 82:15,18
85:17 94:23
**part**   50:13 59:2,3
63:18 67:3
**particular**   5:5
24:11 26:2 27:5
32:16 34:7 35:5
35:24 36:10 37:3
37:18 38:9 45:25
46:16 51:9,13
52:7,17 53:17
55:18 62:3 64:17
74:7 77:10 79:12
80:11 83:7 85:8
87:2 92:24 95:14
**particularly**   22:25
**parties**   3:7 105:15
**pass**   31:7 34:3
96:13
**passed**   69:16
71:12
**passes**   12:17
**patient**   10:3 64:4
**patients**   12:21
**patrick**   1:17 4:10
5:11 103:15 106:3
106:21
**pd**   84:25
**pd15**   84:25
**pearl**   28:10
**people**   12:18
15:24 16:7 23:13
31:24 67:9 69:2
71:21 73:17
**period**   12:23
14:17 50:6 52:10
52:11 93:16

**person** 33:12
  37:11 49:7 63:24
  64:12 66:4 67:12
  67:18 71:12,20
  74:16 82:24 86:16
  86:21 93:20 95:16
**person's** 67:14
**personally** 41:12
**personnel** 13:4
  37:10 68:11
**pertinent** 6:12
**phone** 19:11 40:22
  40:24,25 99:6
**photo** 75:2
**photos** 73:12 74:9
  74:22 75:5,9,11,19
  75:20 77:17
  100:11 104:20
**physical** 31:8
  52:15 95:25
**physically** 15:5
  36:17 50:18 51:25
**pick** 19:11 91:24
**picture** 30:2
**pie** 45:16
**piece** 31:4
**pieces** 69:13
**place** 40:21 63:6
  103:11
**placed** 43:21
  56:19
**plaintiff** 1:4,18 2:4
  6:10 104:4
**plaintiff's** 54:4
**play** 53:3
**please** 4:8 6:14,21
  7:3 81:15 89:13
**pled** 88:11
**pllc** 2:4
**plus** 58:4

**point** 24:7 34:22
  81:19
**population** 18:6
**port** 57:13
**portable** 57:9,9,14
  57:18,20,21
**ports** 43:18
**position** 21:16
  34:13
**positioned** 34:25
**possessing** 47:15
**possession** 75:20
  94:13,18
**possible** 29:16
  53:18
**possibly** 9:15
  43:22
**post** 35:14 36:3
  38:8 51:9
**posted** 38:25
  96:12
**postmortem** 70:4
**potential** 101:8
**potentially** 48:13
  69:11
**pounds** 58:4
**pp** 84:25,25
**pp10** 85:3
**pre** 27:20,21
**prefer** 5:4
**preliminary** 8:9
**premises** 32:7
**preparation** 7:14
**preparedness** 50:7
  50:19
**pres** 12:12 13:9,12
**presbyterian**
  10:24 11:7,8
**present** 97:21
  99:19

**pretrial** 28:6,7
**pretty** 87:13 94:21
  101:14
**prevention** 11:2,3
  11:11,13 12:20
**previous** 94:24
**print** 82:22,23
**printed** 82:16 84:8
  84:9 85:6
**prior** 9:19 10:11
  10:14,17 15:4,6,20
  21:9,11 22:10
  23:23 29:2,5
  39:18 42:3 45:19
  49:19,22 50:12
  66:18,19 67:8
  76:3 89:25 96:2,9
  98:9,11
**prison** 20:9 27:16
  29:19 59:4 62:20
  79:21 95:3
**prisoner** 28:16,17
  63:21 64:14 76:6
**prisoners** 9:5,15
  23:25 24:7 26:21
  27:5,12,16,17 29:3
  29:18 30:11 31:5
  36:9,19 86:10,14
  93:18 94:14
**privilege** 78:16,20
**privileged** 78:13
**privy** 69:4 97:19
**probably** 27:11
  50:10 74:22 75:2
  75:5 83:19 87:8
  99:24
**problem** 6:17
  22:21 78:21
**problems** 52:19
  90:6,7

