# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

NICOLE MORRISON, as Administrator for the
Estate of Roberto Grant, and NICOLE MORRISON,
as Mother and Legal Guardian for the Property
of AG and SG, Decedent's Minor Children,

                    Plaintiffs,

          -against-              17 Civ. 6779 (WHP)

UNITED STATES OF AMERICA, FEDERAL BUREAU OF
PRISONS, CORRECTION OFFICER KERN, EXECUTIVE
ASSISTANT LEE PLOURDE, and JOHN AND JANE DOE(S)
AGENTS, SERVANTS AND EMPLOYEES OF THE DEFENDANTS,

                    Defendants.

-------------------------------------------------x

                    REMOTE VIDEOCONFERENCE DEPOSITION OF

ROY TIMOTHY GRAVETTE, a non-party witness herein,

located in Lafayette, Louisiana 70503, taken by

the Defendants, pursuant to Rule 26, held on

Wednesday, February 24, 2021, at 10:30 o'clock

a.m., before Deborah Moschitto, a Shorthand

Reporter and Notary Public of the State of New

York.

2

```
 1

 2     A P P E A R A N C E S:

 3

 4          LAW OFFICE OF ANDREW C. LAUFER, PLLC
                    Attorneys for Plaintiffs
 5                  264 West 40th Street - Suite 604
                    New York, New York 10018
 6
            BY:     ANDREW C. LAUFER, ESQ.
 7                  212-422-1020
                    alaufer@lauferlawgroup.com
 8

 9
            UNITED STATES ATTORNEY'S OFFICE
10          SOUTHERN DISTRICT OF NEW YORK
                    Attorneys for Defendant
11                  UNITED STATES OF AMERICA
                    86 Chambers Street - 3rd Floor
12                  New York, New York 10007

13          BY:     LUCAS ISSACHAROFF, ESQ.

14

15                            * * *

16

17

18

19

20

21

22

23

24

25
```

3

```
 1
 2                        S T I P U L A T I O N S
 3
 4                        IT IS HEREBY STIPULATED AND
 5         AGREED by and between the attorneys for the
 6         respective parties hereto, that the filing,
 7         sealing and certification of the within
 8         deposition be waived; that such deposition
 9         may be signed and sworn to before any officer
10         authorized to administer an oath; that all
11         objections, except as to the form, are
12         reserved to the time of the trial.
13
14                             *  *  *
15
16
17
18
19
20
21
22
23
24
25
```

1                     R. Gravette

2                     THE COURT REPORTER:  Hello.  My

3          name is Deborah Moschitto.  I'm a Shorthand

4          Reporter and Notary Public of the State of

5          New York.

6                     This deposition is being held via

7          videoconferencing equipment.  The witness and

8          reporter are not in the same room.  The

9          witness will be sworn in remotely pursuant to

10         agreement of all parties.  The parties

11         stipulate that the testimony is being given

12         as if the witness was sworn in person.

13                    Do counsel so stipulate?

14                    MR. LAUFER:  Yes.

15                    MR. ISSACHAROFF:  Yes.

16                    THE COURT REPORTER:  The witness

17         is located in Louisiana and I'm located in

18         New York.  Do counsel stipulate to me

19         swearing in the witness?

20                    MR. LAUFER:  Yes.

21                    MR. ISSACHAROFF:  Yes.

22         R O Y    T I M O T H Y    G R A V E T T E,

23              the witness herein, having been duly

24              sworn by Deborah Moschitto, a Notary

25              Public in and for the State of New York,

1                         R. Gravette

2              was examined and testified as follows:

3       EXAMINATION BY

4       MR. ISSACHAROFF:

5              Q.    Good morning, Mr. Gravette.  My

6       name is Lucas Issacharoff.  I'm an AUSA in

7       the Southern District of New York, and I

8       represent the United States in this lawsuit.

9                    During today's deposition, I'm

10      going to ask you a series of questions which

11      you will answer under oath.

12                   Do you understand that you are

13      under oath and that you have sworn to tell

14      the truth?

15             A.    Yes, I do.

16             Q.    Before we get started, I'd like

17      to go over a few ground rules.

18                   Have you been deposed before?

19             A.    Yes.

20             Q.    So you're familiar with the

21      process, but I'll just go through them

22      quickly.

23                   The court reporter is going to

24      take a transcript of what we say, and

25      especially because we're doing this over

1                        R. Gravette

2       video, it's especially important that we not

3       talk at the same time because that can create

4       problems with the transcript.  So if you

5       could do your best to let me finish asking a

6       question before you answer, I will do my best

7       to let you finish answering before I ask my

8       next question.

9               Does that make sense?

10        A.    Yes, it does.

11        Q.    Similarly, you must give a verbal

12      response to each question, because the court

13      reporter cannot record a nod or a shake of

14      your head, as you're doing so far.

15              Does that make sense?

16        A.    Yes, it does.

17        Q.    If at any time you don't

18      understand my question, it's very important

19      for you to tell me so that I can clarify.

20              Will you tell me if you don't

21      understand my question?

22        A.    Yes, I will.

23        Q.    If you don't tell me when you

24      don't understand a question, I'm going to

25      assume that you understand what I am asking.

```
1                         R. Gravette

2                    Does that make sense?

3          A.     Yes, it does.

4          Q.     If you ever want or need to take

5     a break, please let me know and we will take

6     one.  The only caveat is that if I have asked

7     you a question, I may request that you answer

8     it before we take a break.  The only caveat

9     to that caveat is that if you need to consult

10    with Mr. Laufer about a matter of

11    attorney-client privilege, you can do so

12    before answering a question; okay?

13         A.     Okay.

14         Q.     From time to time, you may hear

15    counsel object to my question, but unless he

16    instructs you not to answer, once he has

17    stated his objection, please go ahead and

18    answer.

19         A.     Okay.

20         Q.     Have you taken any drugs or

21    medications today?

22         A.     No, I haven't.

23         Q.     Is there any other reason why you

24    would not be able to understand my questions

25    and respond fully and truthfully?
```

```
 1                       R. Gravette
 2          A.     No, there isn't.
 3          Q.     Do you have a copy of your expert
 4     report in this case in front of you?
 5          A.     Yes, I do.
 6                 MR. ISSACHAROFF:  I'm going to
 7     mark that report as Exhibit 1, but I think if
 8     we all have our own copies, rather than me
 9     try to share it on the screen, we can all
10     just look at our own and agree that we're
11     looking at the same document.
12                 MR. LAUFER:  That's fine.
13                 THE WITNESS:  That's fine.
14                 MR. ISSACHAROFF:  This is the
15     report of Tim Gravette produced on
16     December 1, 2020.
17                 (Report of Tim Gravette, produced
18                 12/1/20, marked Exhibit 1 for
19                 identification.)
20          Q.     Is the report I'm referring to
21     your complete report in this matter?
22          A.     Yes, it is.
23          Q.     Have you had a chance to review
24     your report between when you finalized it and
25     today?
```

1                         R. Gravette

2               A.      Yes, I have.

3               Q.      In reviewing your report, did you

4       find anything that you wanted to change or

5       supplement or correct?

6               A.      No, sir.

7               Q.      Based on your review of the

8       materials in this matter, did you reach any

9       conclusions?

10              A.      Yes.

11              Q.      What were the conclusions that

12      you reached?

13              A.      They're outlined in my report.

14      I'd be happy to look at it.

15              Q.      Okay.  Where would we go to see

16      what those conclusions are?

17              A.      "Present opinions," on page 7.

18              Q.      Okay.  So is your first

19      conclusion that the United States Government

20      had a duty to protect Mr. Roberto Grant from

21      harm during the time he was incarcerated at

22      the Metropolitan Correctional Center?

23              A.      That is part of my opinions.

24      However, there are some conclusions

25      throughout the report.

1                        R. Gravette

2          Q.    Okay.  Well, can you -- whether

3     you want to refer to this portion of the

4     report or the report as a whole, can you

5     state for me what the opinions you're

6     offering are?