**procedure** 1:19
  57:24 58:14 60:25
  62:17
**procedures** 30:23
  30:24 63:6
**proceed** 5:3 78:11
**proceeded** 17:9
**process** 58:21
**produce** 75:23
**produced** 47:7
  75:8,10,14,17,18
  75:19,22 82:16
  100:13
**production** 47:11
  75:11 78:14
**program** 84:16
**promoted** 5:25
  14:14 16:15,22
  17:13 18:22 50:12
**promotion** 5:20
**pronounced** 60:3
  73:23
**proper** 50:17
**property** 12:18,19
**prosecution** 101:9
**protective** 78:18
  85:9
**providing** 4:24
**provisions** 30:9
**public** 1:22 4:4
  103:22 105:7
  106:25
**pull** 77:13 78:2
**pulled** 49:2,4
**pulse** 43:15,15,23
  43:25 63:25 64:5
  64:6,7,7,8 65:12
  68:15,18,19
**purposes** 53:23
**pursuant** 1:18

**put** 44:3 69:21
73:6 76:24 79:15
**puts** 73:3

**q**

**queens** 105:5
**question** 6:15 8:9
40:16 66:15 70:23
77:21 104:23
**questioning** 48:25
97:9
**questions** 6:22 7:3
7:5 49:14 101:24
102:2 104:22
**quick** 40:5 78:7
**quiet** 53:18 96:4
**quit** 91:19

**r**

**r** 2:2 3:2 4:2 47:5
103:2 105:2
**r&d** 83:21
**radial** 64:6
**radio** 22:17,20
**radios** 22:19
**rampant** 93:10,13
96:10
**randanzo** 98:21
**rank** 5:16,21,22
5:25 16:24 17:5
20:9,15
**ranks** 17:10
**read** 81:13
**reading** 22:7
**ready** 78:8
**really** 6:19 36:11
40:5 78:6
**reason** 51:11
52:23 76:23 85:15
86:14 106:5
**reasons** 42:11

**recall** 20:23 22:14
23:11 29:9,11
60:16,18,20,21
96:4,6,15,24 97:11
98:18 100:5
**receive** 11:17 14:8
**received** 9:8 41:8
50:17
**receiving** 83:21
**recertification**
9:12,13
**recess** 82:4
**recollection** 70:13
**record** 4:9 82:7
105:12
**recorded** 40:24
**recovery** 44:19
**redacted** 89:9
**refer** 77:15,20
**reference** 97:5
**referral** 76:3,5,21
76:21 77:9 80:3,5
80:9,11
**referred** 60:6,14
62:17 76:25 77:2
77:6,17 80:13
**refresh** 70:12
**refresher** 14:11
**regard** 9:8 17:13
30:10 58:15 69:9
**regarding** 6:13
21:18 58:8 76:5
77:22 80:9 96:17
96:25
**regular** 53:4 71:20
**related** 87:5
105:15
**relation** 61:17
62:14 104:25
**released** 20:6

**releases** 20:7
**remarks** 88:14
**remember** 22:3
23:3 29:12 37:25
39:5 41:23 56:23
56:24 64:17,25
97:10,25
**remembered** 22:9
**removed** 42:17
86:22
**removing** 64:9
**rephrase** 32:23
**report** 37:4 39:25
53:24 54:19 55:5
55:9,12,17,18,25
56:2,5 60:25
72:14,22 90:15
**reported** 16:19
**reporter** 6:16 54:6
**reporting** 65:23
84:11 106:1
**reports** 55:7 70:3
70:8
**represent** 6:10 8:4
27:16
**representations**
4:19
**represented** 4:18
99:12
**request** 44:4 75:22
**requested** 104:17
**required** 44:25
46:13 101:20
**reserved** 3:22
**respect** 78:16
**respective** 3:6
**respond** 6:22
39:12 44:19 50:14
**responded** 13:5
23:14,19 31:25
39:7,9 41:24