7          A.    The opinions I'm offering are

8     that the Metropolitan Correctional Center and

9     the Federal Bureau of Prisons had a duty to

10    protect Roberto Grant, and that they also had

11    a duty to solve the case that happened, and

12    they were unable to.  They concluded that the

13    case was closed.

14              That based on my review of the

15    information, and the information provided by

16    the staff who were there, I'm of the opinion

17    that Roberto Grant, more than likely died as

18    a result of horseplay and also the use of K2.

19         Q.    Any other opinions?

20         A.    Not at this moment.

21         Q.    Did you conclude that any -- and

22    when I say BOP, do you understand me to be

23    referring to the Bureau of Prisons?

24         A.    Yes.

25         Q.    Did you conclude that any BOP

1                    R. Gravette

2       officer directly harmed Mr. Grant?

3            A.     No, I did not.

4            Q.     Did you conclude that there was

5       any deficiency or negligence in the manner in

6       which BOP officers responded to Mr. Grant's

7       medical emergency once they were alerted?

8            A.     Not a medical emergency, no.

9            Q.     Did you conclude that there was

10      any wrongdoing or negligence in the manner in

11      which BOP officers attempted to resuscitate

12      Mr. Grant or transported him to the hospital?

13           A.     No.

14           Q.     So in what respect would you say

15      that BOP officers or employees failed to

16      fulfill their obligations in this matter?

17           A.     Captain Ward and Lieutenant

18      Delaney, both in their deposition testimony,

19      confirmed that the Correctional Officers

20      Kearins and Georgopoulos was supposed to make

21      rounds at least every 30 minutes, not to

22      exceed 40, and Ms. Georgopoulos, in her

23      testimony, she stated they made rounds a few

24      times during the shift.  A few times is not

25      every 30 minutes.

1                    R. Gravette

2              So, therefore, there was a lack

3         of supervision as what's directed by the

4         captain and the shift supervisor.

5              Q.    So the wrongdoing that you find

6         is that Officers Kearins and Georgopoulos did

7         not conduct rounds as frequently as they

8         should have and that this reflects a failure

9         of supervision by Lieutenant Delaney and

10        Captain Ward; is that correct?

11             A.    Well, that's part of the

12        supervision, is to ensure that they're making

13        the proper rounds.  She last -- Georgopoulos

14        last saw Roberto Grant alive at the

15        10:00 p.m. count, and then she responded to

16        the medical emergency when the inmates

17        started yelling to get their attention,

18        somewhere around 11:40 p.m., which is over an

19        hour and a half later.

20             Q.    I just want to try to clarify

21        whether, in your view, any other BOP officer

22        did anything else wrong in connection with

23        Mr. Grant's death other than the failure to

24        make rounds as frequently as they should

25        have.

13

```
1                      R. Gravette
2          A.     Right.  Failure to supervise the
3     inmate population as directed by their
4     supervisor, and then also Lieutenant Delaney
5     shared some responsibility in that because he
6     is the shift supervisor.
7          Q.     Okay.  In your review of the case
8     materials, were you -- did you come across
9     any threats or credible threat to Mr. Grant
10    or his safety that should have been addressed
11    by BOP?
12         A.     There was none that I saw.
13         Q.     All right.  We'll return to the
14    questions as to rounds as well as your other
15    opinions, but for now I want to walk through
16    your career and qualifications.
17              Can you walk me through your
18    educational background beginning with high
19    school?
20         A.     I graduated from Leesville High
21    School in Leesville, Louisiana, and I
22    attended some college, but no degree.
23         Q.     Okay.  And was it immediately
24    after you attended college that you began to
25    work at BOP?
```

14

1                          R. Gravette

2          A.      No, it's not.

3          Q.      What jobs did you have between

4    college and BOP?

5          A.      I worked in a retail automobile

6    sales, worked in the Gulf of Mexico,

7    production platform.  I worked as an

8    insurance sales representative.

9          Q.      And in 1990, you joined BOP?

10         A.      Correct.

11         Q.      In what capacity did you first

12   join BOP?

13         A.      As a correctional officer.

14         Q.      And where was -- was that in --

15   where were you first assigned?

16         A.      Talladega, Alabama.

17         Q.      And what were your roles and

18   responsibilities as a correctional officer?

19         A.      Primary role of a correctional

20   officer is the safety and security and

21   orderly running of the facility, to supervise

22   inmates in their daily work details, housing

23   unit areas, feeding, making sure they get to

24   their assigned appointments and that sort of

25   thing.

1                      R. Gravette

2           Q.     Did you have any investigative

3      role or capacity as a correctional officer?

4           A.     Yes.  I worked in -- I'm sorry.

5           Q.     I'm sorry, go ahead.

6           A.     I worked in the special

7      investigative supervisor's office as a

8      telephone monitor, as well.  I assisted with

9      some of the investigations.

10          Q.     Okay.  And how long were you a

11     correctional -- a CO for?  And by that I mean

12     before being -- I'm sorry, let me rephrase

13     that.

14                 How long were you a CO at

15     Talladega?  And by that I mean at what point

16     were you either promoted or transferred?

17          A.     I was a correctional officer at

18     Talladega from June of 1990 till October of

19     1993, and then I was promoted to GS-9

20     lieutenant and moved to the Federal Detention

21     Center in Miami, Florida.

22          Q.     Okay.  And what was your -- what

23     were your responsibilities as a GS-9

24     lieutenant?

25          A.     The GS-9 lieutenant, I was -- the

1                    R. Gravette

2    activities lieutenant at both the Federal

3    Detention Center and the Metropolitan

4    Correctional Center in Miami, supervised

5    inmates as well as staff in the performance

6    of activities, make sure that everyone, the

7    inmates were fed, make sure they got to their

8    areas of responsibility and that sort of

9    thing.

10        Q.    You reviewed the deposition of

11   Lieutenant Delaney in this case; is that

12   correct?

13        A.    Correct.

14        Q.    Do you recall what level of

15   lieutenant he was?

16        A.    He was a GS-11 lieutenant,

17   operations lieutenant.

18        Q.    Okay.  And did you become a GS-11

19   lieutenant after you were a GS-9?

20        A.    Correct.  After eleven months, I

21   was promoted to GS-11 lieutenant in Miami,

22   Florida.

23        Q.    And what were your roles and

24   responsibilities as a GS-11?

25        A.    GS-11 lieutenant, I was a special

1                      R. Gravette

2       housing unit lieutenant for a while, I was

3       the operations unit, the same as Delaney, for

4       a while.  I did some administrative

5       lieutenant duties during that period of time.

6       I was disturbance control squad leader,

7       special operation response team leader.

8            Q.     And were you transferred to

9       another -- one or more other facilities while

10      you were a GS-11?

11           A.     Yes.  I transferred -- in 1995 I

12      transferred to the Federal Correctional

13      Institution at Estill, South Carolina.

14           Q.     And then at some point were you

15      promoted to GS-12 captain?

16           A.     Yes, in December of 19 -- I

17      believe it was '97, to the Federal Detention

18      Center in Oakdale, Louisiana.

19           Q.     And then in 1999, were you

20      transferred to another facility?

21           A.     Yes, the Federal Correctional

22      Institution in Edgefield, South Carolina as a

23      GS-13 captain.

24           Q.     And then I see on your resume

25      that you became an associate warden at three

```
 1                    R. Gravette
 2    facilities from 2001 to 2010?
 3         A.     Correct.
 4         Q.     What were those three facilities?
 5         A.     I went back to the Federal
 6    Correctional Institution in Talladega,
 7    Alabama, and then following that, I
 8    transferred to the Federal Correctional
 9    Complex in Beaumont, Texas, and then my final
10    assignment with the Bureau of Prisons was at
11    the Federal Correctional Institution in Three
12    Rivers, Texas.
13         Q.     What security levels were those
14    three institutions?
15         A.     Talladega, it was a medium
16    security facility with an administrative unit
17    that housed -- at one time housed Mary Lee to
18    Cubans, and then later on it housed other
19    inmates from other facilities that were
20    problematic in the southeast region.
21              And at that unit, the Federal
22    Correctional Complex in Beaumont, Texas, we
23    had a federal prison camp, we had a low
24    security facility, we had a meeting security
25    facility and United States penitentiary,
```

1                    R. Gravette

2       which covers all of them, all security levels

3       there.