44:14,16 57:15
63:15 67:23 71:9
72:5 95:11,12
**responder** 67:25
68:4 70:18 72:20
**responding** 23:3
41:17 59:22,24
68:11 71:10 72:5
**response** 6:16 50:2
95:12 97:3,15
**responses** 51:6
**responsibilities**
12:15 19:3
**responsibility**
17:18
**responsive** 50:24
**rest** 25:7 32:17
82:18
**restore** 67:15
**restraints** 96:2
**results** 70:8
**resuscitate** 69:23
**retained** 104:10
**retrieved** 43:21
**return** 16:9
**review** 7:13,18
55:20 58:8,12,13
62:18,23 63:5
70:2 81:12 82:10
89:11 101:23
**reviewed** 78:25
**reviewing** 78:23
81:15 89:13
**reviews** 76:19
**revive** 43:2 49:18
69:18,20 70:19
**rhythm** 68:21
**right** 5:17 9:12
25:19 26:8,19
33:23 43:16,19
49:21 50:25 51:2

54:11 57:11,12
60:23 64:15,16
67:24 69:12 74:12
79:17,25 84:13
99:10 100:15
101:17
**rise** 24:23
**road** 1:20
**roberto** 21:12,13
22:4,11,15 41:10
55:10 58:9 62:15
80:16,17 86:7
**rockaway** 1:20
**role** 41:13
**roof** 18:10
**room** 25:12 73:24
**rotate** 45:10
**round** 45:13,17,18
45:19
**rounds** 12:17 18:3
45:4,7,7,10,22
**routine** 45:6
**rudimentary**
30:15
**rules** 1:19
**ruling** 61:25
**rulings** 104:22
**run** 94:20
**running** 19:14,17
**runs** 18:16

**s**

**s** 2:2 3:2,2 104:2
106:5
**safe** 12:22
**safety** 13:15 42:10
**sally** 43:18 57:13
**satisfactory** 4:20
5:6
**saving** 49:20 67:22
71:13 74:23

**saw** 42:16
**saying** 16:11 49:17
75:14 91:23
**says** 38:2,3 80:2
88:5 94:17
**scanned** 84:10
89:19
**scanners** 18:11
**scanning** 31:7
**scans** 74:6
**scene** 40:2 71:6,8
95:16
**school** 10:7,9,18
**scope** 12:4 47:3,4
47:5,5 55:13
79:19 89:21
100:14
**screening** 19:25
**sealing** 3:7
**searching** 65:12
**second** 35:17
95:17 99:5
**secret** 61:22
**section** 45:18 56:9
77:3 81:10 84:11
88:25
**secured** 12:21
71:15 72:6
**security** 10:22,23
11:2,9,11,14 12:17
18:6,8,10 19:19,24
20:2 27:15,17,23
30:9 36:3 72:2
84:22
**see** 16:11 24:4,22
24:23,24 34:18
43:14 50:17 53:14
56:7 63:24 64:13
64:19 65:9 68:21
71:22 74:19 81:9
83:2,13 88:10

89:24 92:5 96:7
97:8
**seeing** 56:23 64:25
65:16
**seeking** 4:21
**seen** 67:10
**segregated** 86:13
**self** 54:24
**selling** 13:20
**send** 78:3
**sending** 90:3
**sends** 76:18
**senior** 17:3,3,4,4
17:24 18:24 19:4
19:5 20:18 21:21
21:22 96:5
**sent** 48:10 77:23
89:6 96:8
**sentence** 27:21
**sentenced** 27:22
28:5
**sentry** 82:14,15
84:14,23 85:25
94:17
**separate** 26:10,10
41:7
**separated** 36:5
85:4 86:21 87:2
88:4,17
**separation** 41:3
85:3 86:17 87:12
87:19 88:6
**separations** 87:14
**served** 62:4
**service** 3:16
**set** 27:13 89:11,15
105:11,20
**seven** 37:12 48:7
**seventeen** 81:4
**sewell** 90:4