4                    And at the Federal Correctional

5       Institution in Three Rivers, Texas, it was a

6       medium security facility with an attached

7       federal prison camp.

8            Q.     What security level or what type

9       of facility is the Metropolitan Correctional

10      Center in New York?

11           A.     Administrative.

12           Q.     And are there differences in how

13      inmates are supervised between these

14      facilities?

15           A.     No.  I've worked at two

16      administrative facilities:  The Federal

17      Detention Center in Miami, Florida, as well

18      as the Federal Detention Center in Oakdale,

19      Louisiana, and safety and security and

20      orderly running of the facility is the same.

21      Supervision of the inmates is the same.  The

22      count procedures are the same.

23                   There are some differences

24      because of physical layouts and that sort of

25      thing, but overall, supervising inmates is

```
 1                    R. Gravette
 2      customary, custom and practice basically
 3      industry-wide.
 4           Q.    And in 2010, did you leave BOP?
 5           A.    I retired, yes, I did.
 6           Q.    And since then, have you operated
 7      Gravette Consulting?
 8           A.    Yes.
 9           Q.    And what do you do in that
10      capacity?
11           A.    I assist -- normally I assist
12      people in the legal profession with
13      correctional safety cases involving jails,
14      prisons.  I've done audits.  I've worked with
15      the Department of Justice going out with a
16      Civil Rights Division, inspecting
17      institutions.  I worked creative corrections
18      for a while, auditing ICE facilities.  I
19      worked with the Office of Personnel
20      Management doing investigations.
21           Q.    Since your -- since you retired
22      from BOP, what percentage of your work would
23      you say has been consulting in litigation?
24           A.    For the past I would say five
25      years, it's been -- that's what I've done.
```

1                    R. Gravette

2          Q.      Okay.

3          A.      Plus try to be retired and play a

4     little golf.

5          Q.      Good.  And do you typically

6     represent the plaintiff or the injured party

7     in litigation -- I'm sorry, are you typically

8     hired by attorneys representing the plaintiff

9     or the injured party in litigation?

10         A.      No.  No, it's about 60/40 with

11    the defense, on the defense side.  I work for

12    Virginia Regional Jail Authority.  I work for

13    the National Association of Counties.  I work

14    for several states doing defense work, as

15    well as the Federal Government.

16         Q.      Is there any experience that you

17    would consider relevant to the opinions you

18    offer in this case, missing from your CV?

19         A.      No.

20         Q.      Do you currently hold any

21    professional licenses?

22         A.      No, I do not.

23         Q.      Have you ever held any

24    professional licenses?

25         A.      No, I'm not required to.

```
 1                    R. Gravette
 2         Q.    Have you ever been the subject of
 3    any form of disciplinary action or sanction
 4    from an employer or any licensing board or
 5    association?
 6              MR. LAUFER:  Objection.  You can
 7    answer.
 8         A.    I received a letter of reprimand
 9    for cursing in a meeting one time in the
10    Bureau of Prisons, which was removed after
11    six months, but that's all I've ever done.
12         Q.    Have you ever been investigated,
13    aside from that, for professional misconduct?
14              MR. LAUFER:  Objection.  You
15    could answer.
16         A.    Yes, yes.
17         Q.    In what -- can you tell me what
18    was involved in that?
19         A.    When I was in Beaumont, Texas, we
20    had an inmate who was on a food strike, he
21    wasn't eating, hadn't eaten in days, and I
22    was the associate warden with responsibility
23    for his medical services.
24              And I went and talked to him.  I
25    told him, "Man, you're going to have to eat.
```

```
 1                    R. Gravette
 2      If you don't, we're going to have to force
 3      feed you, make sure you're okay."  So he
 4      submitted a complaint saying that I
 5      threatened him.  I didn't threaten him.  I
 6      was trying to get him to eat.
 7                  So that was investigated and
 8      quickly thrown out, so, again that's -- I've
 9      been pretty crystal clear on most things.
10           Q.     Anything else aside from that?
11           A.     No, not that I recall.
12           Q.     Have you ever been named as a
13      defendant in a lawsuit?
14           A.     Yes.
15           Q.     One or more times?
16           A.     I think three.
17           Q.     And in what -- what were the
18      nature of those lawsuits?
19           A.     One was one of the bombers from
20      the original bombing that happened in New
21      York City.  His name was Ajaj.
22                  And when the second bombing
23      happened in 2001, I was captain of the
24      Federal Correctional Institution in South
25      Carolina, and he was there, so we secured him
```

1                         R. Gravette

2        in a special housing unit on orders from the

3        DOJ, around the clock, and put a video on

4        him.  And he sued me, the warden, everybody

5        he could think of, because we locked him up

6        and that was one.

7                    When I was in Beaumont, Texas, we

8        had a hurricane and a group of inmates got

9        together and filed a lawsuit and said that

10       they weren't treated well during the

11       hurricane.  That was thrown out.

12                   And there was another guy in

13       Edgefield, South Carolina, that stated that

14       myself and 17 other people beat him up at the

15       same time, which is kind of out there and the

16       court threw that out.

17                   So that's all I had.

18            Q.    The World Trade Center bomber,

19       what happened with that case?

20            A.    It was dismissed.

21            Q.    Okay.  So all three of these were

22       dismissed?

23            A.    Yes, as far as I know.  I never

24       heard anything more about them.

25            Q.    Okay.  In your capacity as an

```
 1                    R. Gravette
 2      expert witness, has the court ever refused to
 3      accept your expert testimony or report for
 4      whatever reason?
 5           A.      In Phoenix, Arizona I was
 6      relatively new at it and the court didn't
 7      refuse the report.  What the court required
 8      me to do was to rewrite the report because
 9      the incident was a disruptive inmate and
10      there were several staff members who had to
11      restrain him, and when I wrote the original
12      report, I wrote it as they were a group, and
13      the judge says:  No, you have to rewrite it
14      and individually what did he do, he did,
15      that's all.
16                  And the Dolvert (phonetic) thing,
17      that's out there somewhere, that comes up.
18           Q.      Is this the Attendo v. Apire
19      (phonetic) case?
20           A.      Yes.
21           Q.      And then any other instances?
22           A.      Not that I'm aware.
23           Q.      What about the Lizarazo v.
24      Greaves case in the district of Florida in
25      2018?
```

1                          R. Gravette

2          A.     The last I heard on that was

3     Lizarazo passed away and his father decided

4     not to pursue the suit.  That's all I heard.

5          Q.     What do you consider to be your

6     areas of expertise?

7          A.     Corrections, prisons, jails.

8          Q.     Do you have any expertise in

9     pathology?

10          A.     Pathology, no.

11          Q.     Which areas of your expertise did

12     you rely on in offering the opinions in your

13     report in this case?

14          A.     My experience as a correctional

15     officer, my experience as a supervisor, line

16     supervisor, lieutenant, my experience as a

17     captain and also my experience as

18     administrator.

19          Q.     And on which aspect of your

20     training did you rely?

21          A.     All of my Bureau of Prisons

22     training, including the investigative

23     training that I attended and my experience in

24     that.

25          Q.     In your 20-year career at the

1                        R. Gravette

2        Bureau of Prisons, did an inmate ever die in

3        custody in a facility where you were

4        employed?

5               A.      Yes.

6               Q.      Could you estimate roughly how

7        many?

8               A.      Four.

9               Q.      Do you recall each of those?

10              A.      In Edgefield, South Carolina, a

11       murder and an overdose.  Three Rivers, Texas,

12       a suicide and a homicide.

13              Q.      With respect to the murder in

14       Edgefield, South Carolina, is it your view

15       that that murder reflected negligence on the

16       part of one or more BOP employees?

17              A.      No.

18              Q.      With respect to the overdose in

19       Edgefield, South Carolina, is it your opinion

20       that that reflected negligence on the part of

21       one or more BOP employees?