**shakedowns** 47:22
48:2
**share** 28:16
**sharing** 28:24
**sheet** 106:1
**shift** 17:25 23:16
23:22,23 24:2
52:4,5 55:4 59:7,8
72:16
**shifts** 23:15 24:16
**shock** 43:24 44:2,4
**short** 82:4
**show** 82:23
**showed** 39:15
**shower** 25:13 43:2
69:19 70:20
**showers** 25:12
**showing** 48:7
**shows** 83:3 84:9
**shut** 36:17
**sia** 76:15 80:12
**sick** 37:21
**side** 15:5,6,22,22
33:24,25 34:2,6,12
**sides** 26:14,15
**sign** 20:7 60:13
**signature** 105:23
**signed** 3:10,12,15
**signing** 20:4 60:18
60:20
**signs** 48:7 67:5
**single** 45:4
**sir** 8:2,14 9:13
28:7,25
**sis** 40:6 59:11,18
73:15,25 76:16
90:5 96:13
**sit** 33:14 34:20
52:25
**sitting** 34:22

**situation** 50:15
  53:20
**situations** 68:2
**six** 17:24 21:25
  25:17 27:11 35:9
  35:10
**skills** 12:25 20:20
  21:3 41:5
**skin** 65:6,10
**slapping** 69:18
**slowed** 47:23,25
**slur** 48:8
**slurred** 48:8
**small** 79:24
**smell** 91:9 92:2,3
  92:11
**smelled** 31:9 91:4
  92:6
**smells** 91:25 92:7
  92:11,16
**smoke** 30:5 91:9
  91:13,14,15,15
  92:2,4,14
**smoker** 91:12,23
  92:4,19
**smoking** 32:3,5
  69:15 91:5,17,17
  92:16,18,20,21
**smuggled** 31:2
**soaking** 42:17,21
**socialize** 99:2
**somebody** 87:15
  87:16
**soon** 14:24
**sooner** 97:11
**sorry** 11:4,5 27:7
  61:19 75:13 81:3
  89:3 93:11
**sort** 32:3 58:21
  67:6

**sounded** 23:4
**sounds** 81:24 82:2
**south** 23:2,11 25:2
  25:15 31:17,22,25
  32:14 33:24 34:2
  38:3 53:8
**southern** 1:2 2:9
**special** 76:15
**specialist** 17:4,5
**specific** 10:16
  11:12 36:24 90:12
  90:16 94:19
**specifically** 31:22
  65:18 83:5 88:7
**specified** 103:11
**speech** 48:9
**spg** 88:20
**sporadic** 45:6
**sprayed** 29:23,25
  92:13
**sprinkler** 13:17
**ss** 105:4
**stacked** 26:8,9,20
**staff** 19:7 21:4,4
  22:22,22 30:13
  35:21 38:11 39:5
  41:24 42:2,2,13,14
  43:20 47:15,21
  49:2,4,21,25 50:14
  50:17,24 54:22
  56:3,24 57:14
  59:23,24,24 63:14
  67:11,20,22 71:11
  71:17,19,25 72:5,9
  94:20
**stairs** 26:11 57:3,6
  57:25 58:5
**stairways** 26:3
**stamped** 8:5 81:9
**stand** 48:9 51:22