22              A.      Not that I recall.

23              Q.      With respect to the suicide at

24       Three Rivers, Texas, is it your opinion that

25       that reflected negligence on the part of one

```
 1                      R. Gravette

 2     or more BOP employees?

 3          A.     The housing unit also in that

 4     instance was disciplined for not properly

 5     making rounds and checking on the inmates.

 6          Q.     And what about the homicide in

 7     Three Rivers, Texas?

 8          A.     No.

 9          Q.     Was the -- in the Three Rivers,

10     Texas suicide, was the inmate who committed

11     suicide under continuous observation?

12          A.     No.

13          Q.     They weren't in any sort of

14     medical or specialized unit?

15          A.     No, he wasn't.

16          Q.     Okay.  Is it fair to say that the

17     death of an inmate in BOP custody does not

18     necessarily reflect negligence on the part of

19     BOP employees?

20          A.     Sometimes it's negligence and

21     sometimes it's not.

22          Q.     Okay.  What did you do to prepare

23     for today's deposition?

24          A.     I briefly went through my notes

25     and then I read over my report a few times.
```

1                          R. Gravette

2              Q.      Did you speak with anyone about

3       this deposition, other than plaintiff's

4       counsel?

5              A.      No.

6              Q.      Other than the documents listed

7       in your -- in the appendix to your expert

8       report, did you review any other documents in

9       preparation for this deposition?

10             A.      No, just my notes.  The notes are

11      reflected in the report, so basically it's

12      the same thing.

13             Q.      Okay.  You said that you have

14      notes that are reflected in the report?

15             A.      Well, I mean, when I reviewed the

16      case material, I take notes as to what I want

17      to try to, you know, highlight.

18                     MR. ISSACHAROFF:  I'd ask that

19      those notes be produced.

20                     MR. LAUFER:  Make a request in

21      writing.  We'll take it under advisement.

22                     Tim, just preserve them and you

23      can e-mail them to me.

24                     THE WITNESS:  Okay.

25      (Document request)

```
 1                    R. Gravette

 2         Q.    How long did you spend preparing

 3    for today's deposition?

 4         A.    I would call it an hour.

 5         Q.    I always ask that, but today

 6    since I'm paying for it, it's of special

 7    importance.

 8         A.    Okay.  Should I say five?

 9         Q.    Turning back to your report,

10    aside from plaintiff's counsel, did anyone

11    assist you in preparing this report?

12         A.    No, sir.

13         Q.    And aside from the documents

14    listed as Exhibit B, did you consider any

15    other sources in forming your opinions in

16    this case?

17         A.    No, sir.

18         Q.    Did you review any BOP policies,

19    handbooks or procedures in forming your

20    opinions in this case?

21         A.    Let me double-check.

22               (Pause.)

23         A.    No, I did not.

24         Q.    Do policies, procedures and

25    handbooks ever differ between BOP facilities?
```

```
 1                    R. Gravette
 2          A.    Yes, they do.
 3          Q.    Did you review any policies,
 4     procedures or handbooks specific to the
 5     Metropolitan Correctional Center in
 6     connection with preparing your report?
 7          A.    I don't have them listed in my
 8     Exhibit B.  As far as that, I depended on
 9     what the lieutenant and captain said as far
10     as making rounds and then the rest of it, I'm
11     familiar with.
12          Q.    You reviewed several depositions
13     before forming your opinions in this case; is
14     that correct?
15          A.    Yes, I did.
16          Q.    In forming your opinions, did you
17     assume that any of that deposition testimony
18     was truthful or untruthful?
19          A.    Sworn testimony, if they say it
20     is truthful, I have to consider it to be that
21     way, unless I know otherwise.
22          Q.    Did plaintiff's counsel ask you
23     to make any assumptions on which you relied
24     in forming your opinions in this case?
25          A.    No.
```

```
 1                      R. Gravette
 2           Q.    If you could turn to page 3 of
 3      your report, which I have as page 17 of the
 4      PDF -- that might not be right.  I'm sorry,
 5      no, that's not correct.  I have it as page 8
 6      of the PDF, or 7, my computer is still being
 7      a little odd -- the numbered page 3 of your
 8      report, if you could turn to that, which
 9      begins, "The following is a description of
10      the incident."
11           A.    Yes, sir.
12           Q.    Can you read the last sentence on
13      this page?
14           A.    "Based on my review of the case
15      material, this is when K2 was smoked in the
16      unit and when the rumored horseplay took
17      place where" -- I put "granted," but "Grant
18      was allegedly choked."
19           Q.    What in your review of the case
20      materials leads you to conclude that K2 was
21      smoked in the unit at this time?
22           A.    Inmate said that he had smoked K2
23      during the day with Grant.  Officer
24      Georgopoulos said when she was waiting to get
25      inside the grille, she could see the inmates
```

```
 1                    R. Gravette

 2      in there spraying.  Another responding staff

 3      member stated that he could smell smoke in

 4      the unit.

 5           Q.    Okay.  What in the case materials

 6      leads you to conclude that horseplay took

 7      place?

 8           A.    The testimony of Georgopoulos, of

 9      Officer Georgopoulos.  She had rumors from

10      other inmates.  She had other inmates tell

11      her there was possible horseplay, that he was

12      choked.  And also the Medical Examiner's

13      report, as well as Dr. Hal.  I put all that

14      together and determined that that was a

15      strong possibility.

16           Q.    What leads you to believe that

17      the horseplay took place between 10:00 p.m.

18      and 11:40 p.m. on May 18, 2015?

19           A.    Could you repeat those times

20      again, please?

21           Q.    Sure.  10:00 p.m. and 11:40 p.m.

22      on May 18, 2015.

23           A.    Because at the ten o'clock count,

24      when Georgopoulos went to the unit to count,

25      he was standing at his bunk, everything was
```

1                       R. Gravette

2      okay.  And then at 11:40, approximately when

3      they went in and found him unresponsive, he

4      was unresponsive as well as he urinated on

5      himself and he had water on his upper torso.

6          Q.    Is it fair to say that if the

7      horseplay had taken place prior to

8      10:00 p.m., you would not view that as a

9      likely cause of Mr. Grant's death?

10         A.    I would have to say that I would

11     view the horseplay as the likely cause of his

12     death because what the Medical Examiner said,

13     and also Dr. Hal, and the rumors of

14     horseplay, because if somebody chokes you

15     out, you're not going to be okay at ten

16     o'clock after you've been choked out and then

17     be unresponsive later.  That doesn't make

18     sense.

19         Q.    Okay.  So if the horseplay took

20     place -- it's your opinion that it must have

21     occurred between 10:00 p.m. and 11:40 p.m.?

22         A.    That's -- that's the way it's

23     indicated to me.

24         Q.    Is it fair to say that the

25     information you have on alleged horseplay

1                    R. Gravette

2        comes from Officer Georgopoulos' statements

3        regarding a rumor that she heard from an

4        inmate?

5            A.    Yes.

6            Q.    And is it your understanding that

7        that inmate, who spoke to Officer

8        Georgopoulos, observed the horseplay

9        firsthand?

10            A.    I would have to go back to the

11        notes, but that's the way I understood it.  I

12        mean, he's in the unit.  He knows what's

13        going on in there.  Inmates know what happens

14        in their unit.

15            Q.    Do you consider a rumor being

16        relayed by an inmate to a CO to be a reliable

17        source of information?

18            A.    When you put the rumor together

19        with the damage that he had as indicated by

20        the Medical Examiner, yes.

21            Q.    Is it your understanding that

22        Officer Georgopoulos directly observed any

23        horseplay involving Mr. Grant?

24            A.    She did not indicate that she did

25        that.

```
 1                    R. Gravette

 2          Q.    Can I ask you to turn to page 5

 3     of your report?

 4          A.    Okay.

 5          Q.    If you go to the last sentence of

 6     the first paragraph on that page, do you see

 7     where it says, "I am of the opinion the

 8     probability of inmate horseplay in 11 South,

 9     which included the choking of Grant, possibly

10     played a part in his death."

11          A.    Yes.

12          Q.    What do you mean when you say,

13     "The probability of inmate horseplay"?

14          A.    The FBI was never able to say

15     exactly what happened.  The Medical Examiner

16     had undetermined.  And I put that in my

17     report, that I don't know for sure what

18     happened, but I do know that the probability,

19     and that's why I used the word "probability,"

20     that horseplay played a part in the death of

21     Roberto Grant in that unit.

22          Q.    And when you say the probability

23     of horseplay, is that less than 50 percent,

24     more than 50 percent, more than 80 percent?

25     Can you kind of give me a ball park of what
```

1                         R. Gravette

2        you're talking about?