**standard** 58:14
  60:24
**start** 8:8 15:22
  16:4,7,25 55:17
**started** 13:12
  14:18 22:8 30:21
  37:19 38:3 47:2
  52:13 68:19 95:18
**starting** 15:20
**state** 1:22 4:4,8
  86:19 105:4,8
**stated** 4:23 95:8
  97:17
**statement** 60:12
  63:17 98:5
**statements** 59:22
  59:23 71:5 95:2,3
  95:4 97:22
**states** 1:2,8,16 2:8
  2:10 4:18 54:2
  85:14,22 97:20
  101:7 106:2
**stating** 48:23
**station** 32:20 33:9
  33:17 34:14,21
**stations** 34:4
**stay** 37:6
**steps** 26:4,5
**stipulate** 5:10
**stipulated** 3:5,20
**stop** 68:20
**stopolopoulos**
  95:22
**stopped** 13:8
**store** 11:11
**story** 87:24
**street** 2:5,10 4:12
  71:19
**stretcher** 57:9,14
  57:16,17,20,21,22

**stretchers** 57:10
  58:2
**strike** 54:25
**structured** 70:24
**stuff** 9:22 24:20
  29:21,22,23,24
  42:22,25 62:22
  65:18 89:25 91:24
  93:5,6 94:18 97:9
**style** 25:6
**subject** 78:18
**submitted** 7:20,23
**subpoena** 62:5
**subscribed** 103:18
  106:22
**subsequent** 78:14
**substance** 70:11
**succeed** 44:18
**suffered** 63:21
  66:17 68:24
**suicide** 54:24
  66:22
**supposed** 45:2
**suppressant** 13:17
  13:24
**sure** 6:21 18:9
  50:25 52:6 78:21
**surrounded** 71:25
**surrounding**
  71:17
**surveillance** 32:13
  32:18,25 38:6
**suspected** 101:11
**suspicion** 31:11
**suspicious** 31:10
**sweating** 69:24
**switch** 52:2
**sworn** 3:10 4:3
  103:5,18 105:11
  106:22

synch   30:18
synthetic   29:24
  30:4 31:2
synthetics   30:22
system   74:8 75:3
systems   13:16,17
  13:18,21,24 40:20
  40:21 41:5 50:21
  50:22

**t**

t   3:2,2 4:2 47:5
  103:2 104:2 105:2
  105:2
table   53:2
tables   33:12
tabs   74:8
tailored   41:5
take   6:16 44:17
  55:20 74:9 81:19
  81:21
taken   1:17 29:17
  75:5 82:5
takes   79:5
talk   13:25 17:17
  21:15 44:22 82:8
  94:25 101:15
talked   33:16 95:14
  97:4
talking   60:23 69:3
  71:7 72:8 80:18
  90:9
tasking   58:6
taste   16:12 92:3
team   28:20 53:14
  53:16 87:20
techniques   9:3
  15:18
telephones   33:8
telephonic   1:15
tell   19:2 43:24,25
  68:10 91:16 95:8

telling   56:15 70:19
  71:11
ten   17:25
tend   71:21
terms   101:4,8
test   30:7 31:7,8
  40:13 50:21,21,22
  50:23
tested   31:11
testified   4:5 87:15
testify   61:16 103:5
  104:24
testimony   61:21
  103:6,10 105:13
testing   30:15,25
  50:20
thank   77:19 91:20
  101:18 102:3
thankfully   13:6
theoretically
  28:21
theories   101:10
thing   11:20 63:12
  74:24 91:11,18
  97:7
things   14:9 30:19
  30:25 52:9 65:4
  87:22 96:24
think   23:6 46:20
  46:25 47:17 48:12
  49:11 57:6 61:25
  74:25 75:16 90:23
  96:20 99:21,23
  100:3,8
third   20:8 42:4
  89:8
thirty   3:16 45:11
  45:12
thousand   30:21
three   14:23 15:13
  26:3,9,10 44:16