3            A.     It's a high probability, a high

4        probability.  I would say 80 or above.  If I

5        were a betting man, yes.

6            Q.     And when you say "possibly played

7        a part in his death," is that -- can I

8        interpret that to -- let me rephrase that.

9                   When you say possibly played a

10       part in his death, does that mean that even

11       if horseplay occurred, it is possible that

12       that did not play a part in his death?

13                  MR. LAUFER:  Objection.  You can

14       answer.

15           A.     If horseplay occurred, as

16       described.

17                  And also another thing that I

18       relied on there was Officer Georgopoulos who,

19       worked that unit, was familiar with that unit

20       and familiar with the inmates, she stated in

21       her deposition that she thought it was a

22       murder.  And I put in my report that I did

23       rely heavily on what she said because she was

24       the person there.

25           Q.     Is it possible, though, that even

```
 1                    R. Gravette

 2      if horseplay did occur, that that did not

 3      cause Mr. Grant's death?

 4              MR. LAUFER:  Objection.  You can

 5      answer.

 6         A.    That's why I said probability.

 7      In my testimony today, I'm saying it's a very

 8      high probability that that was one of the

 9      causes of death.

10         Q.    In your experience at BOP, did

11      inmates ever engage in horseplay?

12         A.    Yes.

13         Q.    Let me back up.

14              If you look at the bottom

15      paragraph on page 4, you cite to Code 220 in

16      the inmate -- BOP and inmate discipline

17      policy?

18         A.    Yes.

19         Q.    And that prohibits horseplay, as

20      you read it?

21         A.    Yes, based on my experience, that

22      prohibits horseplay.

23         Q.    And was Code 220 in effect or

24      something substantially similar to Code 220

25      in effect during your career at BOP?
```

1                        R. Gravette

2            A.      Yes.

3            Q.      So is it fair to say that

4       horseplay was prohibited when you worked at

5       BOP as well?

6            A.      Yes, that's true.

7            Q.      So if an inmate engaged in

8       horseplay, they would be violating Code 220;

9       is that correct?

10           A.      That's the way I read it, and

11      that's the way I recall it, yes.

12           Q.      Would the fact that an inmate

13      engaged in horseplay mean that a BOP officer

14      had necessarily failed to follow BOP rules,

15      policies or procedures?

16           A.      No, not every time.

17           Q.      Is it your opinion that if

18      Mr. Grant engaged in horseplay, this would

19      reflect a failure by guards to follow BOP

20      rules, policies or procedures?

21                   MR. LAUFER:  Objection.  You

22      could answer.

23           A.      If the correctional officers were

24      aware that Mr. Grant was involved in

25      horseplay and they did not intervene or do

40

1                      R. Gravette

2        anything to stop it, then they would be

3        complacent.

4                      Also, if they weren't making the

5        proper rounds and going around and observing

6        the inmates in the unit, as directed by their

7        supervisor, where they would deter horseplay

8        and other illegal activities, which I put in

9        my report, then they're also responsible for

10       that, for not doing what they were supposed

11       to do.

12           Q.    Let me take the first part of

13       that first.

14                  You said that if officers

15       observed or were aware of horseplay and

16       failed to intervene, that they would be

17       responsible for that?

18           A.    Well, sure.

19           Q.    Based on your review of the

20       materials in this case, do you have any

21       reason to believe that BOP officers observed

22       or were aware of Mr. Grant's engaging in

23       horseplay?

24                  MR. LAUFER:  Objection.  You can

25       answer.

1                    R. Gravette

2          A.      No.  No.

3                  THE WITNESS:  I'm sorry, Andy.

4                  MR. LAUFER:  Don't worry, Tim,

5       you're doing fine.

6          Q.      You also indicated that in this

7       case, you believe that the officers are

8       responsible because they failed to do rounds;

9       is that correct?

10         A.      Yes, sir.

11         Q.      In your experience at BOP, do

12      inmates engage in horseplay even when

13      officers are doing rounds at appropriate

14      intervals?

15         A.      It's a possibility, yes.

16         Q.      So can you conclude, with

17      reasonable certainty, that Mr. Grant would

18      not have engaged in horseplay if Officers

19      Kearins and Georgopoulos had done their

20      rounds at proper intervals?

21                 MR. LAUFER:  Objection.  You

22      could answer.

23         A.      I could not conclude with

24      100 percent certainty that had they made

25      their rounds that that wouldn't happen, but I

1                         R. Gravette

2          could say the probability of them making the

3          rounds and on scheduled times as directed to

4          by their supervisor, would prevent and help

5          deter activity like horseplay, gambling, K2

6          smoking, you name it.

7                         That's why the officers make

8          rounds, is to keep the inmates on their toes

9          and from doing things.  But you can't stop

10         everything.

11         Q.    If I can ask you to turn to

12         page 6 of your report --

13         A.    Okay.

14         Q.    -- if you look at the last

15         sentence of that page, can you read that last

16         sentence?

17         A.    Yes.  "Given the information, the

18         use of K2 in 11 South on the night of Grant's

19         death, I am of the opinion, based on my

20         review of the case material, K2 also played a

21         role in his death.

22         Q.    So what in your review of the

23         case materials leads you to this conclusion?

24         A.    My review of the case material is

25         that the inmates were using K2, that they had

1                      R. Gravette

2      an issue with K2 that night, based on

3      Delaney's testimony.

4                      And the use of K2, which is

5      synthetic marijuana, will sometimes cause

6      people to act out of the ordinary.  And

7      horseplay is not for young guys with A-plus

8      personalities, like a lot of these guys had,

9      you combine K2, their personalities, that

10      kind of setting, you are going to have things

11      like horseplay and other issues.

12          Q.    Okay.  So, sorry, I just want to

13      clarify that.

14                      So when you say K2 played a role

15      in his death, is it your belief that he may

16      have had an adverse reaction to K2 or that K2

17      may have led to behaviors such as horseplay

18      that played a role in his death?

19          A.    Like I said earlier, nobody is

20      certain exactly what happened.  But you've

21      got the K2, you've got the rumors of them

22      putting him in a shower trying to wake him

23      up, so that's a level of intoxication.  You

24      also have the horseplay.

25                      There were several things

1                          R. Gravette

2          happening at one time and my opinion is had

3          those officers been in and out of that unit,

4          or at least at the grille doing something, we

5          may have avoided that.  But they went from

6          10:00 p.m. until roughly 11:40, which means

7          they should have checked that unit at least

8          twice in that amount of time.

9                  Q.      In your experience at BOP, did

10         inmates ever engage in illegal drug use?

11                 A.      Yes.

12                 Q.      Was illegal drug use prohibited

13         at that time?

14                 A.      Yes, it was.

15                 Q.      Did the fact that inmates engaged

16         in illegal drug use mean that guards had

17         failed to follow BOP rules and/or rules,

18         policies and procedures?

19                 A.      In some rare instances, yes.  But

20         normally, no.  I mean inmates have 24 hours a

21         day, 365 days a year to figure out how to

22         beat the correctional officer.  So inmates,

23         they're going to use drugs, they're going to

24         have sex, they're going to make wine, they're

25         going to drink it, they're going to gamble,

1                    R. Gravette

2        they're going to plot escapes.  They're going

3        to murder somebody every once in a while.

4        There's going to be some assaults.  There's

5        all kind of things.

6                You know, Judge Thomas said that

7        prison is a tough place, basically what he

8        said, not in those exact words, but, yeah,

9        things happen there.  But that's why you have

10       rules and regulations and policies and

11       procedures to cut down on that.

12            Q.    Those things that you mentioned,

13       that list of inmate misbehavior and

14       wrongdoing, that can happen even if guards

15       are following all of the BOP rules, policies

16       and procedures; is that correct?