52:5 54:9 64:9
threw   69:19
thump   49:2
tier   25:14,19,20
  26:5,6,18,19,19,21
  26:24 34:15,22
  35:6,11,12 36:2,5
  37:20,22 38:2,2,3
  38:7,11,14,16 42:7
  42:10 45:9,24,25
  46:2,2 51:10 53:2
  57:4 72:3
tiers   25:9,15,18,23
  26:3 32:23,25
  34:16,18,20 35:2,9
  36:21 45:8 52:25
time   1:12 3:22
  6:18,25 8:16
  10:18 12:23 14:2
  14:16,17 16:5
  18:21 20:17,19,24
  23:15 24:11,15
  35:14,23 36:8,21
  36:24 37:4 38:17
  38:25 43:22 44:2
  45:4,4,8 46:14,16
  46:20 50:6 51:2
  51:13,19 52:10,11
  52:12,13 53:21
  55:14,20 59:4,25
  60:3 64:4 72:11
  73:21 74:10 80:12
  85:6 90:5 91:8
  93:16,25 96:11
  97:21 98:5,13,24
  99:5,13 100:4
  103:10
timeframe   16:3
times   20:23 21:5,9
  24:9,17 31:23
  52:5 67:2 91:13

92:10,13 99:6
title   21:20
tobacco   91:15
today   7:15 8:8
  97:15,16 100:3
  101:19
toe   69:25
toking   69:14,15
told   37:25 97:4
  98:20
top   21:7,8 22:13
  23:6 25:16 26:6
  26:23 39:4 44:15
  49:8 50:9 56:22
  57:8,22 58:18
  60:8,15 64:24
  79:24 87:7 97:24
topping   48:6
torso   64:10
total   26:25
touch   101:16
touched   31:13
touching   73:18
toxicology   70:3,8
track   84:16
tracks   84:17
train   50:14
trained   49:25
  67:12
training   9:8 11:18
  11:23 12:3 14:8
  14:11,21,25 15:5
  40:6,9,11 41:6,7
  50:18,19 63:19,22
  67:4
transaction   82:15
  83:15
transactions   31:17
  84:15,23 85:5
transcript   101:22
  103:9,9