17            A.    Correctional officers following

18       all their rules, policies and procedures, in

19       some instances, it does happen.

20            Q.    Can you state with reasonable

21       certainty that Mr. Grant would not have used

22       K2 on the night of his death if Officers

23       Kearins and Georgopoulos had followed BOP

24       rules, policies and procedures?

25                MR. LAUFER:  Objection.  There's

1                    R. Gravette

2      no indication in the record that Mr. Grant

3      used K2, but I'll allow him to answer the

4      question.

5          A.    The possibility of him using K2

6      still exists, but I go back to making

7      irregular rounds.  The more you're in that

8      unit, the more you're observing those inmates

9      and they know you're coming around.  It's

10     less likely that they're going to do things.

11         Q.    And let me ask the same question:

12     Can you state with reasonable certainty that

13     other inmates in the unit would not have used

14     K2 on the night of Mr. Grant's death if

15     Officers Kearins and Georgopoulos had made

16     regular rounds?

17         A.    If they would have made regular

18     rounds as directed by their supervisors, the

19     likelihood would have been decreased.

20         Q.    Is it your opinion that -- let me

21     ask you this:  Would your view of this

22     matter, or any of your opinions in this

23     matter, change if you learned that Mr. Grant,

24     himself, had smuggled in the K2 that was used

25     on the night of his death?

```
 1                        R. Gravette

 2          A.     No.

 3          Q.     You've noted several times that

 4   Officers Kearins and Georgopoulos did not

 5   conduct rounds in the manner that they were

 6   directed to do so; is that correct?

 7          A.     That's correct.

 8          Q.     And what is the basis for your --

 9   for that assertion?

10          A.     Their immediate supervisor, the

11   operations lieutenant, Lieutenant Delaney,

12   and their overall supervisor, their captain,

13   Captain Ward, who is in charge of the

14   correctional services department which

15   includes Kearins and Georgopoulos.

16          Q.     And Officer Delaney and Captain

17   Ward both indicated that rounds should be

18   conducted roughly, or that rounds should be

19   conducted during each roughly 30 to 40-minute

20   block; is that correct?

21          A.     Yes.

22          Q.     And what is your basis for

23   concluding that Officers Kearins and

24   Georgopoulos did not follow that guidance?

25          A.     Georgopoulos' testimony where she
```

1                    R. Gravette

2        says that -- I'm sorry.

3             Q.     Continue.

4             A.     -- where she said they would make

5        rounds a few times during their shift.  A few

6        times during an eight-hour period is a long

7        way from 16 required rounds.

8             Q.     Do you know how many -- what

9        Officer Georgopoulos means by "a few times"?

10            A.     I don't know exactly what she

11       means about a few times, but I know that

12       normally when someone says "a few," they mean

13       two or three or four.  That's a few.  It's a

14       long way from 16.

15            Q.     Do you know whether Officers

16       Georgopoulos and Kearins observed -- I'm

17       sorry, let me rephrase that.

18                   Do you know whether Officer

19       Georgopoulos observed Mr. Grant's tier

20       between the 10:00 p.m. count and 11:40 p.m.

21       on the evening of May 18, 2015?

22            A.     She didn't indicate that she did.

23            Q.     And what's your basis for saying

24       that?

25            A.     Because there is no indication in

```
 1                      R. Gravette

 2     any of the material that I reviewed that she

 3     went back to the unit between that time, that

 4     hour and 40 minutes.

 5          Q.     And what would -- if she had done

 6     so, where would that be indicated?

 7               MR. LAUFER:  Objection.  You can

 8     answer.

 9          A.     She would have indicated that in

10     her testimony.

11          Q.     Okay.  But you would not expect

12     it to show up in, for example, a true scope

13     log or any other written documents each time

14     officers made rounds?

15          A.     Not in a general population unit,

16     no.

17          Q.     Okay.

18          A.     Unless there are some changes

19     since I did it, but I don't know of any, and

20     I keep up with all that stuff.

21          Q.     So just to be clear, your only

22     basis for asserting that Officer Georgopoulos

23     did not observe Mr. Grant's tier between

24     10:00 p.m. and 11:40 p.m. that night is her

25     deposition testimony?
```

1                    R. Gravette

2          A.      Her deposition testimony as well

3      as what happened in that period of time.  You

4      got inmates smoking K2 in the unit.  You got

5      inmates trying to revive Grant, taking him to

6      the shower area.  So, I mean, if she was

7      making those rounds and in and out of that

8      unit, it's a high probability that those

9      things wouldn't have taken place.

10         Q.      Based on your review of the

11     testimony, when the officers did rounds, did

12     they enter the units?

13         A.      Yes, according to Georgopoulos,

14     they entered the units because they would

15     have had to go in and check the bathrooms and

16     she specifically said that they checked the

17     bathrooms.

18         Q.      Okay.  So is it your

19     understanding that Officers Georgopoulos and

20     Kearins would have done the rounds together?

21         A.      Sure.  In an open bay unit like

22     that, I would expect them to.

23         Q.      So when they do rounds, it's not

24     your understanding that they could do rounds

25     simply by looking through the gate at the

1                      R. Gravette

2        entrance to the unit?

3                      MR. LAUFER:  Objection.  You

4        could answer.

5             A.      They could do that.  I would

6        prefer that they actually go into the unit

7        and walk through.  But that's why I had

8        mentioned earlier in my testimony today that

9        had they simply gone to the grille and looked

10       around, I mean, that would deter a lot of

11       things.

12            Q.      And if they went to the -- if

13       they were just going to the grille and

14       looking around, would that, in your view, be

15       a violation of BOP rules, policies or

16       procedures?

17            A.      The way the captain put it, and

18       the way that Delaney put it, they should make

19       rounds in that unit, which would include

20       going inside the grille.  There's nothing,

21       based on my experience and training, that

22       would prohibit them from going inside that

23       grille just to make rounds.  It's been done

24       for years and years and years.

25            Q.      Okay.  It's your understanding

1                    R. Gravette

2        that the unit where Grant was housed was a

3        dormitory style unit; is that correct?

4             A.     Yes.

5             Q.     And how many separate units were

6        in the area patrolled by Officers

7        Georgopoulos and Kearins that night?

8             A.     I don't know.

9             Q.     Okay.  But let's say that I would

10       represent to you that there were six

11       different dormitory style units that were in

12       the area of their responsibility, would it be

13       your expectation that they would enter each

14       of those units at least once every half hour?

15            A.     I'm not sure how you're

16       representing that because based on the

17       testimony of Lieutenant Delaney, that is the

18       only dormitory style unit in the facility.

19            Q.     Is it your understanding that

20       there were different tiers of that unit?

21            A.     Well different tiers, yeah, but

22       that's not a different unit.  A tier is just

23       a tier within a unit.  I'm not trying to be

24       argumentative.  I'm sorry.

25            Q.     No, no, it's helpful to clarify.

1                    R. Gravette

2                    Is it your understanding that

3      each tier would have its own gate?

4           A.     Normally, no.  You have one main

5      gate on the bottom floor and then you walk up

6      the stairs to the second tier.

7           Q.     I see, okay.

8                    Can you conclude, with reasonable

9      certainty, that Officers Georgopoulos and

10     Kearins did not conduct rounds on Mr. Grant's

11     tier between 10:00 p.m. and 11:40 p.m. on

12     that evening?

13          A.     Based on the information I

14     reviewed I cannot say that they did.  I found

15     no indication that they did make rounds

16     during that period of time.

17          Q.     Can you affirmatively rule out

18     that they made rounds during that period of

19     time?

20                    MR. LAUFER:  Objection.  You

21     could answer.