| | | | |
|---|---|---|---|
| **transfer**  16:17 | **understand**  16:13 | **v** | **wanted**  37:7 95:11 |
| **transferred**  48:18 | 69:7 | | **wants**  76:20 |
| 60:2 | **unit**  24:24 25:2,4 | **v**  106:2 | **warden**  19:6,8,15 |
| **trauma**  44:5 63:20 | 26:2,16,17,18 | **vaguely**  22:5 | 20:10,11,13,16 |
| 64:15,21 68:16 | 28:20 29:4 32:17 | **valuables**  12:21 | 72:11 73:6 76:17 |
| **treating**  67:18 | 33:20,22 34:6,7,8 | **vantage**  34:22 | 76:18,19,22 80:12 |
| **trejava**  91:3 | 36:4,10 37:11,18 | **variations**  92:10 | 84:2 |
| **trial**  3:22 27:20 | 37:20 38:4 42:3 | **various**  10:22 | **washing**  34:4 |
| **tried**  52:16 66:23 | 43:17,19 44:23,24 | **veracity**  71:5 | **watch**  33:14 35:16 |
| 70:19 94:6 | 44:24 45:25 46:9 | **verbal**  6:22 60:22 | 52:25 |
| **trouble**  52:15,19 | 48:19 51:9,23 | **verification**  75:3 | **way**  25:2 34:25 |
| 53:7,8,11,12 92:19 | 52:8,17 53:14,15 | **verifying**  20:4 | 70:24 71:4 90:9 |
| 94:13 | 53:17,17 57:11 | **veritext**  106:1 | 90:20 105:17 |
| **tru**  47:3,4,5 | 72:8 87:20 90:6 | **vertically**  25:19 | **ways**  29:20 |
| 100:13 | 93:8 94:9 | **veteran's**  16:20 | **we've**  100:13 |
| **true**  103:9 105:12 | **united**  1:2,8,16 2:8 | **vetting**  30:10 | **wear**  50:10 |
| **truth**  103:5 | 2:10 4:18 53:25 | **video**  4:16 5:4 | **weave**  80:18 |
| **try**  46:11 53:18 | 85:14,22 97:20 | 6:19 32:12,24 | **weed**  15:24 |
| **trying**  42:25 49:17 | 101:7 106:2 | **view**  34:15 | **week**  41:6 47:24 |
| 57:6 69:18,23 | **units**  25:5,8 29:15 | **viewed**  64:4 | 48:6 |
| **tv**  33:14 52:25 | 32:17 33:8 36:11 | **violated**  77:7 | **weeks**  14:23 15:13 |
| **tvs**  40:18 52:24 | 53:4 | **violent**  93:16 | 15:20 |
| **twenty**  26:24 27:3 | **unlawful**  32:6 | **w** | **weigh**  58:3 |
| 27:4 37:12 53:3 | **unseal**  99:24 | | **welcome**  91:21 |
| **two**  9:10 14:13 | 100:20 | **wad**  43:8 | **went**  8:18 12:7 |
| 15:20 17:25,25 | **unsigned**  3:14 | **wait**  6:14 45:12 | 15:10 26:4,5 |
| 25:23 27:12 30:20 | **uploaded**  75:5 | **waived**  3:9 | 31:12 41:24 43:12 |
| 35:15 42:2 69:21 | **uploads**  74:7 | **walk**  33:21 | 69:17 75:2 84:20 |
| 69:21 78:3,23 | **upper**  25:25 64:10 | **walked**  26:17 | 99:15 |
| 98:16 | **uptick**  93:16 | **walking**  38:11 | **west**  2:5 |
| **type**  11:9,11,23 | **use**  53:24 92:23 | 45:24 46:2 | **wet**  31:9 42:16,17 |
| 32:12 40:9 53:10 | 94:3 | **wall**  33:20 | 42:21 49:15 69:22 |
| 90:7 | **usual**  57:24 | **walls**  25:10 | 69:24,24 97:7 |
| **types**  13:21 30:7 | **usually**  24:11 | **want**  5:7 9:20 16:8 | **whatsoever**  51:11 |
| **tyrone**  86:20 | 36:14 41:16 52:20 | 16:12 23:8 32:18 | **whereof**  105:19 |
| **u** | 53:7 87:15 88:12 | 37:15 44:15,21 | **white**  28:2,4 |
| | 93:21 | 45:3 57:7 68:10 | **whoever's**  34:14 |
| **u**  3:2 47:5 | **utilize**  12:2 | 74:21 77:21 78:5 | **williams**  1:3 106:2 |
| **u.s.**  84:21 | | 81:18 83:19 93:24 | **willing**  5:2 |
| **uh**  6:23 | | 100:8,12,19 101:3 | **wise**  53:7 88:19 |
| **underneath**  65:5 | | 101:9 | |

**withdraw**   66:15
  78:15
**witness**   1:17 3:10
  3:16,18 4:3,21
  5:11 6:12 41:16
  43:3 61:20 62:8
  72:18,20 85:20
  95:13 100:6 102:5
  105:10,13,19
**witnesses'**   106:3
**word**   7:25
**work**   12:4 14:18
  15:20 16:7,9
  17:24,25 54:25
  55:13 79:20 94:17
  99:3
**worked**   10:23,24
  13:14 14:5 76:7
**working**   4:17 8:12
  12:12 13:8,12
  15:5,8,16,22 17:23
  20:25 23:9,11
  59:9 63:19 85:14
  85:22 91:14
**worried**   6:19
**wrist**   64:6
**wrong**   37:18 68:6

| x |
|---|

**x**   1:3,9 104:2,12

| y |
|---|

**y**   4:2
**year**   14:11 86:23
**years**   8:13 9:10
  12:16 21:25 30:20
  31:24 50:11 61:15
**yelling**   37:19 38:4
**york**   1:2,20,22 2:5
  2:5,9,11,11 4:4,13
  10:25 11:8 105:4
  105:8 106:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.