22          A.     Not with 100 percent certainty.

23     That would be a question for those guys.

24          Q.     Can you conclude with reasonable

25     certainty that Mr. Grant would not have died

54

```
 1                    R. Gravette

 2      if Officers Georgopoulos and Kearins had

 3      conducted rounds every 30 to 40 minutes?

 4           A.     No, I cannot.

 5           Q.     Have you formed any other

 6      opinions in this action that we have not

 7      discussed today?

 8           A.     Not that I can think of.

 9           Q.     Are there any opinions that you

10      intend to offer at a trial in this action

11      that we have not discussed today?

12           A.     Not at this time.

13                  MR. ISSACHAROFF:  Let's take five

14      minutes while I review my notes, just to see

15      if I have anything else.

16                  MR. LAUFER:  I'll just have a

17      quick follow-up, but not much.

18                  MR. ISSACHAROFF:  Okay.  So let's

19      come back at 11:35.

20                  MR. LAUFER:  That's fine.  Is

21      that good with you, Tim?

22                  THE WITNESS:  That's fine.  Thank

23      you.

24                  (Recess taken.)

25                  MR. ISSACHAROFF:  Back on the
```

1                         R. Gravette

2     record.

3          Q.     Mr. Gravette, in preparing

4     your -- in coming to your opinions in this

5     case, did you review BOP interviews of

6     inmates in Mr. Grant's unit?

7          A.     Yes.

8          Q.     And did you review FBI 302s of

9     interviews of inmates in Mr. Grant's unit?

10         A.     Yes, I did.

11         Q.     Can you summarize for me

12    briefly -- let me rephrase that.

13               Would you agree that generally

14    speaking, the 302s and the BOP interviews of

15    the inmates who were in Mr. Grant's unit on

16    the night that he died reflected that he was

17    sitting on his bunk or walking and having a

18    conversation when he slumped over?

19               MR. LAUFER:  Objection.  You can

20    answer.

21         A.     The interviews were all over the

22    place.  You had different inmates telling you

23    different things.

24         Q.     What were those different things?

25         A.     I have to refer to my notes real

```
 1                      R. Gravette

 2       quick.

 3            Q.      Please go ahead and do so.

 4            A.      Okay.  The first, page 15 of my

 5       notes, you've got Ramocca (phonetic) says

 6       that the staff doesn't believe the windpipe

 7       rumor.  The next guy, Bookman, said inmates

 8       were trying to stand Grant up to revive him.

 9       I heard a rumor he was dropped.  Rashad

10       Simpson saw Grant grab his chest and fell to

11       the floor.  Ricky Ford:  Grant sat on his

12       bunk, sat up, passed out.

13                      A little bit of everything.

14            Q.      Do any of the inmate interviews,

15       whether by BOP or by the FBI and the

16       prosecutors, reflect that Grant was engaged

17       in horseplay immediately prior to his

18       slumping over or collapsing?

19            A.      I don't recall anyone saying

20       immediately before.  I recall reading about

21       some rumors.  Some inmates bought into the

22       rumors.  Some of them didn't.

23                      But having worked for that

24       environment for years and years, it's hard to

25       get the true story of what actually happened
```

```
 1                     R. Gravette

 2      when you're dealing with the inmate

 3      population, and that's why I depended on what

 4      the officer said, Georgopoulos.

 5                     I'm sorry, I'm having trouble

 6      with that name.

 7           Q.     But Georgopoulos -- it's your

 8      understanding that Georgopoulos didn't

 9      directly observe any sort of horseplay;

10      correct?

11           A.     No.  But she heard the rumor that

12      she was told by the inmates, as well as what

13      she said during her deposition testimony,

14      that she felt that's what happened.

15           Q.     So is it fair to say that on the

16      one side, you have Georgopoulos replaying a

17      rumor from an inmate and reaching her own

18      conclusions as to what happened and on the

19      other side, you have several inmates

20      testifying that something different happened?

21                     MR. LAUFER:  Objection.  You can

22      answer.

23           A.     Right.

24           Q.     If Mr. Grant had died from a K2

25      overdose, would it be your opinion that his
```

58

```
 1                    R. Gravette
 2   death was attributable to wrongdoing or
 3   negligence by any BOP officers?
 4              MR. LAUFER:  Objection.  You can
 5   answer.
 6        A.    His death also was attributed to,
 7   part of his death was his wind pipe and as
 8   well as his problems -- excuse me, I'm trying
 9   to use the proper word, not abrasions, but
10   issues that were noted by the Medical
11   Examiner on his neck and his throat area.
12              Now, as far as the K2, was the
13   staff responsible?  Like we've gone over
14   before, the likelihood of him and the other
15   inmates using K2, if that's the case, would
16   have been greatly diminished had the officers
17   made rounds properly.
18        Q.    Have you reviewed the expert
19   report of Dr. James Gill in this case?
20        A.    Dr. James Gill?  Not that I
21   recall, no.
22        Q.    Okay.  So I understand that, you
23   know, what you've said about the Medical
24   Examiner and Dr. Hal's report, but let me
25   just ask you again:  If there were evidence
```

1                    R. Gravette

2        or let me put it this way:  If you knew that

3        Mr. Grant had died solely due to a K2

4        overdose or an adverse reaction to K2, would

5        you believe that his death was attributable

6        to the negligence or wrongdoing of BOP

7        officers or guards?

8                    MR. LAUFER:  Objection.  You can

9        answer.

10            A.    If that were the case, I would

11       have to reconsider my opinions.  However, I

12       do not see that as the case, because he did

13       have injuries consistent with horseplay and

14       being choked.  That is what was said by

15       Dr. Hal and from what I read in the Medical

16       Examiner's report and the other things that I

17       put in all together.

18            Q.    Okay, but I believe that you

19       state in your report -- hold on a moment.

20                  In your report you state that you

21       do not profess or claim to be a medical

22       expert or a trained medical professional; is

23       that correct?

24            A.    Yes.

25            Q.    And you also state that you can

1                    R. Gravette

2       only speculate as to what happened to

3       Mr. Grant on May 18, 2015; is that correct?

4            A.    What page are you reading that

5       from?  Sorry.

6            Q.    That's on page 7 of your report,

7       the first sentence of the second paragraph.

8            A.    Yes, that's what it says.

9            Q.    If you had credible evidence that

10      Mr. Grant was, in fact, conversing with other

11      inmates in his unit when he suddenly

12      collapsed and lost consciousness, would that

13      change any of your views or opinions in this

14      matter?

15                 MR. LAUFER:  Objection.  You can

16      answer.

17           A.    I would have to read those

18      interviews and see in what context those

19      interviews were taken and by whom, whose

20      interviews were taken before I would be able

21      to opine on that.

22           Q.    Before you would be able to opine

23      on whether they were credible; is that

24      correct?

25           A.    Correct.

1                    R. Gravette

2          Q.     But if they were credible and if

3     you had some reason to know or believe that

4     Mr. Grant was talking and conversing

5     immediately prior to his loss of

6     consciousness, would that change your views

7     in this case?

8               MR. LAUFER:  Objection.  You can

9     answer.

10         A.     If Mr. Grant was conversing and

11    suddenly collapsed and we had credible

12    evidence to support that, then I would have

13    to re-look at it and see.  But I can't tell

14    you what I would do on "if" information.

15              MR. ISSACHAROFF:  Okay.  I have

16    no further questions at this time.

17              MR. LAUFER:  I just have a couple

18    of follow-up, Tim.

19    EXAMINATION BY

20    MR. LAUFER:

21         Q.     So I'd like to draw you to page 6

22    of your report, towards the top.  Let me know

23    when you get there.

24         A.     I'm here.  I'm there.

25         Q.     So this addresses some of the

```
 1                    R. Gravette

 2      testimony of Lieutenant Delaney, does it not,

 3      where I begin towards the top, "Did you have

 4      any issues with drug transactions occurring

 5      with 11 South on or before the incident

 6      involving my client?"

 7                    And then the answer is,

 8      "Throughout the whole institution, there were

 9      issues and not specifically just 11 South."

10                    I'm going to fast forward a

11      little bit down to, "On the night" -- of your

12      report where you write, "On the night Grant

13      found unresponsive, there were other inmates

14      in 11 South who had been overcome with the

15      effects of K2," and he made the following

16      statement in his deposition testimony, and

17      we're referring to Lieutenant Delaney again,

18      "I found out the next day that several

19      inmates had overdosed on K2 on that same tier

20      where inmate was.  They actually -- I think

21      there were maybe three or four other inmates

22      and the other inmates tried -- took them

23      either in the -- you know, the shower or the

24      toilet area and were putting water on their

25      faces to revive them.  I remember that
```

1                    R. Gravette

2       specifically, you know, hearing that news,

3       that there were several of the inmates on

4       tiers themselves who had also overdosed and

5       they were not able to bring those inmates

6       back.  When it came to Grant, he was

7       unresponsive to the point that that didn't

8       happen."

9               I'm not sure what that last line

10      is, but I guess suffice to say, after reading

11      that testimony I just put there, that you put

12      in your report here, and begin the directives

13      that Delaney had given Kearins and

14      Georgopoulos, in terms of doing rounds, would

15      inmates overdosing in a particular unit draw

16      more attention on a particular round than it

17      normally would during regular times where you

18      don't have incidents occurring within a unit?

19          A.    With that amount of activity

20      within the unit, and I put that in the

21      report, that there should have been extra

22      emphasis placed on that unit by Kearins and

23      Georgopoulos in making rounds, maybe getting

24      some help up there.  If what he's saying is

25      accurate, and I'm sure it is, it's like they

64

1                         R. Gravette

2          were having a party in there that night.

3              Q.      So the supervision of this

4          particular unit where Mr. Grant was found

5          dead that evening, on that same evening

6          should have drawn more attention from prison

7          personnel because of these overdoses?

8              A.      That's correct.

9              Q.      Now, I think counsel asked you a

10         question regarding the additional rounds,

11         would they have prevented Mr. Grant's death,

12         and I believe you said no.  Well, it may not

13         have prevented it, but would it have made it

14         substantially less likely that Mr. Grant

15         would have died that evening had Georgopoulos

16         and Kearins done their rounds as they were

17         directed to by their superiors?

18             A.      Yes.  And if I'm not mistaken, I

19         said that in my earlier testimony today, that

20         the probability would have decreased had they

21         been making more rounds in the unit.

22             Q.      And you believe that to a

23         reasonable degree of prison condition's

24         certainty or correction's certainty?

25             A.      Yes, I mean that's based on

1                      R. Gravette

2        experience.  I mean, when you have inmates --

3        officers sitting in the office not doing what

4        they're supposed to be doing, bad things

5        happen.

6                There is a very famous case at

7        the MCC where a guy committed suicide up

8        there when the officers weren't doing what

9        they were supposed to be doing so...

10            Q.    That's Jeffrey Epstein?

11            A.    Yes.

12                MR. LAUFER:  Thank you.  I have

13        nothing further.

14                MR. ISSACHAROFF:  I just have a

15        quick redirect.

16        FURTHER EXAMINATION

17        BY MR. ISSACHAROFF:

18            Q.    You were just asked about whether

19        officers should have assigned more resources

20        or more supervision or given more attention

21        to that unit given the apparent frequency of

22        drug use.  In your role, you had roughly 15

23        or more years experience as a supervisor at

24        BOP facilities; is that correct?

25            A.    Yes.

1                      R. Gravette

2          Q.     And in those roles, would you

3     ever have to make determinations about where

4     to allocate resources and assign frequency of

5     supervision or attention?

6          A.     Yes.  I was involved, and

7     sometimes you would have to beef up an area

8     when you have troubled spots.

9          Q.     Is there any rule or policy or

10    regulation or BOP handbook that says

11    specifically how resources or supervision or

12    attention should be allocated?

13         A.     There is some guidance, however

14    it's based on experience, sound correctional

15    management techniques, the information that

16    you have at that given moment and that given

17    time as to how you allocate your resources.

18         Q.     Is it fair to say that you would

19    use your judgment and discretion in making

20    those decisions?

21         A.     Yes.

22              MR. ISSACHAROFF:  No further

23    questions.

24              MR. LAUFER:  We're done.  I don't

25    think I have anything else.

```
 1                    R. Gravette

 2                MR. ISSACHAROFF:  Thank you so

 3      much, Mr. Gravette.

 4                THE WITNESS:  Thank you.

 5                MR. ISSACHAROFF:  Thank you for

 6      your long service.

 7                THE WITNESS:  Thank you very

 8      much.  You guys stay warm up there.

 9                (Time noted:  11:57 o'clock a.m.)

10
                              ROY TIMOTHY GRAVETTE
11
        SUBSCRIBED AND SWORN TO
12      BEFORE ME THIS      DAY
        OF             , 2021.
13

14           NOTARY PUBLIC

15

16                      *  *  *

17

18

19

20

21

22

23

24

25
```

68

1

2                            I N D E X

3   WITNESS              EXAMINED BY          PAGE

4   ROY TIMOTHY
    GRAVETTE             Mr. Issacharoff      5-61
5
                         Mr. Laufer           61-65
6
                         Mr. Issacharoff      65-67
7

8                            *  *  *
9

10

11                       E X H I B I T S

12  GOVERNMENT           DESCRIPTION          PAGE

13  Exhibit 1      Report of Tim Gravette,
                   produced 12/1/20              8
14
    (Government Exhibit 1 attached to transcript.)
15

16
                             *  *  *
17

18

19                 INFORMATION TO BE SUPPLIED

20  DESCRIPTION                              PAGE

21  Copy of the witness' notes               29

22
                             *  *  *
23

24

25

69

```
 1
 2                     C E R T I F I C A T E
 3
 4    STATE OF NEW YORK    )
                           )          ss:
 5    COUNTY OF QUEENS     )
 6
 7                    I, DEBORAH MOSCHITTO a Shorthand
 8    Reporter and Notary Public within and for the
 9    State of New York, do hereby certify:
10                    That the within is a true and
11    accurate transcript of the testimony taken on the
12    24th of February, 2021.
13                    I further certify that I am not
14    related to any of the parties to the proceeding by
15    blood or marriage, and that I am in no way
16    interested in the outcome of this matter.
17                    IN WITNESS WHEREOF, I have hereunto
18    set my hand this day 10th of March, 2021.
19
20
                          DEBORAH MOSCHITTO
21
22
23
24
25
```

70

```
1              DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  MORRISON V. USA

5

6       DECLARATION UNDER PENALTY OF PERJURY

7

8              I declare under penalty of perjury

9    that I have read the entire transcript of my

10   Deposition taken in the captioned matter or

11   the same has been read to me, and the same is

12   true and accurate, save and except for

13   changes and/or corrections, if any, as

14   indicated by me on the DEPOSITION ERRATA

15   SHEET hereof, with the understanding that I

16   offer these changes as if still under oath.

17                     _____

18                     ROY TIMOTHY GRAVETTE

19   Subscribed and sworn to on the ____ day of

20   _____, 20 ____ before me.

21   _____

22   Notary Public,

23   in and for the State of

24   _____.

25
```

71

```
1                      DEPOSITION ERRATA SHEET

2          Page No.____Line No.____Change to:_____

3          _____

4          Reason for change:_____

5          Page No.____Line No.____Change to:_____

6          _____

7          Reason for change:_____

8          Page No.____Line No.____Change to:_____

9          _____

10         Reason for change:_____

11         Page No.____Line No.____Change to:_____

12         _____

13         Reason for change:_____

14         Page No.____Line No.____Change to:_____

15         _____

16         Reason for change:_____

17         Page No.____Line No.____Change to:_____

18         _____

19         Reason for change:_____

20         Page No.____Line No.____Change to:_____

21         _____

22         Reason for change:_____

23

24         SIGNATURE:_____DATE:_____

25                      ROY TIMOTHY GRAVETTE
```

72

1                    DEPOSITION ERRATA SHEET

2         Page No.____Line No.____Change to:_____

3         _____

4         Reason for change:_____

5         Page No.____Line No.____Change to:_____

6         _____

7         Reason for change:_____

8         Page No.____Line No.____Change to:_____

9         _____

10        Reason for change:_____

11        Page No.____Line No.____Change to:_____

12        _____

13        Reason for change:_____

14        Page No.____Line No.____Change to:_____

15        _____

16        Reason for change:_____

17        Page No.____Line No.____Change to:_____

18        _____

19        Reason for change:_____

20        Page No.____Line No.____Change to:_____

21        _____

22        Reason for change:_____

23

24        SIGNATURE:_____DATE:_____

25                    ROY TIMOTHY GRAVETTE